UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                     Chapter 11 Cases

MEDICAL STAFFING NETWORK HOLDINGS,                         Case No. 10-29101-BKC-EPK
INC., *et al.*,[1]

                                                           (Joint Administration Pending under
                                                           case no. 10-29101-BKC-EPK)

            Debtors.
_____/

**DECLARATION OF MOHSIN Y. MEGHJI IN SUPPORT OF CHAPTER 11
PETITIONS AND REQUEST FOR FIRST DAY RELIEF**

## I.        INTRODUCTION

1.        My name is Mohsin Y. Meghji.  I am over the age of eighteen and am competent
to testify.  I am a principal and founder of Loughlin Meghji + Company ("LM+Co"), a national
restructuring, consulting and financial advisory firm.

2.        On April 6, 2010, Medical Staffing Network Holdings, Inc., Medical Staffing
Holdings, LLC, Medical Staffing Network, Inc., MSN-Illinois Holdings, Inc., InteliStaf
Holdings, Inc., InteliStaf Group, Inc., Medical Staffing Network of Illinois, LLC, Medical
Staffing Network Assets, LLC, InteliStaf Healthcare, Inc., InteliStaf Partners No. 1, LLC,
InteliStaf Partners No. 2, LLC  and InteliStaf Healthcare Management, L.P. (collectively, the
"Debtors") retained LM+Co to provide interim management and restructuring services to the

---

[1] The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last
four digits of the taxpayer identification number of each of the Debtors follows in parenthesis:  (i)
Medical Staffing Network Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii)
Medical Staffing Network, Inc. (9868); (iv) MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings,
Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii) Medical Staffing Network of Illinois, LLC (4409);
(viii) Medical Staffing Network Assets, LLC (4413); (ix) InteliStaf Healthcare, Inc. (7108); (x) InteliStaf
Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC (5965); and (xii) InteliStaf Healthcare
Management, L.P. (7958).

Debtors, including the services of a Chief Restructuring Officer ("CRO"), effective as of March 27, 2010. Since that time, I have served as the CRO for each of the Debtors. On the date hereof, the Debtors filed an application seeking authority to retain LM+Co to provide interim management services, including the provision of my service as the Debtors' CRO.

3.     LM+Co has significant temporary help industry and healthcare industry expertise and has provided interim management and advisory services in a number of large and mid-size restructurings including the healthcare and/or workforce industries, among others. Representative engagements include: Interim HealthCare (home healthcare franchisor), Tender Loving Care (a home healthcare provider), and Comsys, Inc. (a private staffing services provider).

4.     I have over 20 years of experience in crisis management and business reorganizations, including in the areas of financial restructurings, operational improvement plans and cash management.

5.     My experience as a restructuring advisor includes engagements in which  I have acted as CRO, crisis manager, interim management and financial advisor to management, investors and creditors for a broad range of industries, including financial services, healthcare, manufacturing, textile and telecommunications companies.  I have advised the stakeholders of more than 100 companies.

6.     Prior to founding LM+Co, I was a partner in the Restructuring Group of Arthur Andersen LLP based in New York.  I currently sit on the Board of Directors of Anvil Knitwear. I previously served on the Board of Directors for a number of companies on behalf of private equity/hedge fund investors, including Mariner Health Care, Inc. from 2002 until its sale in

December 2004 (as a nominee for Oaktree Capital), Cascade Timberlands, LLC (on behalf of King Street Capital) and Dan River, Inc. (representing a group of financial investors).

7.      I graduated with honors from Schulich School of Business of York University in Canada, with a Bachelor of Business Administration degree.  I am also a U.S. Certified Turnaround Professional (CTP) as well as a U.K. and Canadian Chartered Accountant.

8.      In my capacity as Chief Restructuring Officer of the Debtors, I have reviewed many of the Debtors' books and records and have conferred with members of the Debtors' senior management.  The facts set forth herein are derived from my review of those records and information conveyed to me by other members of senior management of the Debtors and members of my team from LM+Co.

## II.      FACTUAL BACKGROUND

9.      On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions under chapter 11, title 11, United States Code (the "Bankruptcy Code") in this Court.

10.      The Debtors continue to operate their businesses and manage their assets as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

11.      No trustee, examiner or official committee of unsecured creditors has been appointed or established in the Debtors' bankruptcy cases.

## A.      Background and Corporate Structure of the Debtors

12.      The Debtors comprise of Medical Staffing Network Holdings, Inc., a publicly traded company, and eleven (11) direct and indirect subsidiaries that are owned by Medical Staffing Network Holdings, Inc.   An organizational chart of the Debtors is attached hereto as **Exhibit "A."**

(i)     **Medical Staffing Network Holdings, Inc.**

13.    Medical Staffing Network Holdings, Inc. ("MSN Holdings") is a Delaware corporation that was incorporated in September 1998.  The shares of Medical Staffing Network Holdings, Inc. were publicly traded on the New York Stock Exchange under the symbol MRN until December 15, 2008.  Since being delisted from the NYSE, the Debtor's Common Stock has been traded on the OTCQX marketplace, which is the premier tier of the U.S. Over-the-Counter (OTC) market, under the symbol MSNW.PK.  There are 31,989,567 shares of stock outstanding. Warburg Pincus Private Equity VIII, LP is the largest shareholder, holding 13,953,136 shares or about 44% of the outstanding shares.  There are twenty three equity holders, including Cede & Company, which holds 15,406,226 shares in street names for approximately 1000 beneficial holders.

14.    The Debtors' corporate headquarters are located at 901 Yamato Road, Suite 110, Boca Raton, FL 33431 (the "Corporate Office").

15.    MSN Holdings is a holding company.

(ii)    **Medical Staffing Holdings, LLC**

16.    Medical Staffing Holdings, LLC is a Delaware limited liability company that was formed in October 2001.  Medical Staffing Network Holdings, Inc. is the sole member of Medical Staffing Holdings, LLC.

(iii)   **Medical Staffing Network, Inc.**

17.    Medical Staffing Network, Inc. ("MSN, Inc.") is a Delaware corporation that was formed in January 1998.  MSN, Inc., along with Medical Staffing Network of Illinois, LLC and InteliStaf Healthcare, Inc. are the three operating debtor entities (collectively "MSN" or the "Operating Debtors").

**(iv)    MSN-Illinois Holdings, Inc.**

18.    MSN-Illinois Holdings, Inc. is an Illinois corporation that was formed in July 2003.  MSN-Illinois Holdings, Inc. is a holding company that owns Medical Staffing Network of Illinois, LLC and Medical Staffing Network Assets, LLC.

**(v)    InteliStaf Holdings, Inc.**

19.    InteliStaf Holdings, Inc. is a Delaware corporation that was formed in October 2000.  InteliStaf Holdings, Inc. is holding company that is the parent of InteliStaf Group, Inc.

**(vi)    InteliStaf Group, Inc.**

20.    InteliStaf Group, Inc. is a Delaware corporation that was formed in October 2000. InteliStaf Group, Inc. is the direct subsidiary of InteliStaf Holdings, Inc. that is the parent company of all InteliStaf subsidiaries.

**(vii)    Medical Staffing Network of Illinois, LLC**

21.    Medical Staffing Network of Illinois, LLC is an Illinois limited liability company formed in July 2003.   The sole member of Medical Staffing Network of Illinois, LLC is MSN-Illinois Holdings, Inc.   Medical Staffing Network of Illinois, LLC is one of the Operating Debtors.

**(viii)    Medical Staffing Network Assets, LLC**

22.    Medical Staffing Network Assets, LLC is an Illinois limited liability company formed in July 2003.  The sole member of Medical Staffing Network Assets, LLC is MSN-Illinois Holdings, Inc.  Medical Staffing Network Assets, LLC is a company that owns primarily all of Medical Staffing Network, Inc.'s intellectual property, inclusive of trademarks, trade names, etc., and charges a royalty fee to Medical Staffing Network, Inc. and Medical Staffing Network of Illinois, LLC for the use of these assets.

### (ix)    <u>InteliStaf Healthcare, Inc.</u>

23.    InteliStaf Healthcare, Inc. is a Delaware corporation formed in March 1995. InteliStaf Healthcare, Inc. is one of the Operating Debtors.

### (x)    <u>InteliStaf Partners No. 1, LLC</u>

24.    InteliStaf Partners No. 1, LLC is a Delaware limited liability company formed in December 2002.  InteliStaf Healthcare, Inc. is the sole member of InteliStaf Partners No. 1, LLC. InteliStaf Partners No. 1, LLC is the one percent general partner of InteliStaf Healthcare Management, L.P.

### (xi)    <u>InteliStaf Partners No. 2, LLC</u>

25.    InteliStaf Partners No. 2, LLC is a Delaware limited liability company formed in Delaware in December 2002.  InteliStaf Healthcare, Inc. is the sole member of InteliStaf Partners No. 2, LLC.  InteliStaf Partners No. 2, LLC is the ninety nine percent limited partner of InteliStaf Healthcare Management, L.P.

### (xii)    <u>InteliStaf Healthcare Management, L.P.</u>

26.    InteliStaf Healthcare Management, L.P. is a Delaware limited partnership that was formed in December 2002.  InteliStaf Partners No. 1, LLC is the general partner of InteliStaf Healthcare Management, L.P., and InteliStaf Partners No. 2, LLC is the limited partner of InteliStaf Healthcare Management, L.P.

### The Board of Directors of MSN and a Description of its Business

27.    The board of directors (the "Board") of MSN, Inc. is extraordinarily talented, and is a truly independent board. Five of the six members of the Board are  non-insiders of the company.  The Board consists of the following six individuals:

- *Robert J. Adamson* has served as MSN, Inc.'s Chief Executive Officer and a director since MSN, Inc.'s inception in March 1998.  Prior to co-founding the company, he served for 15 months as Chief Operating Officer and Chief Financial Officer of

TravelPro USA, a privately held consumer products company. Prior to joining TravelPro, Mr. Adamson was the President of StarMed Staffing, L.P, a temporary healthcare staffing company and then a wholly owned subsidiary of Medical Resources, Inc. Mr. Adamson also served as the Co-President and Chief Financial Officer of Medical Resources. Prior to his work at StarMed, Mr. Adamson was employed in various financial executive positions for eight years in the computer industry.

- *Anne Boykin, PhD, RN*, became a director in July 2002. Since 1990, Dr. Boykin has been Dean and Professor of the Christine E. Lynn College of Nursing at Florida Atlantic University, and, since 1997, has also been Director of the Christine E. Lynn Center for Caring. Dr. Boykin has over 35 years of experience in clinical nursing, nurse management, nurse education and academia.

- *C. Daryl Hollis* became a director in March 2004. Mr. Hollis is a certified public accountant and has served as a business consultant since 1998. He has served in the past as Executive Vice President and Chief Financial Officer of The Panda Project, Inc., a developer, manufacturer and marketer of proprietary semiconductor packaging and interconnect devices, and Senior Vice President and Chief Financial Officer of Pointe Financial Corporation, a bank holding company. Mr. Hollis was also a partner with Ernst & Young LLP from 1977 through 1990. Mr. Hollis is currently a member of the Board of Trustees for Blue Cross Blue Shield of North Carolina. Mr. Hollis previously served as a director and audit committee chair for LOUD Technologies, Inc., Northland Cranberries, Inc., Catalina Lighting, Inc. and San Holdings, Inc.

- *Philip A. Incarnati* became a director in October 2002. Since 1989, Mr. Incarnati has been the President and Chief Executive Officer of McLaren Health Care Corporation, a healthcare delivery system. Mr. Incarnati is also a director of King Pharmaceuticals Inc., a branded pharmaceuticals manufacturer, and Provider Healthnet Services, Inc., an information technology and health information management provider. Mr. Incarnati was appointed to the Eastern Michigan University (" *EMU* ") Board of Regents in 1992 by Michigan Governor John Engler and served as Chairman of the EMU Board of Regents until April 2005. He remains a member of the EMU Board of Regents, and, since December 2007, he has been a director of Reliant Renal Care, a regional dialysis provider.

- *Edward J. Robinson* became a director in August 2005. Mr. Robinson, a certified public accountant, was Chief Operating Officer of Meditrust Operating Company, a healthcare REIT, from 1997 to 1998. Previously, Mr. Robinson was President and Chief Operating Officer of Avon Products, Inc., a beauty and related products company, from 1993 to 1997 and Executive Vice President and Chief Financial Officer from 1989 to 1992. Prior thereto, he was Executive Vice President and Chief Financial Officer of RJR Nabisco and held various financial positions with RJR Nabisco, a consumer products company, and its predecessor companies, Standard Brands and Nabisco Brands. Mr. Robinson serves on the Advisory Board of W.R. Capital Management, L.P. and is the Chairman of the Audit Committee of Cross

Match Technologies.  Mr. Robinson is a Certified Public Accountant licensed by the State of New York.

- *David Wester* became a director in January 2005.  Mr. Wester has been the President of VITAS Healthcare Corporation since 2004, has served as Chief Financial Officer and Treasurer of that company since 1997 and served as a Director of the company from 2002 to 2004.  Mr. Wester previously served as Executive Vice President for Foundation Health, Inc., a Florida health plan, and as Executive Vice President and Chief Financial Officer of Care Florida, Inc., a privately held company providing managed health care benefits (formerly Heritage Health Plan).  Mr. Wester began his career with Price Waterhouse LLP.

28.     Each member of the Board is vastly experienced, many in the healthcare industry, and each has served as a member of the Board for five or more years.

29.     MSN is a leading diversified temporary healthcare staffing company and is well known in the industry as the largest provider of *per diem* healthcare staffing services (staffing assignments of less than two weeks in duration) in the United States as measured by revenues, as well as one of the top three providers of traveling nursing (temporary nurses that work in the field for a thirteen week period).  MSN's *per diem* staffing assignments, short-term contract-based assignments (more than two weeks in duration) and travel staffing assignments (two to thirteen weeks) place its professionals, predominately nurses, at hospitals and healthcare facilities in response to its clients' temporary staffing needs.  Although a thirteen week period is the norm in the industry, MSN has changed the paradigm to allow its traveling nurses to work periods from two to thirteen weeks.  The short term contract-based assignments are typically staffed by MSN's per diem branches, while the longer-length assignments are staffed by both MSN's centralized travel offices and *per diem* branches.

30.     MSN provides critical support to hospitals in times of crisis or fluctuating census. It provides a flexible work force for nurses in the medical field.  This advantage in today's challenging economic times has provided hospitals with the flexibility needed to manage their

labor pools and reduce costs.  MSN's nurses and other healthcare technicians can work any time, anywhere, on as little as two hour's notice from a customer.

31.     In addition to nursing staff, MSN is also a leading temporary provider of "allied health" professionals, including radiology and diagnostic imaging specialists, clinical laboratory specialists, rehabilitation specialists, pharmacists and respiratory therapists.

32.     MSN is also expanding into the home healthcare field.  For years, MSN has maintained a few branches in the homecare sector.  In an effort to accommodate the changing trends in healthcare towards homecare, MSN made the decision to grow and open new homecare branches in a variety of markets.  Recently, MSN embarked on an initiative to open fourteen new home healthcare facilities by the end of the calendar year.  It is currently about one-third of the way toward its goal.

33.     MSN derives approximately 70% of its revenue from its *per diem* nursing staff working assignments, 15% from its short-term contract-based nursing staff assignments and travel staffing assignments, and 15% from its allied health staff.

34.     MSN offers its services through a network of 80 *per diem* branch locations that provide nurse staffing on a *per diem* basis in 38 states, while servicing all 50 states through its centralized travel nurse and "allied health" staffing offices. MSN's client base includes approximately 7,000 healthcare facilities, including leading profit and not-for-profit hospitals, teaching hospitals, governmental facilities and regional healthcare providers throughout the United States.  On any given day, MSN has approximately 3,000 healthcare field employees working from its pool of approximately 19,000 available field employees.

35.     Customers nationwide rely on MSN to provide a "just in time solution" to fill nursing shortages left by vacancies caused by illness, increase in census, seasonality or crisis and emergencies.

36.     MSN also serves as a human resource company for its nurses and other professionals.  As will be discussed at length herein below, MSN provides its employees with malpractice insurance, as well as excellent benefits, including a 401(k) plan and health benefits.

37.     All of MSN's workforce must meet stringent hiring standards in accordance with MSN's Joint Commission certification.  In addition to being a Joint Commission certified staffing agency, MSN also ensures that its field staff has proper credentials and licensure.  Prior to placement, each employee must successfully pass stringent background screenings, health screenings, drug screenings and competency assessments.

**B.     Industry Conditions**[2]

38.     As discussed above, the Debtors' operations are concentrated in the temporary healthcare staffing industry, which has three major components: nurse staffing, allied health staffing and *locum tenens* (physician) staffing.  MSN provides staffing of nurses (largest sector of the temporary healthcare staffing industry) and allied health professionals.  The nurse staffing market is comprised of two delivery models: *per diem* staffing and travel staffing. *Per diem* staffing, the significantly larger component of nurse staffing, provides healthcare professionals for assignments which can last from a single shift to two weeks, and is used to meet local labor shortages and openings due to holidays, vacations, illness and staff turnover, as well as daily and seasonal fluctuations in hospital volume. The *per diem* staffing market operates with many local operators and is highly fragmented. The *per diem* staffing model is also highly decentralized,

---

[2] The information contained in this section of my declaration is derived from my review of publicly available information and principally filings made by MSN with the United States Securities Exchange Commission.

requiring a local presence in every market served because these short-term staffing needs are typically filled on a local basis, and are typically dependent on the relationship that exists between local operators, local professionals and the local healthcare facilities. Local based contracts, which are more than two weeks in duration, are similar to the longer duration travel contracts discussed below; however, these contracts are typically staffed by *per diem* branches.

39.     In the travel staffing market, healthcare facilities hire travel nurses on a contracted, fixed-term basis to meet seasonal or other volume-driven fluctuations in hospital admissions levels for time periods ranging from several weeks to one year, but are typically thirteen weeks long. Travel staffing companies coordinate travel and housing arrangements for their professionals who typically relocate to the area in which they are placed. The travel staffing model utilizes a centralized approach in serving its clients.

40.     Allied health staffing consists of highly specialized radiology and diagnostic imaging specialists, clinical laboratory specialists, rehabilitation specialists, pharmacists, respiratory therapists and other similar healthcare vocations. These professionals are staffed on both a *per diem* and travel basis.

41.     Yet another element of MSN's staffing business in which it serves as a market leader is its unique OneSource vendor management service ("VMS") agreements.  These OneSource arrangements provide MSN with exclusivity to manage and control all supplemental staffing for its clients.  Through OneSource, MSN provides its clients with a certified workforce from one source for a fair market rate, utilizing a single point of contact that coordinates temporary staffing across all departments for the entire facility.  OneSource streamlines and standardizes every facet of staffing for the clients, including order processing, reporting, invoicing, quality initiatives and payment processes.  MSN first attempts to fill the needs of its

OneSource clients using its internal *per diem* or travel staff. When this is not possible, MSN has relationships with over 100 subcontractors to help fill its customer needs.  MSN does not pay the subcontractor until MSN is paid by the facility.

42.    MSN's OneSource clients represent approximately 10% of MSN's revenue and that number continues to grow.  Currently MSN is in the final running for a new customer OneSource contract with a very large multi-state health system which will significantly contribute to MSN's revenue growth and provide additional opportunities for employment of its healthcare professionals.  MSN is able to continue building these relationships due to its years of experience, clinical expertise, quality control and reputation for excellence.

43.    Service revenues from MSN's primary business (temporary staffing of healthcare personnel) continue to be under intense pressure due to high unemployment rates, an economy in recession, weak hospital admissions, and other challenging healthcare staffing industry dynamics that have suppressed incremental demand for temporary nurses. Due to the current economic conditions and high unemployment rate, MSN believes that nurses in many households may become a primary wage earner, which could drive such nurses to seek more traditional full-time employment. As hospitals continue to experience lower than projected admissions levels, they are placing greater reliance on existing full-time staff, resulting in increased overtime and nurse-patient loads. Due to weak admissions levels, hospitals are carefully controlling and actively looking to reduce their variable costs, which includes the use of temporary healthcare staffing.

44.    MSN remains confident in the long-term growth potential of the temporary staffing industry. The U.S. Administration on Aging projected that the number of Americans 65 years of age or older is expected to grow from 40.2 million in 2010 to 71.5 million in 2030. Among the trends noted in a March 2006 U.S. Census Bureau report, the U.S. population age 65

and over, which is now the fastest growing segment of the U.S. population, is expected to double in size within the next 25 years and by 2030, almost 1 out of every 5 Americans will be 65 years or older. In a November 2007 report, the U.S. Bureau of Labor Statistics stated that more than 1.0 million nurses will be needed by 2020, making nursing the nation's top profession in terms of projected job growth. Additionally, there is pressure to restrict mandatory healthcare worker overtime requirements by employers and to establish regulated nurse-patient ratios. Several states have enacted legislation establishing nurse to patient ratios and/or prohibiting mandatory overtime while other states have similar legislation pending. In conjunction with the aforementioned factors, the long-term prospects for the healthcare staffing industry should improve as hospitals experience higher census levels, due in large part to an aging society, an increasing shortage of healthcare workers and the potential of up to approximately 32 million U.S. residents gaining access to health insurance coverage following the recent passage of the healthcare reform bill.

**C.**     **Historical Financial Performance**

45.     For the fiscal year ended December 30, 2007, the Debtors, on a consolidated basis, generated revenue of approximately $482.3 million and income from operations of $10 million.  For the fiscal year ended December 28, 2008, the Debtors, on a consolidated basis, generated revenues of approximately $537.8 million, and a loss from operations of $114 million, which included non-cash write-downs relating to the impairment of goodwill and intangible assets of $130.9 million.  For the fiscal year ended December 27, 2009, the Debtors, on a consolidated basis, generated revenues of approximately $340.9 million, and a loss from operations of $34.3 million, which included non-cash write-downs relating to the impairment of goodwill and intangible assets of $43.9 million.

46.     For the fiscal quarter ended March 28, 2010, the Debtors, on a consolidated basis, generated revenue of $72.0 million and a loss from operations of $1.3 million.  Projected revenue for the year 2010 is $302,113,000.  As of March 28, 2010, the Debtors, on a consolidated basis, reported approximately $87.8 million in assets, and approximately $140.9 million in liabilities. The projected revenue for the

### D.      Cost Cutting Initiatives and Events Leading to Chapter 11 Filing

47.     I understand that MSN's business strategy since its inception included increasing its market share and presence in the temporary healthcare staffing industry through strategic acquisitions of companies that complemented or enhanced its business.  Since its founding in 1998, it has completed 30 acquisitions. On July 2, 2007, MSN acquired all of the interests of InteliStaf Holdings, Inc., an Illinois based temporary healthcare staffing company and MSN's largest competitor, for approximately $92.0 million in cash.  I have  been advised that the primary reason for the acquisition was to increase MSN's presence in travel nurse staffing and to expand the number of markets in which it operated. Through its acquisition of InteliStaf, MSN acquired a 68% ownership in InteliStaf of Oklahoma, LLC through a joint venture with an independent third party. The third party is a hospital system that is the largest client of the joint venture.

48.     In September 2007, MSN acquired certain assets of AMR ProNurse ("AMR") for approximately $11.0 million in cash.  I understand that the express purpose for this acquisition was to acquire AMR's 13 years of experience in implementing vendor management service solutions in some of Chicago's most prestigious hospitals and healthcare organizations.

49.     On July 2, 2007, MSN repaid all amounts owing under its previous senior credit facility and entered into a new senior credit facility (the "Original Credit Agreement").  The

Original Credit Agreement was comprised of a six-year $30.0 million revolving senior credit facility, a six-year $100.0 million senior secured term loan and a seven-year $25.0 million senior secured second term loan. The proceeds of the Original Credit Agreement were used to finance the purchase price of the InteliStaf and AMR acquisitions, to repay outstanding borrowings under the extinguished senior credit facility, to pay fees and expenses incurred in connection with the InteliStaf acquisition and for general working capital purposes.

50.    On August 7, 2007, MSN initiated a plan to restructure and integrate the operations of InteliStaf (the "IS Plan"). The objectives of the IS Plan were to eliminate redundant costs resulting from the acquisition of InteliStaf and to improve efficiencies in operations. As part of the IS Plan, MSN reduced its pre-acquisition workforce by approximately 70 employees and closed four of its branches. Additionally, MSN reduced InteliStaf's pre-acquisition workforce by approximately 200 employees and closed three of InteliStaf's branches.

51.    In June 2008, due to a weakening economy, MSN eliminated over 100 corporate and branch positions. I have been advised that, in October 2008, due to technological advancements, recent VMS successes and an increased focus on local contract staffing (*i.e.,* assignments ranging two weeks or longer staffed by a local *per diem* branch), MSN consolidated its national branch footprint by closing 20 *per diem* locations where VMS and local contract business opportunities were less evident. As a result of the realignment, the Company eliminated 150 branch, corporate and operations personnel.

52.    In 2008 and 2009, service revenues from MSN's primary business (temporary staffing of healthcare personnel) continued to be under intense pressure due to an economy in recession, weak hospital admissions, and other challenging healthcare staffing industry dynamics that suppressed incremental demand for temporary nurses. In general, people started to go to the

doctor and healthcare facilities less often and elective procedures were curtailed.  MSN's customers, which include several large hospital groups, began using less and less temporary nursing and other staff and starting turning inward to meet their staffing needs.  These industry conditions caused the Company's revenues to drop substantially in fiscal year 2009 compared to fiscal year 2008.

53.    As the industry declined, MSN made a concerted effort to reduce its overhead and cut approximately $43 million in infrastructure to accommodate the challenging times.  In the first quarter of fiscal 2009, MSN closed/merged three *per diem* branches, eliminated 100 branch, corporate and operations personnel, and implemented various cost containment initiatives, including employee furloughs, reducing compensation for the corporate executive teams, placing a hold on the 401(k) matching program, seeking 15-20% discounts across the board from all of its vendors and restructuring its health insurance program.  In the second quarter of fiscal 2009, MSN closed/merged one *per diem* branch, continued its cost containment initiatives and eliminated 50 branch, corporate and operations personnel.

54.    After amending its Original Credit Agreement its debt in March 2009, all of MSN's excess cash went to its senior lenders to pay debt service.  As revenue continued to decline through 2009, all operating cash went to service debt, leaving MSN without a financial cushion to support operations.

**(i)    Loan Facilities**

55.    MSN, Inc., as borrower, and the other Debtors, as guarantors, are parties to a senior secured credit facility (the "Prepetition First Lien Secured Facility") provided by GECC, as agent ("Prepetition First Lien Agent"), and certain lenders (the "Prepetition First Lien Lenders") pursuant to the Amended and Restate Credit Agreement, dated as of March 12, 2009 (as amended or otherwise modified, the "Prepetition First Lien Credit Agreement"), consisting of

(a) an $18.0 million revolving senior credit facility, and (b) an $81.0 million senior secured term loan (collectively, with all loans and liabilities in respect of the Prepetition First Lien Secured Facility, the "Prepetition First Lien Secured Obligations").  The Prepetition First Lien Secured Obligations are secured by first priority liens and security interests on substantially all of the Debtors' assets (the "Prepetition First Lien Secured Facility Liens"), which liens and security interests are subject solely with respect to priority, to the Prepetition Senior Encumbrances, if any.

56.    MSN, Inc., as borrower, and the other Debtors, as guarantors, are parties to a senior secured credit facility (the "Prepetition Second Lien Secured Facility" and, together with the Prepetition First Lien Facility, the "Prepetition Secured Facilities") provided by NexBank, SSB, as agent (the "Prepetition Second Lien Agent" and, together with the Prepetition First Lien Agent, the "Lien Agents"), and certain lenders (the "Prepetition Second Lien Lenders" and, together with the Prepetition First Lien Lenders, the "Prepetition Lenders") pursuant to the Amended and Restated Second Lien Credit Agreement dated as of March 12, 2009, consisting of a $25.0 million senior secured second lien term loan (the "Prepetition Second Lien Credit Agreement" and, together with the Prepetition First Lien Credit Agreement, the "Prepetition Credit Agreements").  All loans and other liabilities in respect of the Prepetition Second Lien Secured Facility are referred to herein as the "Prepetition Second Lien Secured Obligations" and, together with the Prepetition First Lien Secured Obligations, the "Prepetition Secured Obligations".  All Prepetition Second Lien Secured Obligations are secured by second priority liens and security interest in substantially all of the Debtors' assets (the "Prepetition Second Lien Secured Facility Liens" and, together with the Prepetition First Lien Secured Facility Liens, the "Prepetition Secured Facilities Liens").

57.     The Debtors, the First Lien Agent and the Second Lien Agent are parties to that certain Intercreditor Agreement, dated as of July 2, 2007 (the "Intercreditor Agreement") that governs the respective rights, obligations and priorities of the First Lien Lenders and the Second Lien Lenders with respect to their relative interests in the Prepetition Collateral and certain other matters, including, without limitation, the DIP Facility.  Pursuant to the Intercreditor Agreement, the First Lien Security Interests are senior in priority to the Second Lien Security Interests on all Prepetition Collateral.

58.     As of the Petition Date, the Debtors were indebted to the Prepetition First Lien Lenders in the approximate amount of  $ 98,784,590.16.  As of the Petition Date, the Debtors were indebted to the Prepetition Second Lien Lenders in the approximate amount of $26,771,780.80.

59.     The debt of the Prepetition First Lien Lenders is secured by senior liens in and upon substantially all of the assets of the Debtors.

60.     On March 12, 2009, the lenders for the 1st Lien Revolver and the 1st Lien Term Loan were General Electric Capital Corporation ("GECC"), as administrative agent, swingline lender, and lender and Frontline Financial Corporation, as documentation agent, and the other lenders who subscribed to the loan commitment (collectively the "First Lien Lenders").

61.     On March 12, 2009, the lenders for the 2nd Lien Term Loan were GECC, as administrative agent, and lender and the other lenders who subscribed to the loan commitment (collectively the "Second Lien Lenders").  In January 2010, GECC resigned as the Second Lien Agent and NexBank, SSB was appointed successor and administrative agent.

62.     In connection with the 1st Lien Revolver, 1st Lien Term Loan and 2nd Lien Term Loan, Borrower, Medical Staffing Holdings, LLC, MSN Holdings, MSN-Illinois Holdings, Inc.,

Medical Staffing Network of Illinois, LLC, Medical Staffing Networks Assets, LLC, Greenhouse Acquisition Sub, Inc., Intelistaf Holdings, Inc., Intelistaf Group, Inc., Intelistaf Healthcare, Inc., Intelistaf Partners No. 1, LLC,  Intelistaf Partners No. 2, LLC, Intelistaf Healthcare Management, L.P., and Intelistaf Partners No. 1, LLC (collectively, the "Guarantors") executed and delivered a Guaranty and Security Agreement (the "Guaranty and Security Agreement") in favor of GECC, as Administrative Agent and Collateral Agent, as Guarantors and Grantors of Security Interests in and to all of the personal property owned by such grantors as described therein, granting a first priority security interest in favor of the holders of the 1st Lien Revolver and 1st  Lien Term Loan and a second priority security interest in favor of the holders of the 2nd Lien Term Loan..

63.    On or about July 2, 2007, Borrower and each of the Guarantors executed (i) an Intellectual Property Security Agreement in favor of GECC, as administrative agent and collateral agent related to trademarks and related intellectual property and (ii) an Intellectual Property Security Agreement in favor of GECC, as administrative agent and collateral agent related to copyrights and related intellectual property (collectively, the "Security Agreements").

64.    In connection with such amended loan documents, Borrower, Medical Staffing Holdings, LLC, MSN Holdings and GECC entered into a reaffirmation agreement ("Reaffirmation Agreement") which reaffirmed certain existing loan documents which were executed in connection with the Original Credit Agreement dated July 2, 2007, including, without limitation, the two Security Agreements and the Intercreditor Agreement (hereinafter defined).

65.    The First Lien Lenders and the Second Lien Lenders entered into an Intercreditor Agreement dated July 2, 2007 which governs the relationship among the two groups of creditors (the "Intercreditor Agreement").

66.    The Agents for the 1st Lien Revolver and Term Loan and the 2nd Lien Term Loan filed numerous UCC financing statements in the applicable public records with respect to Borrower and each of the Guarantors covering virtually all of the Debtors' assets.

67.    The primary changes made in the Amended Credit Agreements as compared to the Original Credit Agreement were as follows: (i) Borrower repaid $10.5 million of outstanding borrowings under the senior secured term loan portion of the Original Credit Agreement during the first quarter of fiscal 2009, (ii) the financial covenants were amended, (iii) a new financial covenant (minimum EBITDA, as defined in the agreements) was added, (iv) the quarterly amortization of principal was changed, such that effective for the third quarter of fiscal 2009, Borrower was required to pay a total annual amortization amount of 2.5% of the remaining $81.0 million outstanding under the 1st Term Loan in equal installments for the next four quarters with the total annual amortization amount increasing by an additional 2.5% of the initial $81.0 million borrowing to be paid in equal installments for the next four quarters, etc. until maturity, (v) a London Interbank Offered Rate (LIBOR) floor of 2.5% and a prime rate floor of 3.5% were incorporated for both the 1st and 2nd Lien Term Loans, (vi) there was an increase in the applicable margin for both the 1st and 2nd Lien Term Loans, (vii) an annual 2.0% P-I-K interest charge was incorporated for both the 1st and 2nd Lien Term Loans that accrues quarterly and is payable upon the maturity of the respective loans (the accrued P-I-K interest is included in the line item "Current portion of long-term debt" in the liabilities and stockholders' equity (deficit) section of our consolidated balance sheet), and (viii) the size of the 1st Lien Revolver was reduced to $18.0 million.

68.    There was no change to the maturity dates for the 1st Term Loan (July 2, 2013), 1st Lien Revolver (July 2, 2013) or 2nd Term Loan (July 2, 2014) and all of these loans

continued to be secured by a lien on substantially all of the assets of the Borrower and the Guarantors.

69.     Pursuant to the terms of the Original Credit Agreement, Borrower was required to make annual payments of $1.0 million, in four equal quarterly installments. Pursuant to the terms of the Amended Credit Agreements, Borrower was required to make quarterly principal amortization payments of $0.5 million beginning in the third quarter of fiscal 2009. The quarterly amortization payment will increase by $0.5 million each subsequent year in the third quarter. Additionally, at the end of each fiscal year beginning in 2009, Borrower was obligated to compute an excess cash flow calculation (as defined), which could result in Borrower being required to prepay an additional amount of outstanding term loan borrowings.

**(ii)    Forbearance Agreements**

70.     On November 24, 2009, MSN informed GECC, as administrative agent under the First Lien Credit Agreement, that MSN had not met, as of October 25, 2009, the Minimum Consolidated Fixed Charge Coverage Ratio and the Minimum Consolidated EBITDA covenants set forth in the First Lien Credit Agreement.

71.     On December 18, 2009, MSN entered into a Forbearance Agreement to Amended and Restated Credit Agreement (the "Forbearance Agreement") with GECC and with the requisite percentage of the First Lien Lenders.

72.     Under the Forbearance Agreement, GECC and the First Lien Lenders agreed to forbear from exercising default related rights and remedies with respect to the First Lien Credit Agreement until February 1, 2010 (unless a "Forbearance Default," as defined in the Forbearance Agreement, occurred prior to that date). Further, during the forbearance period: (i) the debt due under the First Lien Credit Agreement was to bear PIK interest at the default rate (which was 4% per annum over the 2% per annum PIK interest already payable under the First

Lien Credit Agreement), and (ii) MSN was not permitted the aggregate amount of its unrestricted cash and cash equivalents to be, at any time, less than $900,000.

73.    On February 1, 2010, MSN informed GECC,  the First Lien Lenders and the Second Lien Lenders that, while the company had not yet completed the close of its books for the month and fiscal year ended December 27, 2009, the company had reason to know that it would not be in compliance as of December 27, 2009 with certain of the financial covenants contained in the First Lien Credit Agreement between the Company and the First Lien Lenders and the Second Lien Credit Agreement between the Company and the Second Lien Lenders. Since that time, MSN has been negotiating with its senior lenders with respect to its ongoing financial covenant violations and has retained financial and legal advisors to assist it in exploring strategic options that might be available to it.

74.    On April 7, 2010, MSN entered into a second forbearance agreement ("Second Forbearance Agreement") with its First Lien Lenders.   Under the Second Forbearance Agreement, GECC, as agent, and the First Lien Lenders agreed to forbear from exercising default related rights and remedies relating to the first lien debt until May 7, 2010, unless a default under the agreement occurred prior to that date.  As a result of an intercreditor agreement between the First Lien Lenders and Second Lien Lenders, the Second Lien Lenders were blocked from exercising or seeking to exercise any rights or remedies with respect to any of the collateral that secures both the debt due to the First Lien Lenders and the debt due to the Second Lien Lenders.  Under the Second Forbearance Agreement, MSN was allowed to borrow under the First Lien Revolver up to $5 million.  On April 30, 2010, the First Lien Lenders agreed to extend the period of the Second Forbearance Agreement until June 4, 2010.  On June 4, 2010, the Debtors and the First Lien Lenders entered into a Second Amendment to Forbearance

Agreement, whereby the First Lien Lenders agreed to forbear from exercising default related rights and remedies until June 30, 2010.

75.    On April 30, 2010, the Debtors and the First Lien Lenders entered into a Limited Waiver to Amended and Restated Credit Agreement and Amendment to Forbearance Agreement (the "Limited Waiver").  Pursuant to the Limited Waiver, the First Lien Lenders waived certain requirements under the Amended Credit Agreement in order to permit the Debtors to enter into an escrow arrangement to manage payments received from non-government VMS clients, and to secure the Debtors' obligations in respect of the Debtors' corporate credit card issued by Bank of America with a certificate of deposit in the aggregate principal amount of not more than $165,000 plus accrued interest, however the Debtors only posted a certificate of deposit in the amount of $110,000.

76.    With continued weakness in the industry, MSN forecast, based on currently projected cash flows from operations, that it would be unable to pay future scheduled interest and principal payments due to its senior lenders as such obligations became due.  MSN recognized that as a result, the lenders would be in a position to accelerate the maturity of MSN's debts and take action under the credit agreements to enforce their rights and remedies.  In light of these factors, MSN determined that it was in the Company's best interest to restructure its debt obligations.

77.    On June 9, 2010, the Company entered into a Restructuring Support Agreement (RSA) with all of the First Lien Lenders and 90% of the Second Lien Lenders (collectively the "Lenders") whereby the First Lien Lenders will enter into an Asset Purchase Agreement ("APA") with the Company to acquire substantially all of the assets and business of the Company in a sale to take place under Section 363 of Chapter 11 of the United States

Bankruptcy Code, subject to Bankruptcy Court approval.  The Second Lien Lenders have agreed to consent to the sale subject to the terms and conditions of the APA and not to object to such sale transaction.  The Debtors commenced these cases in order to implement the agreed-upon financial restructuring outlined in the RSA.

### III.  NECESSITY FOR EMERGENCY HEARINGS ON "FIRST DAY" MOTIONS

78.  Contemporaneously herewith, the Debtors have filed the following "first day" motions (the "First Day Motions"):

a.   Debtors' *Ex Parte* Motion for Joint Administration;

b.   Debtors' *Ex Parte* Agreed Motion for Authorization to File Consolidated Chapter 11 Case Management Summary;

c.   Debtors' Application for Authority to Retain Loughlin Meghji + Company, *Nunc Pro Tunc* to Petition Date;

d.   Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Berger Singerman, P.A., as Counsel for Debtors in Possession, *Nunc Pro Tunc* to the Petition Date;

e.   Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Akerman Senterfitt, as Special Corporate and Transactional Counsel to the Debtors, *Nunc Pro Tunc* to the Petition Date;

f.   Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Jefferies & Company, Inc., as Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date;

g.   Debtors' Application for Approval of Employment of The Garden City Group, Inc., as Claims, Noticing, Balloting and Solicitation Agent of the Bankruptcy Court Under 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date;

h.   Debtors' Motion to Establish Certain Notice, Case Management and Administrative Procedures;

i.   Debtors' Emergency Motion to (I) Set Claims Bar Dates, and (II) for Approval of Form and Manner of Notice of Commencement of Cases and Bar Dates for Filing Proofs of Claim;

j.      Debtors' Motion for Order Establishing Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals;[3]

k.      Debtors' Emergency Motion for (A) Authority to (I) Maintain Bank Accounts and to Continue to Use Existing Business Forms and Checks, and (II) Continue to Use Existing Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines;

l.      Debtors' Emergency Motion for Order (I) Authorizing it to (A) Pay Prepetition Employee Wages, Salaries, Commissions, Benefits and Other Compensation; (B) Remit Withholding Obligations; (C) Maintain Employees Benefits Programs and Pay Related Administrative Obligations and (II) Authorizing Applicable Banks and Other Financial Institutions to Honor, Process and Pay Checks Presented for Payment and to Honor Certain Fund Transfer Requests;

m.      Debtors' Emergency Motion for Authorization to Pay Prepetition Property, Sales, Use, Franchise, Trust Fund and Other Taxes and Similar Obligations;

n.      Debtors' Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Agreements Relating Thereto; (II) Continue Certain Premium Financing Agreements Relating Thereto; and (III) Honoring of Certain Obligations in Respect Thereof;

o.      Debtors' Emergency Motion (A) for Authorization to (I) Obtain Postpetition Financing Pursuant to Sections 105(a), 361, 362, 363 and 364 of the Bankruptcy Code and (II) Use Cash Collateral Pursuant to Section 363 of the Bankruptcy Code, (B) for Authorization to Grant Adequate Protection to Prepetition Secured Parties Pursuant to Sections 361, 363 and 364(c) and (d) of the Bankruptcy Code, and (C) Scheduling a Final Hearing on the Motion;

p.      Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois, LLC's Emergency Motion for Authorization to (I) Continue Providing Services Pursuant to the Debtors' OneSource Contracts and OneSource Subcontracts, and (II) Continue Management of Subcontractor Payments Pursuant to Escrow Agreement;

q.      Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois, LLC's Emergency Motion for Authorization to Continue Providing Services Pursuant to the Debtors' Government Prime Contract Accounts and Government Prime Contract Account Subcontracts, Including Management of Subcontractor Payments;

---

[3] This is being filed on the first day but emergency relief is not being sought

r.    Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois, LLC's Emergency Motion For Authorization To Continue Paying Administrative Fees and to Conduct Business Pursuant to the Clients Contract Where Debtors Provide Services as Subcontractor;

s.    Debtors' Emergency Motion Seeking Approval to Retain and Employ Professionals Utilized in the Ordinary Course of Business;

t.    Debtors' Emergency Motion to Reject, to the Extent it May be Considered an Executory Contract, Agreement with Goldman Sachs & Co. As of the Petition Date

u.    Debtors' Emergency Motion to Reject Executory Contract as of the Petition Date; Debtor, Medical Staffing Network, Inc.'s Emergency Omnibus Motion to Reject (I) Unexpired Leases of Non-Residential Real Property; and (II) Unexpired Equipment Lease Agreements;

v.    Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois, LLC's Emergency Motion for Authorization to Continue Operations of InteliStaf of Oklahoma, LLP, a Joint Venture Between InteliStaf Healthcare, Inc. and Non-Debtor Third Party, Integris Prohealth, Inc.;

w.    Debtor, Medical Staffing Network Holdings, Inc.'s Motion for Order Pursuant to 11 U.S.C. Sections 105(a), 1107(a) and 1108 of the Bankruptcy Code Authorizing Debtors to File a Form 15 With the Securities and Exchange Commission;

x.    Debtor, Medical Staffing Network, Inc.'s Motion for Determination That The Appointment Of A Patient Care Ombudsman Is Unnecessary;

y.    Debtors' Emergency Motion for an Order Authorizing Payment of Pre-Petition Claims of Critical Vendors; and

z.    Debtors' Motion for Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement; (D) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief.[4]

---

[4] This is being filed on the first day but emergency relief is not being sought.

## IV.   SERVICE OF FIRST DAY MOTIONS

79.     The Debtors have directed The Garden City Group, Inc. to provide notice of all motions presented to the Court for consideration as First Day Motions by overnight mail, hand delivery, facsimile or electronic mail on all parties identified on the Master Service List on July 2, 2010.  The Debtors have also instructed The Garden City Group, Inc. to file an affidavit of service certifying that it effectuated service in the manner set forth above.

### A.   Debtors' *Ex Parte* Motion for Joint Administration

80.     The Debtors seek orders directing the joint administration of their Chapter 11 cases for procedural purposes only, including the joint filing of any disclosure statements and plans of reorganization and other contested matters.

81.     The Debtors are "affiliates" as I understand that term is defined in section 101(2)(A) of the Bankruptcy Code.  MSN Holdings is the direct or indirect parent of each of the other Debtors.

82.     The issues that will be addressed in these bankruptcy cases will be related and overlapping.  Joint administration of these cases will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their estates.

83.     Each creditor may still file its claim against a particular estate.  I believe the rights of all creditors will actually be enhanced by the reduction in costs resulting from joint administration.  The Court also will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders and maintaining redundant files.  Finally, I believe supervision of the administrative aspects of these Chapter 11 cases by the Office of the United States Trustee will be simplified.

**B.      Debtors' *Ex Parte* Agreed Motion for Authorization to File Consolidated Chapter 11 Case Management Summary**

84.      I am advised that in accordance with Local Rule 2081-1(B)(a), the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form *Chapter 11 Case Management Summary* (the "Case Management Summary") providing certain information regarding the assets, liabilities and financial affairs of Chapter 11 debtors. These Chapter 11 cases were commenced by MSN Holdings and eleven (11) of its related debtor affiliates.

85.      Contemporaneously herewith the Debtors have each filed in their respective Chapter 11 cases *ex-parte* motions seeking joint administration of these Chapter 11 cases.  The Debtors request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information of each of the Debtors.  The Debtors request authority to file a consolidated Case Management Summary, as the filing of a separate Case Management Summary for each of the numerous Debtors would be burdensome.  In addition, much of the information contained in the Case Management Summary is duplicative for many of the Debtors and the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

86.      I am advised that the U.S. Trustee does not oppose the filing of a consolidated Case Management Summary in these Chapter 11 cases.  However, although the U.S. Trustee does not oppose the requested relief, the U.S. Trustee has reserved the right to request that the Debtors each prepare and file separate Case Management Summaries should the U.S. Trustee believe that such separate Case Management Summaries are necessary. The Debtors believe that

filing a consolidated Case Management Summary provides creditors and parties in interest with the financial disclosures contemplated by Local Rule 2081-1(B).

## C.   Debtors' Application for Authority to Retain Loughlin Meghji + Company, *Nunc Pro Tunc* to Petition Date

87.   The Debtors seek approval of their agreement with LM+Co in order for LM+Co to provide interim management services, including appointing me as CRO.

88.   LM+Co has significant  industry expertise in a wide range of sectors, including skilled nursing, hospitals, home healthcare, medical equipment, managed behavioral care, diagnostic centers, outpatient and inpatient clinics and surgery centers.

89.   LM+Co has recently provided crisis, interim management and/or financial advisory services in a number of large and mid-size restructurings, including serving as CRO for a $200 million private equity sponsor owned private temporary staffing services company in the industrial, manufacturing and construction industries with a key focus on an operational turnaround; serving as financial advisor to a lender group for Comsys Inc., a $400 million intellectual technology staffing and services company for an out-of-court restructuring; serving as financial and restructuring advisor for a private equity sponsor/lender in a consensual out of court restructuring in relation to Interim HealthCare, a home healthcare/healthcare staffing company with system wide revenues of $600 million; serving as financial advisor to the lending group in the successful Chapter 11 bankruptcy reorganization of Mariner Health Care, an operator in the skilled nursing, institutional pharmacy, rehabilitation therapy and long-term acute care sector; and serving as financial advisor to lenders for Tender Loving Care, a $300 million home healthcare provider in a consensual out of court debt restructuring between a private equity sponsor and the lender group.

90.   LM+Co professionals have completed more than 500 successful restructurings and more than 50 capital market transactions.  In the exercise of my business judgment, and

based on LM+Co's qualifications, it is in the best interests of the Debtors and their estates and creditors to retain LM+Co in accordance with the terms of the engagement letter.

**D.    Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Berger Singerman, P.A. as Counsel for Debtors in Possession, *Nunc Pro Tunc* to the Petition Date**

91.    The Debtors seek authority to retain, on an interim and final basis, the law firm of Berger Singerman, P.A. ("BSPA") as general bankruptcy counsel *nunc pro tunc* to the Petition Date.  The Debtors understand that Paul Steven Singerman and BSPA have extensive experience representing Chapter 11 debtors in this District (and others across the country) and that they are well-qualified to serve as general bankruptcy counsel to the Debtors.

92.    To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Paul Steven Singerman, on Behalf of Berger Singerman, P.A. as Proposed* Counsel *for* Debtors-*In-Possession,* affirmed by Mr. Singerman and filed by BSPA which accompanies the Application to retain it, neither Mr. Singerman nor BSPA has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

93.    Counsel has informed me that corporations may not appear in a Florida or federal court *pro se*, and that only a licensed attorney may appear on their behalf.  Because there is a myriad of relief that must be sought from the Court immediately, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of counsel before a final hearing on the application for approval of counsel's employment can be convened. For example, the Debtors require the Court's approval of an agreement to provide debtor-in-possession financing.  Without such funds, the Debtors will be unable to operate their business and maximize the value of their assets for the benefit of their estates.   It is, therefore, my belief that only with the granting of interim approval of counsel's employment will such immediate and irreparable injury be avoided.  In that regard, counsel advises that this relief has been granted in

other Chapter 11 cases in this District. *See*, *e.g.*, *In re Gemini Cargo Logistics, Inc., et al.,* Chapter 11 Case No. 08-18173-BKC-PGH (Bankr. S.D. Fla. June 20, 2008); *In re First NLC Financial Services, LLC, et al.,* Chapter 11 Case No. 08-10632-BKC-PGH (Bankr. S.D. Fla. Feb. 13, 2008); *In re Tousa, Inc., et al.,* Chapter 11 Case No. 08-10928-BKC-JKO (Bankr. S.D. Fla. Jan. 31, 2008).  Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates and creditors to retain Berger Singerman under the terms of its engagement letter.

**E.    Debtors' Application for Approval, on an Interim and Final Basis,  of Employment of Akerman Senterfitt as Special Corporate and Transactional Counsel for Debtors, *Nunc Pro Tunc* to the Petition Date**

94.    The Debtors seek authority to retain, on an interim and final basis, the law firm of Akerman Senterfitt ("Akerman") as special corporate and transactional counsel, *nunc pro tunc* to the Petition Date.  Philip Schwartz and Akerman have served as general counsel to the Debtors prior to the filing of these cases. The Debtors understand that Philip B. Schwartz and Akerman have extensive experience representing corporate and transactional clients in this and other districts, and that they are well-qualified to serve as special corporate counsel to the Debtors. The Debtors believe it is in their best interests, and those of their creditors, that Mr. Schwartz and Akerman be retained to serve as Debtors' special corporate and transactional counsel in their Chapter 11 cases.

95.    To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Philip M. Schwartz, on Behalf of Akerman Senterfitt as Proposed Special Corporate and Transactional Counsel for Debtors,* affirmed by Mr. Schwartz, which accompanies the Application to retain it, neither Mr. Schwartz nor Akerman has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

96.     Due to Akerman's extensive experience with the Debtors' corporate matters, and in light of the ongoing and complex transactional issues that are pivotal to the Debtors' successful reorganization, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of special corporate counsel before a final hearing on the application for approval of special corporate counsel's employment can be convened.  It is, therefore, my belief that only with the granting of interim approval of special corporate counsel's employment will such immediate and irreparable injury be avoided.  Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates and creditors to retain Akerman under the terms of its engagement letter.

**F.      Debtors' Application for Approval, on an Interim and Final Basis, of Employment of Jefferies & Company, Inc., as Investment Banker to the Debtors *Nunc Pro Tunc* to the Petition Date**

97.     The Debtors seek authority to retain, on an interim and final basis, the investment banking firm of Jefferies & Company, Inc. ("Jefferies"), *nunc pro tunc* to the Petition Date.  The Debtors understand that Leon Szlezinger ("Szlezinger") and Jefferies have significant and extensive experience providing investment banking services, including services previously provided to the Debtors pre-petition, and has an excellent reputation for providing such services throughout the United States and internationally. in restructuring matters, and that they are well-qualified to provide investment banking services to the Debtors in these cases.   The Debtors believe it is in their best interests, and those of their creditors, that Jefferies be retained to serve as investment banker to the Debtors in their Chapter 11 cases.

98.     To the best of the Debtors' knowledge, except as disclosed in the *Declaration of Leon Szlezinger, on Behalf of Jefferies & Company, Inc. as Proposed Investment Banker to the Debtors,* affirmed by Mr. Szlezinger, which accompanies the Application to retain it, neither

Szlezinger nor Jefferies has any connection with the Debtors' creditors or other parties in interest or their respective attorneys.

99.     Due to Jefferies' extensive experience acting as investment banker to companies in restructuring matters, and in light of the pre-petition work done for the Debtors by Jefferies, the Debtors will suffer immediate and irreparable harm if they are unable to obtain the services of an investment banker before a final hearing on the application for approval of Jefferies' employment can be convened.   It is, therefore, my belief that only with the granting of interim approval of Jefferies' employment will such immediate and irreparable injury be avoided.

**G.      Debtors' Application for Approval of Employment of The Garden City Group, Inc. as Claims, Noticing, Balloting and Solicitation Agent of the Bankruptcy Court Under 28 U.S.C. § 156(c), *Nunc Pro Tunc* to the Petition Date**

100.     The Debtors seek approval of their agreement with The Garden City Group, Inc. ("GCG") and have GCG appointed as claims, noticing, balloting and solicitation agent of the Court. I am informed that GCG is one of the country's leading Chapter 11 administrators, with experience in noticing, claims administration, balloting, solicitation, and facilitating other administrative aspects of Chapter 11 cases.  I am further informed that GCG has substantial experience in cases of this size and complexity, and has acted as the official notice, claims, and balloting agent in many large bankruptcy cases pending in various districts nationwide. The approval of the Debtors' agreement with GCG and GCG's appointment as claims, noticing, balloting and solicitation agent of the Court will facilitate the orderly and efficient management of these Chapter 11 cases.  Accordingly, in the exercise of my business judgment, it is in the best interests of the Debtors, their estates and creditors to retain GCG under the terms of its engagement letter.

**H.    Debtors' Motion for Order Establishing Certain Notice, Case Management and Administrative Procedures**

101.    The Debtors seek to establish notice, case management and administrative procedures for the conduct of these Chapter 11 cases, including, but not limited to, scheduling omnibus hearings in advance, providing service via e-mail, maintenance of a website for access by creditors and parties in interest, setting up a core list of persons and entities on whom and which service must be made, etc. (the "Notice Procedures").  The Notice Procedures, among other things, (a) define the parties who are to receive notice of each document that is filed with the Court, (b) describe what information must be included in notices of requests for relief from the Court, (c) set forth the deadlines for objections to be filed to requests for relief and the date of the hearing at which such requests for relief will be heard, and (d) explain the procedures for service of documents filed with the Court.

102.    The Debtors have thousands of creditors and parties-in-interest, including vendors, lenders and lessors. Therefore, I anticipate that hundreds of creditors and other parties in interest will file requests for service in these Chapter 11 cases.  I also expect that numerous motions and applications will be filed in these Chapter 11 cases in pursuit of various forms of relief.  By scheduling regular omnibus hearings in advance, parties in interest, and certainly the Debtors, will be better able to plan for and schedule attendance at hearings, thus reducing the need for emergency hearings and/or expedited relief and fostering consensual resolution of important matters.  Moreover, by establishing certain notice and service procedures, all parties in interest will be assured of receiving appropriate notice of matters affecting their interests and ample opportunity to prepare for and respond to and be heard on such matters.  Based on the foregoing, I submit that the proposed notice, case management and administrative procedures are in the best interests of the Debtors, their creditors and parties in interest.

I.     **Debtors' Emergency Motion to (i) Set Claims Bar Date, and (ii) for Approval of Form and Manner of Notice of Commencement of Cases and Bar Dates for Filing Proofs of Claim**

103.    The Debtors seek approval of the form and notice of commencement of these Chapter 11 cases and respective bar dates for the submission of Proofs of Claims.  I believe that given the size and complexity of these Chapter 11 cases, the proposed form and notice, including the manner of publication of that form and notice, will help ensure that as many creditors and parties in interest as possible receive notice of the filing of these Chapter 11 cases and the bar dates by which they must assert claims against the Debtors.   Pursuant to the proposed procedures, Proofs of Claims will be submitted to GCG (as defined above), the Debtors' proposed Claims and Notice Agent.   The Debtors propose to publish notice of the commencement of these Chapter 11 cases and the respective bar dates within ten (10) days of the entry of an Order granting this motion, and at least thirty (30) days prior to the general bar date for filing Proofs of Claims, so as to afford creditors, equity holders and parties in interests more than ample time to assert Proofs of Claims.    The Debtors believe that adoption of the procedures, and the publication of those procedures, is in the best interests of their creditors and parties in interest and will allow each of the Debtors' constituents the ability to participate in these Chapter 11 cases to the extent they are so inclined.

J.     **Debtors' Motion for Order Establishing Procedures for Monthly and Interim Compensation and Reimbursement of Expenses for Professionals (the "Interim Compensation Procedures Motion")**

104.    The Debtors seek approval of interim compensation procedures for professionals retained by the Debtors in these cases, which has been filed on the first day, but which has not been requested to be set for emergency relief. The proposed procedures will provide an orderly mechanism to compensate professionals and provide reimbursement of out-of-pocket expenses on a monthly basis, comparable to those established in other complex Chapter 11 cases in this

and other districts as explained to me by counsel. In this way, the Court and parties in interest can more effectively monitor the fees incurred, and the Debtors will be able to spread out their payments of professional fees, rather than suffer larger depletions to their cash on an irregular basis.

105.     In summary, the requested monthly compensation procedure would require all professionals retained with Court approval to present to the Debtors, counsel for the Debtors, counsel for the DIP Agent, General Electric Capital Corporation, counsel for the Official Committee of Unsecured Creditors, if one is established, any other appointed committee, and the United States Trustee a detailed statement of services rendered and expenses incurred for the prior month. If no timely objection is filed, the Debtors would direct Berger Singerman to promptly pay from the Professional Expense Escrow (as defined in the DIP Credit Agreement) 80% of the amount of fees incurred for the month, with a 20% holdback, and 100% of out-of-pocket expenses for the month. These payments would be subject to the Court's subsequent approval as part of the normal interim fee application process (approximately every 120 days). These procedures will help ensure the continued services of professionals rendering critical services to the Debtors and help facilitate an orderly wind-down or disposition of the Debtors' assets or enterprise. The Debtors seek to pay LM+Co. and GCG monthly without holdback due to the nature of their engagements.

**K.     Debtors' Emergency Motion for (A) Authority to (i) Maintain Bank Accounts and to Continue to Use Existing Business Forms and Checks, and (ii) Continue to Use Existing Cash Management System, and (B) Waiver of Certain Investment and Deposit Guidelines**

106.     I understand that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. These guidelines require Chapter 11 debtors to, among other things, close all existing

bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account. The Debtors seek a waiver of these requirements.

107. The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date because the Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it will be easy to differentiate between pre and post-petition transactions by date. In the ordinary course of their business, the Debtors use many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors are engaged, and the numerous other parties with whom the Debtors deal, the Debtors need to be permitted to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, I believe it is in the best interests of the Debtors and their creditors to continue to use existing business forms and maintain existing business records.

108. In addition, the Debtors request authority to maintain their existing bank accounts (each a "Bank Account" or and collectively, the "Bank Accounts") and cash management system (the "Cash Management System") in accordance with their usual and customary practices to ensure a smooth transition into Chapter 11 with minimal disruption to operations and payments to employees. The Debtors also request authority to close any of the Bank Accounts if, in the

exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

109.    Only if the Bank Accounts are continued with the same account numbers can the transition into Chapter 11 be smooth and orderly, with minimal interference with continuing operations and payment of the Debtors' employees.  In order to conduct their post-petition businesses, the Debtors need to be able to issue checks to vendors, service providers, employees, and others.  Due to the large number of the Debtors' employees paid on a daily basis, opening new accounts and obtaining checks for those accounts would cause severe delay and disruption to the Debtors' business and have a serious and potentially devastating impact on the Debtors' ability to reorganize.  Moreover, a change in the Bank Accounts to which customers wire and route payments could delay the Debtors' receipt of funds needed for operations. By preserving business continuity and avoiding the operational and administrative paralysis that would result from closing the existing Bank Accounts and opening new ones, all parties-in-interest, including employees, vendors, and customers, will be best served, and the benefit to the Debtors' estates will be considerable.  Additionally, the confusion that would otherwise result could only work to the detriment of these Chapter 11 cases.  (Of course, no checks issued prior to the Petition Date are to be honored, except as otherwise provided by separate order of this Court.)

110.    The Debtors employ a vast and complex Cash Management System similar to those commonly employed by staffing agencies of size and complexity comparable to the Debtors.  The Cash Management System is comprised of a network of approximately 26 cash accounts maintained throughout the United States. The primary components of the Debtors' existing Cash Management System are:

a.        depository accounts (primarily lockbox accounts) maintained with Bank of America and Capital One (collectively, the "Depository Accounts");[5] additionally there is an account held in escrow under the care in care of an independent escrow agent (the "Escrow Agent")[6];

b.        two master funding accounts at Bank of America into which the lockbox funds are swept (the "BOA Master Funding Accounts"): One of the BOA Master Funding Accounts (BOA Account # 9422)("BOA Master Funding Account 1") is the account into which the lockbox funds are swept, as designated by General Electric Capital Corporation, the Debtors' first lien administrative agent (the "First Lien Administrative Agent").  The second BOA Master Fund Account (BOA Account #1651)("BOA Master Funding Account 2") is the account into which borrowings are deposited; and

c.        a series of disbursement accounts maintained at Bank of America and other institutions that are funded from BOA Master Funding Account 2 and a master funding maintained at Wachovia (collectively, with BOA Master Funding Account 2, the "Master Funding Accounts") and used for the payment of funds to employees, vendors and others (collectively, the "Disbursement Accounts").

111.    The Debtors' Cash Management System is centrally managed by the Debtors' financial personnel at their  corporate headquarters in Boca Raton, Florida.  Through the utilization of the existing Cash Management System, the Debtors are able to facilitate cash forecasting and reporting, monitor collection and disbursement of funds, and maintain control

---

[5] Bank of America and Wachovia Bank, N.A. are authorized depository pursuant to 11 U.S.C. § 345(b).

[6] For a more detailed explanation of the escrow arrangement, the Debtors respectfully refer the Court to the *Debtors', Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois LLC's Emergency Motion for Authorization to (i) Continue Providing Services Pursuant to the Debtors' OneSource Contracts and OneSource Subcontracts, and (ii) Continue Management of Subcontractor Payments Pursuant to Escrow Agreement* filed on the Petition Date.

over the administration of the various bank accounts required to effect the collection, disbursement, and movement of cash, as well as the payment of the Debtors' employees. The movement of funds through the Debtors' Cash Management System is described below and is illustrated in the chart attached to the motion as Exhibit "C."

112.    The Cash Management System used by the Debtors constitutes ordinary, usual, and essential business practice. This system allows the Debtors to (a) control corporate funds centrally, (b) ensure availability of funds when necessary, (c) ensure prompt and efficient payment of employees, and (d) reduce administrative expenses.

113.    The Debtors' operations require that the Cash Management System continue during the pendency of the Chapter 11 cases. If the Debtors were required to adopt a new cash management system, their operations and payments to their employees and subcontractors would be severely disrupted, which would have a serious and potentially devastating impact on the Debtors' ability to reorganize. Further, the establishment of new cash accounts and a new collection and disbursement system would result in substantial additional costs to the Debtors' bankruptcy estates. Accordingly, maintenance of the existing Cash Management System is essential and in the best interests of all creditors and other parties in interest.

114.    The Debtors maintain six Depository Accounts, five of which are lockbox accounts maintained at Bank of America (Account #s 0358, 3810, 1982, 6893 and 9832)(individually each a "Lockbox Account", collectively the "Lockbox Accounts"), and one depository account maintained at Capital One (Account # 0095). The Depository Accounts exist for the collection of all funds paid to the company. Funds from the Lockbox Accounts, excluding Account #9832, are automatically swept on a daily basis into BOA Master Funding Account 1. Funds from Lockbox Account # 9832 are reconciled by the Escrow Agent who then

disburses funds owed to the Debtors to BOA Master Funding Account 1 and disburses the remaining funds to various subcontractors. Funds from the Capital One account are not permitted to exceed $25,000; therefore when the amount in this account approaches $15,000-$20,000, the Debtors transfer the funds to the Bank of America Acct. # 0358 Lockbox Account.

115.    From BOA Master Funding Account 1, funds are transferred directly to the bank account designated by the First Lien Administrative Agent.

116.    On a daily basis, borrowed funds are requested from the First Lien Administrative Agent and deposited into BOA Master Funding Account 2. From BOA Master Funding Account 2, funds are disbursed via electronic fund transfer to its payroll and disbursement accounts, which include controlled Disbursement Accounts ("Controlled Disbursement Accounts") and Pre-Funding Disbursement Accounts.

117.    The Debtors maintain two Controlled Disbursement Accounts (Bank of America Account #s 1886 and 5405). For these accounts, checks are presented to the bank, the bank notifies the Debtors of the amount that needs to be funded and the Debtors then fund the Controlled Disbursement Accounts from BOA Master Funding Account 2[7] that same day to cover the payment amounts requested. The Controlled Disbursement Accounts are used for accounts payable.

118.    The Debtors maintain 13 Pre-Funding Disbursement Accounts (Wachovia Bank, N.A. Account # 1503, Bank of America Account #s 6919, 8655, 2337, 8869, 0316, 0332, 5329, 3866, 5358, 1560 and 1990 and US Bank Account # 6532. These accounts are funded by the Debtors based on an a checks-clearing analysis. The Debtors use historical data of checks cleared on a daily basis, as well as files received from Ceridian, the Debtors' third party payroll

---

[7] The Debtors maintain an additional master funding account at Wachovia Bank, Acct. # 5520, which is not currently being utilized.

processor, to determine how much to fund on a particular day.  These accounts are payroll and accounts payable disbursement accounts.  The Debtors maintain two additional operating accounts at Bank of America (Account #s 8361 and 1578).   These accounts are technically operating accounts for MSN Holdings (Account # 8361) and MSN Assets (Account # 1578) but are not being utilized and contain minimal funds.

119.   The Debtors utilize a system, referred to as "Positive Pay," to monitor disbursements from the Disbursement Accounts for possible fraud.  Under the Positive Pay system, the Debtors generate daily check registers which are electronically sent to all banks with Disbursement Accounts.  The banks match up the checks presented to the banks on the Disbursement Accounts with the registers.  In the event a check does not match up with the register, the bank notifies the Debtors and the Debtors then review to determine if fraud is present.

120.   I believe that the Debtors' current cash and investments are safe because all of Debtors' financial institutions are, upon information and belief, financially stable banking institutions, are FDIC insured and are authorized depositories that satisfy section 345(b) of the Bankruptcy Code.   Bank of America and Wachovia Bank, N.A. are authorized depositories pursuant to the U.S. Trustee's Guidelines.  Due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take some time for the Debtors to locate and determine, where necessary, appropriate alternative accounts that satisfy section 345(b). Therefore, it is in the best interests of the Debtors, their estates and their creditors to obtain a waiver of the requirements of section 345(b).

121.   I am advised by counsel that courts, including courts from this District, have often granted relief from these requirements and replaced them with alternative procedures.  *See, e.g.,*

*In re Protective Products of America, Inc., et al.*, Case No. 10-10711-BKC-JKO (Bankr. S.D. Fla. Feb. 11, 2010) (Final Order (A) Authorizing the Debtors (I) to Maintain Bank Accounts and to Continue to Use Existing Business Forms and Checks, (II) to Continue to Use Existing Cash Management System; and (B) Waiving Certain Investment and Deposit Guidelines); *In re DM Industries, Ltd.*, Case No. 09-15533-BKC-LMI (Bankr. S.D. Fla. May 15, 2009) (Final Order Authorizing the Debtor (I) to Maintain Bank Accounts and to Continue to Use Existing Business Forms and Checks; and (II) to Continue to Use Existing Cash Management System); *In re Levitt and Sons, LLC*, *et al.*, Case No.  07-19845-BKC-RBR (Bankr. S.D. Fla. January 27, 2009) (Final Order Granting Debtors' Emergency Motion for (1) Authority to Continue Use of Existing Business Forms and Records; (2) Authority to Maintain Existing Corporate Bank Accounts and Cash Management System; and (3) Extension of Time to Comply With 11 U.S.C. § 345 Investment Guidelines); *In re Gemini Cargo Logistics, Inc., et al.*, Chapter 11 Case No. 08-18173-BKC-AJC (Bankr. S.D. Fla. July 16, 2008) (Final Order (A) Authorizing the Debtors (I) to Maintain Bank Accounts and to Continue to Use Existing Business Forms and Checks, (II) to Continue to Use Existing Cash Management System; and (B) Waiving Certain Investment and Deposit Guidelines); *In re Gemini Air Cargo, Inc.*, Case No. 06-10780-BKC-AJC (Bankr. S.D. Fla. Mar. 20, 2006) (Order Granting Debtors' Emergency Motion For Order (1) Authorizing Continued Use Of Existing Business Forms And Records; (2) Authorizing Maintenance Of Existing Corporate Bank Accounts And Cash Management System; And (3) Extending Time To Comply With 11 U.S.C. § 345 Investment Guidelines); *In re Atlas Air Worldwide Holdings, Inc.*, Chapter 11 Case No. 04-10796-BKC-RAM (Bankr. S.D. Fla. March 26, 2004) (Final Order Granting Debtors' Emergency Motion for Order (1) Authorizing Continued Use of Existing Business Forms and Records; (2) Authorizing Maintenance of Existing Corporate Bank

Accounts and Cash Management System; and (3) Extending Time to Comply with 11 U.S.C. § 345 Investment Guidelines); *In re Fine Air Serv., Corp.*, Chapter 11 Case No. 00-18671-75 (Bankr. S.D. Fla. Feb. 7, 2001) (Order Granting Debtor's Emergency Motion for Order Authorizing (a) Continued Use of Existing Bank Accounts and Business Forms and (b) Maintenance of Cash-Management System).

**L.      Debtors' Emergency Motion for Order (I) Authorizing It to (A) Pay Prepetition Employee Wages, Salaries, Commissions, Benefits and Other Compensation; (B) Remit Withholding Obligations; (C) Maintain Employee Benefits Programs and Pay Related Administrative Obligations and (II) Authorizing Applicable Banks and Other Financial Institutions to Honor, Process and Pay Checks Presented for <u>Payment and to Honor Certain Fund Transfer Requests (the "Employee Motion")</u>**

122.      The Debtors seek the relief requested in the Employee Motion because the Debtors' business *is* its employees and any delay in paying employee compensation, deductions, or benefits will destroy the Debtors' relationships with its employees, irreparably impair employee morale and may well result in the exodus of field employees to other staffing agencies; this at a time when the dedication, confidence, and cooperation of these employees is most critical.  The Debtors face the imminent risk that their operations may be severely impaired if the Debtors are not immediately granted authority to make the payments described in the Employee Motion.  Corporate employee support for the Debtors' efforts to facilitate a reorganization of its business is crucial to the success of this effort, particularly given the unique knowledge of the employees regarding the Debtors' operations.  At this critical early stage of these Chapter 11 Cases, the Debtors simply cannot risk the substantial and likely irreparable disruption to their business operations that would inevitably attend any decline in work force morale attributable to the Debtors' failure to pay employee compensation, deductions, and benefits in the ordinary course.  Finally, to remain in a position to maintain their operations, the Debtors must continue their corporate policies of permitting certain employees, particularly travel field employees, to

incur business-related expenses and thereafter to seek reimbursement by submitting appropriate invoices or vouchers evidencing such out-of-pocket disbursements, if any.  In addition, the Debtors pay for certain expenses for their travel nurses directly, such as apartment rentals, furniture rentals and car rentals.

123.    Because the amounts represented by employee compensation, benefits and deductions are needed to enable the employees to meet their own personal obligations, absent the relief requested herein, the employees could suffer undue hardship and, in many instances, serious financial difficulties.  Moreover, without the requested relief, the stability of the Debtors will be severely undermined by the potential threat that otherwise loyal employees at all levels, both corporate and field, will seek employment elsewhere.

124.    The Debtors further request that all applicable banks and other financial institutions be authorized and directed to receive, process, honor, and pay any and all checks or electronic transfers drawn on the Debtors' general disbursement account related to employee compensation, deductions, benefits, withholding obligations and premiums and fees in respect to workers' compensation insurance as outlined in the Employee Motion, whether presented prior to or after the Petition Date, upon receipt by such bank and institution of notice of such authorization, provided only that sufficient funds are on deposit in the applicable accounts to cover such payments.

125.    As of the Petition Date, the Debtors employed approximately 20,000 employees (the "Employees"), who provide a myriad of services to the Debtors throughout the United States.

126.    Approximately 915 of the Employees are corporate and operations employees ("Corporate Employees").  Of the Corporate Employees, approximately 151 are employed by

InteliStaf Healthcare, Inc., 722 are employed by Medical Staffing Network, Inc. and 42 are employed by Medical Staffing Network of Illinois, LLC.    Approximately 19,000 of the Employees are professionals (nurses and allied health professionals) and independent contractors (collectively the "Field Employees").    MSN has approximately 3,000 Field Employees working each day.

127.    The annual payroll for all of the Debtors' Employees is approximately $250 million.    Approximately 83% of annual payroll is for compensation of Field Employees, with the remaining 17% attributable to compensation for Corporate Employees.

128.    The Corporate Employees are paid on either a full-time, part-time, hourly or on-call/temporary basis and work nationwide.    Corporate Employees consist of the Debtors' executive team, management, supervisory, administrative, clerical, branch managers, staffing coordinators, collections and other similarly specialized skilled Employees and other non-represented Employees.

129.    Corporate Employees who work full-time ("Full-time Employees") are generally paid bi-weekly on varying dates of each month, and are paid five days in arrears depending on their work schedules.    Full-time Employees who are accounts receivable collectors, directors, adjusters, supervisors and managers are also eligible for bonuses based on various criteria relating to accounts receivable collections, which bonuses are included in their compensation. Vice Presidents, Branch Managers, staffing coordinators and recruiters are also eligible for bonuses based on various criteria.

130.    Payroll for Full-time Employees is approximately $1.4 million bi/weekly and the Debtors' portion of the payroll taxes for these Employees is approximately $400,000 biweekly. The Debtors estimate that, as of Petition Date, accrued but unpaid payroll for the Corporate

Employees will be approximately $660,000 and accrued but unpaid payroll taxes will be approximately $50,000.  The Corporate Employees are paid on either a full-time, part-time, hourly or on-call/temporary basis and work nationwide.  Corporate Employees consist of the Debtors' executive team, management, supervisory, administrative, clerical, branch managers, staffing coordinators, collections and other similarly specialized skilled Employees and other non-represented Employees.  All Field Employees are part time, at-will hourly  employees, none of whom are salaried.  Field Employees either work , *i.e.,* on daily shifts or short term contract assignments ("Employees") or work travel assignments on 2-13 week contracts ("Travel Employees").   Employees may be paid daily, multiple times a week, weekly or biweekly. Travel Employees receive a compensation package which typically includes use of an apartment or a house subsidy, as well as meal subsidies.  This compensation package is considered part of the Travel Employee's salary. Travel Employees are usually paid weekly, although they may be paid either daily, weekly or bi-weekly.

131.    Payroll for the Field Employees, collectively, is approximately $3 million each week.  The Debtors' portion of payroll taxes for those Field Employees is approximately $900,000 per week.  These numbers are approximates, as they vary each week depending on the needs of the Debtors' clients for that particular week.  Field Employees have the option of being paid by check, direct deposit or on a Visa labeled debit card.

132.    The Debtors estimate that, as of the Petition Date, accrued but unpaid payroll for the Field Employees will be approximately $3.7 million, and accrued but unpaid payroll taxes will be approximately $350,000.

133.    There are additional Field Employees who are independent contractors.  These are physician assistants and Certified Registered Nurse Anesthetists who are IRS Form 1099 agents

on assignment.  There are approximately 600 IRS Form 1099 independent contractors working for the Debtors, who are paid approximately $250,000 per week in the aggregate, which amount is included in the $3 million/per week payroll for Field Employees discussed hereinabove.

134.    The Debtors are not aware of any Employee who is owed in excess of the $11,725.00 cap in prepetition wages and benefits (other than potentially unpaid prepetition accrued vacation).

135.    All Full-time Employees are eligible to accrue paid vacation.  The length of service determines a Full-time Employee's amount of paid vacation, which is based on the average weekly number of hours normally worked ("Vacation Time").  Vacation Time begins to accrue after 180 days.  Vacation Time ranges from 1 week to 4 weeks, based on an Employee's years of service and date of hire.  Actual payment to Employees for Vacation Time is based on an Employee's years of service and the number of vacation days taken.  The Debtors permit the carryover of Vacation Time of up to 40 hours from the previous year's earned Vacation Time.

136.    Employees who retire, resign, or are terminated are, for the most part, entitled to receive a cash payment based on their accrued, unused Vacation Time.

137.    The Debtors maintain information related to accrued Vacation Time for all Employees. The Debtors estimate that, as of July 2, 2010, approximately $800,000 exists in earned, accrued but unpaid Vacation Time for all Employees including the associated employer's liability for taxes.

138.    Only Field Employees working at government-operated facilities are entitled to Vacation Time, which is accrued every pay period. They receive 10-20 vacation days per year, depending on length of service, and 10-12 paid holidays.  These benefits are required pursuant to the Federal Service Contract Act.

139.     Of the Corporate Employees, only Full-time Employees are eligible for 5 days of sick leave per year.  Up to 80 hours of sick leave can be carried over to the next year.  Eligible Employees accrue sick leave ("Sick Leave") on a monthly basis.  Employees who resign or are terminated are not entitled to any compensation for their accrued and unused Sick Leave.

140.     In addition, after three months of employment, Full-time Corporate Employees are entitled to one or two personal days per year ("Personal Leave").  These days do not carry over and are not paid out on termination. Full-time Corporate Employees are eligible for six paid holidays.  Any Corporate Employee is also entitled to up to three paid days for bereavement leave ("Bereavement Leave"). This time is not accrued and not carried over.   Full-time Employees are also entitled to up to five paid days for jury duty, which time is not accrued and not carried over ("Jury Duty").

141.     Only Field Employees working at certain government-operated facilities are entitled to paid holidays.  They receive up to 12 paid holidays per year.  Field Employees working at government-operated facilities under the Service Contract of America Act are entitled to sick leave.  If they work 40 hours per week, they are eligible for 40 hours of sick time per year.  If they work 20 hours per week, they are eligible for 20 hours of sick time per year.  No Field Employees are entitled to sick leave or any other types of personal leave.

142.     The Debtors are seeking authority to honor in the ordinary course of business all pre-petition accrued Vacation Time, Sick Leave, Personal Leave, Bereavement Leave and Jury Duty rights of their Employees who continue to be employed by the Debtors after the Petition Date.  The Employees will utilize any accrued Vacation Time and Sick Leave in the ordinary course of business.

143.    Any Corporate Employee is entitled to reimbursement of certain limited categories of expenses incurred in the ordinary course of business which are approved and are within corporate policy guidelines.  Reimbursements are paid by check or electronic funds transfer. The Debtors routinely reimburse Employees for certain expenses incurred within the scope of their employment, including expenses for mileage, office supplies, travel, lodging, tolls, ground transportation, meals, supplies, and miscellaneous business expenses (collectively, the "Business Expenses").

144.    All Field Employees are entitled to reimbursement for job-related Business Expenses for which they receive prior approval, including such items as travel, lodging, tolls, ground transportation, mileage, meals, and professional credentialing costs.

145.    The Debtors also occasionally reimburse certain Corporate Employees for their actual out-of-pocket relocation expenditures, up to a certain amount, in order to attract desirable candidates to accept positions with the Debtors (the "Relocation Expenses")[8] (and, together with the Business Expenses, the "Reimbursable Expenses").  The Debtors are seeking authority to continue making payments related to Relocation Expenses in the ordinary course in an abundance of caution to ensure the ability to attract prospective employees.

146.    Certain Employees have not yet been reimbursed for Reimbursable Expenses previously incurred.  The majority of the Reimbursable Expenses have been incurred through the use of Employees' personal credit card accounts.  The Employees submit receipts for reimbursement that are processed through the normal expense report and accounts payable process.  It is difficult for the Debtors to estimate the amount of Reimbursable Expenses outstanding as of the Petition Date, because not all Employees have submitted expense reports as

---

[8]  There are no Relocation Expenses pending as of the Petition Date.  The Debtors are seeking authorization to continue the practice of paying Relocation Expenses on a post-petition basis in the ordinary course of their businesses as they did prior to the Petition Date.

of the Petition Date.  It is critical that the Debtors be authorized to reimburse all such expenses as and when reports are submitted.  The Debtors, therefore, are seeking authority to pay all pre-petition Business Expenses and Relocation Expenses in the ordinary course of business, including those incurred prior to the Petition Date.  The Debtors estimate that there is approximately $80,000 in accrued, unpaid pre-petition Reimbursable Expenses.

147.    In the ordinary course of their business, and as is customary for companies of their size, the Debtors maintain various employee benefits and policies that provide their Employees with medical, dental, life insurance, workers' compensation insurance and other benefits which are described in more detail below.  These plans and programs are collectively referred to as the "Employee Benefit Plans."

148.    The Debtors are requesting authority to preserve all medical, dental, vision, prescription drug, life insurance and disability benefits provided to their employees.  The Debtors are requesting authority to pay, from time to time, as when due, certain prepetition dental claims under the Debtors' self funded dental plan.  The Debtors are also requesting authority to continue paying as when due, all premiums, expenses, and employee wage deductions related to medical, dental, disability and dismemberment insurance, workers' compensation and life insurance benefits (collectively, "Medical and Insurance Benefits") for their employees and their eligible dependents.

149.    The Debtors provide their Employees with a variety of medical benefits ("Medical Plan") and dental benefits ("Dental Plan")(collectively, the "Medical & Dental Plans"), dependent on whether the Employee is a Corporate Employee, Full-time Employee, Employee or Travel Employee, through various health care providers.

150. In general, all Full-time Employees are eligible for the benefits described herein on the first day of the month following a 90 day period subsequent to their hire date, unless otherwise noted. Corporate Employees who are not Full-time Employees do not receive benefits.

151. Full-time Employees are offered two choices of preferred provider insurance Medical Plans. Each of the plans is self-insured by the Debtor and administered by Blue Cross/Blue Shield of Illinois ("Blue Cross") which also provides excess coverage for claims over the reserve amount of $150,000.

152. The Medical & Dental Plans are partially funded through subsidies by the Debtors and Employees contribute to the Medical Plans through payroll deductions. The Debtors deduct funds from Employee paychecks prior to plan payments in order to collect Employee contributions. Payment and funding of the Medical Plans is handled on a weekly cash basis.

153. The Debtors offers Full-time Employees two Dental Plan options that are fully insured through Delta Dental. Employees that elect coverage under the dental plan also receive as part of their coverage a core vision plan through VSP which is subsidized by the Debtors. Employees can voluntarily purchase a buy-up vision plan. Eligibility for the Dental and Vision Plans is the same as for the Medical Plan.

154. Travel Employees and  Employees with a contract have the same choices of Medical Plans to participate in as the Full-time Employees. Travel Employees and  Employees with a contract are eligible the first of the month following their contract date.  Employees without a contract are eligible to participate in a Medical Plan the first of the month following 120 hours worked within a 30 day period.

155.    Travel Employees and  Employees who work 120 hours or more each month have the choice of either a core/basic Dental Plan or a buy-up plan under which they can receive additional benefits.  If a Travel or  Employees elects any Dental Plan, the Employee will receive the basic vision coverage through VSP, paid for by the Debtors.  They can elect the buy-up vision plan, which is subsidized by the Debtors.

156.    Field Employees who work 80 to 119 hours per month are entitled to participate in a limited benefit Starbridge Dental Plan, a fully insured plan offered by CIGNA, which pays up to $500 per year in benefits.

157.    Employees who do not have a contract and who work between 80 and 119 hours per month, have a limited benefits PPO Medical Plan, with 3 choices/levels of benefits, entitled "Starbridge" and offered by CIGNA.

158.    Pre-payments from Employees for the Medical & Dental Plans are $56,000 per bi-weekly pay period. The total cost per bi-weekly pay period, including the Employee contribution for the Medical & Dental Plans, is approximately $350,000.

159.    Certain Field Employees with a start date of June 27, 2010 working under the Federal Occupational Health Group Service Contract Act (FOH Employees), who work 20 to 40 hours per week, are eligible to participate in a choice of two fully insured medical plans through Aetna, two fully insured dental plans through Delta Dental and a vision plan through David Vision, as more fully explained in the motion.

160.    The Debtors are requesting authority to make all payments, claims, and remittances related to the Medical & Dental Plans in the ordinary course of business.

161.    All premiums for medical and dental plans are paid monthly and are current.

162.    It is critical that the Debtors be authorized to continue making these payments on medical and dental plans on a regular basis as and when they come due.  Debtors must pay the insurance premiums to retain employees and minimize disruption of the Debtors' business.  If the Debtors fail to pay these insurance premiums, the health care service providers will seek payment directly from the Debtors' employees and might refuse to provide continuing medical services or treatment to them.  Employees and their dependents who have sought health care services in reliance on their insurance could become frightened, upset and/or financially devastated if their medical services are affected by the Debtors bankruptcy filing.

163.    The Debtors offer Life Insurance, Accidental Death & Dismemberment ("AD&D"), Supplemental Life, Supplemental AD&D, disability insurance, accident insurance, and business travel and accident insurance   to certain Employees (collectively, the "Supplemental Insurance Plans").

164.    Full-time Corporate Employees receive basic life insurance & AD&D Insurance. The premium is paid 100% by the Debtors.  The benefit amount is equal to the employee's annual salary.  The Basic Life Insurance Policies are issued by Reliance Standard Life Insurance Company ("Reliance").   Full-time Corporate Employees can also purchase supplemental life insurance at their own cost for themselves and their families through Reliance.

165.    Full-time Corporate Employees receive short term and long term disability policies issued by Reliance.  The benefit for the short term disability is 60% of basic weekly earnings up to a maximum of $750/week.  The benefit for the long term disability is 60% of basic weekly earnings for the duration of the disability. These employees also receive business travel and accident insurance up to a total benefit amount of one times their base salary The premiums for these policies are paid 100% by the Debtors.

166.    The Debtors also offer Full-time Corporate Employees a voluntary supplemental accident plan through ING.  The premium is paid 100% by the employee.

167.    The Debtors provide Travel Employees with life insurance and AD&D insurance up to a $15,000 benefit through Reliance.  The premium is paid for 100% by the Debtors.   These employees also receive business travel and accident insurance up to a total benefit amount of $25,000 through Reliance.  The Debtors pay 100% of the premium.

168.    The Debtors offer Travel Employees voluntary short-term disability insurance through ING.  The employee pays 100% of the premium.  The Debtors also offer an additional accident insurance plan through ING that is 100% paid by the employee.

169.    Employees that work 120 hours or more per month receive life insurance up to $15,000. The premium is paid 100% by the Debtors. The Debtors also offer AD&D coverage for a benefit up to $15,000.  The premium is paid 100% by the Debtors.

170.    The Debtors also offer  Employees additional term life insurance up to a $100,000 pay-out for employees and their families. Premiums on these policies are paid 100% by the employee.  The Debtors also offer a short-term disability policy through ING, which is paid 100% by the employee, and an additional accident insurance plan through ING that is 100% paid by the employee.

171.    Employees that work 80 to 119 hours per month are eligible for life insurance in the amount of $5,000 through Reliance.  The premium is paid 100% by the Debtors.  These employees also receive AD&D coverage in the amount of $5,000 through Reliance, the premium for which is paid 100% by the Debtors.  In addition, these employees can purchase supplemental short term disability and accident coverage through ING, both of which are 100% paid by the employee.

172.    FOH Employees with a start date of June 27, 2010 receive basic life insurance and AD&D under the Service Contract Act as set forth in the motion.

173.    Amounts to pay for coverage under the Supplemental Insurance Plans are withheld from Employee paychecks and transmitted by the Debtors to the insurance companies listed herein above.  The Debtors believe that such withheld funds, to the extent that they remain in Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  Thus, the Debtors believe that their practice of directing such funds to the appropriate parties is in the ordinary course of business.  The Debtors, however, are seeking the approval of this Court for the Debtors to continue such practices out of an abundance of caution.

174.    The Debtors offer a 401(k) plan (the "401(k) Plan") for all Employees. Employees are eligible to participate in the plan after completing one month of service.  The employees contribute through payroll deductions to a 401(k) plan administered by MassMutual.

175.    The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute monies held in trust and, therefore, are not property of the Debtors' bankruptcy estates.  Thus, the Debtors seek authority to pay all amounts related to the 401(k) Plans that arose prior to the Petition Date, as they become due, in the ordinary course of the Debtors' business.

176.    The Debtors provide workers' compensation insurance coverage for the benefit of all Employees.  These benefits are covered primarily under the Debtors' workers' compensation insurance programs, which programs are self-insured by the Debtors up to a maximum of $500,000 per incident and $1 million per individual, with excess coverage provided by Traveler's Insurance ("Traveler's"), which also administers the program.  The Debtor pays

directly to Traveler's, on a monthly basis, those amounts required to pay allowed claims, then Traveler's pays the claimants' directly.  Failure to maintain this insurance in the various states in which the Debtors conduct business could result in the institution of administrative or legal proceedings against the Debtors.  The monthly premium for the workers' compensation, including excess coverage, is approximately $323,000.

177.    The Debtors are seeking authority to pay any workers' compensation premium that remained accrued and unpaid as of the Petition Date and continue paying and/or contesting in good faith, as appropriate in the Debtors' business judgment, all amounts related to workers' compensation claims that arose prior to the Petition Date, including, without limitation, any payments to insurers required as a result of such claims, as they become due in the ordinary course of the Debtors' businesses.

178.    Permission to pay the Employee Medical and Insurance Benefits is imperative for those employees who are currently receiving services or who are recuperating from recent medical treatment.  In addition, these employees might not receive disability income replacement payments.  The morale of the Debtors' employees would be seriously undermined if medical or insurance benefits were interrupted. More importantly, however, the Debtors desire to avoid the risk that its employees will not be given needed treatment because health care providers have not been paid for prepetition services rendered to them and their families.  Therefore, the Debtors request authority to take all steps necessary to pay claims, premiums and administrative expenses for the Employee Medical and Insurance Benefits.

179.    In addition to the benefits described herein, the Debtors offer flexible spending accounts ("FSA").  These are two types of FSA accounts offered: health care reimbursement and dependent care.  Under the health care reimbursement FSA, employees can pay with pre-tax

dollars for certain IRS-approved medical care expenses not covered by insurance, including deductibles and co-pays.  Each Employee, after one year of employment, can elect up to a $5000 pre-tax benefit per year.  Each Employee, after three months of employment, can elect up to $4,750 for dependent care flexible spending.   Under the dependant care FSA, the Debtors prefund $250 for each employee.   The annual maximum employee contribution is $4,750. Approximately 150 employees participate in the FSA plan per year. The Debtors believe that these programs are important to maintaining Employee morale and assisting in the retention of the Debtors' workforce.  The cost of such programs for the Debtors each month is negligible. The Debtors believe that failing to honor such programs would have an adverse affect on the Debtors' Employees.  The Debtors request authority to continue such programs in their sole discretion and make payments pursuant to such programs in the ordinary course of business. As part of the foregoing relief, the Debtors also seek authorization to pay all Employee federal and state withholding and payroll-related taxes relating to prepetition periods including, but not limited to, all withholding taxes, Social Security taxes, unemployment taxes, Medicare taxes and garnishments, as well as all other withholdings such as contributions to savings, retirement plans, insurance contributions and charitable contributions, if any (collectively, the "Withholding Obligations").

180.   The Debtors routinely withhold from Employee paychecks the Withholding Obligations, and are required to transmit these amounts to third parties.  The Debtors believe that such withheld funds, to the extent that they remain in the Debtors' possession, constitute amounts held in trust and therefore, are not property of the Debtors' bankruptcy estates.  Thus, whether or not such funds are prepetition amounts, the Debtors believe that directing such funds to the appropriate parties does not require Court approval.

181.    The Debtors' business operations depend on their ability to retain their existing skilled and dedicated employees.  Absent the relief requested in the Employee Motion, existing employees and their families will suffer undue hardship because the funds requested to be paid are needed to enable the employees and their families to meet their financial obligations and to maintain their life and health insurance.  If the requested relief is not granted, many of the Debtors' employees may seek other employment.  The Debtors ability to preserve their going concern value and to maximize the value of their assets for all creditors of their estates will be adversely affected if they are unable to retain their dedicated and loyal employees.  Accordingly, it is critical that any hardship and disruption caused by these Chapter 11 cases be minimized in order to preserve morale, maintain the Debtors' workforce and preserve the Debtors' going concern value.

182.    The relief requested in the Employee Motion will enable the Debtors to maintain their current operations without interruption, thereby preserving the value of the business, and, at the same time, maintain employee morale and maintain the employee base so critical to the Debtors' staffing business.  Without the relief requested, the Debtors' ability to preserve their going concern value and to maximize the value of their assets for all creditors of their estates will be adversely and irrevocably affected if they are unable to retain their employees.

**M.    Debtors' Emergency Motion for Authorization to Pay Prepetition Property, Sales, Use, Franchise, Trust Fund and Other Taxes and Similar Obligations**

183.    The Debtors request the Court enter an order authorizing, but not directing, the Debtors to pay prepetition sales, use, trust fund, transportation, property, and other taxes and similar obligations, as detailed herein, in the ordinary course of the Debtors' businesses.  In addition, the Debtors request that (i) to the extent Debtors have paid certain taxes which should not have been paid, the Court authorize the Debtors to seek a refund of such taxes, and (ii) to the

extent that the Debtors dispute any such pre-petition tax, the Court authorize the Debtors to set aside, in a segregated account, funds to pay the subject tax until a final determination is made as to whether the Debtors are obligated to pay the subject tax.

184.    In connection with the operation of their businesses, the Debtors (a) incur certain taxes by various taxing authorities (collectively the "Taxes"); (b) are responsible for the collection of certain Taxes; and (c) are charged fees, licenses, and other similar charges and assessments by various licensing authorities (collectively the "Fees"). The Taxes and Fees are paid to various taxing and licensing authorities (the "Authorities") on a periodic basis (whether monthly, quarterly, or yearly) that is established for each particular Tax or Fee.

185.    As of the Petition Date, the Debtors estimate that the Debtors have incurred or collected approximately $114,000 of pre-petition Taxes and fees that are owed (but have not yet been paid) to the Authorities.

186.    If the Taxes and Fees are not paid immediately, I am informed that some, if not all, of the Authorities may, pursuant to Bankruptcy Code § 362(b)(9), cause the Debtors to be audited and subjected to various administrative proceedings.  Such audits and administrative proceedings and the accompanying disruption in business activities would materially and adversely affect the Debtors' reorganization prospects and unnecessarily divert the Debtors' attention away from these cases.  Moreover, while reserving the right to argue to the contrary in particular cases, the Debtors believe that the Debtors generally do not have any legal or equitable interest under Bankruptcy Code § 541(a)(1) in funds held by it and due in respect of the Taxes and Fees.

187.    Accordingly, the Debtors request that the Debtors be authorized, but not directed, to pay the Taxes and Fees to the relevant Authorities in the ordinary course of business.  Nothing

herein, however, shall preclude the Debtors from contesting, in their sole discretion, the validity and amount of any Taxes and Fees under bankruptcy or non-bankruptcy law.

188.    The Debtors further request that all depositories on which checks were drawn in payment of pre-petition amounts to the Authorities be directed to clear such checks as and when presented for payment, if appropriate.

189.    The timely payment of Taxes and Fees is therefore necessary and in the best interest of the Debtors' estates.

**N.    Debtors' Emergency Motion for Authorization to (I) Continue to Administer Insurance Policies and Agreements Relating Thereto; (II) Continue Certain Premium Financing Agreements Relating Thereto; and (III) Honoring of Certain Obligations in Respect Thereof (the "Insurance Motion")**

190.    The Debtors maintain a Workers' Compensation and Employers Liability policies (the "Workers' Compensation and Employers Liability Insurance") with The Charter Oak Fire Insurance Co. and with Travelers Property Casualty Company of America, both member companies of the Travelers Companies, Inc.  The Workers' Compensation and Employers Liability Insurance policies in effect as of the Petition Date are listed on Exhibit "A" to the Insurance Motion.  The Workers' Compensation and Employers Liability policies provide for payment of annual deposit premiums via installment payments, with separate annual adjustments due for policy terms 12/1/2002-11/30/2003 through current year in accordance with specific written Workers' Compensation Agreements, typically due in August each year.   All premiums and program payments for current policy term due under the Workers' Compensation and Employers Liability policies are paid through July 31, 2010.  The Workers' Compensation and Employers Liability policies are subject to a Self-Insured Retention ("SIR") / Retained Amount of $500,000 for each claim.  In addition, the Debtors pay set rates based on monthly payroll to

the States of Wyoming, Ohio and Washington per the laws of those states.  In those states, all Workers' Compensation claims are paid from the state funds.

191.    The Debtors maintain a business automobile liability policy (the "Business Auto Liability Insurance") with Travelers Property Casualty Company of America, for hired and non-owned automobile liability insurance.   The Business Auto Liability Insurance policy is in effect as of the Petition Date and listed on Exhibit "A" to the Insurance Motion  The Business Auto Liability Insurance policy provides for payment for premiums on an annual basis.  All premiums due under the Business Auto Liability Insurance policy are paid through July 31, 2010.  The Business Auto Liability insurance is subject to a Deductible of $100,000 per Accident.

192.    The Debtors maintain a commercial package liability policy (the "Commercial Package Liability Insurance") with Travelers Property Casualty Company of America, for general liability, employee benefits liability and commercial property insurance for properties not specifically insured separately.   The Debtors maintain a commercial property insurance policy (the "Commercial Property Insurance") with Travelers Property Casualty Company of America for certain properties in the states of Florida, New York and Texas.  The Commercial Package Liability Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The Commercial Package Liability Insurance policy and the Commercial Property Insurance policy each provides for payment of premiums on an annual basis. Each of the policies are billed to Debtor under a monthly installment plan.   All premiums under the Commercial Package Liability Insurance policy and the Commercial Property Insurance policy are paid through July 27, 2010.

193.    The Debtors maintain three healthcare professional liability policies (collectively, the "Healthcare Professional Liability Insurance"), two with Lexington Insurance Company and

the third with National Union Fire Insurance Co.  The first of the Healthcare Professional Liability Insurance policies covers nurses and allied health professional staffing, and excludes nurse midwives and medical doctors as well as certified registered nurse anesthetists who are placed by a specific branch as Locum Tenens.  The second Healthcare Professional Liability Insurance policy covers certified registered nurse anesthetists, nurse practitioners, physicians assistants and anesthesiologists (medical doctors practicing anesthesiology only) placed as Locum Tenens.  Each of the two foregoing Healthcare Professional Liability Insurance policies is subject to a SIR of $1.0 million per claim. The third Healthcare Professional Liability Insurance policy covers certified registered nurse anesthetists, nurse practitioners and physicians assistants, who may be subject to the provisions of a State's mandatory Patient Compensation Fund.  The Healthcare Professional Liability Insurance policies are in effect as of the Petition Date and are listed Exhibit "A" attached to the Insurance Motion.  The Healthcare Professional Liability Insurance policies provide for the periodic payment of premiums on an annual basis. All premiums under the Healthcare Professional Liability Insurance policies are paid through July 27, 2010.

194.    The Debtors maintain an endorsement under a previous professional liability insurance policy (the "Professional Liability Insurance-Tail") with Lexington Insurance Company, which covers claims arising from Wrongful Acts of radiologist physicians occurring on or after April 7, 1997 and prior to February 15, 2003, for claims reported on or after May 7, 2006.  The Professional Liability Insurance-Tail policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The Professional Liability Insurance-Tail endorsement was paid under a previous policy term.

195.    The Debtors maintain a miscellaneous professional liability insurance policy (the "Miscellaneous Professional Liability Insurance") with Twin City Fire Insurance Company, for miscellaneous errors or omissions of clinical resource services.  The Miscellaneous Professional Liability Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The Miscellaneous Professional Liability Insurance policy provides for the payment of premiums on an annual basis.  All premiums under the Miscellaneous Professional Liability Insurance policy are paid through July 27, 2010.

196.    The Debtors maintain an excess healthcare professional and umbrella liability policy (the "Excess Healthcare Professional and Umbrella Liability Insurance") with Lexington Insurance Company.  The Excess Healthcare Professional and Umbrella Liability Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The Excess Healthcare Professional and Umbrella Liability Insurance policy provides for the payment of premiums on an annual basis.  All premiums under the Excess Healthcare Professional and Umbrella Liability Insurance policy are paid through July 27, 2010.

197.    The Debtors maintain certain directors and officers liability policies (collectively, the "D&O Liability Insurance") with National Union Fire Insurance Company Pittsburgh, PA., Zurich American Insurance Co. and XL Specialty Insurance Co.  The D&O Liability Insurance policies are in effect as of the Petition Date and are listed on Exhibit "A" attached to the Insurance Motion.  The D&O Liability Insurance policies provide for the payment of premiums on an annual basis.  All premiums under the D&O Liability Insurance policies are paid through April 17, 2011.

198.    The Debtors maintain an employment practices liability policy (the "Employment Practices Liability Insurance") with Lexington Insurance Company.  The Employment Practices

Liability Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion. The Employment Practices Liability Insurance policy provides for the payment of premiums on an annual basis. All premiums under the Employment Practices Liability Insurance policy are paid through July 18, 2010. The Employment Practices Liability Insurance policy is subject to a Retention of $100,000 per claim.

199.    The Debtors maintain a fiduciary liability insurance policy (the "Fiduciary Liability Insurance") with National Union Fire Insurance Company of Pittsburgh, PA. The Fiduciary Liability Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion. The Fiduciary Liability Insurance policy provides for the payment of premiums on an annual basis. All premiums under the Fiduciary Liability Insurance policy are paid through July 18, 2010.

200.    The Debtors maintain a special crime insurance policy (the "Special Crime Insurance") with U.S. Specialty Insurance Co. The Special Crime Insurance is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion. The Special Crime Insurance provides for the payment of premiums on an annual basis All premiums under the Special Crime Insurance policy are paid through July 18, 2010.

201.    The Debtors maintain a crime insurance policy (the "Crime Insurance" with Federal Insurance Company. The Crime Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion. The Crime Insurance policy provides for the payment of premiums on an annual basis. All premiums under the Crime Insurance policy are paid through July 18, 2010.

202.    The Debtors maintain a general staffing and errors and omissions policy (the "General Staffing and E&O Insurance") with Federal Insurance Company. The General Staffing

and E&O Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The General Staffing and E&O Insurance policy provides for the payment of premiums on an annual basis.  All premiums under the General Staffing and E&O Insurance policy are paid through December 1, 2010.

203.    The Debtors maintain a commercial excess and umbrella policy (the "Commercial Excess and Umbrella Insurance") with Federal Insurance Company.  The Commercial Excess and Umbrella Insurance policy is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The Commercial Excess and Umbrella Insurance policy provides for the payment of premiums on an annual basis.  All premiums under the Commercial Excess and Umbrella Insurance policy are paid through December 1, 2010.

204.    The Debtors main two license and permit bond policies (collectively, the "License/Permit Bonds Insurance") with Travelers Casualty & Surety Company of America.  The License/Permit Bonds Insurance is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The License/Permit Bonds Insurance policies provides for the payment of premiums on an annual basis.  All premiums under the License/Permit Bonds Insurance policies are paid through March 30, 2011 and April 7, 2011.

205.    The Debtors maintain two flood insurance policies (collectively, the "Flood Insurance") for contents only, with Fidelity National Indemnity Insurance Company, for the Debtors' corporate headquarters premises located at 901 Yamato Road, Boca Raton, FL and for the premises located at 4525 Weaver Parkway, Warrenville, IL.  The Flood Insurance is in effect as of the Petition Date and is listed on Exhibit "A" attached to the Insurance Motion.  The Flood Insurance policies provide for the payment of premiums on an annual basis.  All premiums under the Flood Insurance policies are paid through March 3, 2011 and March 6, 2011.

206.    The Debtors use BankDirect Capital Finance to finance the (i) Healthcare Professional Liability Insurance; (ii) Excess Healthcare Professional and Umbrella Liability Insurance; (iii) Miscellaneous Professional Liability Insurance; (iv) Professional Liability Insurance-Tail; (v) Crime Insurance; (vi) Employment Practices Liability Insurance; (vii) Fiduciary Liability; and (viii) Special Crime Insurance policies.  Medical Staffing Network Holdings, Inc. has entered into insurance premium financing agreements (each an "Agreement" and collectively, the "Agreements") with BankDirect Capital Finance with respect to the (i) Healthcare Professional Liability Insurance; (ii) Excess Healthcare Professional and Umbrella Liability Insurance; (iii) Miscellaneous Professional Liability Insurance; (iv) Professional Liability Insurance-Tail; (v) Crime Insurance; (vi) Employment Practices Liability Insurance; (vii) Fiduciary Liability; and (viii) Special Crime Insurance policies.  Pursuant to the Agreement dated February 23, 2010, the Debtors make nine (9) monthly payments to BankDirect Capital Finance of $94,435.35, which amount includes principal and interest, with interest fixed at 4.75%.  Pursuant to the Agreement dated April 15, 2010, the Debtors make eight (8) monthly payments to BankDirect Capital Finance in the amount of $25,450.04, which amount includes principal and interest, with interest fixed at 4.75%.  Attached to the Insurance Motion as Composite Exhibit "B" are copies of the Agreements with BankDirect Capital Finance.

207.    In the exercise of my reasonable business judgment, I believe it is in the best interest of the Debtors and their creditors to (a) continue to administer the Workers' Compensation and Employers Liability Insurance, Business Auto Liability Insurance, Commercial Package Liability Insurance, Commercial Property Insurance, Healthcare Professional Liability Insurance, Professional Liability Insurance-Tail, Miscellaneous Professional Liability Insurance, Excess Healthcare Professional and Umbrella Liability

Insurance, D&O Liability Insurance, Employment Practices Liability Insurance, Fiduciary Liability Insurance, Special Crime Insurance, Crime Insurance, General Staffing and E&O Insurance, Commercial Excess and Umbrella Insurance, License/Permit Bonds Insurance and Flood Insurance policies, (b) continue to pay certain claims, deductibles and/or premiums to the extent they may become due and payable according to the terms of such policies; and (c) continue to pay BankDirect Capital Finance's monthly fee for financing the (i) Healthcare Professional Liability Insurance; (ii) Excess Healthcare Professional and Umbrella Liability Insurance; (iii) Miscellaneous Professional Liability Insurance; (iv) Professional Liability Insurance-Tail; (v) Crime Insurance; (vi) Employment Practices Liability Insurance; (vii) Fiduciary Liability; and (viii) Special Crime Insurance. The Debtors further request authority to pay certain amounts as they come due under the various insurance policies in the ordinary course of their businesses.

208.    All of the insurance policies maintained by the Debtors in the course of their business contain a self insured retention ("SIR") provision, ranging from $100,000 to $1,000,000, depending on the type of coverage. This means the Debtors are self insured to a certain extent, in that they are responsible for paying the SIR claim under each policy. To the extent that the claim for the SIR arose prior to the Petition Date, the claim for the SIR is a general unsecured claim.

209.    For example, the Healthcare Professional Liability Insurance policies cover liability claims arising from negligent acts of the Debtors nurses and other medical personnel. It is imperative that the Debtors have the ability to  honor the SIR claims under these policies, as their customers require all temporary staffing personnel provided by the Debtors to be fully insured. It would adversely impact the Debtors business if the Debtors did not have the ability to

honor  SIR claims  The Debtors reserve the right to not pay the SIR claims in certain cases where liability is disputed, or where there is no business reason to pay the SIR claim.

210.    The Debtors submit that the amounts proposed to be paid with respect to prepetition periods under the Debtors' insurance policies are small when compared with the harm that would be occasioned if employees needed to further the rehabilitation effort left or if a significant claim arose absent insurance coverage.  For all the reasons stated in the Insurance Motion, the maintenance of the insurance policies, and the payment of all premiums and amounts and continuance of the various administration programs, serve the best interests of the bankruptcy estate and is required by the United States Trustee's guidelines and federal and state law as a condition of operations.  The relief requested in the Insurance Motion is in the best interests of the Debtors and their estates, and I have been advised by counsel that similar relief has been granted in other large Chapter 11 cases in this District.

211.    To the extent that any of the insurance policies may be deemed executory contracts, the Debtors do not at this time seek authority to assume the contracts.  The Debtors request only authorization to continue the programs, pay claims in accordance with the programs, and pay such premiums and administrative expenses as may be necessary to keep the policies in force.  The Debtors have also requested authority to pay for various insurance coverages related to employee benefits in the Employee Motion.  The Debtors submit that the entry of an Order authorizing the relief sought in the Insurance Motion will be in the Debtors' best interests and those of their creditors.

**O.** **Debtors' Emergency Motion (I) for Authorization to (A) Obtain Postpetition Secured Financing Pursuant to 11 U.S.C. §§105, 361, 362, and 364, and (B) Utilize Cash Collateral Pursuant to 11 U.S.C. § 363; (II) for Order Granting Adequate Protection to Prepetition Secured Parties Pursuant to 11 U.S.C. §§ 361, 362, 363 and 364, and (III) to Schedule a Final Hearing Pursuant to Bankruptcy Rule 4001**

212.    As explained above MSN, Inc., as borrower, and the other Debtors, as guarantors, are parties to a senior secured credit facility (the "Prepetition First Lien Secured Facility") provided by GECC, as agent ("Prepetition First Lien Agent"), and certain lenders (the "Prepetition First Lien Lenders") pursuant to the Amended and Restate Credit Agreement, dated as of March 12, 2009 (as amended or otherwise modified, the "Prepetition First Lien Credit Agreement"), consisting of (a) an $18.0 million revolving senior credit facility, and (b) an $81.0 million senior secured term loan (collectively, with all loans and liabilities in respect of the Prepetition First Lien Secured Facility, the "Prepetition First Lien Secured Obligations").  The Prepetition First Lien Secured Obligations are secured by first priority liens and security interests on substantially all of the Debtors' assets (the "Prepetition First Lien Secured Facility Liens"), which liens and security interests are subject solely with respect to priority, to the Prepetition Senior Encumbrances, if any.

213.    MSN, Inc., as borrower, and the other Debtors, as guarantors, are parties to a senior secured credit facility (the "Prepetition Second Lien Secured Facility" and, together with the Prepetition First Lien Facility, the "Prepetition Secured Facilities") provided by NexBank, SSB, as agent (the "Prepetition Second Lien Agent" and, together with the Prepetition First Lien Agent, the "Lien Agents"), and certain lenders (the "Prepetition Second Lien Lenders" and, together with the Prepetition First Lien Lenders, the "Prepetition Lenders") pursuant to the Amended and Restated Second Lien Credit Agreement dated as of March 12, 2009, consisting of a $25.0 million senior secured second lien term loan (the "Prepetition Second Lien Credit Agreement" and, together with the Prepetition First Lien Credit Agreement, the "Prepetition

Credit Agreements"). All loans and other liabilities in respect of the Prepetition Second Lien Secured Facility are referred to herein as the "Prepetition Second Lien Secured Obligations" and, together with the Prepetition First Lien Secured Obligations, the "Prepetition Secured Obligations". All Prepetition Second Lien Secured Obligations are secured by second priority liens and security interest in substantially all of the Debtors' assets (the "Prepetition Second Lien Secured Facility Liens" and, together with the Prepetition First Lien Secured Facility Liens, the "Prepetition Secured Facilities Liens").

214.    The Debtors, the First Lien Agent and the Second Lien Agent are parties to that certain Intercreditor Agreement, dated as of July 2, 2007 (the "Intercreditor Agreement") that governs the respective rights, obligations and priorities of the First Lien Lenders and the Second Lien Lenders with respect to their relative interests in the Prepetition Collateral and certain other matters, including, without limitation, the DIP Facility. Pursuant to the Intercreditor Agreement, the First Lien Security Interests are senior in priority to the Second Lien Security Interests on all Prepetition Collateral.

215.    The Debtors do not have working capital or financing to operate their businesses. Accordingly, they require post-petition financing and the ability to use the all of the cash generated from the operation, sale, disposition or other realization of any assets or property subject to the Prepetition Liens, wherever located, and which constitutes cash collateral as defined in section 363 of the Bankruptcy Code (the "Cash Collateral"). The need for post-petition financing and the use of the Prepetition Lenders' Cash Collateral is immediate. In the absence of such use, serious and irreparable harm to the Debtors and their estates will occur.

216.    The success of these chapter 11 cases and the stabilization of the Debtors' operations and business at the outset thereof depend upon the Debtors' ability to continue to fund

the operations of their businesses and permit them to meet payroll and other operating expenses, as well as the Debtors' ability to preserve the going concern value of their businesses.

217.    The Debtors have been informed that the DIP Lender is willing to provide the Post-Petition Advances under the  Senior Secured Priming and Superpriority Debtor-In-Possession Credit Agreement among Medical Staffing Network, Inc., as a Debtor-In-Possession, Medical Staffing Holdings, LLC and Medical Staffing Network Holdings, Inc., Each as a Debtor and Debtor-In-Possession, the Lenders Party hereto and General Electric Capital Corporation, as Administrative Agent and Collateral Agent (the "DIP Credit Agreement"), subordinate their superpriority claims, security interests and liens to the Carve-Out, and consent to the Debtors' use of Cash Collateral, subject to the conditions set forth in the Interim Order and in the Loan Documents, including, without limitation, the provisions of the Interim Order assuring that the security interests and liens pursuant to section 364(c) and (d) of the Bankruptcy Code and the various claims, superpriority claims, and other protections granted pursuant to the Interim Order and the DIP Loan Documents will not be affected by any subsequent reversal or modification of the Interim Order, or by any other order that is applicable to the DIP Loan Documents (including with respect to the Cash Collateral), as provided in section 364(e) of the Bankruptcy Code.

218.    The Debtors believe that the DIP Lender has acted in good faith in consenting to and in agreeing to provide the financing under the DIP Credit Agreement, and the reliance of the DIP Lender on the assurances referred to above is in good faith.  The DIP Lender and the Debtors have negotiated at arms' length and in good faith regarding the DIP Credit Agreement and the Debtors' use of Cash Collateral to fund the continued operations of the Debtors.  The DIP Lender will not agree to provide the DIP Credit Agreement, or agree to the Debtors' use of

Cash Collateral, absent the approval of the terms and conditions set forth in the DIP Loan Documents and the Interim Order.

219.    Given the extent of outstanding secured and unsecured indebtedness owing by the Debtors and the extreme time constraints resulting from the Debtors' liquidity problems, the range of realistic financing alternatives was extremely limited.[9]  The Debtors submit that the terms and conditions set forth in the DIP Loan Documents, taken as a whole, are fair and reasonable under the circumstances; reflect the Debtors' and their respective directors' exercise of prudent business judgment consistent with their fiduciary duties; and are supported by reasonably equivalent value and fair consideration.

220.    The Prepetition First Lien Lender is entitled to receive adequate protection, pursuant to sections 361, 362, 363 and 364 of the Bankruptcy Code, for any diminution in the value of the Prepetition Collateral, including Cash Collateral, resulting from, without limitation: (i) the Debtors' use of such Prepetition Collateral, including Cash Collateral, (ii) the sale or lease of such Prepetition Collateral other than Cash Collateral, (iii) the automatic stay imposed by section 362 of the Bankruptcy Code, (iv) the priming liens granted to the DIP Lender, and/or (v) the subordination to the Carve-Out.  In view of the foregoing, the Debtors respectfully request entry of an Interim Order in substantially the form attached to the motion as Exhibit 1.

221.    The Prepetition First Lien Lenders have consented to the use of Cash Collateral, provided that the Prepetition First Lien Lenders receive adequate protection, and provided such use is: (i) consistent with the purposes set forth in the Interim Order and the DIP Credit

---

[9] The Debtors submit that efforts to obtain financing from other sources would have been futile given (a) the Debtors' capital structure and the inability of the Debtors to successfully obtain financing that primes the liens of the prepetition lenders, as the Debtors could not establish adequate protection of such liens in that circumstance, and (b) the paucity of credit in the market generally.

Agreement, (ii) in accordance with the budget (the "<u>Budget</u>")[10] in substantially the form as attached to the Interim Order, and (iii) not prohibited by the Interim Order or the DIP Credit Agreement.

222.    As adequate protection to the Prepetition First Lien Lenders for any diminution in value of the Prepetition Collateral resulting from the Debtors' use of Cash Collateral after the Petition Date or the Debtors' use, sale or disposition of the other Prepetition Collateral, the Debtors propose to grant to the Prepetition First Lien Lenders: superpriority claims and valid, binding and enforceable liens (the "Adequate Protection Liens") in all Collateral to secure an amount that is equal to the sum of the aggregate diminution, if any, subsequent to the Petition Date, in the value of the Prepetition Collateral, caused by (i) the aggregate reduction in the amount of Prepetition Collateral available to satisfy the Prepetition Obligations as a consequence of depreciation, use, sale, loss, decline in market price or otherwise of the Prepetition Collateral, or (ii) the sum of the aggregate amount of all cash proceeds of Prepetition Collateral or the aggregate fair market value of all non-cash Prepetition Collateral that is used to satisfy any other expenses of, or claims against, Debtors other than the Prepetition Obligations.

223.    The Adequate Protection Liens proposed to be granted to the Prepetition First Lien Lenders will be subject only to (i) the Carve-Out, (ii) the superpriority claims and liens on the collateral which secures obligations owed to the DIP Lender under the DIP Credit Agreement, and (iii) and any Prepetition Senior Permitted Encumbrances.

224.    The Debtors submit that the DIP Claims and Adequate Protection Liens are necessary to provide some measure of adequate protection to the Prepetition First Lien Lenders. Moreover, assuming the Court grants such adequate protection to the Prepetition First Lien Lenders, the Prepetition First Lien Lenders have consented to the use of Cash Collateral.

---

[10] The Budget is attached as Exhibit A to the Interim Order.

Accordingly, pursuant to sections 363(c)(2) and (e) of the Bankruptcy Code, the Debtors submit that use of Cash Collateral is proper under the circumstances, and they request authorization to use Cash Collateral based on the grounds set forth herein.

225.    Moreover, the Debtors have satisfied the requirements of sections 364(c) and (d) because, under current circumstances, they are unable to obtain credit otherwise.  The liens granted to the DIP Lender shall, subject to Carve-Out, be (a) first priority liens on all property that is not subject to properly perfected liens, and (b) a second priority lien on all property that is subject to Prepetition Senior Permitted Encumbrances.  The Debtors believe that by operation of Section 506(b) of the Bankruptcy Code any claims secured by liens that are junior to the Prepetition Senior Permitted Encumbrances are undersecured *en toto* because the value of the collateral.

226.    The Debtors firmly believe that the financing to be provided as contemplated by the DIP Credit Agreement represents the best — and only — financing available to them at this time, warranting approval of the DIP Loan Documents and proposed Interim Order on an emergency basis, pending a final hearing thereon (the "Final Hearing").

227.    In the exercise of their business judgment, the Debtors have concluded that the DIP Lender, due to its existing long-term relationship in its capacity as the Prepetition Lender, is the only lender able to offer a post-petition credit facility that meets the Debtors' working-capital needs on the terms, and within the time frame, required by the Debtors.  I have been advised by counsel that bankruptcy courts routinely defer to the business judgment of the debtors on most business decisions, including borrowing decisions.

228.    In the instant case, the Debtors' proposed use of Cash Collateral and the granting of the priming liens to the DIP Lender (which will be subject to the Carve-Out and Prepetition

Senior Permitted Encumbrances as set forth in the proposed Interim Order) are essential to maintain the value of the Prepetition Collateral and the Debtors' estates.   Further, access to the proceeds of the DIP Facility and use of the Cash Collateral will preserve the value of the Debtors' businesses to the greatest extent practicable under the circumstances.

229.    More fundamentally, unless the Debtors have access to the Cash Collateral and the DIP Credit Agreement, they will not have sufficient funds to continue to operate their businesses and to preserve their assets.  Indeed, in the absence of such financing, they will not continue as a going concern, resulting in a dramatic decrease in the value of the Prepetition Collateral and the overall estates.  Accordingly, the use of the Cash Collateral and DIP Credit Agreement to avert an immediate shutdown and liquidation of the Debtors, and to enable the Debtors to effect a preservation of the value of the Prepetition Collateral is clearly in the best interests of the Debtors' estates.

230.    Based on the circumstances present here, I  firmly believe that the financing sought is the best financing available, and that it is in the best interests of their estates and creditors to enter into the DIP Credit Agreement.  The Debtors also rely upon the Declaration of Leon Szlezinger in support of their motion for DIP Financing and for entry of the Interim Order.

231.    The proposed Interim Order contemplates a modification of the automatic stay imposed by section 362(a) of the Bankruptcy Code to the extent necessary to implement and effectuate the terms and conditions of the Interim Order.  Moreover, under the terms of the proposed Interim Order, upon the occurrence and during the continuance of any event of default as defined in the DIP Loan Documents ("Event of Default"), and if such Event of Default is not cured after five (5) business days written notice of the Event of Default by the DIP Lender to the Debtors and their counsel, counsel to the Creditors' Committee, if one is appointed, and to the

U.S. Trustee, the DIP Lender and the Prepetition First Lien Lender may file a motion to terminate the automatic stay.  The Interim Order further provides that the Court shall conduct a hearing on an expedited emergency basis, but not more than three (3) days following the filing of the motion, in order to act on the motion to terminate the automatic stay under section 362 for the purpose of allowing the DIP Lender and the Prepetition First Lien Lender to exercise all of their rights and remedies under the Interim Order, the Loan Documents, and applicable law. Finally, the Interim Order provides that the only issue that may be raised or addressed at such hearing is whether an Event of Default has occurred.  I have been advised by counsel that stay modifications of this sort are ordinary and typical features under these circumstances and, in the Debtors' business judgment, are reasonable.

**P.    Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois, LLC's Emergency Motion for Authorization to (i) Continue Providing Services Pursuant to the Debtors' OneSource Contracts and OneSource Subcontracts, And (ii) Continue Management of Subcontractor Payments Pursuant to Escrow Agreement**

232.    The Debtors seek entry of an order authorizing them to continue providing services to their clients pursuant to the Debtors' OneSource Contracts and OneSource Subcontracts (as hereinafter defined), and continue management of the Subcontractor Payments pursuant to an Escrow Agreement.  The Debtors maintain exclusive contract relationships ("OneSource Contracts") with approximately 30 hospitals and numerous government healthcare facilities ("OneSource Clients") nationwide.  The OneSource Contracts appoint the Debtors as the exclusive managed services provider responsible for receiving all requests for contingency healthcare professionals and/or supplemental labor for the OneSource Clients.  Pursuant to these contracts, the Debtors receive orders from their OneSource Clients and find suitable professionals to fill the order requests.  The Debtors first fill the order requests via their existing

pool of the Debtors' employees.  If the Debtors' employees are unavailable, or the Debtors have fewer available employees than the order requires, the order is then filled through various subcontractors also known as staffing partners (the "OneSource Subcontractors") with whom the Debtors have a OneSource subcontract ("OneSource Subcontract").  The Debtors are responsible for managing the scheduling of all contingency labor shifts, credentials and reports pertaining to both the Debtors' employees and subcontractor employees.

233.    The OneSource Client receives a single consolidated invoice which reflects monies due to the Debtors and their subcontractors.  Pursuant to an escrow agreement (the "Escrow Agreement") entered into on April 30, 2010 between the Debtors and CBIZ Goldstein Lewin as escrow agent (the "Escrow Agent"), the OneSource Client has been directed to remit payment on the invoice directly to an escrow account at Bank of America (the "Escrow Account") established by the Escrow Agent.  Within one business day after payment is received, the Escrow Agent must so notify the Debtors.  The Debtors then have up to 2 business days to reconcile the funds received against the invoice and provide disbursement instructions to the Escrow Agent.  Pursuant to the disbursement instructions, and within one business day of receipt of the instructions, the Escrow Agent then disburses funds from the Escrow Account to pay the Debtors for their employees and their administrative fee per the OneSource Subcontract (typically ranging from 3-9% for each OneSource Subcontractor) and distributes the remaining funds to the OneSource Subcontractor (the "Subcontractor Payments").  Payment terms for OneSource Contracts with a client typically range from 30-45 days.   All payments from OneSource Clients are made to the Escrow Account.  A copy of the Escrow Agreement is attached as Exhibit "A" to the motion.

234.    The Debtors maintain over 100 OneSource Subcontracts which support the OneSource Contracts nationwide.   A listing of the OneSource Subcontractors is attached as Exhibit "B" to the motion.

235.    By way of example, a OneSource Client would put in an order for 15 nurses.  The Debtors would try to fill the order from their existing employees.  If the Debtors had only 11 available nurses, they would fill the additional 4 spots from their OneSource Subcontractors and the OneSource Client would receive a single invoice for the 15 nurses.  The OneSource Client would remit payment to the Escrow Account.  The Escrow Agent would then notify the Debtors of the payment and the Debtors would reconcile the funds received against the invoice.  The Debtors would then provide disbursement instructions to the Escrow Agent to send the payment for the Debtors' 11 nurses, as well as the administrative fee of 3-9% per the OneSource Subcontract, to the Debtors, and disburse the remaining Subcontractor Payments directly to the OneSource Subcontractor.

236.    On April 30, 2010, the Debtors' First Lien Lenders entered into the Limited Waiver to the Amended Credit Agreement, as further explained above.  Pursuant to the Limited Waiver, the lenders released any lien they may have on that portion of funds deposited into the Escrow Account to the extent such funds are remitted to the OneSource Subcontractors in accordance with the terms of the Escrow Agreement.

237.    The Debtors' relationships with its OneSource clients, and the revenues generated from the OneSource Contracts and OneSource Subcontracts, are a critical aspect of the Debtors' business.  Any disruption in the operation of the OneSource Contracts would cause irreparable harm to the operation of the Debtors' business.

238.    The OneSource contracts represent employment opportunities for not only the Debtors employees but for subcontractor employees nationwide. Any disruption in the operations of the OneSource Contracts and the Subcontractor Payments process could cause irreparable harm to the employees of the Debtor and their Subcontractors.

239.    The OneSource Contracts remain the sole source for locating healthcare professionals for the OneSource Clients. Any disruption in the operations of the OneSource Contracts could cause irreparable harm to the OneSource Clients which may jeopardize and or disrupt patient care at their facilities nationwide.

240.    I have  been advised by the Debtors that, prior to the Petition Date, a number of the OneSource Subcontractors expressed their concerns to the Debtors that, in the event a bankruptcy petition was filed, there would be a disruption in the Subcontractor Payments. Similar concerns were expressed by OneSource Clients who were concerned about a possible disruption in the fulfillment of their staffing needs.  Due to these concerns, the Debtors entered into the Escrow Agreement.  In order to further assure the OneSource Subcontractors that the management of Subcontractor Payments will not be affected by the bankruptcy filing and may continue to operate as they did prior to the Petition Date, and in order to maintain the Debtors' critical relationships with its OneSource Subcontractors and OneSource Clients, the Debtors seek an order from the Court authorizing the Debtors to continue providing services pursuant to the OneSource Contracts and OneSource Subcontracts, including the management of the Subcontractor (both Pre and Post-Petition) Payments through the Escrow Agreement.

**Q.    Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois, LLC's Emergency Motion for Authorization to Continue Providing Services Pursuant to the Debtors' Government Prime Contract Accounts and Government Prime Contract Account Subcontracts, Including Management of Subcontractor Payments**

241.    The Debtors seek entry of an order authorizing them to continue providing services to their clients pursuant to the Debtors' Government Prime Contract Accounts and Government Account Subcontracts (as hereinafter defined), including the management of the Government Account Subcontractor Payments.    The operation of the Government Prime Contract Accounts are, up through the invoicing process, similar to the Debtors' OneSource Contracts but, instead of hospitals, the clients are numerous government healthcare facilities ("Government Clients") nationwide.    The Government Clients appoint the Debtors as the exclusive managed services provider responsible for receiving all requests for contingency healthcare professionals and/or supplemental labor for the Government Clients.    Pursuant to these contracts, the Debtors receive orders from their Government Clients and find suitable professionals to fill the order requests.    The Debtors first fill the order requests via their existing pool of the Debtors' employees.    If the Debtors' employees are unavailable, or the Debtors have fewer available employees than the order requires, the order is then filled through various subcontractors also known as staffing partners (the "Government Account Subcontractors") with whom the Debtors have a Government Account subcontract ("Government Account Subcontract").    The Debtors are responsible for managing the scheduling of all contingency labor shifts, credentials and reports pertaining to both the Debtors' employees and subcontractor employees.

242.    The Government Client receives a single consolidated invoice which reflects monies due to the Debtors and their subcontractors.    Upon receipt of payment from the client, the Debtors deduct payment for the services for their employees, deduct an administrative fee per the

Government Account Subcontract (typically ranging from 3-9% for each Government Account Subcontractor) and then distribute the remaining funds directly to the Government Account Subcontractor accordingly (the "Government Account Subcontractor Payments"). The Debtors maintain approximately ten Government Account Subcontracts which support the Government Accounts nationwide.  A listing of the Government Account Subcontractors is attached as Exhibit "A" to the motion.

243.    Payment terms for Government Accounts with a client typically range from 20-60 days.  Upon receipt of payment from the Government Client, the Debtors promptly make the Government Account Subcontractor Payments to their Government Account Subcontractors within the terms of the Government Account Subcontract Contract, which vary from 1-14 days.

244.    All payments from Government Clients are made to the Debtors' lockbox accounts at Bank of America (the "Lockbox Accounts").  The Debtors utilize a software program that delineates the payments received from the Government Clients and reconciles the client payment against the Government Account Subcontractor receivables.  Once the reconciliation process is completed, the Government Account Subcontractor is then paid for all undisputed amounts due.

245.    Funds for the Government Account Subcontractor Payments are transferred from the Lockbox Accounts to the Debtors' Master Funding Accounts at Bank of America.  The Government Account Subcontractor Payments are made either via check from the Debtors' accounts payable accounts at Bank of America (the "Accounts Payable Accounts") or via wire from Master Funding Account #9422.  Once the checks are presented for payment to the bank, the Debtors transfer funds to the Accounts Payable Accounts sufficient to cover the presented checks.

246.    In 2009, Government Accounts represented approximately $39 million in fiscal year 2009 annual billings to clients nationwide. Approximately $19 million of this amount are direct revenues of the Debtors.  Of the remaining billings, approximately $20 million annually are Government Account Subcontractor Payments, for which the Debtors receive an administrative fee.

247.    The Debtors' relationships with its Government clients, and the revenues generated from the Government Accounts and Government Account Subcontracts, are a critical aspect of the Debtors' business.  Any disruption in the operation of the Government Accounts would cause irreparable harm to the operation of the Debtors' business.

248.    The Government Accounts represent employment opportunities for not only the Debtors employees but for subcontractor employees nationwide. Any disruption in the operations of the Government Accounts and the Government Account Subcontractor Payments process could cause irreparable harm to the employees of the Debtor and their Subcontractors.

249.    The Government Accounts remain the sole source for locating healthcare professionals for the Government Clients. Any disruption in the operations of the Government Account s could cause irreparable harm to the Government Clients which may jeopardize and or disrupt patient care at their facilities nationwide.

250.    I have  been advised by the Debtors that, prior to the Petition Date, a number of the Government Account Subcontractors expressed their concerns to the Debtors that, in the event a bankruptcy petition was filed, there would be a disruption in the Government Account Subcontractor Payments.  Similar concerns were expressed by Government Clients who were concerned about a possible disruption in the fulfillment of their staffing needs.  Due to the manner in which contracts with Government Clients must operate, the Debtors were unable to

establish an escrow arrangement for management of the payments for the Government Accounts. Therefore, in order to assure the Government Account Subcontractors that the management of Government Account Subcontractor Payments will not be affected by the bankruptcy filing and may continue to operate as they did prior to the Petition Date, and in order to maintain the Debtors' critical relationships with its Government Account Subcontractors and Government Clients, the Debtors seek an order from the Court authorizing the Debtors to continue providing services pursuant to the Government Accounts and Government Account Subcontracts, including the management of the Government Account Subcontractor (both Pre and Post-Petition) Payments.

**R.  Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical Staffing Network of Illinois, LLC's Emergency Motion For Authorization To Continue Paying Administrative Fees and to Conduct Business Pursuant to the Clients Contract Where Debtors Provide Services as Subcontractor**

251.    In the operation of their businesses, the Debtors provide contingency healthcare professionals and other supplementary labor to several of their clients ("Clients"). The Debtors' clients manage all aspects of the contracts, including billing and payments to the Debtors as subcontractors ("Client Contracts"). It is imperative to the Debtors' business operations that this Court enter an order authorizing that the operation and management of these contracts, and payments to the Debtors' clients continue uninterrupted during these bankruptcy proceedings.

252.    Pursuant to the Client Contracts, the Debtors receive orders from their Clients and find suitable professionals to fill the order requests. There are two types of contracts where the Debtor is the subcontractor. The first is where the Client is a competitor of the Debtor. The Debtors fill the order for the competitor Client and bill that Client. The Client then bills its customer and remits the Debtors' portion of the bill less its administrative fees. The second type of contract is where the Client is a group purchasing organization ("GPO"). The Debtors fill the

order for the GPO Client and bill that Client.  The GPO Client then bills its customer, who either pays the Debtors directly, in which case the Debtors pay the GPO Client their administrative fee; or the customer of the GPO Client pays the GPO Client directly, and that Client then remits to the Debtors their portion of the bill less the Client's administrative fee.

253.    A listing of the Client Contracts is attached to the motion as Exhibit  "A." Payment terms for the Client Contracts typically range from 30-60 days.

254.    All payments from Client Contracts are made to the Debtors' lockbox accounts at Bank of America (Bank of America Account #s 0358, 3810, 1982, and 6893) (the "Lockbox Accounts"). These funds are then transferred to BOA Master Funding Account 1 (Bank of America Account # 9422) which is then is transferred daily to an account administered by GECC, the Debtors' First Lien Administrative Agent (the "Administrative Agent").  The Debtors utilize a software program that delineates the payments received from customer payments and reconciles the amount of the administrative fee owed against the GPO Client invoice.  Once the reconciliation process is completed by the Debtors, the Debtors typically pay the GPO Client invoice within thirty days.

255.    The Client Contracts represent additional employment opportunities for the Debtors' employees. Any disruption in the operation of the Client Contracts and payment of Clients' administrative fees could cause irreparable harm to the employees of the Debtor and the Debtors' Clients.

256.    In order to assure the Debtors' Clients that management of Client Contracts and payment of administrative fees under these Client Contracts (both pre and postpetition payments) will not be affected by the bankruptcy filing and will continue to operate as it did prior to the Petition Date, and in order to maintain the Debtors' critical relationships with its Clients, the

Debtors seek an order from the Court authorizing the Debtors to continue paying administrative fees, including those earned prepetition, under the Client Contracts.

257.    There will be no prejudice to unsecured creditors resulting from the relief sought in the motion.  Rather, the disruption in the operation and management of the Client Contracts and payment of administrative fees, will result in irreparable harm to the Debtors' business.

258.    By providing the relief requested in the motion, the court will enable the Debtors, as subcontractor, to continue to provide employees to its Clients, and continue to pay administrative fees to its Clients, thus maintaining additional opportunities for the Debtors' employees, while ensuring that the delivery of patient services and patient care is not interrupted and/or negatively impacted.

## S.    Debtors' Emergency Motion Seeking Approval to Retain and Employ Professionals Utilized in the Ordinary Course of Business

259.    The Debtors seek entry of an order approving the retention, employment, compensation and reimbursement of expenses for all professionals utilized by the Debtors in the ordinary course of business ("Ordinary Course Professionals").  A listing of the Ordinary Course Professionals is set forth in Exhibit "A" to the motion.

260.    The Debtors regularly employ the Ordinary Course Professionals to render prepetition services relating to, among other things: (i) defense of workers compensation, malpractice, product liability and employment practices liability claims; and (ii) collections of accounts receivables.  The Debtors will continue to require the services of certain Ordinary Course Professionals while operating as debtors-in-possession and completing their reorganization efforts.

261.    The Ordinary Course Professionals are distinct from those professionals who are tasked specifically with assisting the Debtors with their Chapter 11 restructuring (for whom the

Debtors are seeking to employ through separate applications to this Court). The uninterrupted service of the Ordinary Course Professionals is critical to the Debtors' ability to continue operations and successfully reorganize. The number of Ordinary Course Professionals involved, however, renders it costly and inefficient for the Debtors to submit individual applications and proposed retention orders to the Court for each such Ordinary Course Professional.

262.    The Ordinary Course Professionals will primarily assist with the Debtors' ongoing business operations and will generally not be involved with the administration of the Chapter 11 cases. Thus, I am informed that many, if not all, of the Ordinary Course Professionals do not constitute "professional persons" within the meaning of § 327 of the Bankruptcy Code. The Debtors propose that they be permitted to pay, without formal application to the Court by any Ordinary Course Professional, 100% of fees and disbursements to each of the Ordinary Course Professionals upon the submission to the Debtors of an appropriate invoice setting forth in reasonable detail the nature of the services rendered after the Petition Date.

263.    The Debtors are also requesting that they be authorized and empowered to employ and retain additional Ordinary Course Professionals needed by the Debtors in the ordinary course of their business by filing a supplement to the Exhibit "A" attached to the order granting the motion, without the need for any further hearing or notice to any other party

264.    The employment of the Ordinary Course Professionals is in the best interests of the Debtors' estates. While the Ordinary Course Professionals with whom the Debtors have previously dealt generally wish to provide services to the Debtors on an ongoing basis, many might be unwilling to do so if they are unable to be paid on a regular basis and only through a cumbersome, formal application process. Moreover, if the expertise and background knowledge

of certain of these Ordinary Course Professionals with respect to the particular areas and matters for which they were responsible prior to the Petition Date are lost, the estates undoubtedly will incur additional and unnecessary expenses because the Debtors will be forced to retain other professionals without such background and expertise.  It is therefore in the best interest of the Debtors' estates to avoid any disruption in the professional services required in the day-to-day operation of the Debtors' businesses.

**T.    Debtors' Emergency Motion to Reject, to the Extent it May be Considered an Executory Contract, Agreement With Goldman Sachs & Co. as of the Petition Date**

265.    The Debtors seek authorization to reject a contract with Goldman Sachs & Co. ("Goldman Sachs") as of the Petition Date out of an abundance of caution and without prejudice to their position that the contract has been terminated pre-petition.  Prior to the Petition Date, on September 2, 2008, Debtor MSN Holding entered into an engagement letter (the "Agreement") with Goldman Sachs pursuant to which Goldman Sachs was engaged as a financial advisor to the Debtors in connection with the possible sale of all or a portion of MSN Holdings.  Pursuant to the Agreement, in the event a purchase of 50% or more of the common stock or the assets of MSN Holdings was accomplished, Goldman Sachs would charge a transaction fee of 1.5% of the aggregate consideration paid in such transaction, but in no event less than $3.5 million.  In the event of a transaction for less than 50%, the transaction fee would be agreed to between Goldman Sachs and MSN Holdings.

266.    The Agreement also contained a provision (the "Termination Provision") which stated as follows:

> Our services may be terminated by you or us at any time with or without cause effective upon receipt of written notice to that effect. We will be entitled to the applicable transaction fee set forth above in the event that at any time prior to the expiration of 18 months after such termination (i) an agreement is entered into with respect to a sale of all or a portion of the stock or assets of the Company

which is eventually consummated, or (ii) an Agreement is entered
into pursuant to which a Payment is eventually made.

267.    In a letter to Goldman Sachs dated January 31, 2010 (the "Termination Letter"),

MSN Holdings terminated the Agreement.    The Termination Letter acknowledged the

obligations contained in the Termination Provision.

268.    I have determined in my business judgment that it is prudent to seek an order

from this Court authorizing the Debtors to reject the Goldman Sachs contract.

**U.    Debtors' Emergency Motion to Reject Executory Contracts and Leases as of the**
**Petition Date**

269.    The Debtors seek permission to reject certain lease agreements of commercial

premises located in Florida, California, Illinois, Massachusetts, Maryland, Pennsylvania and

New York.    These lease agreements are set to terminate from, at the earliest, September 30,

2010, to the latest, May 30, 2013.

270.    The lessee, Medical Staffing Network, Inc., has vacated all premises that are the

subject of the lease agreements and no longer needs or uses the leased premises.    Immediate

rejection will preclude the accrual and assertion of administrative expense claims against

Medical Staffing Network, Inc.'s estate, and, thus, will benefit the Debtors' estates and their

creditors.

271.    I understand that Section 365(a) of the Bankruptcy Code allows a debtor, subject

to approval of the bankruptcy court, to assume or reject any executory contract.

**V.    Debtors, Medical Staffing Network, Inc., InteliStaf Healthcare, Inc. and Medical**
**Staffing Network of Illinois, LLC's Emergency Motion for Authorization to**
**Continue Operations of InteliStaf of Oklahoma, LLP, a Joint Venture Between**
**InteliStaf Healthcare, Inc. and Non-Debtor Third Party, Integris ProHealth, Inc.**

272.    The Debtors seek authorization to continue the operations of InteliStaf of

Oklahoma, LLC, a non-debtor ("OKC" or the "Joint Venture"), which is a joint venture between

InteliStaf Healthcare, Inc. ("InteliStaf") and a non-debtor independent third party, Integris ProHealth, Inc. ("Integris").

273.    InteliStaf has a 68% ownership interest in OKC, while Integris has a 32% ownership interest.  Integris operates a hospital and is a significant client of the Debtors.

274.    Pursuant to the Joint Venture's operating agreement, as amended, (the "Operating Agreement"), the Debtors maintain an exclusive relationship with Integris through which OKC acts as the exclusive managed services provider responsible for receiving all requests for contingency healthcare professionals and/or supplemental labor for Integris' hospital.  OKC receives orders from Integris, then finds suitable professionals to fill the order requests.  OKC first fills the order requests via its existing pool of the Debtors' employees.  If the Debtors' employees are unavailable, or the Debtors have fewer available employees than the order requires, the order is then filled through various subcontractors also known as staffing partners or teaming partners (the "Subcontractors") with whom the Debtors have a subcontract ("Subcontract").  A copy of the Operating Agreement is attached to the motion as Exhibit "A."

275.    All expenses of OKC are paid by either InteliStaf or Medical Staffing Network, Inc. ("MSN") and are then passed through the intercompany accounts to properly record the transactions on OKC's books.  Payments are drawn on IS Bank of America Account #1886 and MSN Bank of America Account # 5405[11].

276.    All payroll transactions of OKC are paid by either InteliStaf, MSN or Medical Staffing Network of Illinois, LLC ("MSNIL") and then passed through the intercompany accounts to properly record the transactions on OKC's books.  Payments are drawn on MSN

---

[11] All Debtor bank accounts referenced herein are incorporated in *Debtors' Emergency Motion for (A) Authority to (i) Maintain Bank Accounts and Continue to Use Existing Business Forms and Checks, and (ii) Continue to Use Existing Cash Management Systems, and (B) Waiver of Certain Investment and Deposit Guidelines*, filed contemporaneously herewith.

Bank of America Account #s 8655 and 0332, InteliStaf Bank of America Account # 8869 and MSNIL Bank of America Account # 1651.

277.    OKC bills its clients and cash receipts are directed to be mailed to the InteliStaf Bank of America Lockbox Account #3810.  Occasionally, clients may mail checks to MSN Bank of America Lockbox Account # 0358 or MSNIL Bank of America Lockbox Account # 6893. Journal entries are created and posted to the intercompany accounts to properly record these transactions on OKC's books.  The funds are then transferred to the MSN Master Funding Account (Bank of America Account # 9422), which monies are then transferred to General Electric Capital Corporation ("GECC"), the Debtors' First Lien Administrative Agent.  MSNIL then requests the funds needed for payment of the Subcontractors.  GECC sends the funds to MSNIL, MSNIL transfers the funds to InteliStaf and InteliStaf then disburses funds to pay the Subcontractors in accordance with each Subcontractor agreement.  The administrative fee for arranging for the Subcontractors is paid to OKC.

278.    OKC's books are closed at the end of each accounting month and 32% of the profits, plus a small administrative surcharge, are then deposited into OKC's JP Morgan Chase Account # 3534.  On a quarterly basis, a distribution is paid to Integris from this account for its 32% share of the Joint Venture profits.

279.    In addition to its 68% share of the Joint Venture profits, InteliStaf also receives a 5% fee on total revenues.

280.    In 2009, the annual revenue from the Joint Venture exceeded $10 million. The Debtors' relationship with Integris, and the revenues generated from the Joint Venture, are a critical aspect of the Debtors' business.  Any disruption in the operation of the Joint Venture would cause irreparable harm to the operation of the Debtors' business.

281.    In order to assure that the operations of the Joint Venture will not be affected by the bankruptcy filing and may continue to operate as they did prior to the Petition Date, and in order to maintain the Debtors' critical relationship with Integris, the Debtors seek an order from the Court authorizing the Debtors to continue operating the Joint Venture, including payments to the Subcontractors and payments to Integris (both Pre and Post-Petition), pursuant to the Operating Agreement.

282.    By providing the relief requested in the motion, the Court would enable the Debtors to continue to provide employees and subcontractors employees to their clients through the Joint Venture pursuant to the Operating Agreement, thus maintaining the employment for these professionals while ensuring that the delivery of patient services and patient care is not interrupted and/or negatively impacted

**W.     Debtor, Medical Staffing Network Holdings, Inc.'s Motion for Order Pursuant to 11 U.S.C. Sections 105(a), 1107(a) and 1108 of the Bankruptcy Code Authorizing Debtors to File a Form 15 With the Securities and Exchange Commission**

283.    Medical Staffing Network Holdings, Inc. seeks authorization to file a Form 15 with the Securities and Exchange Commission, seeking the termination of registration for its Common Stock under section 12(g) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and the reporting requirements associated thereto under sections 13 and 15(d) of the Exchange Act.    Prior to December 15, 2008, Medical Staffing Network Holdings, Inc.'s Common Stock was listed on the New York Stock Exchange ("NYSE") under the symbol MRN. On that date, the Common Stock was delisted.   Since being delisted from the NYSE, the Debtor's Common Stock has been traded on the OTCQX marketplace, which is the premier tier of the U.S. Over-the-Counter (OTC) market under the symbol MSNW.PK.

284.    As of June 21, 2010 is held by 23 stockholders of record and approximately 1000 beneficial holders.   At this time, Medical Staffing Network Holdings, Inc. continues to bear the

burden of the numerous reporting requirements pursuant to sections 13 and 15(d) of the Exchange Act.  These filings are labor intensive and take away valuable resources from the Debtors' restructuring efforts.   In addition, the investing public no longer requires the information contained in such filings given:  (i) the small number of stockholders remaining, (ii) the fact that the shares of the Common Stock are no longer widely traded and (iii) the presence of the public reporting requirements commensurate with the Debtors' Chapter 11 cases.   In addition, the need for such regulation has been replaced by the Bankruptcy Court's management of these cases, and therefore, the actions such filings are intended to deter and regulate are sufficiently supervised.

285.    The Debtor submits that this request is ordinary.  The decision to deregister is a not uncommon dilemma faced by boards of directors across the country on a daily basis for a myriad of reasons and the Company would be permitted under applicable federal securities laws to deregister without Court approval.  As such, the Debtor is simply requesting authority to comply with processes already in place with the SEC and is in no way attempting to circumvent such requirements.

**X.      Debtor, Medical Staffing Network, Inc.'s Motion for Determination that the Appointment of a Patient Care Ombudsman is Unnecessary**

286.    The Debtors seeks entry of an Order finding that there is no need for the appointment of an ombudsman as contemplated by section 333 of the Bankruptcy Code under the facts of this case.

287.    Over ninety (90%) of the Debtors' business consists of providing temporary staffing of nurses and other health care personnel, under the direct supervision of the Debtors' customers, who are typically hospitals and other health care providers.  Therefore, in over ninety percent of the cases in which Debtors' employees provide health care services, it is done so

under the auspices of a hospital or other health care business.  The other approximate ten (10%) of the Debtors' business is providing *home* health care, that is, providing health care providers who *travel to patients' homes* (as opposed to patients coming to a facility operated by third party health care businesses) and administer various forms of health care.

288.    The Debtors are not "primarily" engaged in offering to the general public "facilities and services."  Instead, the Debtors are primarily engaged in providing temporary medical staffing.  The Debtors do not offer or provide "facilities" for any type of medical or psychological care, that is, a place where their patients come to receive health care.  Instead, the health care portion of the Debtors' business is provided at patients' homes.  The primary focus of the Debtors' business is the provision of temporary staffing of medical personnel, as opposed to providing facilities and services to the general public.  As such, I am informed and believe there is no basis for the appointment of an ombudsman.

**Y.    Debtors' Emergency Motion for an Order Authorizing Payment of Prepetition Claims of Critical Vendors**

289.    Medical Staffing Network, Inc. (the "Debtor") seeks the entry of an order authorizing the Debtor to pay the prepetition claims of certain vendors that are critical to the operation of the Debtor's business.

290.    Attached to the motion as Exhibit "A" is a list of those vendors (collectively, the "Critical Vendors") that the Debtor deems to be critical to its business operations.  The Critical Vendors are essential to the Debtor's business operations as they enable the Debtors to continue to recruit, test, screen and qualify potential new healthcare employees.  All states and each client have specific credentialing and screening requirements for healthcare employees.  The Debtors must match these requirements in order to be able to place healthcare employees at its clients, thereby generating revenue.  If the Debtor is limited with respect to its ability to properly screen

and credential potential new employees, then the Debtors will be unable to remain competitive in the marketplace.

291.    If payment of the claims of the Critical Vendors, the amounts of which are set forth on Exhibit "A" to the motion (collectively, the "Critical Vendor Claims"), are not paid, the Critical Vendors will terminate the services they provide to the Debtor and operations of the Debtor's business will be jeopardized to the detriment of all creditors.  Most if not all of the Debtor's business operations are dependent upon the Critical Vendors.  Accordingly, interrupting the business relationship of the Debtor, on the one hand, and the Critical Vendors, on the other hand, if not fatal to the Debtor's efforts to reorganization, will severely impair that effort to the detriment of the Debtor's estate and the creditors thereof.  I believe that payments of the Critical Vendor Claims is fair and reasonable for the services provided.

292.    In the exercise of my business judgment, I believe the relief requested in the motion is in the best interests of the Debtors and their estates, and I have been advised by counsel that similar relief has been granted in other large Chapter 11 cases in this and other districts, as set forth in more detail in the motion. In return for payment Critical Vendors must agree to continue providing services to the Debtor under the same terms and conditions as existed pre-petition.

**Z.    Debtors' Emergency Motion for Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement; (D) Scheduling Dates to Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All of the Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief**

293.    Medical Staffing Network Holdings, Inc. and other sellers named therein, as sellers thereto, and MSN Acquisition Co, LLC, a Delaware limited liability company, as purchaser (the "Proposed Purchaser") have executed an Asset Purchase Agreement (the "Asset

Purchase Agreement") in connection with the sale of substantially all of the Debtors' assets as described in the Asset Purchase Agreement (the "Purchased Assets").

294.    The Asset Purchase Agreement provides, among other things, for:

- The Proposed Purchaser to pay the Debtors $84,122,982.40 via a credit bid of the Pre-Petition First Lien Agent's liens and claims, plus the assumption of the Debtors' obligations under the DIP Financing Credit (estimated at approximately $15,000,000), plus assume certain liabilities; and

- The conveyance of the Proposed Assets from the Debtors to the Proposed Purchaser, free and clear of all liens, claims, interests and encumbrances.

295.    Given the Debtors' limited liquidity, the Debtors, in the sound exercise of their business judgment, have concluded that the sale of the Proposed Assets to the Proposed Purchaser (or to the highest and best bidder) presents the best option of maximizing the value of the Debtors' estate for the benefit of the Debtors' creditors.

296.    Under the Asset Purchase Agreement, the Debtors have reserved the right to accept a superior proposal on, and subject to, the terms set forth in the Asset Purchase Agreement.  Accordingly, the Debtors request a hearing (the "Bid Procedures Hearing") for the Court to consider entry of an order (the "Bidding Procedures Order") approving the bidding procedures substantially in the form attached to the motion (the "Bidding Procedures") for additional bidding on the Purchased Assets, approving the form and manner of notice of the Bidding Procedures, approving the Asset Purchase Agreement to be used in conjunction with the Bidding Procedures, and scheduling a Sale Hearing (as hereinafter defined) to approve the sale of the Proposed Assets to the Proposed Purchaser or the Successful Bidder (as defined in the Bidding Procedures).

297.    The Debtors intend to sell substantially all of the Purchased Assets as promptly as possible, consistent with (i) the due process requirements of sections 363 and 365 of the Bankruptcy Code, and (ii) the sale process under the Bidding Procedures.  The Debtors seek approval and implementation of a three-step sales process, as follows:

(a)    a "Bid Procedures Hearing" at which the Debtors will seek approval of the Bidding Procedures, as described below;

(b)    an "Auction" to be conducted in accordance with the Bidding Procedures, following a confirmatory due diligence period for other interested parties, assuming one or more "Qualified Bids" are timely received as provided in the Bidding Procedures. The Debtors propose to conduct the Auction not later than August 19, 2010 ; and

(c)    a "Sale Hearing" proposed to be held at the earliest opportunity after the conclusion of the Auction, at which time an order approving the sale (the "Sale Order") would be entered.

298.    The Debtors expect to be able to meet their burden at the Bid Procedures Hearing and the Sale Hearing of demonstrating that the sale efforts to date have been appropriately conducted, with the Debtors already having exposed the Purchased Assets to a comprehensive and competitive sale process.  As such, the proposed time frame will appropriately balance the Debtors' objective need to quickly conclude the sale with the need to thoroughly market the Purchased Assets and properly negotiate a transaction.

299.    In order to ensure that the Debtors' estates are able to derive maximum value from the Purchased Assets, the Debtors negotiated in the Asset Purchase Agreement the right to continue to solicit offers for the Purchased Assets, as provided in the Bidding Procedures.  The Debtors seek to adopt procedures that will foster continued competitive bidding among potential

buyers without eliminating or discouraging any qualified bids, including the present "stalking horse" bid by the Proposed Purchaser embodied in the Asset Purchase Agreement.

300.    In order to be a "Qualified Bid", a bid must propose a Competing Transaction involving substantially all of the Debtors' assets or operations.  A bid must propose a purchase price equal to or greater than $84,122982.40 in cash, plus the outstanding obligations under the DIP Loan Documents, plus an amount equivalent to the liabilities being assumed under the Asset Purchase Agreement.  A bid will not be considered as a Qualified Bid if (i) such bid contains additional representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Asset Purchase Agreement, (ii) such bid is not received in writing on or prior to the Bid Deadline (as defined in the Bidding Procedures), and (iii) such bid does not contain evidence that the party submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby, including proof of deposit into escrow of no less than $5,000,000 in cash.  The Competing Transaction documents shall also identify any executory contracts and unexpired leases of the Debtors that the bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction.  A bid must obligate the bidder to pay, to the extent provided in the Asset Purchase Agreement, all Cure Costs (as hereinafter defined).

301.    The Debtors, in consultation with their investment banker, Jefferies & Company, Inc. ("Jefferies"), have developed a list of parties who the Debtors believe may potentially be interested in and who the Debtors reasonably believe would have the financial resources to consummate a competing transaction to that of the Proposed Purchaser (a "Competing Transaction"), which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the

"Contact Parties"). The Debtors and Jefferies have previously contacted the Contact Parties to explore their interest in pursuing a Competing Transaction. The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate, as well as advertise the sale of the Proposed Assets.

302.    The Debtors believe that the proposed Bidding Procedures constitute the best method of maximizing the value of the Purchased Assets through the continuation of a competitive sale process. Accordingly, the Debtors request that the Court enter the Bidding Procedures Order authorizing the Debtors to implement the Bidding Procedures.

303.    The Proposed Purchaser and the Debtors have negotiated the Asset Purchase Agreement and the transactions contemplated thereby in good faith. The Debtors request that the Sale Order find that the Proposed Purchaser is a good-faith purchaser entitled to the protections of 11 U.S.C. § 363(m). Given Debtors' and the Proposed Purchaser's interest in proceeding expeditiously, the Debtors request that the Court also waive the ten-day stay of the effectiveness of the Sale Order consistent with Rule 6004(g) of the Federal Rules of Bankruptcy Procedure.

304.    This concludes my declaration.

I DECLARE UNDER PENALTY OF PERJURY THAT FOREGOING IS TRUE AND CORRECT TO THE BEST OF MY KNOWLEDGE.

Signed this 2nd day of July, 2010.

Mohsin Y. Meghji
Chief Restructuring Officer

**EXHIBIT "A"**

**(Organizational Chart)**

# Medical Staffing Network Holdings, Inc. and Subsidiaries





**FEIN & State Incorporation or Formation, Date**

**Medical Staffing Network Holdings, Inc.**
FEIN: 65-0865171
DE - Corp 9/24/98

**Medical Staffing Holdings, LLC**
FEIN: None
DE - LLC 10/16/01

**Medical Staffing Network, Inc.**
FEIN: 59-3489868
DE - Corp 1/7/98

**InteliStaf Holdings, Inc.**
DE - Corp 10/27/00

**InteliStaf Group, Inc.**
DE - Corp 10/27/00

**InteliStaf Healthcare, Inc.**
*is also sole member of:*
FEIN: 11-3257108
DE - Corp 3/17/95
InteliStaf Partners No. 1, LLC   (DE LLC 12/27/02)
*and* InteliStaf Partners No. 2, LLC (DE LLC 12/27/02)

...and these two LLCs own:

**InteliStaf Healthcare Management, L.P.**
FEIN: 22-3887958
DE - LP 12/27/02
InteliStaf Partners No. 1, LLC - as 1% General Partner
InteliStaf Partners No. 2, LLC - as 99% Limited Partner

**InteliStaf of Oklahoma, LLC**
FEIN: 62-1743747
OK - LLC

68% InteliStaf Healthcare, Inc. - - - - - - -
32% Integris Prohealth, Inc. - - - - - - -
(unrelated company)

**MSN-Illinois Holdings, Inc.**
FEIN: None
IL - Corp

**Medical Staffing Network Assets, LLC**
FEIN: None
IL - LLC

**Medical Staffing Network of Illinois, LLC**
FEIN: 01-0794409
IL - LLC 7/30/03

Operating Companies are shaded in light yellow