UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:

MEDICAL STAFFING NETWORK HOLDINGS,
INC., *et al.*, [1]

      Debtors.

_____/

Chapter 11 Cases

Case No. 10-29101-EPK

(Joint Administration Pending)

**DEBTORS' MOTION FOR ENTRY OF ORDER (A) APPROVING COMPETITIVE
BIDDING AND SALE PROCEDURES; (B) APPROVING FORM AND MANNER OF
NOTICES; (C) APPROVING FORM OF ASSET PURCHASE AGREEMENT;
(D) SCHEDULING DATES TO CONDUCT AUCTION AND HEARING TO CONSIDER
FINAL APPROVAL OF SALE, INCLUDING TREATMENT OF EXECUTORY
CONTRACTS AND UNEXPIRED LEASES; (E) AUTHORIZING SALE OF
SUBSTANTIALLY ALL THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS,
CLAIMS, ENCUMBRANCES AND INTERESTS; AND
<u>(F) GRANTING RELATED RELIEF</u>**

Medical Staffing Network Holdings, Inc., Medical Staffing Holdings, LLC, Medical

Staffing Network, Inc., InteliStaf Holdings, Inc., MSN-Illinois Holdings, Inc., InteliStaf Group,

Inc., Medical Staffing Network of Illinois, LLC, Medical Staffing Network Assets, LLC,

InteliStaf Healthcare, Inc., InteliStaf Partners No. 1, LLC, InteliStaf Partners No. 2, LLC and

InteliStaf Healthcare Management, L.P. (each, a "Debtor," and, collectively, the "Debtors"), by

and through undersigned counsel and pursuant to (i) sections 105, 363, 364 and 365 of the

Bankruptcy Code, 11 U.S.C. §§ 101–1532 (the "<u>Bankruptcy Code</u>"), (ii) Bankruptcy Rules

---

[1] The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis:  (i) Medical Staffing Network Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii) Medical Staffing Network, Inc. (9868); (iv) MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings, Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii) Medical Staffing Network of Illinois, LLC (4409); (viii) Medical Staffing Network Assets, LLC (4413); (ix) InteliStaf Healthcare, Inc. (7108); (x) InteliStaf Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC (5965); and (xii) InteliStaf Healthcare Management, L.P. (7958).

2002(a)(2), 6004, 6006 and 9014, and (iii) Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules"), file this *Motion For Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Form of Asset Purchase Agreement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Authorizing Sale of Substantially All The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief* (the "Bidding Procedures Motion").    In support of the Bidding Procedures Motion, the Debtors rely upon the *Declaration of Moshin Y. Meghji In Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") and respectfully state as follows:

## LOCAL BANKRUPTCY RULE 6004-1 CONCISE STATEMENT

In accordance with Local Bankruptcy Rule 6004-1, below is a summary[2] of the nature of the Debtor's request.

- Identity of the Purchaser.  Because the sale is subject to higher and better offers the identity of the purchaser is currently unknown.  However, the Proposed Purchaser (defined below) is comprised of the First Lien Lenders who indicated their willingness to enter into an asset purchase agreement at a higher amount by credit bidding all amounts due under the First Lien Credit Agreement.  The Proposed Purchaser is not an insider of the Debtors.

- The Sale Terms.

  o The Sale Price:  a credit bid of $84,122,982.40, plus assumed liabilities under the Asset Purchase Agreement.

---

[2] To the extent that there is an inconsistency between the terms of this summary and any provision of the Bid Procedures Order, the terms of Bid Procedures Order shall control.

    o  Warranties:  In accordance with the Asset Purchase Agreement, the assets are to be sold "as is, where is."

    o  Closing Date:  Tenth day following entry of Sale Order.

    o  Closing Conditions:  Entry of the Sale Order; No Material Adverse Effect between the Execution Date and the Closing Date; Representations and warranties made by Sellers.

    o   under the Asset Purchase Agreement shall be true as of the Closing Date.

- <u>The Auction Terms.</u>

    o  Proposed Auction Date:  August 19, 2010.

    o  Proposed Bid Deadline:  August 18, 2010.

    o  The Minimum Incremental Bid:  $84,122,982.40, plus the outstanding obligations under the DIP Loan Documents, plus an amount equivalent to the liabilities being assumed under the Asset Purchase Agreement.

    o  Initial Overbid Amount:  $100,000.

- <u>Requirements of Competing Bidders.</u>

    o  Minimum Deposit:  $5,000,000.

    o  Documentation Requirements:  Executed Asset Purchase Agreement in clean and redline, marked to show changes to the Asset Purchase Agreement.

    o  Other Qualifying Conditions: Evidence demonstrating appropriate corporate authority to consummate the transaction; proof of financial ability to perform.

- <u>Purchaser Protections Not Otherwise Described.</u>

    o  Proposed Break Up Fee:  None.

    o  Matching Rights:  Not applicable.

- Statement Regarding Transfer of Personally Identifiable Information.  The Debtors do not maintain any policy regarding personally identifiable information.

- Identity of all Known Lienholders.    General Electric Capital Corporation, as administrative agent and collateral agent under the First Lien Credit Agreement; NexBank, SSB, as administrative agent and collateral agent under the Second Lien Credit Agreement.

- Statement Requesting Dates for Hearings and Auction.   The Debtors are not seeking expedited relief in connection with the Sale.  The Debtors propose an auction on August 19, 2010 and a Sale Hearing on August 20, 2010.

## I.  JURISDICTION

1. This Court has jurisdiction over these cases pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.  BACKGROUND

2. On the date hereof (the "Petition Date"), the Debtors filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.

3. The Debtors are operating their businesses and managing their affairs as debtors in possession pursuant to 11 U.S.C. §§ 1107(a) and 1108.

4. For a detailed description of the Debtors and their operations, the Debtors respectfully refer the Court and parties in interest to the First Day Declaration.

5. Medical Staffing Network Holdings, Inc. (the "Company") and other sellers named therein, as sellers thereto, and MSN AcquisitionCo, LLC as purchaser (the "Proposed Purchaser") have entered into that certain Asset Purchase Agreement, dated as of July 2, 2010 (the "Asset Purchase Agreement")[3] in connection with the sale (the "Sale") of (i) substantially all of the Debtors' assets as described in the Asset Purchase Agreement (collectively, the "Purchased Assets") and (ii) certain equity interests in a non-debtor affiliate of the Debtors (the "Transferred Equity Interests").

---

[3] Capitalized terms used in this Motion and not otherwise defined herein shall have the meanings ascribed to such terms in the Asset Purchase Agreement.  A copy of the Asset Purchase Agreement is attached hereto as Exhibit A.

### III.    RECENT MARKETING EFFORTS

6.    On February 8, 2010, the Debtors retained Jefferies & Company, Inc. ("Jefferies") as their investment banker to assist the Debtors in evaluating their strategic options with respect to the sale or recapitalization of their businesses and related assets, both as a going concern outside of bankruptcy and in the context of a potential Chapter 11 bankruptcy filing.  In this regard, Jefferies began a process in February 2010, nearly four months before the bankruptcy filings, to identify potential sources of new equity as well as potential buyers of the Debtors' businesses (in the approximate amount of $84,122,982.40).

7.    Jefferies conducted an extensive marketing process, focused on identifying investors, strategic and/or financial buyers for the Debtors' assets.  Sixty-one parties were contacted as part of the prepetition marketing process, excluding the First Lien Lenders (as defined in the First Day Declaration), representing those parties who were believed to have potential interest in a transaction with the Company.  Thirty-two of those parties subsequently executed a non-disclosure agreement with the Company, all of which received a confidential investment presentation and access to materials in a data room set up for the purpose of facilitating due diligence (together, the "Diligence Materials").  Jefferies was significantly involved in facilitating due diligence activities including creating management presentations, assembling data requests, and answering specific requests by potential buyers and capital providers.  The Diligence Materials provided prospective buyers with detailed information on the Debtors' business, strategy, market position, growth opportunities, and historical and projected financial performance.

8.     Jefferies transmitted detailed bid instructions to interested parties and ultimately received several written indications of interest, excluding the First Lien Lenders, contemplating the acquisition of substantially all of the Debtors' assets.

9.     On review of the written indications of interest, the Debtors, in consultation with Jefferies, determined that further discussions should be held with potential purchasers, all of which are strategic buyers operating within the Debtors' industry.  Additional diligence materials were made available to these parties and an opportunity provided for the parties to refine their bids.  The highest revised bid received from this process was $72 million.  Discussions were also held with the First Lien Lenders who indicated their willingness to enter into an asset purchase agreement at a higher amount by credit bidding substantially all amounts due under the First Lien Credit Agreement.

## IV.    SUMMARY OF RELIEF REQUESTED

10.     Under the Asset Purchase Agreement, the Debtors have reserved the right to accept a superior proposal on, and subject to, the terms set forth in the Asset Purchase Agreement.  Accordingly, the Debtors request a hearing (the "Bid Procedures Hearing") for the Court to consider entry of an order (the "Bidding Procedures Order")[4] (i) approving the bidding procedures substantially in the form of Exhibit 1 to the Bidding Procedures Order (the "Bidding Procedures") for additional bidding on the Purchased Assets and the Transferred Equity Interests, (ii) approving the form and manner of notice of the Bidding Procedures, (iii) approving the form of the Asset Purchase Agreement to be used in conjunction with the Bidding

---

[4] A copy of the Bidding Procedures Order is attached hereto as Exhibit B, and a copy of the Bidding Procedures is attached to the Bidding Procedures Order as Exhibit 1.

Procedures, and (iv) scheduling a Sale Hearing (as hereinafter defined) to approve the Sale to the Proposed Purchaser or the Prevailing Bidder (as defined in the Bidding Procedures).

11.     The Debtors intend to consummate the Sale as promptly as possible, consistent with (i) the due process requirements of sections 363 and 365 of the Bankruptcy Code, and (ii) the sale process under the Bidding Procedures.  By this Motion, the Debtors seek approval and implementation of a three-step sales process, as follows:

(a)     a "Bid Procedures Hearing" at which the Debtors will seek approval of the Bidding Procedures, as described below;

(b)     an "Auction" to be conducted in accordance with the Bidding Procedures, following a confirmatory due diligence period for other interested parties, assuming one or more "Qualified Bids" are timely received as provided in the Bidding Procedures. The Debtors propose to conduct the Auction on August 19, 2010; and

(c)     a "Sale Hearing" proposed to be held at the earliest opportunity after the conclusion of the Auction, at which time the Debtors will seek entry of an order (i) authorizing the Sale, (ii) authorizing and approving the Asset Purchase Agreement, (iii) approving procedures and rights related to assumption and assignment of certain executory contracts and unexpired leases and (iv) granting related relief (the "Sale Order").  A form of the Sale Order is attached hereto as Exhibit C.

12.     The Debtors expect to be able to meet their burden at the Bid Procedures Hearing and the Sale Hearing of demonstrating that the sale efforts to date have been appropriately conducted, with the Debtors already having exposed the Purchased Assets and the Transferred Equity Interests to a comprehensive and competitive sale process.  As such, the proposed time

frame will appropriately balance the Debtors' objective need to quickly conclude the sale with the need to thoroughly market the Purchased Assets and properly negotiate a transaction.

**V.    RELIEF REQUESTED**

**A.    The Bidding Procedures**

13.    In order to ensure that the Debtors' estates are able to derive maximum value from the Purchased Assets and the Transferred Equity Interests, the Debtors negotiated in the Asset Purchase Agreement the right to continue to solicit offers for the Purchased Assets and the Transferred Equity Interests, as provided in the Bidding Procedures.  The Debtors seek to adopt procedures that will foster continued competitive bidding among potential buyers without eliminating or discouraging any qualified bids, including the present "stalking horse" bid by the Proposed Purchaser embodied in the Asset Purchase Agreement.

14.    The Debtors, in consultation with Jefferies, have developed a list of parties who the Debtors believe may potentially be interested in, and who the Debtors reasonably believe would have the financial resources to, consummate a competing transaction to that of the Proposed Purchaser (a "Competing Transaction"), which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties").  The Debtors and Jefferies have contacted the Contact Parties to explore their interest in pursuing a Competing Transaction.  The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction.  The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate, and will continue to advertise the Sale.

15.    The entry of the Bidding Procedures Order is a condition precedent to the consummation of the Sale.  The Debtors believe that the proposed Bidding Procedures constitute the best method of maximizing the value of the Purchased Assets through the continuation of a competitive sale process that will allow for the solicitation and submission of competitive bids (as set forth in the Bidding Procedures, a competitive bid submitted in accordance with these procedures shall be deemed a "Qualified Bid" and such bidder shall constitute a "Qualified Bidder").[5]  Accordingly, the Debtors request that the Court enter the Bidding Procedures Order authorizing the Debtors to implement the Bidding Procedures and schedule the Auction as more fully set forth in the Bidding Procedures.

16.    In addition, the Asset Purchase Agreement sets forth the terms and conditions under which the Proposed Purchaser will purchase the Purchased Assets and Transferred Equity Interests from the Debtors and also permits the Debtors to solicit higher and better bids for the Purchased Assets and the Transferred Equity Interests.  As discussed in more detail below, any Qualified Bid must include a copy of the Asset Purchase Agreement marked to show all changes requested by the bidder.  Thus, the Debtors request that the Court approve, by entry of the Bidding Procedures Order, the form of Asset Purchase Agreement.

17.    To be considered a Qualified Bid, each bid submitted must comply with the following requirements (as set forth in more detail in the Bidding Procedures):

(a)    A bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Sale set forth in the Asset Purchase

---

[5] In the event that there is any inconsistency between the terms of this Motion and any provision in the Bidding Procedures Order or the Bidding Procedures, the Bidding Procedures Order or the Bidding Procedures, as applicable, shall control.

Agreement.  A bid must include executed transaction documents pursuant to which the bidder proposes to effectuate the Competing Transaction (the "Modified Asset Purchase Agreement").  A bid shall include a copy of the Asset Purchase Agreement marked to show all changes requested by the bidder (including those related to purchase price); provided, however, that the terms of the Modified Asset Purchase Agreement are substantially similar, the same or better than the terms of the Asset Purchase Agreement. A bid must propose a Competing Transaction involving substantially all of the Debtors' assets or operations.  A bid must propose a purchase price equal to or greater than $84,122,982.40, plus the amount of the obligations outstanding under the DIP Loan Documents, plus an amount equal to the liabilities being assumed under the Asset Purchase Agreement.  A bid will not be considered as a Qualified Bid if (i) such bid contains additional representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Asset Purchase Agreement, (ii) such bid is not received in writing on or prior to the Bid Deadline (as defined in the Bidding Procedures), and (iii) such bid does not contain evidence that the party submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby.  The Competing Transaction documents shall also identify any executory contracts and unexpired leases of the Debtors that the bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction.  A bid must obligate the bidder to pay, to the extent provided in the Asset Purchase Agreement, all Cure Costs (as hereinafter defined).

(b)     Each bid must be accompanied by a deposit in the amount of $5,000,000 to an interest bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit

(c)     Each such bidder must provide evidence reasonably satisfactory to the Debtors demonstrating the bidder's financial ability to close and to consummate a Competing Transaction, including, without limitation, evidence of the bidder's ability to provide adequate assurance of future performance under any unexpired leases and executory contracts pursuant to Section 365 of the Bankruptcy Code;

18.     The Bidding Procedures also contain the following relevant terms:

(a)     Subject to this Court's approval of the Bidding Procedures Motion, the Auction shall take place on August 19, 2010 at 10:00 a.m. (prevailing Eastern Time) at the offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, or such other place and time as the Debtors shall notify all Qualified Bidders, including the Proposed Purchaser, the Committee, counsel for the Proposed Purchaser and other invitees in accordance with the Asset Purchase Agreement. The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid received prior to the Bid Deadline (such Qualified Bid, the "Auction Baseline Bid").

(b)     An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid.  Any Overbid after the Auction Baseline Bid shall be made in increments valued at not less than $100,000.  Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include cash and/or noncash consideration.

2863406-5                                                   11

(c)     The Auction will continue until there is only one Qualified Bid that the Debtors determine, in their reasonable business judgment, after consultation with their financial and legal advisors, is the highest and best Qualified Bid at the Auction (the bidder submitting such bid, the "Prevailing Bidder").  The party with the next highest or otherwise best Qualified Bid at the Auction, as determined by the Debtors in the exercise of their business judgment, will be designated as the potential backup bidder (the "Potential Backup Bidder").  In the event that a Qualified Bidder is identified by the Debtors as the Potential Backup Bidder, such party shall be required to serve as the backup bidder (the "Backup Bidder").

(d)     The Backup Bidder shall be required to keep its initial bid (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the date of the Sale Hearing (the "Outside Backup Date") or the closing of the transaction with the Prevailing Bidder. Following the Sale Hearing, if the Prevailing Bidder fails to consummate an approved transaction because of a breach or failure to perform on the part of such Prevailing Bidder, the Debtors may designate the Backup Bidder to be the new Prevailing Bidder, and the Debtors will be authorized, but not required, to consummate the transaction with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Prevailing Bidder's deposit shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Prevailing Bidder.  The deposit of the Backup Bidder shall be held by the Debtors until the earlier of

24 hours after (i) the closing of the transaction with the Prevailing Bidder and (ii) the Outside Backup Date.

19.     Except as otherwise provided in the Asset Purchase Agreement or the Bidding Procedures Order, the Debtors reserve the right as they may reasonably determine to be in the best interests of their estates, after consultation with the Lenders and the Committee, to: (a) determine which bidders are Qualified Bidders; (b) determine which bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) remove some or all of the Purchased Assets or the Transferred Equity Interests from the Auction; (f) waive terms and conditions set forth herein with respect to all potential bidders; (g) impose additional terms and conditions with respect to all potential bidders; (h) extend the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify the Bidding Procedures as they may determine to be in the best interests of their estates or to withdraw the Bidding Procedures Motion at any time with or without prejudice.

**B.      Sale of Assets**

20.     Among other things, the Asset Purchase Agreement provides for:

- A credit bid by the Proposed Purchaser in an amount equal to the Pre-Petition First Lien Agent's liens and claims; plus the assumption of certain of the Debtors' liabilities, including, without limitation, the Debtors' obligations under the DIP Loan Agreement (estimated at approximately $15,000,000) and the L/C Obligations (as defined in the First Lien Credit Agreement; plus the other

Assumed Liabilities; and

- The conveyance of the Purchased Assets from the Debtors to the Proposed Purchaser, free and clear of all liens, claims, interests and encumbrances.

21.     This Court has the statutory authority to authorize the sale free and clear of liens. Pursuant to section 363(f) of the Bankruptcy Code, a trustee or debtor in possession may sell all or any part of property of the estate, free and clear of any and all liens, claims, encumbrances or interests if:

(a)     applicable non-bankruptcy law permits sale of such property free and clear of such interest;

(b)     such entity consents;

(c)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(d)     such interest is in a bona fide dispute, or

(e)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest;

11 U.S.C. § 363(f); In re Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988) (section 363(f) is written in the disjunctive; the court may approve a sale "free and clear" provided at least one of the subsections is met).

22.     Property of the estate may be sold outside the ordinary course of business. Section 363(b)(1) of the Bankruptcy Code provides that "[t]he trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1).  Courts interpreting section 363(b)(1) of the Bankruptcy Code have held that transactions should be approved under section 363(b)(1) when: (a) they are supported by the

sound business judgment of the debtor's management; (b) interested parties are provided with adequate and reasonable notice; (c) the sale price is fair and reasonable; and (d) the purchaser is acting in good faith.  *See* In re Delaware & Hudson Ry. Co., 124 B.R. 169 (D. Del. 1991); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (D. Del. 1987).  Here, each of those factors is met.

23.     Subject to the terms and conditions of the Asset Purchase Agreement, the Debtors, in the sound exercise of their business judgment, have concluded that consummation of the Sale to the Proposed Purchaser (or to the highest and best bidder) will best maximize the value of the Debtors' estate for the benefit of the Debtors' creditors.

24.     To date, the purchase price offered by the Proposed Purchaser is the highest and best offer for the Purchased Assets and the Transferred Equity Interests.  In order to ensure the highest possible recovery for the Debtors' estates, the Debtors have required that their obligation to proceed under the Asset Purchase Agreement be subject to the receipt of higher and better offers through a competitive Auction of the Purchased Assets and the Transferred Equity Interests, as set forth herein.  Accordingly, the Debtors respectfully assert that ample business justification exists for the Sale .

25.     Pursuant to Section 363(f) of the Bankruptcy Code, the Debtors will sell the Purchased Assets  free and clear of all liens, claims, interests and encumbrances.

26.     The Proposed Purchaser and the Debtors have negotiated the Asset Purchase Agreement and the transactions contemplated thereby in good faith.  The Debtors request that the Sale Order find that the Proposed Purchaser is a good-faith purchaser entitled to the protections of 11 U.S.C. § 363(m).  The Debtors further request that, after the Sale Hearing and provided that the Debtors do not deem any other Qualified Bids to be higher or better than the Qualified Bid of the Proposed Purchaser, this Court enter the Sale Order authorizing and approving the

Asset Purchase Agreement and the Debtors' execution of, entry into and consummation of the Asset Purchase Agreement. Finally, given the Debtors' and the Proposed Purchaser's interest in proceeding expeditiously, the Debtors request that the Court waive the ten-day stay of the effectiveness of the Sale Order consistent with Rule 6004(g) of the Federal Rules of Bankruptcy Procedure.

**C.    The Sale Hearing and Manner of Notice**

27.    Subject to Court approval, the Sale Hearing shall be held before the Court on August 20, 2010 at 9:30 a.m. (prevailing Eastern Time), or at such earlier date as counsel and interested parties may be heard.

28.    Objections, if any, to the Sale  contemplated by the Asset Purchase Agreement, or the relief requested in this Motion must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, Flagler Waterview Building, 151 North Flagler Drive, 8th Floor, West Palm Beach, Florida 33401 (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on August 16, 2010 (the "Sale Objection Deadline"); and (d) be served upon (i) counsel to the Debtors, (ii) counsel to the DIP Agent, (iii) counsel to the Committee, (iv) counsel to the Proposed Purchaser, and (v) the Office of the United States Trustee, in each case, so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on the same day.

29.    On or before three (3) business days after entry of the Bidding Procedures Order, the Debtors will cause a notice, substantially in the form attached as Exhibit 2 to the Bidding Procedures Order (the "Auction and Sale Notice"), to be sent by first-class mail postage prepaid, to the following: (a) all creditors or their counsel known to the Debtors to assert a lien (including

any security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets; (b) the Office of the United States Trustee; (c) the Securities and Exchange Commission; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the Sale, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets or the Transferred Equity Interests or have any known interest in the relief requested by this Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (f) counsel to the Proposed Purchaser; (g) counsel to the prepetition and postpetition secured lenders (collectively, the "Lenders"); (h) the United States Attorney's office; (i) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (j) counsel to the Committee; (k) all parties to any litigation involving the Debtors; (l) all counterparties to any executory contract or unexpired lease of the Debtors; (m) all other known creditors and interest holders of Debtors; and (n) all potential bidders previously identified or otherwise known to the Debtors.

30.     In addition to the foregoing, as soon as practicable, but in any event no later than five (5) business days after the entry of the Bidding Procedures Order, the Debtors shall publish the Sale Notice (modified for publication, as necessary) in *The Wall Street Journal*, national edition.

**D.      Procedures for Assumption and Assignment
         of Executory Contracts and Unexpired Leases**

31.     In connection with the Sale, the Auction and the entry of the Sale Order (whether the Prevailing Purchaser is the Proposed Purchaser or another bidder submitting a Qualified Bid), the Debtors request this Court's approval of the following procedures for the assumption and assignment of certain executory contracts and unexpired leases:

(a)    On or before three (3) business days after the entry of the Bidding Procedures Order, the Debtors shall serve by first class mail or hand delivery the notice of potential assumption and assignment of the Scheduled Contracts (as defined in the Cure Notice), substantially in the form attached hereto as Exhibit 3 to the Bidding Procedures Order (the "Cure Notice"), on all non-Debtor parties to the Scheduled Contracts.  The Cure Notice shall identify the Scheduled Contract and provide the cure amount that the Debtors believe must be paid to cure all prepetition defaults under the Scheduled Contracts (the "Cure Amounts").

(b)    Unless the non-Debtor party to a Scheduled Contract (i) files an objection (the "Cure Amount Objection") to (a) its scheduled Cure Amount, (b) the assumption and assignment to the Proposed Purchaser of the Scheduled Contracts, or (c) the ability of the Proposed Purchaser to provide adequate assurance of future performance by the Sale Objection Deadline, and (ii) serves a copy of the Cure Amount Objection so as to be received no later than the Sale Objection Deadline to the Debtors, counsel for the Debtors, counsel to the DIP Agent, counsel to the Committee, if any, counsel to the Proposed Purchaser, and the Office of the United States Trustee, such non-Debtor party shall be deemed to consent to the Cure Amount proposed by the Debtors and shall be forever barred and estopped from objecting to the Cure Amount, and from asserting that (A) any additional amounts are due or defaults exist, (B) any conditions to assumption and assignment must be satisfied under such Scheduled Contract before it can be assumed and assigned to the Proposed Purchaser, (C) any required consent to assignment has not been given, or (D) the Proposed Purchaser has not provided adequate assurance of future performance.

(c)      If the Proposed Purchaser is not the Prevailing Bidder, the non-Debtor parties to the Scheduled Contracts shall have until the Sale Hearing (the "Adequate Assurance Objection Deadline") to object to the assumption and assignment of such Scheduled Contract solely on the issue of whether the Prevailing Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (an "Adequate Assurance Objection"); provided, however, that if the Proposed Purchaser is the Prevailing Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline; provided, further, however, that all objections to the assumption and assignment of Scheduled Contracts that do not relate to the issue of whether the Prevailing Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

(d)      In the event of a dispute regarding:  (a) any Cure Amount with respect to any Scheduled Contract; (b) the ability of the Prevailing Bidder (including the Proposed Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable after the closing and following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtors, with the consent of the Proposed Purchaser or other Prevailing Bidder, as applicable, are authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Prevailing  Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of the Court.

(e)    Within two (2) business days after the closing date, the Debtors will file a complete list of the Scheduled Contracts that were assumed and assigned, as of the Closing Date, to the Proposed Purchaser or to the Successful Bidder, to the extent that the Successful Bidder is not the Proposed Purchaser.

**WHEREFORE**, the Debtors respectfully request entry of an order in the form attached hereto and identified as <u>Exhibit B</u> granting the relief requested herein, and granting such other and further relief as is fair and just.

Dated:  July 2, 2010                              BERGER SINGERMAN, P.A.

*Proposed Counsel for Debtors in Possession*
200 S. Biscayne Boulevard, Suite 1000
Miami, FL 33131
Telephone:  (305) 755-9500
Facsimile:   (305) 714-4340
and
350 East Las Olas Boulevard, Suite 1000
Fort Lauderdale, FL 33301
Telephone: (954) 525-9900
Facsimile:  (954) 523-2782

By:    */s/  Paul Steven Singerman*
        Paul Steven Singerman
        Florida Bar No. 378860
        singerman@bergersingerman.com
        Jordi Guso
        Florida Bar No. 863580
        jguso@bergersingerman.com

# EXHIBIT A

## Asset Purchase Agreement

EXECUTION VERSION

**ASSET PURCHASE AGREEMENT**

**BY AND AMONG**

**MSN ACQUISITIONCO, LLC**

**as Purchaser,**

**and**

**MEDICAL STAFFING NETWORK, INC.,**

**MEDICAL STAFFING HOLDINGS, LLC,**

**MEDICAL STAFFING NETWORK HOLDINGS, INC.**

**AND**

**CERTAIN SUBSIDIARIES OF MEDICAL STAFFING NETWORK, INC.**

**as Sellers**

**Dated as of July 2, 2010**

CH\1168949.14

# TABLE OF CONTENTS

Page

ARTICLE I. DEFINITIONS ............................................................................................ 2
   1.1     Certain Definitions ................................................................................. 2
   1.2     Terms Defined Elsewhere in this Agreement ........................................ 11

ARTICLE II. PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES ........ 13
   2.1     Purchase and Sale of Assets ................................................................. 13
   2.2     Excluded Assets .................................................................................... 16
   2.3     Assumption of Liabilities ...................................................................... 17
   2.4     Excluded Liabilities .............................................................................. 18
   2.5     Purchase and Sale of the Transferred Equity Interests .......................... 19
   2.6     Cure Costs; Schedule Updates ............................................................. 19
   2.7     Further Conveyances and Assumptions ................................................ 20
   2.8     "As Is, Where Is" Transaction ............................................................. 20

ARTICLE III. CONSIDERATION ................................................................................... 21
   3.1     Consideration ....................................................................................... 21

ARTICLE IV. CLOSING AND TERMINATION ............................................................... 21
   4.1     Closing ................................................................................................. 21
   4.2     Closing Deliveries by Sellers ............................................................... 22
   4.3     Closing Deliveries by the Purchaser ..................................................... 23
   4.4     Termination of Agreement .................................................................... 23
   4.5     Procedure Upon Termination ................................................................ 25
   4.6     Effect of Termination ........................................................................... 25

ARTICLE V. REPRESENTATIONS AND WARRANTIES OF THE SELLERS ..................... 26
   5.1     Corporate Organization and Qualification ............................................ 26
   5.2     MSN, MSNH and Subsidiaries ............................................................ 27
   5.3     Authority Relative to This Agreement ................................................... 27
   5.4     Conflicts; Consents of Third Parties ..................................................... 28
   5.5     Absence of Certain Developments ........................................................ 28
   5.6     Litigation ............................................................................................. 30
   5.7     Intellectual Property ............................................................................. 30
   5.8     Agreements, Contracts and Commitments; Certain Other Agreements .. 31
   5.9     Regulatory Matters; Permits ................................................................. 33
   5.10    Brokers and Finders .............................................................................. 33
   5.11    Title to Assets and the Transferred Equity Interests .............................. 33
   5.12    Tangible Personal Property; Equipment ................................................ 34
   5.13    Real Property ........................................................................................ 34

i

5.14    Compliance with Law; Permits ..................................................................34
5.15    Tax Returns; Taxes ....................................................................................35
5.16    Employees ..................................................................................................36
5.17    Company Benefit Plans ..............................................................................37
5.18    Parents .......................................................................................................39
5.19    Affiliate Matters ........................................................................................39
5.20    Insurance Policies ......................................................................................39
5.21    Environmental Matters ..............................................................................40
5.22    Customers, Vendors and Suppliers ............................................................40
5.23    Accounts Receivable ..................................................................................41
5.24    Financial Statements ..................................................................................41
5.25    Capital Expenditures ..................................................................................41
5.26    Absence of Undisclosed Liabilities ...........................................................41
5.27    Claims for Indemnification ........................................................................42
5.28    SEC Filings ................................................................................................42

ARTICLE VI. REPRESENTATIONS AND WARRANTIES OF THE PURCHASER.............42
6.1    Corporate Organization and Qualification ..................................................42
6.2    Authority Relative to this Agreement ..........................................................43
6.3    Consents and Approvals; No Violation ........................................................43
6.4    Brokers and Finders ....................................................................................44
6.5    Adequate Assurances Regarding Assigned Contracts..................................44
6.6    Sufficiency of Financing .............................................................................44
6.7    Investigation ................................................................................................44

ARTICLE VII. EMPLOYEES .................................................................................44
7.1    Employee Matters ........................................................................................44
7.2    Excluded Plans ............................................................................................45
7.3    COBRA Coverage ........................................................................................45
7.4    No Third-Party Beneficiaries.......................................................................45

ARTICLE VIII. BANKRUPTCY COURT MATTERS .................................................45
8.1    Competing Bid and Other Matters................................................................45
8.2    Sale Order ....................................................................................................47

ARTICLE IX. COVENANTS AND AGREEMENTS ...................................................47
9.1    Conduct of Business of Sellers ....................................................................47
9.2    Access to Information...................................................................................50
9.3    Assignability of Certain Contracts, Etc. .....................................................51
9.4    Rejected Contracts .......................................................................................52
9.5    Further Agreements ......................................................................................52
9.6    Further Assurances .......................................................................................52
9.7    Preservation of Records ...............................................................................54
9.8    Publicity.......................................................................................................54
9.9    Communication with Acquired Customers ..................................................54
9.10    Notification of Certain Matters...................................................................55

ii

    9.11    DIP Loan Documents ................................................................................. 55
    9.12    Insurance Policies. .................................................................................... 55

ARTICLE X. CONDITIONS TO CLOSING ................................................................ 56
    10.1    Conditions Precedent to the Obligations of the Purchaser and Sellers ................. 56
    10.2    Conditions Precedent to the Obligations of Sellers ......................................... 57
    10.3    Conditions Precedent to the Obligations of the Purchaser ................................. 57
    10.4    Failure Caused by Party's Failure to Comply ............................................... 58

ARTICLE XI. TAXES ................................................................................................. 59
    11.1    Additional Tax Matters ........................................................................... 59

ARTICLE XII. MISCELLANEOUS ............................................................................ 59
    12.1    Payment of Expenses .............................................................................. 59
    12.2    Survival of Representations and Warranties; Survival of Confidentiality ............ 60
    12.3    Entire Agreement; Amendments and Waivers ................................................ 60
    12.4    Counterparts .......................................................................................... 60
    12.5    Governing Law ...................................................................................... 60
    12.6    Jurisdiction, Waiver of Jury Trial .............................................................. 60
    12.7    Notices ................................................................................................. 61
    12.8    Binding Effect; Assignment ..................................................................... 62
    12.9    Severability .......................................................................................... 62
    12.10   Injunctive Relief .................................................................................... 63
    12.11   Non Recourse ........................................................................................ 63
    12.12   No Waiver or Release .............................................................................. 63
    12.13   Time of the Essence ................................................................................ 64
    12.14   Certain Interpretations ............................................................................. 64

CH\1168949.14

## EXHIBITS

| | |
|---|---|
| Exhibit A | Form of Bill of Sale |
| Exhibit B | Form of Assignment and Assumption Agreement |
| Exhibit C | Form of Sale Order |
| Exhibit D | Form of Bidding Procedures Order |
| Exhibit E | Form of Integris Assignment and Assumption Agreement |

## SCHEDULES

| | |
|---|---|
| Schedule A | Subsidiaries of MSN |
| Schedule 1.1(l) | Cure Costs |
| Schedule 1.1(pp) | Knowledge of Sellers |
| Schedule 1.1(vv) | Non-Assumed Contracts |
| Schedule 2.1(f) | Deposits and Prepaid Expenses |
| Schedule 2.1(v) | Seller Benefit Plans |
| Schedule 2.2(i) | Additional Excluded Assets |
| Schedule 2.3(h) | Additional Assumed Liabilities |
| Schedule 2.4(j) | Excluded Liabilities |
| Schedule 9.1(a) | Conduct of Business of Sellers |
| Schedule 9.1(b)(viii) | Senior Management |
| Schedule 10.3(d) | Assigned Contracts |

## SELLERS DISCLOSURE SCHEDULE

| | |
|---|---|
| Section 5.1 | Corporate Organization and Qualification |
| Section 5.2(a) | Seller Jurisdiction of Incorporation and Qualification |
| Section 5.2(b) | Ownership by Sellers |
| Section 5.3 | Sellers' Documents |
| Section 5.4(a) | Conflicts |
| Section 5.4(b) | Consents of Third Parties |
| Section 5.5 | Absence of Certain Developments |
| Section 5.6 | Litigation |
| Section 5.7 | Owned and Licensed Intellectual Property; Claims |
| Section 5.8(a) | Material Contracts |
| Section 5.8(b) | Notice of Default under Material Contracts |
| Section 5.8(c) | Assigned Contracts |
| Section 5.9(a) | Material Permits |
| Section 5.10 | Brokers and Finders |
| Section 5.12(a) | Personal Property Leases |
| Section 5.12(b) | Default under Personal Property Leases |
| Section 5.13(b) | Leased Real Property |
| Section 5.15 | Tax Returns; Taxes |
| Section 5.16(a) | Worker's Compensation and Long Term Disability Claims |
| Section 5.16(b) | Employment Loss |
| Section 5.16(c) | Severance or Termination Payment Obligations |

Section 5.17          Employee Plans
Section 5.17(e)       Post-Separation Benefits
Section 5.18          Parent Contracts
Section 5.19          Affiliate Matters
Section 5.20          Insurance Policies and Claims
Section 5.22          Significant Customers and Significant Vendors/Suppliers
Section 5.24          Financial Statements
Section 5.26          Undisclosed Liabilities
Section 5.27          Claims for Indemnification

## PURCHASER DISCLOSURE SCHEDULE

Section 6.2           Purchaser's Documents
Section 6.3(a)        Conflicts
Section 6.3(b)        Consents of Third Parties

CH\1168949.14

## ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT** (this "Agreement"), dated as of July 2, 2010 (the "Execution Date"), by and among Medical Staffing Network, Inc., a Delaware corporation ("MSN"), Medical Staffing Holdings, LLC, a Delaware limited liability company ("MSH"), Medical Staffing Network Holdings, Inc., a Delaware corporation ("MSNH") and those subsidiaries of MSN set forth on the signature pages hereto and also on Schedule A (collectively with MSN, MSH and MSNH, the "Sellers" and each, individually, a "Seller"), and MSN AcquistionCo, LLC, a Delaware limited liability company (the "Purchaser"). Certain capitalized terms used herein are defined in Article I.

## RECITALS

WHEREAS, Sellers currently conduct the Business and the Purchaser desires to purchase the Business;

WHEREAS, each Seller intends to commence a case under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court"), (as Jointly Administered, collectively, the "Chapter 11 Case");

WHEREAS, the First Lien Lenders are secured creditors of the Sellers holding valid interests in, on and against the Sellers, their estates and property of their estates, arising in connection with the First Lien Loan Documents;

WHEREAS, the Sellers will submit a proposed Bidding Procedures Order which, when approved, will authorize the Credit Bid of the claims of the First Lien Lenders;

WHEREAS, the First Lien Agent and First Lien Lenders have assigned their rights to receive the Purchased Assets and the Transferred Equity Interests and to assume the Assumed Liabilities to the Purchaser; and

WHEREAS, on or prior to the entry of the Bidding Procedures Order, the DIP Loan Agreement (as defined below) shall have been entered into by the parties thereto and become effective; and

WHEREAS, in connection with the Chapter 11 Case and subject to the terms and conditions contained herein and following the entry of the Sale Order approving the Purchaser as the highest and best bid and subject to the terms and conditions thereof, Sellers shall sell, transfer and assign to the Purchaser, and the Purchaser shall purchase and acquire from Sellers, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, the Purchased Assets and the Transferred Equity Interests and shall assume from Sellers the Assumed Liabilities, all as more specifically provided herein and in the Sale Order.

**NOW, THEREFORE,** in consideration of the foregoing and the mutual representations, warranties, covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound hereby, the Purchaser and Sellers hereby agree as follows:

## ARTICLE I.

## DEFINITIONS

1.1     Certain Definitions.  For purposes of this Agreement, the following terms used in this Agreement shall have the respective meanings assigned to them below:

(a)     "Accounts Receivable" means (i) any and all accounts receivable, trade accounts and other amounts (including overdue accounts receivable) owed to any of the Sellers relating to, or arising in connection with the operation and conduct of, the Business and any other rights of any of the Sellers to payment from third parties and the full benefit of all security for such accounts or rights to payment, including all trade accounts receivable representing amounts receivable in respect of services rendered, in each case owing to any of the Sellers, and any return of premiums or other funds relating to or arising from any Insurance Policies; (ii) all other accounts or notes receivable of any of the Sellers and the full benefit of all security for such accounts or notes receivable arising in the conduct of the Business; and (iii) any and all claims, remedies or other rights relating to any of the foregoing, together with any interest or unpaid financing charges accrued thereon, in each case existing on the Execution Date or arising in the Ordinary Course of Business after the Execution Date and in each case that have not been satisfied or discharged prior to the close of business on the day immediately preceding the Closing Date or have not been written off or sent to collection prior to the close of business on the day immediately preceding the Closing Date (it being understood that the receipt of a check prior to the close of business on the day immediately preceding the Closing Date shall constitute satisfaction or discharge of the applicable account or note receivable to the extent of the payment represented thereby).

(b)     "Affiliate" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

(c)     "Alternative Transaction" means (i) the approval by the Bankruptcy Court of the sale or sales of all or a material portion of the Purchased Assets to a third party other than Purchaser (or an Affiliate of Purchaser), or (ii) the filing of a plan of reorganization that does not contemplate the sale of the Purchased Assets to Purchaser (or an Affiliate of Purchaser) in accordance with the terms hereof.

(d)     "Auction" has that meaning ascribed to such term by the Bidding Procedures Order.

2

(e)      "Bankruptcy Rules" means the Federal Rules of Bankruptcy Procedure.

(f)      "Bidding Procedures Order" means an order substantially in the form attached hereto as Exhibit D or in such form as is otherwise in form and substance satisfactory to Sellers and the Purchaser.

(g)      "Business" means the business of providing temporary healthcare staffing through per diem nurse staffing services as well as travel nurse, home health, allied health and vendor managed services.

(h)      "Cash and Cash Equivalents" means all of Sellers' cash (including petty cash and checks received prior to the close of business on the Closing Date), checking account balances, marketable securities, certificates of deposits, time deposits, bankers' acceptances, commercial paper and government securities and other cash equivalents.

(i)      "Code" means the Internal Revenue Code of 1986, as amended.

(j)      "Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, license, commitment or instrument or other agreement, arrangement or commitment that is binding upon a Person or its property.

(k)      "Credit Bid" means a credit bid of a portion of the First Lien Indebtedness in an amount equal to $88,550,832.30, excluding the L/C Obligations (as defined in the First Lien Credit Agreement) and Protective Advances (as defined in the DIP Loan Agreement).

(l)      "Cure Costs" means the amounts necessary to cure all defaults, if any, and to pay all actual pecuniary losses, if any, that have resulted from such defaults, under the Assigned Contracts, in each case as of the Petition Date and to the extent required by Section 365(b) of the Bankruptcy Code and any order of the Bankruptcy Court, which amounts (if not already paid or to be paid in the Ordinary Course of Business pursuant to an order of the Bankruptcy Court) shall be identified to Purchaser on Schedule 1.1(l) at least twenty (20) days prior to the Sale Hearing.

(m)      "DIP Agent" means General Electric Capital Corporation, in its capacity as administrative agent and collateral agent to the DIP Lenders under the DIP Loan Agreement.

(n)      "DIP Lenders" means the lenders party from time to time to the DIP Loan Agreement.

(o)      "DIP Loan" means the Indebtedness (including principal, interest, fees, premium and any other amounts due or other obligations) of Sellers (or any Seller) arising under the DIP Loan Agreement and/or the DIP Loan Documents.

(p)      "DIP Loan Agreement" means that certain Senior Secured Priming and Superpriority Debtor-in-Possession Credit Agreement, to be executed on or about July 6, 2010, by and among Medical Staffing Network, Inc., as borrower, Medical Staffing Holdings, LLC, Medical Staffing Network Holdings, Inc. and certain other subsidiaries thereof, as guarantors, the

3

DIP Lenders party thereto, as lenders, and the DIP Agent, as agent for the DIP Lenders, to be provided in connection with the Chapter 11 Case and this Agreement as such DIP Loan Agreement may be amended, modified, supplemented, or restated from time to time.

(q)    "DIP Loan Documents" means the "Loan Documents" as defined in the DIP Loan Agreement, as such Loan Documents are amended, modified, supplemented or restated from time to time.

(r)    "Documents" means all of Sellers' written files, documents, instruments, papers, books, reports, records, tapes, microfilms, photographs, letters, budgets, forecasts, plans, operating records, safety and environmental reports, data, studies and documents, Tax Returns, ledgers, journals, title policies, customer lists, regulatory filings, operating data and plans, research material, technical documentation (design specifications, engineering information, test results, maintenance schedules, functional requirements, operating instructions, logic manuals, processes, flow charts, etc.), user documentation (installation guides, user manuals, training materials, release notes, working papers, etc.), marketing documentation (sales brochures, flyers, pamphlets, web pages, etc.), and other similar materials, in each case whether or not in electronic form.

(s)    "Employee" means an individual who, as of the applicable date, is employed by any Seller in connection with the Business.

(t)    "Employment Loss" means (i) an employment termination, other than a discharge for cause, voluntary departure or retirement, (ii) a layoff exceeding six (6) months, (iii) a reduction in hours of work of more than fifty percent (50%) in each month of any six (6) month period or (iv) or any similar employment action that (when aggregated with any other employment action) could trigger the notice requirements of the WARN Act or any other similar state law.

(u)    "Encumbrance" means any lien, encumbrance, claim (as defined in Section 101(5) of the Bankruptcy Code), right, demand, charge, mortgage, deed of trust, option, pledge, security interest or similar interests, title defects, hypothecations, easements, rights of way, restrictive covenants, encroachments, rights of first refusal, preemptive rights, judgments, conditional sale or other title retention agreements and other impositions, imperfections or defects of title or restrictions on transfer or use of any nature whatsoever.

(v)    "Environmental Laws" means all Laws relating to pollution or protection of health, natural resources or the environment, or the generation, use, treatment, storage, handling, transportation or Release of, or exposure to, Hazardous Materials, including, without limitation, the Federal Water Pollution Control Act (33 U.S.C. §1251 et seq.), Resource Conservation and Recovery Act (42 U.S.C. §6901 et seq.), Safe Drinking Water Act (42 U.S.C. §3000(f) et seq.), Toxic Substances Control Act (15 U.S.C. §2601 et seq.), Clean Air Act (42 U.S.C. §7401 et seq.), Comprehensive Environmental Response, Compensation and Liability Act (42 U.S.C. §9601 et seq.) and other similar federal, state, provincial and local statutes.

(w)    "Equipment" means all equipment, machinery, vehicles, furniture, fixtures, supplies and other tangible personal property of every kind and description used, or held

4

for use, in connection with the operation of the Business and owned by any Seller, wherever located, including but not limited to, communications equipment, the IT Assets, and any attached and associated hardware, routers, devices, panels, cables, manuals, cords, connectors, cards, and vendor documents, and including all warranties of the vendor applicable thereto, to the extent such warranties are transferable, but excluding software and any other intangibles associated therewith except to the extent embedded in such Equipment and required to operate it.

(x)    "ERISA Affiliate" means any entity which is, or at any relevant time was, a member of (A) a controlled group of corporations (as defined in Section 414(b) of the Code), (B) a group of trades or businesses under common control (as defined in Section 414(c) of the Code), (C) an affiliated service group (as defined under Section 414(m) of the Code) or (D) any group specified in regulations under Section 414(o) of the Code, any of which includes or included any Seller.

(y)    "Field Associate" means any health care professional working for the one of the Sellers on a temporary staffing assignment at a healthcare facility, whether such Field Associate is an Employee or an independent contractor.

(z)    "Final Order" means an order or judgment of the Bankruptcy Court or any other court of competent jurisdiction entered by the Clerk of the Bankruptcy Court or such other court on the docket in Sellers' Chapter 11 Case or the docket of such other court, which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for *certiorari*, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for *certiorari* or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of *certiorari*, new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court or other court of competent jurisdiction shall have been affirmed by the highest court to which such order was appealed, or *certiorari* shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for *certiorari* or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Bankruptcy Rules; provided, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order, shall not cause such order not to be a Final Order.

(aa)    "First Lien Agent" means General Electric Capital Corporation in its capacity as administrative agent and collateral agent under the First Lien Credit Agreement.

(bb)    "First Lien Credit Agreement" means that certain Amended and Restated Credit Agreement, dated as of March 12, 2009, among MSN, as Borrower, Medical Staffing Holdings, LLC and Medical Staffing Network Holdings, Inc. as certain of the guarantors, the First Lien Lenders, the First Lien Agent, GE Capital Markets, Inc., as sole lead arranger and sole bookrunner, and Firstlight Financial Corporation as documentation agent.

5

(cc)    "First Lien Indebtedness" means all obligations, claims, rights, actions, causes of action, suits, liabilities, damages, debts, costs, expenses and demands whatsoever, in law or in equity, arising under, or otherwise relating to, the First Lien Credit Agreement.

(dd)    "First Lien Lenders" means the lenders from time to time party to the First Lien Credit Agreement.

(ee)    "First Lien Loan Documents" means the "Loan Documents" as defined in the First Lien Credit Agreement, as such Loan Documents are amended, modified, supplemented or restated from time to time.

(ff)    "GAAP" means United States generally accepted accounting principles as in effect from time to time.

(gg)    "Governmental Body" means any government, quasi governmental entity, or other governmental or regulatory body, agency or political subdivision thereof of any nature, whether foreign, federal, state or local, or any agency, branch, department, official, entity, instrumentality or authority thereof, or any court or arbitrator (public or private) of applicable jurisdiction.

(hh)    "Hazardous Materials" means petroleum and all derivatives thereof or synthetic substitutes therefor, asbestos and asbestos containing materials, and any and all materials now or hereafter defined, listed, designated or classified as, or otherwise determined to be, "hazardous wastes," "hazardous substances," "radioactive," "solid wastes," or "toxic" (or words of similar meaning) under or pursuant to or otherwise listed or regulated pursuant to any Environmental Law.

(ii)    "Identified Persons" for purposes of any particular representation that is qualified by Knowledge means Sellers' Employees having primary responsibility for the matters that are the subject of such representation

(jj)    "Indebtedness" of any Person means, without duplication, (i) the interest in respect of, principal of and premium (if any) in respect of (x) indebtedness of such Person for money borrowed and (y) indebtedness evidenced by notes, debentures, bonds or other similar instruments for the payment of which such Person is responsible or liable; (ii) all obligations of such Person issued or assumed as the deferred purchase price of property (other than for services and goods acquired in the Ordinary Course of Business); (iii) all obligations of such Person under leases required to be capitalized in accordance with GAAP; (iv) all obligations of such Person for the reimbursement of any obligor on any letter of credit, banker's acceptance or similar credit transaction; (v) all obligations of the type referred to in clauses (i) through (iv) of any Persons for the payment of which such Person is responsible or liable, directly or indirectly, as obligor, guarantor, surety or otherwise, including guarantees of such obligations; and (vi) all obligations of the type referred to in clauses (i) through (v) of other Persons secured by any Encumbrance (other than Permitted Encumbrances), on any property or asset of such Person (whether or not such obligation is assumed by such Person).

6

(kk) "Integris Assignment and Assumption Agreement" means an assignment and assumption agreement with respect to the Transferred Equity Interests, substantially in the form attached hereto as Exhibit E.

(ll) "Integris JV Agreement" means that certain Operating Agreement, entered into and effective as of May 7, 1998, by and among HealthStaf of Oklahoma, L.L.C., predecessor to Intelistaf of Oklahoma, LLC, Healthstaf Medical Services, Inc. and Integris Prohealth, Inc., as amended from time to time.

(mm) "Intellectual Property" means all intellectual property and proprietary rights of any kind, including the following: (i) trademarks, service marks, trade names, slogans, logos, trade dress, internet domain names, uniform resource identifiers, rights in design, brand names, and other similar designations of source or origin, together with all goodwill, registrations and applications related to the foregoing; (ii) patents, utility models and industrial design registrations (and all continuations, divisionals, continuations in part, provisionals, renewals, reissues, re-examinations and applications for any of the foregoing); (iii) copyrights and copyrightable subject matter (including without limitation any registrations and applications for any of the foregoing); (iv) trade secrets and other confidential or proprietary business information (including manufacturing and production processes and techniques, research and development information, technology, drawings, specifications, designs, plans, proposals, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information), know how, proprietary processes, formulae, algorithms, models, and methodologies; (v) computer software, computer programs, and databases (whether in source code, object code or other form); and (vi) all rights to sue for past, present and future infringement, misappropriation, dilution or other violation of any of the foregoing and all remedies at law or equity associated therewith.

(nn) "Intercompany Obligations" means any intercompany obligation or Indebtedness between any Seller, on the one hand, and another Seller, on the other hand, whether or not evidenced by promissory notes, written contracts and/or recorded in the books and records of such Seller(s).

(oo) "IT Assets" means all of Sellers' computers, computer software and databases (including source code, object code and all related documentation), firmware, middleware, servers, workstations, routers, hubs, switches, data communications lines, and all other information technology equipment and elements, and all associated documentation that are used, or held for use, in connection with the operation of the Business.

(pp) "Knowledge of Sellers" (or "Sellers' Knowledge") means the actual knowledge of those persons listed on Schedule 1.1(pp) after reasonable inquiry of the Identified Persons.

(qq) "Laws" means all federal, state, local or foreign laws, statutes, common law, rules, codes, regulations, restrictions, ordinances, orders, decrees, approvals, directives, judgments, rulings, injunctions, writs and awards of, or issued, promulgated, enforced or entered

7

CH\1168949.14

by, any and all Governmental Bodies, or court of competent jurisdiction, or other legal requirement or rule of law.

(rr)    "Leased Real Property" means all of the real property leased, subleased, licensed, used or occupied by any Seller, together with all buildings, structures, fixtures and improvements erected thereon, and any and all rights privileges, easements, licenses, hereditaments and other appurtenances relating thereto, and used, or held for use, in connection with the operation of the Business.

(ss)    "Liability" means, as to any Person, any debt, adverse claim, liability, duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed, including all costs and expenses relating thereto.

(tt)    "Licensed Intellectual Property" means any Intellectual Property that is licensed to any Seller, and used, or held for use, in connection with the operation of the Business.

(uu)    "Material Adverse Effect" means any change, effect, event, occurrence, development, circumstance or state of facts which has had or would reasonably be expected to have a materially adverse effect on the business, properties, operations, financial condition, prospects or results of operations of the Business or the Sellers, taken as a whole, or which would materially impair the Sellers' ability to perform their obligations under this Agreement or have a materially adverse effect on or prevent or materially delay the consummation of the transactions contemplated by this Agreement; provided, however, that changes in the business, properties, operations, financial condition, prospects or results of operations of the Sellers arising by reason of any of the following shall not constitute a material adverse change: (i) the filing of a voluntary petition under Chapter 11 of the Bankruptcy Code or the effect, directly or indirectly, of such filing; (ii) changes in conditions in the U.S. or global economy or capital or financial markets generally, including changes in interest or exchange rates; (iii) factors generally affecting the industries or markets in which the Sellers operate; (iv) changes in general legal, tax, regulatory, political or business conditions that, in each case, generally affect the geographic regions or industries in which the Sellers conduct their business; and (v) acts of war, armed hostilities, sabotage or terrorism, or any escalation or worsening of any such acts of war, armed hostilities, sabotage or terrorism threatened or underway as of the date of this Agreement.

(vv)    "Non-Assumed Contracts" means any Contracts to which any Seller is a party but that are not Assigned Contracts, including, without limitation, the Contracts set forth on Schedule 1.1(vv).

(ww)    "Ordinary Course of Business" means the ordinary and usual course of day-to-day operations of the Business consistent with past practice.

(xx)    "Owned Intellectual Property" means all Intellectual Property owned by any Seller, and used, or held for use, in connection with the operation of the Business.

8

(yy)   "Permits" means all notifications, licenses, permits (including environmental, construction and operation permits), provider numbers, accreditations, franchises, certificates, approvals, consents, waivers, clearances, exemptions, classifications, registrations, variances, orders, tariffs, rate schedules and other similar documents and authorizations issued by any Governmental Body and/or any self-regulatory or accreditation body or organization to any Seller and used, or held for use, in connection with the operation of the Business or applicable to ownership of the Purchased Assets or assumption of the Assumed Liabilities.

(zz)   "Permitted Encumbrances" means (i) Encumbrances for utilities and current Taxes not yet due and payable or being contested in good faith; (ii) easements, rights of way, restrictive covenants, encroachments and similar non-monetary encumbrances or non-monetary impediments against any of the Purchased Assets which do not, in the aggregate, adversely affect the operation of the Business and, in the case of the Assumed Leased Real Property, which do not, in the aggregate, adversely affect the use or occupancy of such Assumed Leased Real Property as it relates to the operation of the Business, (iii) applicable zoning Laws, building codes, land use restrictions and other similar restrictions imposed by Law, (iv) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the Ordinary Course of Business and (v) such other Encumbrances or title exceptions as the Purchaser may approve in writing in its sole discretion or which do not, individually or in the aggregate, adversely affect the operation of the Business.

(aaa)   "Person" means an individual, corporation, partnership, limited liability company, joint venture, association, trust, unincorporated organization, labor union, estate, Governmental Body or other entity or group.

(bbb)   "Petition Date" means the date on which the Sellers commenced the Chapter 11 Case.

(ccc)   "Qualified Bid" has the meaning assigned to that term in the Bidding Procedures Order as approved by the Bankruptcy Court.

(ddd)   "Regulatory Approvals" means any consents, waivers, approvals, orders Permits or authorizations of any Governmental Body required in connection with the execution, delivery and performance of this Agreement and the consummation of the transactions contemplated hereunder.

(eee)   "Release" means, with respect to any Hazardous Material, any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, disposing or migrating into or through any surface or ground water, drinking water supply, soil, surface or subsurface strata or medium, or the ambient air.

(fff)   "Sale Hearing" means the hearing to approve this Agreement and seeking entry of the Sale Order.

(ggg)   "Sale Motion" means the motion or motions of Sellers, in form and substance reasonably acceptable to Sellers and Purchaser, seeking approval and entry of the Bidding Procedures Order and Sale Order.

9

(hhh)  "Sale Order" means an order substantially in the form attached hereto as Exhibit C or otherwise in form and substance satisfactory to Sellers and the Purchaser.

(iii)  "Second Lien Agent" means NexBank, SSB, in its capacity as administrative agent and collateral agent under the Second Lien Credit Agreement.

(jjj)  "Second Lien Credit Agreement" means that certain Amended and Restated Second Lien Credit Agreement, dated as of March 12, 2009, among Medical Staffing Network Inc. as borrower, Medical Staffing Holdings, LLC and Medical Staffing Network Holdings, Inc. as certain of the guarantors, the Second Lien Lenders and the Second Lien Agent.

(kkk)  "Second Lien Lenders" means the lenders from time to time party to the Second Lien Credit Agreement.

(lll)  "Second Lien Loan Documents" means the "Loan Documents" as defined in the Second Lien Credit Agreement, as such Loan Documents are amended, modified, supplemented or restated from time to time.

(mmm)"Seller Plan" means (i) all "employee benefit plans" (as defined in Section 3(3) of ERISA), including all employee benefit plans which are "pension plans" (as defined in Section 3(2) of ERISA) and any other written employee benefit arrangements or payroll practices (including, without limitation, severance pay, vacation pay, company awards, salary continuation for disability, sick leave, death benefit, hospitalization, welfare benefit, group or individual health, dental, medical, life insurance, survivor benefit, deferred compensation, profit sharing, retirement, retiree medical, supplemental retirement, bonus or other incentive compensation, equity compensation arrangements or policies) and (ii) all written employment, termination, bonus, severance, change in control or other similar contracts or agreements, in each case to which any Seller is a party, with respect to which any Seller has any Liability or obligation or which are maintained by any Seller and to which any Seller contributes or is obligated to contribute with respect to current or former directors, officers, consultants and Employees.

(nnn)  "Seller Intellectual Property" means any Intellectual Property that is owned by or licensed to Sellers, and used, or held for use, in connection with the operation of the Business.

(ooo)  "Tax" and "Taxes" mean any and all taxes, charges, fees, tariffs, duties, impositions, levies or other assessments, imposed by any Governmental Body, and include any interest, penalties or additional amounts attributable to, or imposed upon, or with respect to, Taxes.

(ppp)  "Tax Period" means any period prescribed by any Governmental Body for which a Tax Return is required to be filed or a Tax is required to be paid.

(qqq)  "Tax Return" means any return, report, information return, declaration, claim for refund or other document (including any schedule or related or supporting information)

10

supplied or required to be supplied to any Governmental Body with respect to Taxes, including amendments thereto.

(rrr) "Transferred Equity Interests" means all of the equity interests in InteliStaf of Oklahoma, LLC held by InteliStaf Healthcare, Inc.

(sss) "WARN Act" means the Worker Adjustment and Retraining Notification Act of 1988, 29 U.S.C. §2101 et seq.

1.2  Terms Defined Elsewhere in this Agreement. For purposes of this Agreement, the following terms have meanings set forth in the sections indicated:

| Term | Section |
|------|---------|
| 2009 Audited Financial Statements | 5.24 |
| Accounts Receivable List | 5.23 |
| Acquired Customers | 2.1(a) |
| Actions | 5.6 |
| Additional Excluded Insurance Policies | 2.2(d) |
| Agreement | Preamble |
| Allocation | 11.1(b) |
| Antitrust Laws | 9.12(a) |
| Assigned Contracts | 2.1(s) |
| Assumed Customer Contracts | 2.1(a) |
| Assumed Independent Contractor Contracts | 2.1(k) |
| Assumed Intellectual Property | 2.1(s) |
| Assumed Intellectual Property Licenses | 2.1(s) |
| Assumed Leased Real Property | 2.1(j) |
| Assumed Liabilities | 2.3 |
| Assumed Personal Property Leases | 2.1(h) |
| Assumed Plans | 2.1(v) |
| Assumed Real Property Leases | 2.1(j) |
| Assumed Vendor Contracts | 2.1(e) |
| Back-up Bidder | 8.1(e) |
| Bankruptcy Code | Recitals |
| Bankruptcy Court | Recitals |
| Bankruptcy Exceptions | 5.3 |
| Chapter 11 Case | Recitals |
| Closing | 4.1 |
| Closing Date | 4.1 |
| COBRA Continuation Coverage | 7.3 |
| Competing Bid | 8.1(c) |
| Credit Bid Amount | 3.1(a) |
| Credit Bid and Release | 3.1(b) |
| DOJ | 9.12(a) |
| Employee Plans | 5.17(a) |

11

| Term | Section |
|------|---------|
| Exchange Act | 5.28 |
| Excluded Assets | 2.2 |
| Excluded Documents | 2.1(x) |
| Excluded Liabilities | 2.4 |
| Excluded Plans | 2.2(h) |
| Execution Date | Preamble |
| Exempt Trust | 5.17(c) |
| Expense Reimbursement | 8.1(b) |
| Financial Statements | 5.24 |
| First Lien Indebtedness | 3.1(b) |
| FTC | 9.12(a) |
| Holdings | Preamble |
| Insurance Policies | 5.20 |
| Integris JV Consent | 4.2(g) |
| Material Contracts | 5.8(a) |
| Material Permits | 5.9(a) |
| Most Recent Balance Sheet | 5.24 |
| MSH | Preamble |
| MSN | Preamble |
| MSN Bylaws | 5.1 |
| MSN Certificate | 5.1 |
| MSNH | Preamble |
| MSNH SEC Documents | 5.28 |
| Named Insured | 4.2(h) |
| Outside Back-up Date | 8.1(e) |
| Outside Date | 4.4(b) |
| Prevailing Bidder | 8.1(e) |
| Purchase Price | 3.1(a) |
| Purchased Assets | 2.1 |
| Purchased Names | 2.1(i) |
| Purchaser | Preamble |
| Purchaser Disclosure Schedule | Article VI |
| Purchaser's Documents | 6.2 |
| Purchaser Termination Fee | 4.6(b) |
| Qualified Plan | 5.17(c) |
| Registered IP | 5.7(a) |
| Representatives | 9.2(a) |
| Rights of Indemnity | 5.27 |
| Securities Act | 5.28 |
| Seller | Preamble |
| Seller Reserves | 5.23 |
| Seller Disclosure Schedule | Article V |
| Sellers' Documents | 5.3 |
| Significant Customers | 5.22 |

12

CH\1168949.14

| Term | Section |
|------|---------|
| Significant Vendors/Suppliers | 5.22 |
| Subsidiary Organizational Documents | 5.1 |
| Third Party Insurance Policies | 5.20(b) |
| Transferred Employee | 7.1 |
| WARN Act | 7.4 |

## ARTICLE II.

## PURCHASE AND SALE OF ASSETS; ASSUMPTION OF LIABILITIES

2.1    Purchase and Sale of Assets.  Pursuant to Sections 105, 363 and 365 of the Bankruptcy Code and on the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall purchase and acquire and accept from each Seller, and each Seller shall sell, transfer, assign, convey and deliver to the Purchaser, at the Closing, all of such Seller's right, title and interest in, to and under the Purchased Assets, free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and other than Permitted Encumbrances).  "Purchased Assets" shall mean all of the business, assets, properties, contractual rights, goodwill, going concern value, rights and claims of any Seller related to the Business, wherever situated and of whatever kind and nature, real or personal, tangible or intangible, whether or not reflected on the books and records of any Seller, other than the Excluded Assets, including, without limitation, each Seller's right, title and interest in, to and under each of the following assets:

(a)    (i) all Contracts with customers of Sellers (the "Acquired Customers") (it being the current intention of the Purchaser to accept assignments of substantially all of the contracts between Sellers and their customers), and all rights pursuant thereto, entered into by any Seller including, without limitation, the Material Contracts set forth on part (i) to Section 5.8(a) of the Seller Disclosure Schedule and any other such Contract added to the list of Assumed Customer Contracts in accordance with Section 2.6, (ii) any other such Contract with customers of Sellers entered into in the Ordinary Course of Business between the Execution Date and the Closing Date that, if entered into by Sellers on or prior to the Execution Date, would not be a Material Contract, and (iii) any other contract with customers of Sellers entered into between the Execution Date and the Closing Date that, if entered into by Sellers on or prior to the Execution Date, would be a Material Contract provided that the execution thereof has been approved by the Purchaser in writing pursuant to Section 9.1 (collectively, the "Assumed Customer Contracts");

(b)    all Accounts Receivable;

(c)    all Cash and Cash Equivalents, whether on hand, in transit or in banks or other financial institutions, security entitlements, securities accounts, commodity contracts and commodity accounts and including any cash collateral that is collateralizing any letters of credit issued pursuant to the DIP Loan Documents or any other letter of credit, including, without

13

limitation, any letter of credit issued prior to the Petition Date, or obligation with respect thereto, assumed by the Purchaser, but excluding any cash tendered as part of the Purchase Price;

(d)    all Documents used in or relating to the Business or in respect of the assets purchased by Purchaser under this Section 2.1 or Assumed Liabilities, including but not limited to, the Acquired Customers, services, marketing, advertising and promotional activities, trade shows and all files, supplier lists, vendor lists, records, literature and correspondence with sufficient detail as reasonably available;

(e)    (i) all Contracts with suppliers and vendors, including, without limitation, Contracts with subcontractors for staffing services and affiliate providers, and all rights pursuant thereto, entered into by any Seller including, without limitation, the Material Contracts set forth on parts (v) and (viii) to Section 5.8(a) of the Seller Disclosure Schedule and any other such Contract added to the list of Assumed Vendor Contracts in accordance with Section 2.6 to the extent such Contracts may be assumed and assigned under Section 365 of the Bankruptcy Code, (ii) any other such Contract with suppliers or vendors of Sellers entered into in the Ordinary Course of Business between the Execution Date and the Closing Date that, if entered into by Sellers on or prior to the Execution Date, would not be a Material Contract and (iii) any other contract with suppliers or vendors of Sellers entered into between the Execution Date and the Closing Date that, if entered into by Sellers on or prior to the Execution Date, would be a Material Contract provided that the execution thereof has been approved by the Purchaser in writing pursuant to Section 9.1 (collectively, the "Assumed Vendor Contracts");

(f)    all deposits and prepaid expenses of Sellers, including but not limited to (i) security deposits with third party suppliers, vendors or service providers, ad valorem taxes and lease and rental payments (other than deposits held and prepaid expenses relating to any Excluded Assets), (ii) rebates, (iii) tenant reimbursements, (iv) pre-payments and (v) those deposits and pre-paid expenses set forth on Schedule 2.1(f);

(g)    all Equipment including, without limitation, the Equipment leased pursuant to the Personal Property Leases set forth in Section 5.12(a) of the Seller Disclosure Schedule;

(h)    all leases and subleases for personal property to which any Seller is a party and used or held for use in the operation of the Business and all of the rights of any and all Sellers to such personal property, including without limitation, those items leased pursuant to the Personal Property Leases set forth in Section 5.12(a) of the Seller Disclosure Schedule (the "Assumed Personal Property Leases");

(i)    the names Medical Staffing Network, Inc., the names of all of the other Sellers and, in all cases, any derivations thereof (the "Purchased Names");

(j)    all leases and subleases for the Leased Real Property set forth in Section 5.13(b) of the Seller Disclosure Schedule and all of Sellers' right, title and interest in and thereto and any other such leases and subleases added to the list of Assumed Real Property Leases in accordance with Section 2.6 (such leases and subleases, the "Assumed Real Property Leases" and the underlying Leased Real Property, the "Assumed Leased Real Property");

14

(k)     all Contracts between the Sellers and any independent contractors (including Field Associates) who are not employees of Sellers but who have been retained to and who render services (i) on behalf of Sellers or (ii) on behalf of third parties where Sellers act as intermediaries or brokers, including, in each case, Contracts with independent service providers (collectively, the "Assumed Independent Contractor Contracts");

(l)     all Permits and all pending applications therefor, including, without limitation, the Material Permits;

(m)     all rights under non-disclosure or confidentiality, non-compete, or non-solicitation agreements with Employees and agents or with third parties, including without limitation, the Acquired Customers;

(n)     all rights, claims, credits, causes of action or rights of set off against third parties relating to the assets purchased by Purchaser under this Section 2.1 (including, for the avoidance of doubt, those arising under, or otherwise relating, to the Assigned Contracts) or Assumed Liabilities, including rights under vendors' and manufacturers' warranties, indemnities and guaranties;

(o)     any counterclaims, setoffs or defenses that any Seller may have with respect to any Assumed Liabilities;

(p)     subject to Section 2.2(d), to the extent assignable or transferable in accordance with applicable Law or the Sale Order, all rights and benefits under Insurance Policies that relate to or arise from the Business, Purchaser, Purchased Assets or Assumed Liabilities including, without limitation, (A) all proceeds from Insurance Policies except to the extent that such proceeds relate to claims that are Excluded Assets or Excluded Liabilities and (B) all claims, demands, proceedings and causes of action asserted by any Seller under Insurance Policies that relate to or arise from the Business, Purchaser, Purchased Assets or Assumed Liabilities and (C) any letters of credit related thereto;

(q)     all Tax Returns or Tax Records of Sellers;

(r)     any claim, right or interest of any Seller in or to any refund, rebate, abatement or other recovery for Taxes with respect to the Business or the assets purchased by Purchaser under this Section 2.1, together with any interest due thereon or penalty rebate arising therefrom, for any Tax Period (or portion thereof) ending on or before the Closing Date;

(s)     (i) all of the Sellers' right, title and interest in and to the Seller Intellectual Property (collectively, the "Assumed Intellectual Property") and (ii) all Contracts pursuant to which any Seller is granted a license to, or any rights under, any Intellectual Property of any third Person and all Contracts pursuant to which any Seller grants to a third Person a license to, or any rights under, any Seller Intellectual Property (the "Assumed Intellectual Property Licenses" and, together with the Assumed Customer Contracts, the Assumed Vendor Contracts, the Assumed Personal Property Leases, the Assumed Real Property Leases and the Assumed Independent Contractor Contracts, the "Assigned Contracts");

15

(t)      all Rights of Indemnity pursuant to the Assigned Contracts;

(u)      all goodwill and other intangible assets associated with the Business or the assets purchased by Purchaser under this Section 2.1;

(v)      the Seller Plans listed on Schedule 2.1(v) (the "Assumed Plans"), and any associated funding media, assets, reserves, credits and service agreements, and all Documents created, filed or maintained in connection with the Assumed Plans (to the extent transferable in accordance with the existing terms and conditions of the applicable Seller Plan) and any applicable insurance policies related thereto;

(w)      all personnel files for Transferred Employees, except to the extent that any transfer or assignment is prohibited by applicable Law;

(x)      all Documents (whether copies or originals), other than those Documents that relate to the formation, qualifications to conduct business as a foreign corporation or other legal entity, arrangements with registered agents relating to foreign qualifications, taxpayer and other identification numbers, seals, minute books, stock transfer books, stock ledgers, stock certificates, by-laws and other documents relating to the organization and existence of any Seller as a corporation or other legal entity, as applicable, together with analogous documentation (the "Excluded Documents"); and

(y)      all loans and other indebtedness payable to any Seller.

Notwithstanding the foregoing, and for the avoidance of doubt, the Purchased Assets do not include the Excluded Assets.

2.2      Excluded Assets.  Notwithstanding anything to the contrary in this Agreement, in no event shall any Seller be deemed to sell, transfer, assign or convey, and each Seller shall retain all of such Seller's right, title and interest to, in and under, the following assets, properties, interests and rights of each Seller (collectively, the "Excluded Assets"):

(a)      all Non-Assumed Contracts;

(b)      all Documents (whether copies or originals): (i) to the extent they relate solely to any of the Excluded Assets or Excluded Liabilities, (ii) that a Seller is required by Law to retain and is prohibited by Law from providing a copy of to the Purchaser, (iii) that were prepared primarily in connection with the transactions contemplated by this Agreement, including bids received from third Persons, and (iv) that constitute Excluded Documents.

(c)      all shares of capital stock or other equity interests of any Seller or any Affiliate of any Seller or securities convertible into, exchangeable or exercisable for any such shares of capital stock or other equity interests, other than the Transferred Equity Interests;

(d)      any of Sellers' director and officer insurance policies, fiduciary policies or employment practices policies (in each case of the foregoing, including any tail policies or

16

coverage thereon) and any of Sellers' rights, claims, demands, proceedings, credits, causes of action or rights of set off thereunder;

(e)     any preference or avoidance claims or causes of action under the Bankruptcy Code or applicable state Law with respect to the Excluded Assets, including, without limitation, all rights and claims of Sellers arising under Chapter 5 of the Bankruptcy Code with respect to (A) the assets excluded from the transaction contemplated hereby pursuant to this Section 2.2 or (B) the assets purchased by Purchaser under Section 2.1;

(f)     all claims that Sellers may have against any Person solely with respect to any other assets excluded from the transaction contemplated hereby pursuant to this Section 2.2;

(g)     each Seller's rights, interests and benefits under this Agreement;

(h)     each Seller Plan that is not an Assumed Plan (the "Excluded Plans"); and

(i)     the contracts, properties and assets set forth on Schedule 2.2(i).

2.3     Assumption of Liabilities.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, the Purchaser shall assume at the Closing only the following Liabilities of the Sellers (collectively, but in all cases excluding the Excluded Liabilities, the "Assumed Liabilities"):

(a)     any and all Liabilities of the Sellers under each Assigned Contract, including any Cure Costs relating to such Assigned Contract;

(b)     the obligation to pay the amounts owed (and no other Liabilities) for goods or services received by Sellers in the Ordinary Course of Business in respect of any trade and vendor accounts payable (other than under any Assumed Vendor Contracts) arising on or after the Petition Date;

(c)     any and all Liabilities arising under or otherwise in respect of any Assumed Plan (to the extent transferable in accordance with the existing terms and conditions of the applicable Seller Plan), but, for the avoidance of doubt, excluding all Excluded Plans;

(d)     all Liabilities arising under the DIP Loan Agreement and the DIP Loan Documents;

(e)     $6,425,000.00 in L/C Obligations (as defined in the First Lien Credit Agreement);

(f)     all Liabilities arising out of the conduct of the Business or ownership of the Purchased Assets or assumption of the Assumed Liabilities on or after the Closing Date;

(g)     all Liabilities arising under or with respect to the Transferred Equity Interests or relating to the Integris JV (including any Intercompany Obligations relating thereto); and

17

(h)  any additional Liabilities set forth on Schedule 2.3(h).

2.4  **Excluded Liabilities.**  Except for the Assumed Liabilities, the Purchaser shall not assume, or become liable for the payment or performance of, any Liabilities of any Seller of any nature whatsoever, whether accrued or unaccrued, including, without limitation, the following Liabilities (collectively, the "Excluded Liabilities") which shall remain Liabilities of Sellers:

(a)  all Liabilities of the Sellers relating to or otherwise arising, whether before, on or after the Closing Date, out of, or in connection with, any of the Excluded Assets;

(b)  all Liabilities of the Sellers in respect of Non-Assumed Contracts;

(c)  except to the extent that Liabilities are assumed pursuant to Section 2.3(a) or Section 2.3(g) (which shall be Assumed Liabilities), litigation and related claims and Liabilities arising out of or in connection with events occurring on or prior to the Closing Date, no matter when raised;

(d)  any and all Liabilities relating to any environmental, health or safety matter (including any Liability or obligation under any Environmental Law), arising out of or relating to any Seller's operation of their respective businesses or their leasing, ownership or operation of real property on or prior to the Closing Date no matter when raised;

(e)  except to the extent that Liabilities are assumed pursuant to Section 2.3(d), Section 2.3(e) and Section 2.3(g) (which shall all be Assumed Liabilities), all Liabilities of each Seller in respect of Indebtedness, whether or not relating to the Business, including all Liabilities arising under the First Lien Loan Documents and the Second Lien Loan Documents;

(f)  except to the extent that Liabilities are assumed pursuant to Section 2.3(a), Section 2.3(c) and Section 2.3(g) (which shall all be Assumed Liabilities), any claims, demands, proceedings or causes of action subject to or covered by the Additional Excluded Insurance Policies;

(g)  any and all Liabilities under the Excluded Plans and any Seller Plan not set forth in Section 5.17 of the Seller Disclosure Schedule;

(h)  any and all Liabilities of any Seller for Taxes;

(i)  any payments due to any equityholders of Sellers in respect of management or other fees other than compensation owed to equityholders who are Employees of any Seller in the Ordinary Course of Business;

(j)  all Liabilities set forth on Section 2.4(j) of the Seller Disclosure Schedule;

(k)  any Liabilities of any Seller in, under or pursuant to Intercompany Obligations, except as provided in Section 2.3(g);

CH\1168949.14

(l)    any and all Liabilities of any Seller under any collective bargaining agreement or any agreement with any labor union; and

(m)    any Liabilities arising from the operation of any successor liability Laws, including, without limitation, "bulk sales" statutes, to the extent that non-compliance therewith or the failure to obtain necessary clearances would subject the Purchaser or the Purchased Assets to the claims of any creditors of any of the Sellers other than with respect to the Assumed Liabilities, or would subject any of the Purchased Assets to any Liens or other restrictions, other than Liens arising in connection with the Assumed Liabilities.

For the avoidance of doubt, except as expressly noted above, none of the Excluded Liabilities shall be included as Assumed Liabilities.

2.5    Purchase and Sale of the Transferred Equity Interests.  On the terms and subject to the conditions set forth in this Agreement and the Sale Order, at the Closing, InteliStaf Healthcare, Inc. shall, sell, convey, assign, transfer and deliver to Purchaser and Purchaser shall purchase, acquire and accept from InteliStaf Healthcare, Inc., all of InteliStaf Healthcare, Inc.'s right, title and interest in and to the Transferred Equity Interests, free and clear of all Encumbrances, except Permitted Encumbrances.  At or prior to the Closing, InteliStaf Healthcare, Inc. will execute and deliver to Purchaser all documents and instruments required to transfer and vest good and valid title in and to the Transferred Equity Interests to Purchaser in accordance with the terms of this Agreement, including, but not limited to, the Integris Assignment and Assumption Agreement, substantially in the form attached hereto as Exhibit E, and the Integris JV Consent.

2.6    Cure Costs; Schedule Updates.

(a)    Purchaser and Sellers agree that it is their intention to reach final agreement on the schedules to this Agreement (other than the Seller Disclosure Schedule and the Purchaser Disclosure Schedule, which have been finalized as of the date of this Agreement) by the third business day prior to the hearing on the Bidding Procedures Order.

(b)    Notwithstanding anything in this Agreement to the contrary, the Purchaser may revise any schedule (other than the Seller Disclosure Schedule and the Purchaser Disclosure Schedule) setting forth the Purchased Assets and the Excluded Assets to (i) include in the definition of Purchased Assets (pursuant to the applicable schedule) and to exclude from the definition of Excluded Assets, any Contract, Medicaid provider number, Medicare provider number or Seller Plan of any Seller not previously included in the Purchased Assets, at any time on or prior to the tenth (10th) day prior to the Sale Hearing and require Sellers to give notice to the parties to any such Contract and (ii) to exclude from the definition of Purchased Assets (pursuant to the applicable schedule) and to include in the definition of Excluded Assets, any Assigned Contract, Medicaid provider number, Medicare provider number, Assumed Plan or other asset of any Seller previously included in the Purchased Assets and not otherwise included in the definition of Excluded Assets, at any time on or prior to the fifth (5th) day prior to the Sale Hearing; provided that no such change of a schedule, the definition of the Purchased Assets or the definition of the Excluded Assets shall reduce the amount of the Purchase Price below the

19

amount of the Credit Bid. If any Contract, Medicaid provider number, Medicare provider number or Seller Plan is added to (or excluded from) the Purchased Assets as permitted by this Section 2.6, Sellers shall promptly take such steps as are reasonably necessary, including, if applicable, payment or adequate assurance of payment of all Cure Costs (which shall be funded by the DIP Loan under the DIP Loan Agreement and the DIP Loan Documents prior to the Closing Date) and prompt delivery of notice to the non-debtor counterparty, to cause such Contracts to be assumed by Sellers, and assigned to Purchaser, on the Closing Date (or excluded under the Sale Order and this Agreement). If any Contract, Medicaid provider number, Medicare provider number or Seller Plan is excluded from the Purchased Assets as permitted by this Section 2.6, all Liabilities to third parties arising under such Contract, Medicaid provider number, Medicare provider number or Seller Plan shall be Excluded Liabilities. Without limiting any of Purchaser's rights pursuant to this Section 2.6, in the event that the Sale Order does not approve the assignment or transfer of one or more of the Assigned Contracts to the Purchaser as Purchased Assets, Purchaser may, in its sole discretion and at any time prior to the Closing Date, exclude any or all of the Assigned Contracts from the Purchased Assets but may not reduce the amount of the Purchase Price.

2.7    Further Conveyances and Assumptions. From time to time following the Closing, the Sellers and Purchaser shall, and the Sellers and Purchaser shall cause their respective Affiliates to, execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and shall take such further actions, at the sole expense of the Purchaser, as may be necessary or appropriate to assign and convey fully to Purchaser and its respective successors or assigns, all of the properties, rights, titles, interests, estates, remedies, powers and privileges intended to be conveyed to Purchaser under this Agreement and the Sellers' Documents and to ensure the assumption of the Liabilities and obligations intended to be assumed by Purchaser under this Agreement and the Sellers' Documents, and to otherwise make effective the transactions contemplated hereby and thereby.

2.8    "As Is, Where Is" Transaction. PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN ARTICLE V OF THIS AGREEMENT, THE SELLERS MAKE NO REPRESENTATIONS OR WARRANTIES WHATSOEVER, EXPRESS OR IMPLIED, WITH RESPECT TO ANY MATTER RELATING TO THE PURCHASED ASSETS. WITHOUT IN ANY WAY LIMITING THE FOREGOING, SELLERS HEREBY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, OF MERCHANTABILITY OR FITNESS FOR ANY PARTICULAR PURPOSE AS TO ANY PORTION OF THE PURCHASED ASSETS. PURCHASER FURTHER ACKNOWLEDGES THAT PURCHASER HAS CONDUCTED AN INDEPENDENT INSPECTION AND INVESTIGATION OF THE PHYSICAL CONDITION OF THE PURCHASED ASSETS AND ALL SUCH OTHER MATTERS RELATING TO OR AFFECTING THE PURCHASED ASSETS AS PURCHASER DEEMED NECESSARY OR APPROPRIATE AND THAT IN PROCEEDING WITH ITS ACQUISITION OF THE PURCHASED ASSETS, EXCEPT FOR ANY REPRESENTATIONS AND WARRANTIES EXPRESSLY SET FORTH IN ARTICLE V HEREOF, PURCHASER IS DOING SO BASED SOLELY UPON SUCH INDEPENDENT INSPECTIONS AND INVESTIGATIONS. ACCORDINGLY, PURCHASER WILL ACCEPT THE PURCHASED ASSETS AT THE CLOSING "AS IS," "WHERE IS," AND "WITH ALL FAULTS."

20

# ARTICLE III.

## CONSIDERATION

3.1     Consideration.

(a)     The purchase price payable to Sellers for the Purchased Assets and the Transferred Equity Interests at the Closing (the "Purchase Price") shall be:

(i)     the Credit Bid of $84,122,982.40, representing a portion of the First Lien Lenders' allowed claim under the First Lien Credit Agreement (the "Credit Bid Amount"); plus

(ii)     the amount of the Assumed Liabilities as described and provided under Section 2.3.

(b)     The Purchase Price shall be satisfied at the Closing as to:

(i)     the Credit Bid, by causing each of General Electric Capital Corporation, as administrative and collateral agent under the First Lien Loan Agreement, and each of the First Lien Lenders to (A) acknowledge satisfaction of their Indebtedness by the Credit Bid Amount and (B) to release all security interests and liens securing the First Lien Indebtedness in the Credit Bid Amount (collectively, (i)(A) and (i)(B) above, the "Credit Bid and Release"); and

(ii)     the amount of the Assumed Liabilities described in Section 2.3, by assuming such Assumed Liabilities through a duly executed assignment and assumption agreement substantially in the form attached hereto as Exhibit B.

# ARTICLE IV.

## CLOSING AND TERMINATION

4.1     Closing.  Subject to the satisfaction of the conditions set forth in Sections 10.1, 10.2 and 10.3 hereof or the waiver thereof by the party entitled to the benefit of the applicable condition, the closing of the purchase and sale of the Purchased Assets and the Transferred Equity Interests, the delivery of the Purchase Price, the assumption of the Assumed Liabilities contemplated by this Agreement and the consummation of the other transactions contemplated by this Agreement (the "Closing") shall take place at the offices of Latham & Watkins LLP, 233 South Wacker Drive, Chicago, Illinois (or at such other place as the parties may designate in writing) on the date that is no later than the tenth (10th) day following the entry of the Sale Order; provided, that, and subject to Section 4.4, to the extent the conditions set forth in Section 10.1, Section 10.2 and Section 10.3 are not so satisfied (other than conditions that by their nature are to be satisfied at the Closing) or so waived on or prior to such date, the period of time within which the Closing shall occur shall be automatically extended until, and the Closing shall occur promptly (but no later than two (2) business days) following, such date as all of the conditions set forth in Section 10.1, Section 10.2 and Section 10.3 have been satisfied (other than conditions that by their nature are to be satisfied

21

at the Closing) or waived by the party entitled to waive the applicable condition, unless another time or date, or both, are agreed to in writing by the parties hereto. The date on which the Closing shall be held is referred to in this Agreement as the "Closing Date." Unless otherwise agreed by the parties in writing, the Closing shall be deemed effective and all right, title and interest of each of Sellers in the Purchased Assets to be acquired by the Purchaser hereunder shall be considered to have passed to the Purchaser and the assumption of all of the Assumed Liabilities shall be considered to have occurred as of 12:01 a.m. Eastern Time on the Closing Date.

    4.2    Closing Deliveries by Sellers.    At the Closing, Sellers shall deliver to the Purchaser:

        (a)    a duly executed bill of sale with respect to the Purchased Assets, substantially in the form attached hereto as Exhibit A;

        (b)    a duly executed assignment and assumption agreement with respect to the Assumed Liabilities, substantially in the form attached hereto as Exhibit B;

        (c)    a true and correct copy of the Sale Order, substantially in the form attached hereto as Exhibit C;

        (d)    a duly executed non foreign person affidavit of each Seller that is not a disregarded entity for federal tax purposes dated as of the Closing Date, sworn under penalty of perjury and in form and substance required under the Treasury Regulations issued pursuant to Section 1445 of the Code, stating that such Seller is not a "foreign person" as defined in Section 1445 of the Code;

        (e)    the officer's certificates required to be delivered pursuant to Sections 10.3(b) and 10.3(c);

        (f)    a list of the Accounts Receivable as of the last day of the fiscal month immediately preceding the month in which the Closing occurs;

        (g)    a duly executed bankruptcy dissolution waiver and consent, in form reasonably satisfactory to Purchaser, whereby InteliStaf of Oklahoma, LLC (i) waives all of its rights under Article X of the Integris JV Agreement, including its rights of redemption, with respect to the redemption of any Seller's membership interests in InteliStaf of Oklahoma, LLC with respect to the transactions contemplated hereby, (ii) includes evidence satisfactory to Purchaser that such Seller holds 68% of the membership interests in InteliStaf of Oklahoma, LLC and is a member of InteliStaf of Oklahoma, LLC with all the rights and entitlements of a member thereof and (iii) consents to the transfer of such Seller's membership interests in InteliStaf of Oklahoma, LLC to Purchaser (the "Integris JV Consent");

        (h)    written assurances in the form of policy endorsements or other forms satisfactory to Purchaser that, subject to Section 2.2(d), Purchaser is named as a policyholder ("Named Insured") under Sellers' insurance policies;

22

(i)     a duly executed assignment and assumption agreement with respect to the Transferred Equity Interests, substantially in the form attached hereto as Exhibit E; and

(j)     all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by Sellers at or prior to the Closing in connection with the transactions contemplated by this Agreement.

4.3     Closing Deliveries by the Purchaser. At the Closing, the Purchaser shall deliver, or cause to be delivered, to Sellers (or to other Persons, at the direction of Sellers):

(a)     the Purchase Price, in the form of (i) the Credit Bid and Release, in form satisfactory to Sellers (including documentation reasonably acceptable to Sellers evidencing reduction of First Lien Indebtedness in the full amount of such Credit Bid and Release), and (ii) a release of Sellers' obligations under the DIP Loan Agreement, in form and substance reasonably satisfactory to Sellers;

(b)     a duly executed assignment and assumption agreement substantially in the form attached hereto as Exhibit B;

(c)     the officer's certificates required to be delivered pursuant to Sections 10.2(a) and 10.2(b); and

(d)     all other previously undelivered certificates, agreements and other documents required by this Agreement to be delivered by the Purchaser at or prior to the Closing in connection with the transactions contemplated by this Agreement.

4.4     Termination of Agreement. This Agreement may be terminated at any time prior to the Closing as follows:

(a)     by the mutual written consent of Sellers and the Purchaser;

(b)     by either the Purchaser or Sellers, if the Closing shall not have been consummated prior to October 31, 2010 (the "Outside Date"); provided, however, that in the event that the only condition set forth in Section 10.1, Section 10.2 and Section 10.3 that has not been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived on or prior to the Outside Date is Section 10.3(f), then the Purchaser, in its sole discretion, shall have the right to extend the Outside Date by up to one-hundred twenty days (120) days; provided, further, that if the Closing shall not have occurred on or before the Outside Date due to a material breach of any representations, warranties, covenants or agreements contained in this Agreement by Purchaser or any Seller, then Purchaser (if it is so in breach) or any Seller (if any Seller is in breach), respectively, may not terminate this Agreement pursuant to this Section 4.4(b);

(c)     by either the Purchaser or Sellers, if there shall be any Law that makes consummation of the transactions contemplated hereby illegal or otherwise prohibited, or there shall be in effect a final non-appealable order of a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions

23

contemplated hereby; it being agreed that the parties hereto shall promptly appeal any such adverse determination which is appealable (and pursue such appeal with reasonable diligence);

(d)    by the Purchaser, if any Chapter 11 Case is dismissed or converted to a case or cases under Chapter 7 of the Bankruptcy Code, or if a trustee or examiner with expanded powers to operate or manage the financial affairs, the business or the reorganization of Sellers is appointed in the Chapter 11 Case;

(e)    by the Purchaser, if the Sale Order shall not have been entered by the Bankruptcy Court by the close of business on the day that is three business days following the fifty-fifth (55th) day after the Petition Date; provided, however, that the right to terminate this Agreement under this Section 4.4(e) shall not be available to the Purchaser if its failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Sale Order to meet this requirement on or before such date;

(f)    by either the Purchaser or Sellers, if, following its entry, the Sale Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of the Purchaser and Sellers; provided, however, that the right to terminate this Agreement under this Section 4.4(f) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Sale Order to meet this requirement;

(g)    by the Purchaser or Sellers, if the Bidding Procedures Order shall not have been entered by the Bankruptcy Court by the close of business on the day that is three business days following the date that is twenty-five (25) days after the Petition Date; provided, however, that the right to terminate this Agreement under this Section 4.4(g) shall not be available to the Purchaser if its failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Bidding Procedures Order to meet this requirement  on or before such date;

(h)    by either the Purchaser or Sellers, if, following its entry, the Bidding Procedures Order shall fail to be in full force and effect or shall have been stayed, reversed, modified or amended in any respect without the prior written consent of the Purchaser and Sellers; provided, however, that the right to terminate this Agreement under this Section 4.4(h) shall not be available to any party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Bidding Procedures Order to meet this requirement;

(i)    automatically upon consummation of an Alternative Transaction;

(j)    by Sellers, if the Purchaser has breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 10.2(a) and Section 10.2(b) hereof, as the case may be, would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by the Purchaser within twenty (20) days through the exercise of its reasonable best efforts, then for so long as the Purchaser continues to exercise such reasonable best efforts Sellers may not terminate this Agreement under this Section 4.4(j) unless such breach is not cured within twenty (20) days

24

from written notice to the Purchaser of such breach; provided, further, that Sellers are not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured;

(k)    by Purchaser, if Sellers have breached any representation, warranty, covenant or agreement contained in this Agreement and as a result of such breach the conditions set forth in Section 10.3(b) and Section 10.3(c) hereof, as the case may be, would not then be satisfied at the time of such breach; provided, however, that if such breach is curable by Sellers within twenty (20) days through the exercise of their respective reasonable best efforts, then for so long as Sellers continue to exercise such reasonable best efforts the Purchaser may not terminate this Agreement under this Section 4.4(k) unless such breach is not cured within twenty (20) days from written notice to Sellers of such breach; provided, further, that the Purchaser is not then in material breach of the terms of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured;

(l)    by Sellers, if all of the conditions set forth in Sections 10.1 and 10.3 have been satisfied (other than conditions that by their nature are to be satisfied at the Closing) or waived and Purchaser fails to deliver the Purchase Price or the other deliverables required by Section 4.3; or

(m)    by Purchaser, if any secured creditor of any Seller obtains relief from the stay to foreclose on any of the Purchased Assets.

4.5    Procedure Upon Termination.  In the event of a termination of this Agreement by the Purchaser or Sellers, or both, pursuant to Section 4.4, (a) written notice thereof shall be given promptly by the terminating party to the other parties hereto, specifying the provision hereof pursuant to which such termination is made, (b) except as contemplated by Section 4.6 and Section 8.1 with respect to the obligations of Purchaser to serve as a Back-up Bidder hereunder, this Agreement shall thereupon terminate and become void and of no further force and effect and (c) the consummation of the transactions contemplated by this Agreement shall be abandoned without further action of the parties hereto.  If this Agreement is terminated as provided herein, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether so obtained before or after the execution hereof, to the party furnishing the same.

4.6    Effect of Termination.

(a)    In the event that this Agreement is validly terminated pursuant to a right of termination as provided herein, then each of the parties shall be relieved of its duties and obligations arising under this Agreement effective as of the date of such termination and such termination shall be without Liability to the Purchaser or Sellers; provided, however, that Section 4.4, Section 4.5, this Section 4.6, Article XII, the Bidding Procedures Order (if entered) and the Purchaser's obligation to serve as a Back-up Bidder hereunder shall survive any such termination and shall be enforceable hereunder.  In no event shall any termination of this Agreement relieve any party hereto of any Liability for any willful breach of this Agreement by such party.

25

(b)    Notwithstanding anything to the contrary contained herein, in the event that this Agreement is terminated by Sellers pursuant to Section 4.4(j), Section 4.4(l) or pursuant to any other provision of Section 4.4 due to the Purchaser's material breach of any of its obligations under this Agreement, the claim of each First Lien Lender against the Sellers arising under the First Lien Credit Agreement shall, without any further action on the part of the Sellers, the Purchaser or any of the First Lien Lenders, be reduced in an amount equal to the product of (i) $2,656,524.97 multiplied by (ii) the quotient of (A) the amount of such First Lien Lender's claim against the Sellers arising under the First Credit Agreement divided by (B) the aggregate amount of all of the First Lien Lender's claims against the Sellers arising under the First Lien Credit Agreement (the aggregate amount of all such reductions, the "Purchaser Termination Fee"); provided, however, in no event shall the Purchaser Termination Fee exceed $2,656,524.97 in the aggregate.  The right of the Sellers to receive the Purchaser Termination Fee shall be the sole and exclusive remedy of Sellers against the Purchaser, DIP Agent, DIP Lenders, First Lien Agent and First Lien Lenders and any of their respective Affiliates or subsidiaries for any loss or damage suffered as a result of the breach by Purchaser of this Agreement or the termination of this Agreement by Sellers and in no event will any Seller (or Person acting on behalf of Seller) seek to recover (or be entitled to obtain) any other money damages or any equitable relief or equitable remedies of any kind whatsoever or any other remedy from the Purchaser, DIP Agent, DIP Lenders, First Lien Agent or First Lien Lenders or any of their respective Affiliates or subsidiaries with respect thereto, regardless of whether such monetary damages or other remedies are based on a claim in law or equity, and Sellers (on their own behalf and on behalf of their estates) hereby waive all such claims except in the case of fraud by the Purchaser, DIP Agent, DIP Lenders, First Lien Agent or First Lien Lenders or any of their respective Affiliates or subsidiaries. Each of the First Lien Lenders hereby agrees to take any further action that may be reasonably required to give effect to the provisions of this Section 4.6(b).

## ARTICLE V.

## REPRESENTATIONS AND WARRANTIES OF THE SELLERS

Sellers hereby, jointly and severally, make the representations and warranties in this Article V to the Purchaser as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as qualified or supplemented by Sections in the Seller Disclosure Schedule attached hereto (the "Seller Disclosure Schedule").  Each such Section of the Seller Disclosure Schedule is numbered by reference to representations and warranties in a specific Section of this Article V. The information disclosed in any numbered part of the Seller Disclosure Schedule shall be deemed to be disclosed with respect to every other representation and warranty in this Article V if such disclosure is reasonably apparent on its face.

5.1    Corporate Organization and Qualification.    MSN is a corporation duly incorporated, validly existing and in good standing under the Laws of the State of Delaware. MSN is qualified and in good standing as a foreign corporation in each jurisdiction where the properties owned, leased or operated or the conduct of its Business require such qualification, except as would not have or would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  Each of the other Sellers is duly organized, validly

26

existing and in good standing under the Laws of its respective jurisdiction of organization listed on Section 5.1 of the Seller Disclosure Schedule. Each of the other Sellers is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated or the conduct of its respective Business require such qualification, except as would not have or would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Sellers' ability to operate the Business in the Ordinary Course of Business. Each Seller has all requisite power and authority to own, lease and operate its properties and to carry on the Business as it is now being conducted, subject to the provisions of the Bankruptcy Code. MSN has previously made available to the Purchaser complete and correct copies of MSN's Certificate of Incorporation, as amended and in effect on the Execution Date (the "MSN Certificate"), and MSN's Bylaws, as amended and in effect on the Execution Date (the "MSN Bylaws") and the certificate of incorporation and bylaws (or other comparable organizational documents) of each of the other Sellers and in effect on the Execution Date (the "Subsidiary Organizational Documents").

5.2    MSN, MSNH and Subsidiaries.

(a)    Section 5.2(a) of the Seller Disclosure Schedule sets forth a true and complete list of the names, jurisdictions of organization, and jurisdictions of qualification as a foreign entity of each Seller. Except as set forth in Section 5.2(a) of the Seller Disclosure Schedule, all outstanding shares of capital stock of or other equity ownership interests in each Seller (other than MSNH) are owned, directly or indirectly, by MSNH, free and clear of all Encumbrances, other than Permitted Encumbrances.

(b)    Section 5.2(b) of the Seller Disclosure Schedule sets forth each corporation, association or other entity in which each Seller owns, of record or beneficially, any direct or indirect equity or other interest or any right (contingent or otherwise) to acquire the same.

5.3    Authority Relative to This Agreement. Except for such authorization as is required by the Bankruptcy Court and receipt of any Regulatory Approvals, each Seller has all requisite power, authority and legal capacity to (a) execute and deliver this Agreement, (b) execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Sellers in connection with the consummation of the transactions contemplated by this Agreement that are set forth in Section 5.3 of the Seller Disclosure Schedule attached hereto (the "Sellers' Documents"), and (c) perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby. The execution and delivery of this Agreement and the Sellers' Documents, and the consummation of the transactions contemplated hereby and thereby, have been duly authorized by all requisite action on the part of Sellers; *provided, however,* that the Purchaser acknowledges that MSNH will not be seeking or obtaining the approval of this transaction by its shareholders as required by applicable Delaware law. This Agreement has been, and at or prior to the Closing, each of the Sellers' Documents will be, duly and validly executed and delivered by each Seller and (assuming the due authorization, execution and delivery by the other parties hereto and thereto, and the entry of the Sale Order) this Agreement constitutes, and each of the Sellers' Documents when so executed and delivered will constitute, legal, valid and binding obligations

27

of each Seller, enforceable against each Seller in accordance with its respective terms, subject to: (i) entry of the Sale Order by the Bankruptcy Court, and (ii) applicable bankruptcy, insolvency, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally, and subject, as to enforceability, to general principles of equity, including principles of commercial reasonableness, good faith and fair dealing (regardless of whether enforcement is sought in a proceeding at law or in equity) (the "Bankruptcy Exceptions").

    5.4    <u>Conflicts; Consents of Third Parties</u>.

        (a)    Except as set forth in <u>Section 5.4(a)</u> of the Seller Disclosure Schedule or as permitted by the Sale Order, none of the execution and delivery by Sellers of this Agreement or any Sellers' Document, the consummation of the transactions contemplated hereby or thereby, or compliance by Sellers with any of the provisions hereof or thereof will (A) result in the loss or material impairment of the rights of Sellers in any Seller Intellectual Property or (B) conflict with, or result in any violation of or constitute a breach or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (i) the MSN Certificate, the MSN Bylaws or the Subsidiary Organizational Documents; (ii) subject to and assuming entry of the Sale Order, any Contract or Permit to which any Seller is a party or by which any of the properties or assets of Sellers is bound, including any Assigned Contract; (iii) subject to and assuming entry of the Sale Order, any order of any Governmental Body applicable to any Seller or any of the properties or assets of Sellers, including the Purchased Assets, or the Business; or (iv) subject to and assuming entry of the Sale Order, any applicable Law, other than, in the case of clauses (ii), (iii) and (iv), such conflicts, violations, defaults, terminations or cancellations that would not have, individually or in the aggregate, a material adverse effect on the Sellers' ability to operate the Business in the Ordinary Course of Business.

        (b)    Except (i) as set forth in <u>Section 5.4(b)</u> of the Seller Disclosure Schedule and (ii) no order, Permit or declaration or filing with, or notification to, any Governmental Body or other Person is required on the part of Sellers in connection with the execution and delivery of this Agreement or Sellers' Documents, the compliance by Sellers with any of the provisions hereof or thereof, the consummation of the transactions contemplated hereby or thereby or the taking by Sellers of any other action contemplated hereby or thereby, except for (i) the entry of the Sale Order, and (ii) such other orders, Permits, declarations, filings and notifications, the failure of which to obtain or make would not have, individually or in the aggregate, a Material Adverse Effect on the Sellers' ability to operate the Business in the Ordinary Course of Business..

    5.5    <u>Absence of Certain Developments</u>. Except for actions taken in connection with the Chapter 11 Case, as contemplated or expressly required or permitted by this Agreement, or as set forth in <u>Section 5.5</u> of the Seller Disclosure Schedule, since the Most Recent Balance Sheet Date, the Business has been conducted in the Ordinary Course of Business, and none of Sellers has:

        (a)    acquired any material assets;

(b)      sold, leased, transferred or assigned any material assets, tangible or intangible, other than (i) in the Ordinary Course of Business, or (ii) the disposition of obsolete or immaterial assets not necessary for the conduct of the Business by Sellers;

(c)      accelerated, terminated, modified, amended, or cancelled any Material Contract, or waived, released or assigned any material rights or claims thereunder, in each case, in a manner materially adverse to Sellers (and, to the Knowledge of Sellers, no other party to any such Material Contract has accelerated, terminated, modified, amended, or cancelled such Material Contract or waived, released or assigned any rights or claims thereunder);

(d)      imposed or created any Encumbrance (other than Permitted Encumbrances) upon any of the Purchased Assets, tangible or intangible, that would be binding on the Purchaser;

(e)      incurred or made any capital expenditures in an aggregate amount in excess of $250,000, other than capitalized software costs;

(f)      created, incurred, assumed, or guaranteed any Indebtedness that would be binding upon the Purchaser;

(g)      transferred, assigned, abandoned or granted any license or sublicense of any rights under or with respect to any material Assumed Intellectual Property, other than pursuant to license agreements entered into in the Ordinary Course of Business;

(h)      experienced any damage, destruction or other casualty loss (whether or not covered by insurance) affecting the tangible Purchased Assets and resulting in an aggregate loss in excess of $500,000;

(i)      granted any bonus or any increase in any type of compensation or benefits, including severance or termination pay, to any of its current or former directors, Employees or consultants, except for increases in base compensation in the Ordinary Course of Business;

(j)      paid any bonus, except for bonuses paid or accrued in the Ordinary Course of Business;

(k)      delayed or postponed the payment of undisputed accounts payable or any other undisputed Liabilities of the Business in any material respect (except for payments due under the Second Lien Credit Agreement and as required by the Bankruptcy Code);

(l)      adopted, made or agreed to (i) any welfare, pension, retirement, profit-sharing, incentive compensation or similar plan, program, payment or arrangement for any Employee except pursuant to the existing Seller Plans, or (ii) any new employment, change of control or collective bargaining agreement;

(m)      made any material addition to or modification of any Seller Plan, other than (i) contribution to such plans made in the Ordinary Course of Business or (ii) the extension

29

of coverage to Employees of the Sellers who became eligible after the Most Recent Balance Sheet Date;

(n)    changed any finance or Tax accounting methods, principles or practices, except insofar as may have been required by a change in GAAP or applicable Law;

(o)    made or rescinded any Tax election, settled or compromised any material Tax Liability or entered into a closing agreement with respect to Taxes; and

(p)    received any written notice of any cancellation or termination of any Assigned Contract that is a Material Contract, including without limitation, such Assigned Contracts with Acquired Customers.

5.6    Litigation.  Except as set forth in Section 5.6 of the Seller Disclosure Schedule, there is no material litigation, action, claim, suit, proceeding, investigation, examination, hearing, arbitration, inquiry or subpoena (collectively, "Actions"), pending or, to the Knowledge of Sellers, threatened against Sellers or any property or asset of Sellers or which could give rise to or increase an Assumed Liability.  Except as set forth in Section 5.6 of the Seller Disclosure Schedule, no Seller is subject to any judgment, decree, injunction, or order of any court, arbitration panel or other Governmental Body that relates to the Business or the Purchased Assets and for which the Sellers have continuing obligations or Liabilities.

5.7    Intellectual Property.

(a)    Section 5.7(a) of the Seller Disclosure Schedule sets forth a true, complete and correct list of (i) all of the material patents, registered trademarks, registered copyrights, Internet domain names, and applications for any of the foregoing, in each case that constitute the Owned Intellectual Property (collectively, the "Registered IP") and (ii) all other material Owned Intellectual Property and a list of all Licensed Intellectual Property (except for Intellectual Property licensed related to off the shelf software and licenses implied in the sale of such software).

(b)    Section 5.7(b) of the Seller Disclosure Schedule sets forth a true, complete and correct list of all material software, licenses, and contracts that are included in, comprise or are related to the Owned Intellectual Property set forth in Section 5.7(a) of the Seller Disclosure Schedule, except for off the shelf software and licenses implied in the sale of such software.

(c)    Except as set forth in Section 5.7(c) of the Seller Disclosure Schedule, (i) each of the Sellers owns the Owned Intellectual Property, free from any Encumbrances, other than Permitted Encumbrances, and free from any requirement of any present or future royalty payments, license fees, charges or other payments, or conditions or restrictions whatsoever; and (ii) no action is pending, or to the Knowledge of Sellers, threatened challenging the validity, enforceability, registration, ownership or use of any Registered IP.

(d)    To Sellers' Knowledge, (i) neither the Sellers nor any of their respective services is infringing upon, misappropriating, diluting or otherwise violating, the Intellectual Property of any third party and (ii) no Person is infringing upon, misappropriating, diluting or

30

otherwise violating, in a material manner, any Seller Intellectual Property. Except as set forth in Section 5.7(d) of the Seller Disclosure Schedule, there is no pending claim, action or proceeding alleging that the Sellers are infringing, misappropriating, diluting or otherwise violating the Intellectual Property rights of any Person and to the Knowledge of Sellers no such claims are threatened.

(e)     The Sellers own or have the right to use the Seller Intellectual Property as used in the conduct of the Business as currently conducted, free and clear from any Encumbrances (other than Permitted Encumbrances and subject to the terms and conditions of any agreement pursuant to which such Seller Intellectual Property was obtained or licensed).

5.8    Agreements, Contracts and Commitments; Certain Other Agreements.

(a)     Section 5.8(a) of the Seller Disclosure Schedule sets forth the following types of material executory Contracts that are unexpired as of the Execution Date relating to the Business to which any Seller is a party or by which it is bound or any of the Purchased Assets are bound (such Contracts set forth below are collectively referred to as the "Material Contracts"):

(i)     each note, mortgage, indenture and other obligation and agreement and other instrument for or relating to any lending or borrowing of any Seller or to which any assets of any Seller are subject;

(ii)     each Contract entered into on or after January 1, 2007 pursuant to which any Seller has any remaining liability to pay contingent consideration, including any option to acquire or sell any material properties or material assets of such Seller or any other Seller;

(iii)     each limited partnership agreement, or limited liability company operating agreement and other joint venture agreement or other similar Contract pursuant to which any Seller has any equity interest in any other Person;

(iv)     each Contract with customers of any Seller for goods or services to be provided by such Seller, which Sellers reasonably anticipate will involve future payment or payments to any Seller in excess of $1,250,000 in any calendar year;

(v)     each Contract with suppliers to any Seller for goods or services to be provided to such Seller (other than insurance and real property leases), which Sellers reasonably anticipate will involve future payment or payments by any Seller in excess of $500,000 in any calendar year;

(vi)     each other Contract (other than Contracts with employees, customers or suppliers of any Seller) that involves the payment to or from any Seller in excess of $100,000 in any calendar year in each individual case;

(vii)    Contracts to which any Significant Customer is a party;

(viii)   Contracts to which any Significant Vendor/Supplier is a party;

31

(ix)    employment agreements, severance agreements and collective bargaining agreements with any labor unions;

(x)    Contracts to which any officer or director of each of the Sellers or any Affiliate of any such officer or director, is a party;

(xi)    leases for any real property or any material Equipment used or held for use in the Business;

(xii)    Contracts that: (A) limit or restrict any Seller or any of its Affiliates from engaging in any business or other activity in any jurisdiction; or (B) create or purport to create any exclusive relationship or arrangement;

(xiii)    Contracts granting to any Person an option or a right of first refusal, first-offer or similar preferential right to purchase or acquire any of the Purchased Assets;

(xiv)    Contracts for the granting or receiving of a license, sublicense or franchise or under which any Person is obligated to pay or has the right to receive a royalty, license fee, franchise fee or similar payment;

(xv)    Contracts (i) with respect to Seller Intellectual Property licensed or transferred to any third party or (ii) pursuant to which a third party has licensed or transferred any Intellectual Property to a Seller (in the case of both (i) and (ii), except for off the shelf software and licenses implied in the sale of such software);

(xvi)    each sales agent, dealer, distributor or joint marketing Contract under which the Company has continuing obligations to jointly market any product or service;

(xvii)    each Tax sharing, indemnification, allocation or similar Contract; and

(xviii)    Contracts with any Governmental Body which is a department or instrumentality of the United States federal government.

(b)    Except as set forth in Section 5.8(b) of the Seller Disclosure Schedule, no Seller has received any written notice of, or to the Knowledge of Sellers, oral notice of any default or event that with notice or lapse of time or both would constitute a default by such Seller under any Material Contract.

(c)    Except as set forth in Section 5.8(c) of the Seller Disclosure Schedule, the Sellers have heretofore delivered or made available to the Purchaser true and complete copies of all Material Contracts that are in writing, including all amendments, modifications, schedules and supplements thereto and all waivers (including descriptions of oral waivers) with respect thereto.  Assuming (x) the entry of the Sale Order and (y) due execution by the other party or parties thereto, as of the Closing Date, each Material Contract will be in full force and effect and,

32

subject to the Bankruptcy Exceptions, enforceable in accordance with its terms against each Seller that is a party thereto.

5.9    Regulatory Matters; Permits.

(a)    All of the material Permits that are necessary for the operation of the Business as currently conducted and the ownership of the Purchased Assets are held by the Sellers, and to the Knowledge of Sellers, by Employees, as applicable, in full force and effect (collectively, the "Material Permits"). Section 5.9(a) of the Seller Disclosure Schedule sets forth a true, complete and correct list of all Material Permits held by the Sellers as of the Execution Date and identifies the holder thereof.

(b)    Each Seller is in compliance with its obligations under each of the Material Permits and the rules and regulations of the Governmental Body issuing such Material Permits, and no condition exists that without notice or lapse of time or both would constitute a default under, or a violation of, any Material Permit except for such failures to be in compliance or defaults that would not have, individually or in the aggregate, a material adverse effect on the Sellers' ability to operate the Business in the Ordinary Course of Business.

(c)    Each Material Permit is valid and in full force and effect and there is no proceeding, notice of violation, order of forfeiture or complaint or investigation against any Seller relating to any of the Material Permits pending or to the Knowledge of Sellers, threatened, before any Governmental Body.

5.10    Brokers and Finders.  Except as set forth in Section 5.10 of the Seller Disclosure Schedule, Sellers have not employed, and to the Knowledge of Sellers, no other Person has made any arrangement by or on behalf of Sellers with any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

5.11    Title to Assets and the Transferred Equity Interests.

(a)    At Closing, Sellers will have (and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser) good and marketable title or a valid leasehold interest in and to each of the Purchased Assets free and clear of all Encumbrances except Permitted Encumbrances.  At Closing, Sellers will have (and shall convey to the Purchaser at the time of the transfer of the Purchased Assets to the Purchaser) valid leasehold interests in the Assumed Personal Property Leases and the Assumed Real Property Leases, free and clear of all Encumbrances except Permitted Encumbrances.

(b)    All of the Transferred Equity Interests have been duly authorized and validly issued.  There are no preemptive rights, options, warrants or rights of conversion or other rights, agreements, arrangements or commitments obligating any Seller to sell the Transferred Equity Interests. InteliStaf Healthcare, Inc. owns directly, and has good title to, the Transferred Equity Interests, and, at the Closing, the Purchaser will acquire good and valid title to the Transferred Equity Interests, free and clear of all Encumbrances, except Permitted

33

Encumbrances, to the extent set forth in the Sale Order. The Transferred Equity Interests are all of the equity interests in InteliStaf of Oklahoma, LLC held by InteliStaf Healthcare, Inc.

(c)    The Purchased Assets and the Transferred Equity Interests constitute all of the properties, assets and rights used by Sellers to conduct and operate the Business substantially as currently conducted and operated by Sellers. All of the Purchased Assets are in good order and repair for assets of comparable age and past use and are capable of being used in the Ordinary Course of Business to operate the Business substantially as currently conducted and operated by Sellers, except where the failure to be in such condition would not have, individually or in the aggregate, a Material Adverse Effect on the Sellers' or the Purchasers' ability to operate the Business in the Ordinary Course of Business.

5.12    Tangible Personal Property; Equipment.    Section 5.12(a) of the Seller Disclosure Schedule sets forth all personal property leases (the "Personal Property Leases") involving annual payments in excess of $250,000 relating to personal property, including Equipment, used by any Seller in the Business or to which any Seller is a party or by which the personal property, including Equipment, of any Seller is bound. Except as set forth in Section 5.12(b) of the Seller Disclosure Schedule, none of Sellers has received any written notice of, or to the Knowledge of Sellers, oral notice of any default or event that with notice or lapse of time or both would constitute a default by such Seller under any of the Personal Property Leases.

5.13    Real Property.

(a)    No Seller owns any real property.

(b)    Section 5.13(b)(i) of the Seller Disclosure Schedule sets forth a complete and correct list of all Leased Real Property relating to leased office space and all other Leased Real Property involving annual payments in excess of $250,000, specifying the address or other information sufficient to identify all such Leased Real Property. Each lease for each parcel of Leased Real Property grants Sellers the right to use and occupy the applicable Leased Real Property, in accordance with the terms thereof, subject to Permitted Encumbrances. Except as set forth in Section 5.13(b)(ii) of the Seller Disclosure Schedule, Sellers have not leased or granted to any Person the right to access, enter upon, use, occupy, lease, manage, operate, maintain, broker or purchase any portion of Sellers' interest in the Leased Real Property, that is not otherwise a Permitted Encumbrance or that will not otherwise be terminated on or prior to the Closing Date.

(c)    None of Sellers has received any written notice of, or to the Knowledge of Sellers, oral notice of condemnation or eminent domain proceedings pending or threatened that affect the Leased Real Property. None of Sellers has received any written notice of, or to the Knowledge of Sellers, oral notice of any zoning, ordinance, building, fire or health code or other legal violation affecting any such Leased Real Property, except where any such violations would not have, individually or in the aggregate a material adverse effect on the ability of the Sellers to operate the Business in the Ordinary Course of Business.

5.14    Compliance with Law; Permits.    Except with respect to tax matters which are the representations and warranties set forth in Section 5.15, each Seller is in compliance in all

34

material respects with all applicable material Laws. As of the Execution Date, no Seller has received any written notice of any alleged material violation of any material Law applicable to it or them. No Seller is in default in any material respect of any order of any Governmental Body applicable to the Purchased Assets or the transactions contemplated under this Agreement. To Seller's Knowledge, no investigations, inquiries or reviews by any Governmental Body with respect to the Business have been commenced, nor are any contemplated, that would impose any material Liability on the Purchaser or, from and after the Closing Date, the Purchased Assets or the Business.

5.15    Tax Returns; Taxes.  Except as set forth in <u>Section 5.15</u> of the Seller Disclosure Schedule:

(a)    All Tax Returns required to have been filed by Sellers have been duly filed (or are currently not filed based on the availability of applicable extensions to file such returns under applicable tax laws). All Tax Returns filed are true, correct and complete in all material respects.

(b)    All Taxes due and payable by Sellers (whether or not shown on any Tax Return) have been paid in full. The accruals and reserves with respect to Taxes (other than any reserve for deferred Taxes established to reflect timing differences between book and Tax income) set forth on the Most Recent Balance Sheet are adequate to cover all Taxes of the Sellers accruing or payable with respect to Tax Periods (or portions thereof) ending on or before the date of the Most Recent Balance Sheet. All Taxes of the Sellers attributable to Tax Periods (or portions thereof) commencing after the date of the Most Recent Balance Sheet have arisen in the Ordinary Course of Business.

(c)    No claims, assessments or deficiencies for any amount of Taxes of the Sellers are being asserted, proposed or, to the Knowledge of Sellers, threatened, and no audit or investigation of any Tax Return of Sellers has occurred in the last three (3) years or is currently underway, pending or, to the Knowledge of Sellers, threatened.

(d)    Since January 1, 2005, no claim has been made against a Seller by any Governmental Body in a jurisdiction where such Seller does not file Tax Returns that such Seller is or may be subject to taxation in such jurisdiction.

(e)    The Sellers have withheld and paid all Taxes required to have been withheld and paid by them to the appropriate Governmental Body in connection with amounts paid or owing to any Person.

(f)    There are no Encumbrances for Taxes with respect to Sellers or their respective assets, nor is there any such Encumbrance that is pending or, to the Knowledge of Sellers, threatened other than Permitted Encumbrances.

(g)    None of Sellers has executed or filed with any Governmental Body any agreement or waiver extending the period for assessment, reassessment or collection of any Taxes. No Seller has made an election, nor is any Seller required, to treat any Purchased Asset as owned by another Person or as tax-exempt bond financed property or tax-exempt use property

35

within the meaning of Section 168 of the Code or under any comparable provision of state or local Tax law.

(h)    None of the Sellers has any liability for Taxes of any other Person as a transferee or successor, by law or by contract.

5.16    Employees.

(a)    Sellers have delivered to Purchaser a true and correct list of the Employees (other than Field Associates) as of the Execution Date, specifying their position, annual salary, and date of hire. Sellers are not delinquent in payments to any Employees for any wages, salaries, commissions, bonuses or other direct compensation for any services performed for it or amounts required to be reimbursed to Employees. With respect to the Employees, Sellers are in material compliance with all applicable Laws respecting labor, employment, fair employment practices, terms and conditions of employment, immigration, workers' compensation, occupational safety, plant closings and wages and hours. Sellers have withheld all amounts required by Law or by agreement to be withheld from the wages, salaries and other payments to Employees, and are not liable for any arrears of wages or any Taxes or any penalty for failure to comply with any of the foregoing. Except as set forth on Schedule 5.16(a) of the Seller Disclosure Schedule, there are no material pending claims against the Company under any workers' compensation plan or policy or for long term disability. There are no material controversies pending or, to Sellers' Knowledge, threatened between Sellers and any of their current or former Employees which have or could reasonably be expected to result in an action, suit, proceeding, claim, arbitration or investigation before a governmental authority. No Employees are in any material respect in violation of any term of any employment contract, non-disclosure agreement, noncompetition agreement, or any restrictive covenant to a former employer relating to the right of any such Employee to be employed by Sellers because of the nature of the business conducted by Sellers or to the use of trade secrets or proprietary information of others. No Seller has any direct or indirect material Liability with respect to any misclassification of any Person as an independent contractor rather than as an Employee or with respect to any Employee leased from another employer.

(b)    Section 5.16(b) of the Seller Disclosure Schedule lists the job title, job site and unit, date of Employment Loss, and type of Employment Loss (e.g., termination, layoff or reduction in work hours) of each Employee (excluding Field Associates) or former Employee (excluding Field Associates) who has experienced an Employment Loss in the ninety (90) days immediately preceding the date of this Agreement (excluding Employees who are employed for an average of fewer than twenty (20) hours per week or who have been employed for fewer than six of the 12 months preceding the date of this Agreement). Except as set forth in Section 5.16(b) of the Seller Disclosure Schedule and based, in part, on Purchasers' acknowledgement in Section 7.1 of this Agreement that they currently intend to offer employment to substantially all of Sellers' Employees from and following the Closing, Sellers do not presently intend to take any action that would result in a "mass layoff" or "plant closing" as defined in the WARN Act between the date of this Agreement and the Closing Date. At the Closing, Sellers shall provide an update of Section 5.16(b) of the Seller Disclosure Schedule that discloses all Employees (excluding Field Associates but including former Employees who are not Field Associates) who

36

have experienced an Employment Loss in the ninety (90) days immediately preceding the Closing Date. With respect to any Employment Loss that occurred within the one year preceding the date of this Agreement, Sellers have complied with all of the requirements of the WARN Act.

(c)     No Seller is a party to or bound by, either directly or by operation of Law, any collective bargaining agreement, labor contract, letter of understanding, letter of intent, voluntary recognition agreement or legally binding commitment or written communication to any labor union, trade union or employee organization or group which may qualify as a trade union in respect of or affecting Employees nor is any Seller subject to any union organization effort, nor is any Seller engaged in any labor negotiation.  There are no, and within the prior three years there have not been any (i) strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of Sellers, threatened against or involving any Seller, or (ii) unfair labor practice charges, grievances or complaints pending or, to the Knowledge of Sellers, threatened by or on behalf of any Employee or group of Employees.  Except as set forth on Section 5.16(c) of the Seller Disclosure Schedule, no Seller has an obligation to make any severance or termination payment to any Employee in excess of any amount payable under common law principles or applicable Law.

5.17    Company Benefit Plans.    Except as provided in Section 5.17 of the Seller Disclosure Schedule:

(a)     Each Seller Plan is listed in Section 5.17 of the Seller Disclosure Schedule (collectively, the "Employee Plans").  The Sellers have made available to the Purchaser true and complete copies of (i) all Employee Plans and related trust agreements, annuity contracts or other funding instruments, (ii) the latest Internal Revenue Service determination or opinion letter obtained with respect to any such Employee Plan qualified or exempt under Section 401 or 501 of the Code, as applicable, and the results of discrimination testing for the most recently completed three (3) fiscal years for each such Employee Plan, (iii) Forms 5500 and certified financial statements for the most recently completed three (3) fiscal years for each Employee Plan required to file such form, together with the most recent actuarial report, if any, prepared by the Employee Plan's enrolled actuary, (iv) the current summary plan descriptions for each Employee Plan required to prepare, file and distribute summary plan descriptions, (v) all summaries furnished to Employees, officers or directors of the Sellers of all incentive compensation, other plans and fringe benefits for which a summary plan description is not required and (vi) the form notifications to Employees of their rights under Section 4980B of the Code.

(b)     None of the Employee Plans is a "multiemployer plan" (as defined in Section 3(37) of ERISA), is or has been subject to Sections 4063 or 4064 of ERISA, or is or has been subject to subject to Title IV of ERISA or Code Section 412 or 430.  Neither Sellers nor any of their ERISA Affiliates have any Liability under Title IV of ERISA or Code Section 412 or 430.  None of the Employee Plans is subject to any Laws outside of the United States.

(c)     Each Employee Plan has been established, administered and invested in accordance with its material terms and is in material compliance with all applicable Laws.  The

37

Sellers have performed and complied in all material respects with all of their respective obligations under or with respect to the Employee Plans. Each Employee Plan that is intended to be a "qualified plan" within the meaning of Section 401(a) of the Code ("Qualified Plan") and each trust that is intended to be exempt under Section 501 of the Code ("Exempt Trust") has received a determination or opinion letter from the Internal Revenue Service to the effect that such Qualified Plan is so qualified and such Exempt Trust is so exempt, and, to Sellers' Knowledge, nothing has occurred since the date of the most recent Internal Revenue Service determination or opinion letter, as applicable, that would materially and adversely affect the tax-qualified status of any Qualified Plan or Exempt Trust.

(d)    There is no action, order, writ, injunction, judgment or decree outstanding or proceeding, arbitral action, governmental audit, or investigation relating to, or seeking benefits under, any Employee Plan that is pending or, to the Knowledge of Sellers, threatened against any of Sellers (other than any claims for benefits under the Employee Plans in the Ordinary Course of Business). None of Sellers, or to the Knowledge of Sellers, any fiduciary of any Employee Plan, has any material liability with respect to any transaction in violation of Sections 404 or 406 of ERISA or any "prohibited transaction," as defined in Section 4975(c)(1) of the Code, for which no exemption exists under Section 408 of ERISA or Section 4975(c)(2) or (d) of the Code.

(e)    No Employee Plan provides post-retirement or post-termination employee benefits (including death, medical or health benefits) to or in respect of any Employees or former Employees or their beneficiaries, and none of Sellers has any obligation to provide such benefits other than COBRA Continuation Coverage.  Except as set forth on Schedule 5.17(e) of the Seller Disclosure Schedule, no Employee Plan provides health benefits that are not fully insured through an insurance Contract. All contributions or premiums required to be made by Sellers to or under each Employee Plan have been made in a timely fashion in accordance with applicable Law, the terms of the applicable Employee Plan and any applicable collective bargaining agreement, and no Seller has, and as of the Closing Date will not have, any actual or potential unfunded Liabilities with respect to any Employee Plans.

(f)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby will result, separately or in the aggregate, in the payment of any "excess parachute payment" within the meaning of Code §280G (or any corresponding provision of state, local, or foreign Tax law) or in the imposition of an excise tax under Code Section 4999, (or any corresponding provisions of state, local or foreign Tax law).

(g)    Neither the execution and delivery of this Agreement nor the consummation of the transactions contemplated hereby (whether alone or in conjunction with any other event) will result in forgiveness of Indebtedness or the acceleration or creation of any rights of any person to benefits under any Assumed Plan (including the acceleration of the accrual or vesting of any benefits under any such Employee Plan or the acceleration or creation of any rights under any employment, severance, retention, parachute or change in control agreement or the right to receive any transaction bonus or other similar payment) or the obligation to take action to secure any benefits payable under any Assumed Plan .

38

5.18    Parents.  Except as set forth in Section 5.18 of the Seller Disclosure Schedule, MSNH and MSH are not party to any Contracts relating to the Business or the Assumed Liabilities or any Contracts by which any of the Purchased Assets are bound.  Except for the equity interests of Sellers, MSNH and MSH do not hold any assets used, or held for use, in connection with the Business.

5.19    Affiliate Matters.  Except as set forth in Section 5.19 of the Seller Disclosure Schedule, no (a) shareholder, officer, or director of Sellers, (b) entity in which any such shareholder, officer or director owns any beneficial interest (other than a publicly held corporation whose stock is traded on a national securities exchange or in the over-the-counter market and less than two percent (2%) of the stock of which is beneficially owned by such shareholders, officers or directors in the aggregate), or (c) Affiliate of any of the foregoing is a party to: (i) any Contract with, or relating to, Sellers, their respective businesses, the Purchased Assets or the Assumed Liabilities; or (ii) any property (real, personal or mixed, tangible or intangible) used by the Sellers in the operation of the Business.  Section 5.19 of the Seller Disclosure Schedule also sets forth a true, correct and complete list of all accounts receivable, notes receivable and other receivables and accounts payable owed to or due from any such Person described above by or to any Seller but solely with respect to the Business except for any compensation payable to such officers in their capacity as employees, officers or directors of MSNH in the Ordinary Course of Business.

5.20    Insurance Policies.

(a)    Section 5.20(a) of the Seller Disclosure Schedule lists all insurance policies owned or held by any Seller or otherwise applicable to the Business (the "Insurance Policies").  All such policies (or substitute policies with substantially similar terms and underwritten by insurance carriers with substantially similar or higher ratings) are in full force and effect, all premiums with respect thereto covering all periods up to and including the Execution Date have been paid, and no written notice of cancellation or termination (or any other threatened termination) has been received with respect to any such policy.  Except as set forth on Section 5.20(b) of the Seller Disclosure Schedule, there are no pending, or to Sellers' Knowledge, threatened claims, or circumstances that might give rise to a claim, under any Insurance Policy.  All claims relating to the Purchaser, the Business or any of the Assets under the Insurance Policies have been filed in a due and timely fashion and any such claims that are pending are included in the Assets.  No notice of cancellation or nonrenewal with respect to, disallowance of any claim, or reservation of rights with respect to any claim under, or increase of premium for, any Insurance Policy has been received by Sellers.

(b)    Insurance policies under which Sellers, the Business or any of the Purchased Assets are insured that are provided by or on behalf of vendors, contractors or third party service providers (collectively, the "Third Party Insurance Policies") are, to the Knowledge of Sellers, in full force and effect in accordance with the requirements therefor under the applicable Contracts.  Immediately following Closing, Purchasers will have the ability to directly make claims under the Third Party Insurance Policies related to Sellers, the Business (to the extent not specifically related to the Excluded Assets) or the Purchased Assets pursuant to all of the rights the Sellers had under the Third Party Insurance Policies immediately prior to Closing.

39

(c)    It is the intent of the parties that immediately following the Closing, the Purchasers will have all the rights under the Insurance Policies and Third Party Insurance Policies that the Sellers had under the Insurance Policies and Third Party Insurance Policies immediately prior to the Closing, with respect to the Purchasers, the Business (to the extent not specifically related to the Excluded Assets) and the Purchased Assets.

5.21    Environmental Matters.  To the Knowledge of Sellers: (a) each of Sellers is in material compliance with all Environmental Laws, (b) there is no material investigation, suit, claim, action or judicial or administrative proceeding relating to or arising under Environmental Laws that is pending or threatened against any Seller or any real property owned, operated or leased by any Seller, or any of the Purchased Assets, (c) none of the Leased Real Property has been listed on the federal Comprehensive Environmental Response, Compensation Liability Information System (CERCLIS) database or any other similar federal, provincial or state list of known or suspected contaminated sites, (d) no Hazardous Materials have been treated, stored or Released by any Seller at any location or by any other Person at, on or under the Leased Real Property in any manner or concentration that requires investigation, removal or remediation under Environmental Laws or would otherwise cause any Seller or any future owner or operator of any Leased Real Property to incur material liability under Environmental Laws, and (e) no Seller has received any notice of or entered into any order, settlement, judgment, injunction or decree involving uncompleted, outstanding or unresolved material obligations, liabilities or requirements relating to or arising under Environmental Laws.

5.22    Customers, Vendors and Suppliers.  Section 5.22 of the Seller Disclosure Schedule sets forth a complete and accurate list of all Significant Customers and Significant Vendors/Suppliers.  "Significant Customers" are: (a) the 25 customers that have purchased the most, in terms of dollar value, services sold by the Business during the year ended December 27, 2009; and (b) the 25 customers that have purchased the most, in terms of dollar value, services sold by the Business during the three month period ended March 28, 2010.  "Significant Vendors/Suppliers" are: (i) those vendors and/or suppliers who sold services to the Business during the year ended December 27, 2009 in an amount greater than $250,000 or (ii) those vendors and/or suppliers who are expected to sell services to the Business during the 2010 fiscal year in an amount greater than $250,000. Except as set forth in Section 5.22 of the Seller Disclosure Schedule, true, correct and complete copies of all written Contracts (other than purchase orders) with Significant Customers and Significant Vendors/Suppliers have been provided to the Purchaser.  No Significant Customer or Significant Vendor/Supplier has given any Seller notice terminating, canceling or materially reducing, or threatening to terminate, cancel or materially reduce, any Contract or relationship with Seller.  As of the Execution Date, no Significant Customer: (i) has notified any Seller that the same no longer meets such Significant Customer's quality specifications or any certification requirements imposed upon companies in the Business or (ii) has threatened to terminate such Significant Customer's Contract or relationship with Sellers.  To the Sellers' Knowledge, during the three-month period immediately preceding the Execution Date, there has been no material increase in the dollar amount of customer claims relating to the quality of Sellers' services as compared with the comparable period of the preceding calendar year.  Except as set forth in Section 5.22 of the Seller Disclosure Schedule, no Acquired Customer, Significant Customer or Significant Vendor/Supplier has proposed in writing, or given any Seller written notice of its intention to

40

propose, any material price structure changes or any other material changes to any Contract or commercial relationship with any Seller, nor, to the Knowledge of Sellers, does any Acquired Customer, Significant Customer or Significant Vendor/Supplier intend to propose a material change to the price structure of any such Contract or commercial relationship or any other material change to any such Contract or commercial relationship. For purposes of this Section 5.22, the term Significant Vendors/Suppliers excludes lessors, insurance providers, utilities and professional service providers (including subcontractors who provide services under vendor managed service agreements and auditors and attorneys).

5.23    Accounts Receivable.  Sellers have made available to Purchaser a complete and accurate list, as of May 23, 2010, of the Accounts Receivable of Sellers, including an aging of all Accounts Receivable showing amounts due in 30-day aging categories.  Sellers have provided reserves for Accounts Receivable (the "Seller Reserves") in accordance with GAAP and MSNH's accounting policies as consistently applied in the Ordinary Course of Business by Sellers.  On the Closing Date, Sellers will deliver to the Purchaser a complete and accurate list, as of a date within five (5) days of the Closing Date, of the Accounts Receivable (the "Accounts Receivable List").  All Accounts Receivable represent valid obligations arising from bona fide business transactions in the Ordinary Course of Business.  Subject to the Seller Reserves, there is no pending or, to the Knowledge of Sellers, threatened contest, claim, counterclaim, defense or right of set-off under any Contract or otherwise with any obligor of any Account Receivable relating to the amount or validity of such Accounts Receivable.

5.24    Financial Statements.  Sellers have delivered or made available to the Purchaser the following financial statements (collectively the "Financial Statements"):  (a) audited consolidated balance sheets and statements of income, changes in stockholders' equity, and cash flow as of and for the fiscal year ended December 27, 2009 for MSNH and each of its subsidiaries (the "2009 Audited Financial Statements"), and (b) an unaudited consolidated balance sheet as of May 23, 2010 (the "Most Recent Balance Sheet") for MSNH and each of its subsidiaries as set forth in Section 5.24 of the Seller Disclosure Schedule.  The 2009 Audited Financial Statements have been prepared in accordance with GAAP applied on a consistent basis throughout the periods involved, present fairly, in all material respects, the financial condition of MSNH and its subsidiaries as of such dates and the results of operations and cash flows of MSNH and its subsidiaries for such periods, and are consistent, in all material respects, with the books and records of MSNH and its Subsidiaries (which books and records are correct and complete in all material respects).  The Most Recent Balance Sheet includes all of the assets and Liabilities of MSNH and its subsidiaries as of May 23, 2010, in each case that are required by GAAP to be set forth on a balance sheet, presents fairly, in all material respects, the financial condition of MSNH and its subsidiaries as of May 23, 2010, and is consistent, in all material respects, with the books and records of MSNH and its subsidiaries.

5.25    Capital Expenditures.  As of the Execution Date, Sellers have made available to the Purchaser the most recent capital spending plans of MSNH and its subsidiaries relating to the Business or the Purchased Assets.

5.26    Absence of Undisclosed Liabilities.  Except as set forth in Section 5.26 of the Seller Disclosure Schedule, Sellers do not have any Liabilities except (a) Liabilities reflected on

41

the liabilities side of the Most Recent Balance Sheet, (b) Liabilities that have arisen after the date of the Most Recent Balance Sheet in the Ordinary Course of Business or otherwise in accordance with the terms and conditions of this Agreement (none of which is a material Liability for breach of warranty, malpractice, tort or infringement or a claim or lawsuit or breach of an Environmental Law) and (c) Liabilities that are or will be Excluded Liabilities.

5.27    Claims for Indemnification.    Except as set forth in Section 5.27 of the Seller Disclosure Schedule, during the past two (2) years none of Sellers has made or has had made against it any claim pursuant to rights of indemnity, set-off, counterclaim or any similar action pursuant to or arising under any Contract relating to the acquisition or disposition of the capital stock or assets of MSNH, any of its subsidiaries or any other entity, as the case may be (collectively, "Rights of Indemnity"), and to Sellers' Knowledge, no such claim is currently contemplated or threatened.

5.28    SEC Filings.    MSNH has filed all reports, schedules, forms, statements and other documents required to be filed by MSNH with the SEC since January 1, 2009 pursuant to Sections 13(a) and 15(d) of the Securities Exchange Act of 1934 (the "Exchange Act" and such documents filed by MSN Holdings thereunder, the "MSNH SEC Documents").    As of its respective date, each MSNH SEC Document complied in all material respects with the requirements of the Exchange Act or the Securities Act of 1933, as amended (the "Securities Act"), as the case may be, and the rules and regulations of the SEC promulgated thereunder applicable to such MSNH SEC Document, and did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. Except to the extent that information contained in any MSN Holdings SEC Document has been revised or superseded by a later filed MSN Holdings SEC Document, none of the MSN Holdings SEC Documents contains any untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading.

## ARTICLE VI.

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser hereby makes the representations and warranties in this Article VI to Sellers as of the Execution Date (except with respect to representations and warranties made as of a particular date, which shall be deemed to be made only as of such date), except as qualified or supplemented by Sections in the Purchaser Disclosure Schedule (the "Purchaser Disclosure Schedule") attached hereto:

6.1    Corporate Organization and Qualification.    The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation.    The Purchaser is qualified and in good standing as a foreign entity in each jurisdiction where the properties owned, leased or operated, or the business conducted by it require such qualification except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this

42

Agreement. The Purchaser has all requisite power and authority (corporate or otherwise) to own its properties and to carry on its business as it is now being conducted except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement. The Purchaser has previously made available to MSN complete and correct copies of Purchaser's entity organizational documents, as amended and in effect on the Execution Date.

6.2    <u>Authority Relative to this Agreement</u>. The Purchaser has the requisite limited liability company power and authority to (a) execute and deliver this Agreement, (b) execute and deliver each other agreement, document, instrument or certificate contemplated by this Agreement or to be executed by Purchaser in connection with the consummation of the transactions contemplated hereby and thereby, which are set forth in <u>Section 6.2</u> of the Purchaser Disclosure Schedule attached hereto (the "<u>Purchaser's Documents</u>"), and (c) perform its obligations hereunder and thereunder and consummate the transactions contemplated hereby and thereby. The execution, delivery and performance by the Purchaser of this Agreement and each Purchaser's Document have been duly authorized by all necessary limited liability company action on behalf of the Purchaser. This Agreement has been, and at or prior to the Closing each Purchaser's Document will be, duly and validly executed and delivered by the Purchaser and (assuming the due authorization, execution and delivery by the other parties hereto and thereto) this Agreement constitutes, and each Purchaser's Document when so executed and delivered will constitute, legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, subject to the Bankruptcy Exceptions.

6.3    <u>Consents and Approvals; No Violation</u>.

(a)    Except as set forth in <u>Section 6.3(a)</u> of the Purchaser Disclosure Schedule, none of the execution and delivery by the Purchaser of this Agreement or the Purchaser's Documents, the consummation of the transactions contemplated hereby or thereby, or the compliance by the Purchaser with any of the provisions hereof or thereof will conflict with, or result in any violation of or default (with or without notice or lapse of time, or both) under, or give rise to a right of acceleration, payment, amendment, termination or cancellation under any provision of (i) the certificate of formation and the limited liability agreement (or similar organizational documents) of the Purchaser, (ii) any Contract (including but not limited to any Contracts related to financing) or Permit to which the Purchaser is a party or by which the Purchaser or its properties or assets are bound, (iii) any order of any Governmental Body applicable to the Purchaser or by which any of the properties or assets of the Purchaser are bound, or (iv) any applicable Law, other than, in the case of clauses (ii), (iii), and (iv), except as would not have or reasonably be expected to have a material adverse effect on the Purchaser's ability to consummate the transactions contemplated by this Agreement.

(b)    Except (i) as set forth in <u>Section 6.3(b)</u> of the Purchaser Disclosure Schedule and (ii) no consent, waiver, approval, order, Permit or authorization of, or declaration or filing with, or notification to, any Governmental Body or other Person nor any other Regulatory Approval is required on the part of the Purchaser in connection with the execution and delivery of this Agreement or the Purchaser's Documents, the compliance by the Purchaser with any of the provisions hereof or thereof, the consummation of the transactions contemplated

43

hereby or thereby or the taking by the Purchaser of any other action contemplated hereby or thereby, or for the Purchaser to operate the Purchased Assets.

6.4    Brokers and Finders.  The Purchaser has not employed, and to the knowledge of the Purchaser, no other Person has made any arrangement by or on behalf of the Purchaser with, any investment banker, broker, finder, consultant or intermediary in connection with the transactions contemplated by this Agreement which would be entitled to any investment banking, brokerage, finder's or similar fee or commission in connection with this Agreement or the transactions contemplated hereby.

6.5    Adequate Assurances Regarding Assigned Contracts.   As of the Closing, Purchaser will be capable of satisfying the conditions contained in Sections 365(b)(1)(C) and 365(f) of the Bankruptcy Code with respect to the Assigned Contracts.

6.6    Sufficiency of Financing.  As of the date of this Agreement, the Purchaser and its parent, MSN Holdco, LLC, have received executed Directions to Credit Bid from the First Lien Agent and an Assignment Agreement from the First Lien Agent pursuant to which the First Lien Agent has assigned its right to receive pursuant to the Credit Bid, the Purchased Assets and the Transferred Equity Interest (subject to the Assumed Liabilities), resulting in the Purchaser having the ability, as of the date of this Agreement, to consummate the transactions contemplated by this Agreement.

6.7    Investigation.  Purchaser has conducted its own independent review and analysis of the Business, the Purchased Assets and the Assumed Liabilities, of the value of such Purchased Assets and of the business, operations, technology, assets, Liabilities, financial condition and prospects of the Business, and Purchaser acknowledges that Sellers have provided Purchaser with access to the personnel, properties, premises and records of the Business for this purpose. Purchaser has conducted its own independent review of all orders of, and all motions, pleadings, and other submissions to, the Bankruptcy Court in connection with the Chapter 11 Case.. Purchaser acknowledges that the Purchase Price being paid under this Agreement for the Purchased Assets is the fair value for acquiring the Purchased Assets under the circumstances and that such value, rather than replacement cost, is the appropriate measure of damages if and to the extent Purchaser may have any recourse for any failure of Sellers to deliver the Purchased Assets in accordance with the terms of this Agreement.   In entering into this Agreement, Purchaser has relied upon its own investigation and analysis as well as the representations and warranties made by Sellers in Article V, and Purchaser acknowledges that neither Sellers nor any of their Affiliates makes or has made any representation or warranty, either express or implied, as to the accuracy or completeness of any of the information provided or made available to Purchaser or any of its Affiliates, except as and only to the extent expressly set forth in Article V.

## ARTICLE VII.

## EMPLOYEES

7.1    Employee Matters.  Purchaser may offer employment to the Employees of the Seller (it being the current intention of Purchaser to offer employment to substantially all

44

Employees of Sellers as of the Closing Date), as in existence as of the Closing, as selected by Purchaser, and except as otherwise set forth in this Section 7.1, such employment offers and acceptances shall be on such terms and conditions as may be acceptable to the Employees and Purchaser in their sole discretion and need not bear any relationship to terms and provisions applicable to their employment by the Seller. Each Employee to whom Purchaser has made an offer of employment pursuant to this Section 7.1 and that has accepted such offer and commences employment with Purchaser or its Affiliates on or following the Closing Date is hereinafter referred to as a "Transferred Employee"; provided, however, that each Employee to whom the Purchaser has made an offer of employment pursuant to this Section 7.1 who is on a leave of absence as of the Closing Date shall not become a Transferred Employee unless such Employee returns to active service within six (6) months following the Closing Date and, except pursuant to any Assumed Plan, the Purchaser shall have no liability with respect to any such Employee prior to the date he or she becomes a Transferred Employee.

7.2    Excluded Plans.  Sellers shall be solely responsible and shall retain all Liabilities with respect to the Excluded Plans.

7.3    COBRA Coverage.  The Purchaser shall be responsible for providing, and shall assume all Liabilities in respect of, the provision of continued medical coverage pursuant to its group health plans for employees under Part 6, Title I of ERISA and Section 4980B of the Code ("COBRA Continuation Coverage"), for all current and former employees of Sellers with respect to any "qualifying event" (within the meaning of COBRA) incurred on or prior to the Closing Date or otherwise arising as a result of the transactions described herein. Immediately prior to the Closing, Sellers will provide to the Purchaser a list of all Employees (i) terminated by Sellers within the ninety (90) days immediately preceding the Closing, and (ii) receiving COBRA Continuation Coverage on the Closing Date.

7.4    No Third-Party Beneficiaries.

(a)    Notwithstanding anything set forth in this Article VII, nothing contained herein, whether express or implied, (i) shall be treated as an amendment or other modification of any Seller Plan or (ii) shall limit the right of the Purchaser or any of its Affiliates to amend, terminate or otherwise modify any Assumed Plan following the Closing Date.

(b)    Sellers and the Purchaser acknowledge and agree that all provisions contained in this Article VII with respect to current or former Employees are included for the sole benefit of Sellers and the Purchaser, and that nothing herein, whether express or implied, shall create any third party beneficiary or other rights (i) in any other Person, including, without limitation, any current or former employees, directors, officers or consultants of Sellers, any participant in any Seller Plan, or any dependent or beneficiary thereof, or (ii) to continued employment with the Purchaser or any of its Affiliates.

## ARTICLE VIII.

## BANKRUPTCY COURT MATTERS

8.1    Competing Bid and Other Matters.

45

(a)    On the Petition Date, Sellers shall file with the Bankruptcy Court an application or motion seeking approval of (i) the Bidding Procedures Order and (ii) the Sale Order and the transactions contemplated in this Agreement.

(b)    This Agreement, the parties' obligations hereunder and the transactions contemplated hereby are subject to approval of the Bankruptcy Court and Sellers' right and ability to pursue and consider higher or otherwise better competing bids with respect to the Business and a material portion of the Purchased Assets pursuant to the Bidding Procedures Order (each a "Competing Bid"). From and after the Petition Date until the conclusion of the Sale Hearing, Sellers are permitted to, and may cause their Representatives and Affiliates to, initiate contact with, provide information to, solicit or encourage submission of any inquiries, proposals or offers by, any Person (in addition to the Purchaser and its Affiliates, agents and Representatives) in connection with any sale or other disposition of the Business or a material portion of the Purchased Assets or the continuation of the Business as a reorganized, going-concern, subject only to the provisions of the Bidding Procedures Order.

(c)    From and after the Petition Date until the conclusion of the Sale Hearing, Sellers shall have the responsibility and obligation to respond to any inquiries or offers to purchase all or any part of the Business, and perform any and all other acts related thereto which are required or permitted under the Bankruptcy Code or other applicable Law, including, without limitation, supplying information relating to the Business and the assets of Sellers to prospective purchasers, subject only to the provisions of the Bidding Procedures Order.

(d)    If an Auction is conducted, and the Purchaser is not the prevailing party at the conclusion of such Auction (such prevailing party, the "Prevailing Bidder"), the Purchaser shall be required to serve as a back-up bidder (the "Back-up Bidder") and keep the Purchaser's bid to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern time) on the date which is fifteen (15) days after the date of the entry by the Bankruptcy Court of the Sale Order (the "Outside Back-up Date"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Back-up Date be later than three business days after October 15, 2010 or (ii) the date of closing of an Alternative Transaction with the Prevailing Bidder. Following the Sale Hearing and prior to the Outside Back-up Date, if the Prevailing Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Prevailing Bidder, the Back-up Bidder (if the Back-up Bidder is the next highest bidder at the Auction) will be deemed to have the new prevailing bid, and Sellers will be authorized, but not required, without further order of the Bankruptcy Court or any action on the part of the Back-up Bidder, to consummate the transactions contemplated by this Agreement on the terms and conditions set forth in this Agreement (as the same may be improved upon in the Auction) with the Back-up Bidder.

(e)    The Sellers shall promptly serve true and correct copies of the Sale Motion and all related pleadings in accordance with the Bidding Procedures Order, the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the Local Rules for the United States

Bankruptcy Court for the Southern District of Florida and any other applicable order of the Bankruptcy Court.

8.2    Sale Order.    The Sale Order shall be entered by the Bankruptcy Court substantially in the form attached hereto as Exhibit C and otherwise in form and substance acceptable to Sellers and the Purchaser.  The Sale Order shall, among other things, (a) approve, pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, (i) the execution, delivery and performance by Sellers of this Agreement, (ii) the sale of the Purchased Assets to the Purchaser on the terms set forth herein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (iii) the performance by Sellers of their respective obligations under this Agreement; (b) authorize and empower Sellers to assume and assign to the Purchaser the Assigned Contracts; and (c) find that Purchaser is a "good faith" buyer within the meaning of Section 363(m) of the Bankruptcy Code, not a successor to any Seller and grant the Purchaser the protections of Section 363(m) of the Bankruptcy Code.  The Purchaser agrees that it will promptly take such actions as are reasonably requested by Sellers to assist in obtaining Bankruptcy Court approval of the Sale Order, including, without limitation, furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (a) demonstrating that the Purchaser is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code and (b) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.  In the event that the Bankruptcy Court's approval of the Sale Order shall be appealed, Sellers shall use reasonable efforts to defend such appeal.

## ARTICLE IX.

## COVENANTS AND AGREEMENTS

9.1    Conduct of Business of Sellers.

(a)    During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 4.4 or the Closing, except (1) for any limitations on operations imposed by the Bankruptcy Court or the Bankruptcy Code, (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 9.1(a), or (4) with the prior written consent of the Purchaser (such consent not to be unreasonably withheld, conditioned or delayed), each Seller shall:

(i)    conduct the Business and operate and maintain the Purchased Assets in the Ordinary Course of Business;

(ii)    use commercially reasonable efforts to (x) preserve the goodwill of and relationships with Governmental Bodies, customers, suppliers, vendors, lessors, licensors, licensees, contractors, distributors, agents, Employees and others having business dealings with the Business; and (y) comply with all applicable Laws and, to the extent consistent therewith, preserve their assets (tangible and intangible), including the IT Assets.

47

(b)      During the period from the Execution Date and continuing until the earlier of the termination of this Agreement in accordance with Section 4.4 or the Closing, except (1) for any limitations on operations imposed by, or actions required by, the Bankruptcy Court or the Bankruptcy Code, (2) as required by applicable Law, (3) as otherwise expressly contemplated by this Agreement or as set forth on Schedule 9.1(a), or (4) with the prior written consent of the Purchaser (such consent not to be unreasonably withheld or conditioned and, in the event that Sellers request Purchaser's consent in writing and Purchaser does not provide a written response within two (2) days after such request, Purchaser shall be deemed to have provided its prior written consent to such request), each of the Sellers shall not:

(i)      mortgage, pledge or subject to any Encumbrance (other than a Permitted Encumbrance) the Business or any of the Purchased Assets;

(ii)      sell, assign, license, transfer, convey, lease, surrender, relinquish or otherwise dispose of any of the Purchased Assets except to the extent permitted by the DIP Loan Documents or this Agreement;

(iii)      cancel or compromise any debt or material claim or waive or release any material right of any Seller that constitutes a Purchased Asset or otherwise relates to the Business;

(iv)      (A) enter into any new Contract or renew any existing Contract requiring payments by Sellers in excess of $250,000 over the twelve month period immediately following the execution thereof and (B) cancel, terminate, amend, modify, supplement or rescind any Material Contract or any terms of any Material Contract, except for the purpose of effecting any changes in applicable Law or implementing regulatory requirements or in response to a breach or default by the other party thereto;

(v)      abandon any rights under any Material Contract or breach any Material Contract;

(vi)      incur any long term expenditure associated with the Purchased Assets that would be an Assumed Liability except to the extent permitted by the DIP Loan Documents;

(vii)      incur or permit to be incurred any Liability (other than in connection with the performance of any Non-Assumed Contracts or execution of any Contracts that are not Material Contracts in the Ordinary Course of Business) that would be an Assumed Liability except to the extent permitted by the DIP Loan Documents, or would increase the amount of an Assumed Liability except to the extent permitted by the DIP Loan Documents;

(viii)      terminate any Employee set forth on Schedule 9.1(b)(viii) or hire any Person to replace any such Employee;

(ix)      (A) with respect to any Employee set forth on Schedule 9.1(b)(viii), increase the salary, bonus or severance arrangements of such Employee or

48

amend, modify, terminate or enter into any employment or severance Contract with such Employee and (B) with respect to all other Employees, take any of the foregoing actions other than in the Ordinary Course of Business;

(x)    (A) enter into, amend or terminate any Seller Plan, (B) exercise any discretion to accelerate the vesting or payment of any compensation or benefit under any Seller Plan to any current or former employee, officer or director, or other service provider of Sellers, (C) grant any new awards under any Seller Plan or (D) take any action to fund the payment of compensation or benefits under any Seller Plan to any current or former employee, officer or director, or other service provider of Sellers, except (X) in the case of clauses (A) or (D), in the Ordinary Course of Business with respect to employees of Sellers who are not currently, and have never been, officers or directors of any Seller and (Y) in the case of all Clauses, to conform to applicable Law or as may be required under any Seller Plan that is in effect as of the date hereof;

(xi)    make or rescind any material Tax election, file any amended Tax Return, change its fiscal year or financial or Tax accounting methods, policies or practices, settle or compromise any Tax Liability, enter into a closing agreement with respect to Taxes or agree to an extension of the period for assessment, reassessment or collection of any Taxes;

(xii)    institute, settle or agree to settle or modify in any manner that is adverse to the Business or the Purchased Assets, any litigation, action or proceeding before any court or Governmental Body relating to the Purchased Assets and that is or will be an Assumed Liability except any such litigation, action or proceeding involving payment by or to Sellers that is less than $1,500 individually and $50,000 in the aggregate;

(xiii)    (A) take any action that reasonably jeopardizes the validity of or results in the revocation, surrender or forfeiture of, any of the Material Permits necessary or desirable for the continued operation of the Business, (B) fail to use commercially reasonable efforts to prosecute with due diligence any material pending applications with respect to the Material Permits, including any renewals thereof, (C) with respect to the Material Permits, fail to make all filings and reports and pay all material fees necessary or reasonably appropriate for the continued operation of the Business of Sellers, as and when such approvals, consents, Permits, licenses, filings, or reports or other authorizations are necessary or appropriate or (D) fail to initiate appropriate steps to renew any Material Permits held by Sellers that are scheduled to terminate prior to or within sixty (60) days after the Closing or to prosecute any pending applications for any Material Permit;

(xiv)    transfer, assign or abandon or grant any rights or modify any existing rights under any Seller Intellectual Property other than in the Ordinary Course of Business, or enter into any settlement regarding the breach or infringement, misappropriation, dilution or other violation of any Intellectual Property right;

49

(xv)    make, commit to make or incur any Liability for capital expenditures except to the extent permitted by the DIP Loan Documents; or

(xvi)    enter into any Contract to do any of the foregoing or agree to do anything prohibited by this Section 9.1(b).

(c)    Promptly after the Closing Date, Sellers will (i) at Purchaser's expense, prepare and file with the appropriate Governmental Body appropriate documents, including, but not limited to, articles of amendment, changing their name so as to effectuate the transfer of the Purchased Names and any of like names or combinations of words or derivations thereof to Purchaser and promptly deliver evidence of such name change to the Purchaser and (ii) cease using the Purchased Names, and any derivations thereof.

9.2    Access to Information.

(a)    Each of Sellers agrees that, between the Execution Date and the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 4.4, the Purchaser shall be entitled, through its officers, employees, counsel, accountants and other authorized representatives, agents and contractors ("Representatives"), to have such reasonable access to and make such reasonable investigation and examination of the books and records, properties, businesses, assets, Employees, accountants, auditors, counsel and operations of Sellers as the Purchaser's Representatives may reasonably request, provided, however, that Sellers shall not be obligated to provide information that they are not permitted to provide under applicable healthcare laws and regulations. Any such investigations and examinations shall be conducted during regular business hours upon reasonable advance notice and under reasonable circumstances, including Sellers' right to have its Representative accompany the Purchaser upon the Leased Real Property at the time of any inspection or examination and shall be subject to restrictions under applicable Law. Pursuant to this Section 9.2, Sellers shall furnish to the Purchaser and its Representatives such financial, operating and property related data and other information as such Persons reasonably request. Each of Sellers shall use commercially reasonable efforts to cause its Representatives to reasonably cooperate with the Purchaser and the Purchaser's Representatives in connection with such investigations and examinations, and the Purchaser shall, and use its commercially reasonably efforts to cause its Representatives to, reasonably cooperate with such Sellers and their respective Representatives and shall use their reasonable efforts to minimize any disruption to the Business.

(b)    From and after the Closing Date, Sellers shall give the Purchaser and the Purchaser's Representatives reasonable access during normal business hours to the offices, facilities, plants, properties, assets, Employees, Documents (including, without limitation, any Documents included in the Excluded Assets), personnel files and books and records of Sellers pertaining to the Business. In connection with the foregoing, Sellers shall use commercially reasonable efforts to cause their Representatives to furnish, at the Purchaser's expense, to the Purchaser such financial, technical, operating and other information pertaining to the Business as the Purchaser's Representatives shall from time to time reasonably request and to discuss such information with such Representatives. Without limiting the generality of the foregoing, at the Purchaser's expense, Sellers shall, and shall use commercially reasonable efforts to cause each of

50

their Affiliates to, cooperate with the Purchaser as may reasonably be requested by the Purchaser for purposes of (i) enabling an independent accounting firm selected by the Purchaser to conduct an audit of the Business, including access to MSN's independent auditors' working papers pertaining to the Business or the Purchased Assets including any environmental assessment; (ii) undertaking, with the consent of MSN, which consent shall not be unreasonably withheld or delayed, any study of the condition or value of the Purchased Assets; and (iii) undertaking any study relating to Sellers' compliance with Laws; and Sellers acknowledge that information or access may be requested and used for such purpose; provided, however, that the access, and related rights to investigate and examine, granted to the Purchaser and its Representatives pursuant to this Agreement shall not constitute nor be construed as a waiver of any applicable legal privilege of the Sellers or any Seller, including the attorney-client and work product privileges. All requests for documents, information, meetings and discussions under this Section 9.2 shall initially be made through either Robert Adamson, Kevin Little, Jeff Yesner or representatives of Loughlin Meghji & Co.

(c)     From and after the Closing Date, the Purchaser shall give Sellers and Sellers' Representatives reasonable access during normal business hours to the offices, facilities, plants, properties, assets, Employees, Documents (including, without limitation, any Documents included in the Purchased Assets), personnel files and books and records of the Purchaser pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date or (ii) the Excluded Assets and Liabilities. In connection with the foregoing, the Purchaser shall use commercially reasonable efforts to cause its Representatives to furnish to Sellers such financial, technical, operating and other information pertaining to (i) the conduct of the Business or ownership of the Purchased Assets prior to the Closing Date, or (ii) the Excluded Assets and Liabilities, in each case, as Sellers' Representatives shall from time to time reasonably request and to discuss such information with such Representatives. Without limiting the generality of the foregoing, the Purchaser shall, and shall use commercially reasonable efforts to cause each of its Affiliates to, cooperate with Sellers as may reasonably be requested by Sellers for purposes of enabling an independent accounting firm selected by Sellers to conduct an audit of the Business for periods prior to the Closing Date, including access to Purchaser's independent auditors' working papers pertaining to the Business or the Purchased Assets.

(d)     No information received pursuant to an investigation made under this Section 9.2 shall be deemed to (i) qualify, modify, amend or otherwise affect any representations, warranties, covenants or other agreements of Sellers set forth in this Agreement or any certificate or other instrument delivered to the Purchaser in connection with the transactions contemplated hereby, (ii) amend or otherwise supplement the information set forth in the Seller Disclosure Schedule, (iii) limit or restrict the remedies available to the parties under applicable Law arising out of a breach of this Agreement or otherwise available at Law or in equity, or (iv) limit or restrict the ability of either party to invoke or rely on the conditions to the obligations of the parties to consummate the transactions contemplated by this Agreement set forth in Article X.

9.3     Assignability of Certain Contracts, Etc.  To the extent that the assignment to the Purchaser of any Assigned Contract pursuant to this Agreement is not permitted without the

51

consent of a third party and such restriction cannot be effectively overridden or canceled by the Sale Order or other related order of the Bankruptcy Court, then this Agreement will not be deemed to constitute an assignment of or an undertaking or attempt to assign such Assigned Contract or any right or interest therein unless and until such consent is obtained; provided, however, that the parties hereto will use their commercially reasonable efforts, before the Closing, to obtain all such consents; provided, further, that if any such consents are not obtained prior to the Closing Date, Sellers and the Purchaser will reasonably cooperate with each other in any lawful and feasible arrangement designed to provide the Purchaser (such arrangement to be at the sole cost and expense of the Purchaser) with the benefits and obligations of any such Assigned Contract and the Purchaser shall be responsible for performing all obligations under such Assigned Contract required to be performed by Sellers on or after the Closing Date to the extent that if such Assigned Contract were assumed by the Purchaser as of the Closing Date the obligations thereunder would have constituted an Assumed Liability.

9.4    Rejected Contracts.    No Seller shall reject any Assigned Contract in any bankruptcy proceeding following the date hereof without the prior written consent of the Purchaser.

9.5    Further Agreements.    The Purchaser authorizes and empowers Sellers from and after the Closing Date to receive and to open all mail received by Sellers relating to the Purchased Assets, the Business or the Assumed Liabilities and to deal with the contents of such communications in accordance with the provisions of this Section 9.5.  Each of Sellers shall (a) promptly deliver to the Purchaser any mail or other communication received by them after the Closing Date and relating to the Purchased Assets, the Business or the Assumed Liabilities, (b) promptly transfer in immediately available funds to the Purchaser any cash, electronic credit or deposit received by such Seller but solely to the extent that such cash, electronic credit or deposit are Purchased Assets and (c) promptly forward to the Purchaser any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Purchased Assets.  The Purchaser shall (x) promptly deliver to Sellers any mail or other communication received by it after the Closing Date and relating to the Excluded Assets or the Excluded Liabilities, (y) promptly wire transfer in immediately available funds to Sellers, any cash, electronic credit or deposit received by the Purchaser but solely to the extent that such cash, electronic credit or deposit are Excluded Assets and (z) promptly forward to Sellers any checks or other instruments of payment that it receives but solely to the extent that such checks or other instruments are Excluded Assets.  From and after the Closing Date, Sellers shall refer all inquiries with respect to the Business, the Purchased Assets and the Assumed Liabilities to the Purchaser, and the Purchaser shall refer all inquiries with respect to the Excluded Assets and the Excluded Liabilities to Sellers.

9.6    Further Assurances.

(a)    Subject to the terms and conditions of this Agreement (including Section 8.2) and applicable Law, Sellers and the Purchaser shall use their respective commercially reasonable efforts to take, or cause to be taken, all actions, and to do, or cause to be done, all things necessary, proper or advisable to consummate and make effective the transactions contemplated by this Agreement as soon as practicable, and shall coordinate and cooperate with

52

CH\1168949.14

each other in exchanging information, keeping the other party reasonably informed with respect to the status of the matters contemplated by this Section 9.6 and supplying such reasonable assistance as may be reasonably requested by the other party in connection with the matters contemplated by this Section 9.6.  Without limiting the foregoing, following the Execution Date and until the date on which the Closing occurs or this Agreement is terminated in accordance with Section 4.4, the parties shall use their commercially reasonable efforts to take the following actions but solely to the extent that such actions relate to the transactions contemplated by this Agreement:

        (i)    obtain any required consents, approvals (including Regulatory Approvals), waivers, Permits, authorizations, registrations, qualifications or other permissions or actions by, and give all necessary notices to, and make all filings with, and applications and submissions to, any Governmental Body or third party and provide all such information concerning such party as may be necessary or reasonably requested in connection with the foregoing;

        (ii)    avoid the entry of, or have vacated or terminated, any injunction, decree, order, or judgment that would restrain, prevent, or delay the consummation of the transactions contemplated hereby;

        (iii)    take any and all reasonably necessary steps to avoid or eliminate every impediment under any applicable Law that is asserted by any Governmental Body with respect to the transactions contemplated hereby so as to enable the consummation of such transactions to occur as expeditiously as possible;

        (iv)    execute, acknowledge and deliver all such further conveyances, notices, assumptions, releases and acquaintances and such other instruments, and cooperate and take such further actions, as may be reasonably necessary or appropriate to transfer and assign fully to the Purchaser and its successors and assigns, all of the Purchased Assets, and for the Purchaser and its successors and assigns, to assume the Assumed Liabilities, and to otherwise make effective the transactions contemplated hereby and thereby; and

        (v)    take any and all actions necessary to effect the transfer of all of the Permits and include all such Permits in the Purchased Assets.

Subject to the terms and conditions of this Agreement, the parties shall not take any action or refrain from taking any action the effect of which would be to delay or impede the ability of Sellers and the Purchaser to consummate the transactions contemplated by this Agreement, unless in such party's reasonable judgment, taking such action or refraining from taking such action is consistent with achieving the ultimate objective of consummating the transactions contemplated hereby or is required by applicable Law.

(b)    Following the Execution Date and until the earlier of the Closing Date and the date on which this Agreement is terminated in accordance with Section 4.4, Sellers, on the one hand, and the Purchaser, on the other hand, shall keep each other reasonably informed as to

the status of matters relating to the completion of the transactions contemplated hereby, including promptly furnishing the other with copies of notices or other communications received by Sellers or the Purchaser or by any of their respective Affiliates (as the case may be), from any third party and/or any Governmental Body with respect to the transactions contemplated by this Agreement.

(c)     Notwithstanding anything in this Agreement to the contrary, the obligations of Sellers pursuant to this Section 9.6 shall be subject to any orders entered, or approvals or authorizations granted or required, by or under the Bankruptcy Court or the Bankruptcy Code (including in connection with the Chapter 11 Case), and each of Sellers' obligations as a debtor in possession to comply with any order of the Bankruptcy Court (including the Bidding Procedures Order and the Sale Order) and Sellers' duty to seek and obtain the highest or otherwise best price for the Business as required by the Bankruptcy Code.

9.7     Preservation of Records.  The Sellers and the Purchaser agree that each of them shall preserve and keep the records held by them or their Affiliates relating to the Business, the Purchased Assets and Assumed Liabilities for a period of five (5) years from the Closing Date, in the case of the Purchaser, and until the closing of the Chapter 11 Case or the liquidation and winding up of Sellers' estates, in the case of Sellers, and shall make such records available to the other party as may be reasonably required by such other party in connection with, among other things, any insurance claims by, actions or tax audits against or governmental investigations of Sellers or the Purchaser or any of their respective Affiliates or in order to enable Sellers or the Purchaser to comply with their respective obligations under this Agreement and each other agreement, document or instrument contemplated hereby or thereby.  In the event Sellers or the Purchaser wishes to destroy such records at the end of such five (5) year period, such party shall first give sixty (60) days prior written notice to the other party and such other party shall have the right at its option and expense, upon prior written notice given to such party within such sixty (60) day period, to take possession of the records within one hundred and twenty (120) days after the date of such notice, or such shorter period as the liquidation and winding up of Sellers' estates shall permit.

9.8     Publicity.  Except to the extent required by Applicable Law (including public filings and press releases which MSNH may be required to file or release, as the case may be, pursuant to applicable federal securities laws and/or stock exchange rules), each of the Sellers and the Purchaser shall not issue a press release or make any other public announcement concerning this Agreement or the matters or transactions contemplated hereby without the prior written approval of the other parties hereto (which approval shall not be unreasonably withheld, conditioned or delayed).

9.9     Communication with Acquired Customers.  Sellers and the Purchaser shall send a joint letter to the Acquired Customers, in form and substance reasonably satisfactory to the Purchaser, at a mutually satisfactory time after the Bankruptcy Court's entry of the Sale Order, which shall include, but not be limited to, advising the Acquired Customers about the existence of (but not the terms of) this Agreement and the pending transfer of the Acquired Customer's account and underlying Assigned Contract from Sellers to the Purchaser.  In addition, the Purchaser shall have the right, subject to the prior consent of MSN (which consent shall not be

54

unreasonably withheld, conditioned or delayed), to contact and meet with any Seller's joint venturers and other partners, any parties to any Assigned Contract and any lenders with respect to any Purchased Assets or Assumed Liabilities; provided, however, that prior to the entry of the Sale Order, Sellers shall have the right to participate in any such contact or meeting.

9.10    Notification of Certain Matters.  Sellers shall give prompt notice to the Purchaser, and the Purchaser shall give prompt notice to Sellers, of (a) any notice or other communication from any Person alleging that the consent of such Person which is or may be required in connection with the transactions contemplated by this Agreement is not likely to be obtained prior to Closing and (b) any written objection or proceeding that challenges the transactions contemplated hereby or the entry of the approval of the Bankruptcy Court.   To the extent permitted by applicable Law, Sellers shall give prompt notice to the Purchaser of (w) any notice of any alleged violation of Law applicable to any Seller, (x) the commencement of any investigation, inquiry or review by any Governmental Body with respect to the Business or that any such investigation, inquiry or review, to the Knowledge of any Seller, is contemplated, (y) the infringement or unauthorized use by any Person of any material Intellectual Property (of which any Seller has Knowledge) and (z) the execution of any Material Contract entered into other than in the Ordinary Course of Business (and Sellers shall deliver or make available a copy thereof to the Purchaser).

9.11    DIP Loan Documents.  Notwithstanding anything in this Agreement to the contrary, between the date of this Agreement and the earlier of the termination of this Agreement in accordance with Section 4.4 and the Closing Date, it shall not be a breach of this Agreement for, and nothing in this Agreement shall (or shall be deemed to) limit or affect the ability of, Sellers to incur Indebtedness or borrow funds under the DIP Loan or the DIP Loan Documents, including, without limitation, for the purpose of paying Cure Costs in accordance with the terms and conditions of the DIP Loan Documents.

9.12    Insurance Policies.

Without limiting the generality of Section 5.20, and subject to Section 2.2(d), Sellers shall:

(a)    cause the assignment of all rights of any of Sellers in and to the Insurance Policies and Third Party Insurance Policies, to the extent related to the Purchasers, the Business (to the extent not specifically related to the Excluded Assets) or the Purchased Assets, to the Purchasers as soon as reasonably practicable (and in any event within 7 days following Closing);

(b)    to the extent the Purchasers are not Named Insureds or otherwise do not have the rights to directly make claims under the Insurance Policies or Third Party Insurance Policies, provide the Purchasers with all the rights of the Sellers to make claims thereunder related to the Business (to the extent not specifically related to the Excluded Assets) or the Purchased Assets;

(c)    use commercially reasonable efforts to maintain each Insurance Policy (or in the case of any Third Party Insurance Policy, to cause the applicable vendor, contractor or third party services provider to maintain) in full force and effect through such Insurance Policy's

55

scheduled expiration date in accordance with its terms and provide Purchasers with prompt notice of any event that would reasonably be expected to cause any such Insurance Policy other than any Third Party Insurance Policy to cease to be so in full force and effect, including the reduction in the total aggregate limits of liability applicable to the excess liability or the directors and officers liability insurance programs;

(d)     take all action and furnish all assistance as is reasonably necessary to assist the Purchasers in tendering and pursuing claims including but not limited to settling, compromising or modifying coverage, or establishing the right to make claims with respect to the Business (to the extent not specifically related to the Excluded Assets) or Purchased Assets under the Insurance Policies and Third Party Insurance Policies;

(e)     promptly remit to the Purchasers all net proceeds and recoveries under the Insurance Policies and Third Party Insurance Policies with respect to the Business (to the extent not specifically related to the Excluded Assets) or the Purchased Assets;

(f)     not take or permit any action that would materially affect the rights of the Purchasers with respect to the Insurance Policies or Third Party Insurance Policies, including but not limited to any returns of premium under the Insurance Policies or collateral for any of the Insurance Policies including amounts secured by letters of credit;

(g)     provide reasonable cooperation and assistance to the Purchasers in obtaining comparable insurance policies to the extent any of the Insurance Policies (or any benefits thereunder) at any time prior to the scheduled expiration date become unavailable to the Purchasers; and

(h)     obtain all approvals, authorizations, consents, licenses, permissions, waivers and approvals from, and make all notices and filings with, third parties necessary or advisable to accomplish the foregoing.

Notwithstanding any other provision of this Agreement to the contrary, the Parties shall be entitled to specifically enforce this Section 9.12.

## ARTICLE X.

## CONDITIONS TO CLOSING

10.1     Conditions Precedent to the Obligations of the Purchaser and Sellers.    The respective obligations of each party to this Agreement to consummate the transactions contemplated by this Agreement are subject to the satisfaction or written waiver, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Sellers and Purchaser in whole or in part to the extent permitted by applicable Law):

(a)     there shall not be in effect any statute, rule, regulation, executive order enacted, issued, entered or promulgated by a Governmental Body of competent jurisdiction restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated hereby; and

CHI\168949.14

(b)    the Bankruptcy Court shall have entered the Bidding Procedures Order and Sale Order and each of such orders shall be a Final Order and in form and substance reasonably satisfactory to Sellers and the Purchaser.

10.2    <u>Conditions Precedent to the Obligations of Sellers</u>.  The obligations of Sellers to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by Sellers in whole or in part to the extent permitted by applicable Law):

(a)    the representations and warranties of the Purchaser set forth in <u>Article VI</u> hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a material adverse effect on the Purchaser's ability to consummate the transactions contemplated hereby, and Sellers shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(b)    the Purchaser shall have performed and complied in all material respects with all obligations and agreements required by this Agreement to be performed or complied with by the Purchaser on or prior to the Closing Date, and Sellers shall have received a certificate signed by an authorized officer of the Purchaser, dated the Closing Date, to the foregoing effect;

(c)    the Purchaser shall have delivered, or caused to be delivered, to Sellers all of the items set forth in <u>Section 4.3</u>;

(d)    all portions of the Purchase Price shall have been delivered in accordance with <u>Section 3.1</u>; and

(e)    the Purchaser shall have delivered to Sellers appropriate evidence of all necessary limited liability company action by the Purchaser in connection with the transactions contemplated hereby, including, without limitation:  (i) certified copies of resolutions duly adopted by the Purchaser's members, board of managers or similar governing body approving the transactions contemplated by this Agreement and authorizing the execution, delivery, and performance by the Purchaser of this Agreement; and (ii) a certificate as to the incumbency of officers of the Purchaser executing this Agreement and any instrument or other document delivered in connection with the transactions contemplated by this Agreement.

10.3    <u>Conditions Precedent to the Obligations of the Purchaser</u>.  The obligations of Purchaser to consummate the transactions contemplated by this Agreement are subject to the fulfillment, on or prior to the Closing Date, of each of the following conditions (any or all of which may be waived in writing by the Purchaser in whole or in part to the extent permitted by applicable Law):

57

(a)     Sellers shall have delivered to the Purchaser (i) a certified copy of the Sale Order (which shall contain, among other things, the terms described in Section 8.2) and (ii) copies of all affidavits of service of the Sale Motion or notice of such motion filed by or on behalf of Sellers (which service shall comply with Section 8.1(e));

(b)     the representations and warranties of Sellers set forth in Article V hereof shall be true and correct as of the Closing Date as though made on and as of the Closing Date (except for such representations and warranties made as of a certain date, which shall be true and correct as of such date as though made on and as of such date) except where the failure of such representations or warranties to be true and correct (without giving effect to any limitation or qualification as to "materiality" or "material adverse effect" set forth in such representations and warranties) has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, and the Purchaser shall have received a certificate signed by an authorized officer of MSN, dated the Closing Date, to the foregoing effect;

(c)     Sellers shall have performed and complied in all material respects with all obligations and agreements required in this Agreement to be performed or complied with by them on or prior to the Closing Date, and the Purchaser shall have received a certificate signed by an authorized officer of MSN, dated such Closing Date, to the forgoing effect;

(d)     Except as provided in Section 9.3, all of the Assigned Contracts set forth on Section 10.3(d) of the Seller Disclosure, shall (i) be in full force and effect on the Closing Date, (ii) be assignable to the Purchaser without the consent of the counterparty to such Assigned Contract for such assignment (or such consent shall have been received prior to the Closing Date) and (iii) have had all of Sellers' monetary breaches and monetary defaults thereunder cured as of the Closing Date by payment of the Cure Costs through the funding provided by the DIP Lenders under the DIP Loan (or creation of reserves therefor) in accordance with the Sale Order or otherwise.

(e)     Sellers shall have delivered, or caused to be delivered, to the Purchaser all of the items set forth in Section 4.2;

(f)     Purchaser shall have obtained all of the Material Permits, and all of the Material Permits shall be in full force and effect as necessary for the Purchaser to continue to conduct the Business in the Ordinary Course of Business immediately after the Closing Date; and

(g)     between the Execution Date and the Closing Date, there shall not have occurred a Material Adverse Effect.

10.4    Failure Caused by Party's Failure to Comply.  Neither Sellers nor the Purchaser may rely on the failure of any condition set forth in Sections 10.1, 10.2 or 10.3, as the case may be, if such failure was caused directly by such party's failure to comply with any provision of this Agreement.

# ARTICLE XI.

## TAXES

11.1    <u>Additional Tax Matters</u>.

(a)    Any sales, use, purchase, transfer, franchise, deed, fixed asset, stamp, documentary stamp, use or other Taxes and recording charges which may be payable by reason of the purchase and sale of the Purchased Assets or the assumption of the Assumed Liabilities under this Agreement or the transactions contemplated herein shall be borne and timely paid by Purchaser, and Purchaser shall indemnify, defend (with counsel reasonably satisfactory to the Purchaser), protect, and save and hold the Purchaser harmless from and against any and all claims, charges, interest or penalties assessed, imposed or asserted in relation to any such Taxes.

(b)    The Purchaser shall, within one-hundred twenty (120) days after the Closing Date, prepare and deliver to MSN for its consent (which consent shall not be unreasonably withheld, delayed or conditioned) a schedule allocating the Purchase Price (and any other items that are required for federal income tax purposes to be treated as part of the purchase price) among the Purchased Assets (such schedule, the "<u>Allocation</u>"). If MSN raises any objection to the Allocation within twenty (20) days of the receipt thereof, the Purchaser and MSN will negotiate in good faith to resolve such objection(s). The Purchaser, Sellers and MSN shall report and file all Tax Returns (including amended Tax Returns and claims for refund) consistent with the Allocation as finally agreed upon, and shall take no position contrary thereto or inconsistent therewith (including, without limitation, in any audits or examinations by any Governmental Body or any other proceeding) without first giving the other party prior written notice; provided, however, that nothing contained herein shall prevent Purchaser, MSN, or Sellers from settling any proposed deficiency or adjustment by any Governmental Body based upon or arising out of the Allocation, and neither Purchaser, MSN or Sellers shall be required to litigate before any court any proposed deficiency or adjustment by any Governmental Body challenging such Allocation. The Purchaser, Sellers and MSN shall cooperate in the filing of any forms (including Form 8594 under Section 1060 of the Code) with respect to such Allocation, including any amendments to such forms required pursuant to this Agreement with respect to any adjustment to the Purchase Price. If and to the extent the parties are unable to agree on such Allocation, the parties shall retain a mutually agreed upon accounting firm of national repute to resolve such dispute. Notwithstanding any other provision of this Agreement, the terms and provisions of this <u>Section 11.1(b)</u> shall survive the Closing without limitation.

# ARTICLE XII.

## MISCELLANEOUS

12.1    <u>Payment of Expenses</u>.    Except as otherwise provided in this Agreement and whether or not the transactions contemplated hereby are consummated, Sellers and the Purchaser shall, subject to <u>Section 12.12</u> below, bear their own expenses incurred or to be incurred in connection with the negotiation and execution of this Agreement and each other agreement,

document and instrument contemplated by this Agreement and the consummation of the transactions contemplated hereby and thereby.

12.2    <u>Survival of Representations and Warranties; Survival of Confidentiality</u>.    The parties hereto agree that the representations and warranties, and the covenants and agreements to be performed prior to the Closing, contained in this Agreement shall not survive, and thus shall expire upon, the Closing.    The parties hereto agree that the covenants contained in this Agreement to be performed at or after the Closing shall survive in accordance with the terms of the particular covenant or until fully performed.

12.3    <u>Entire Agreement; Amendments and Waivers</u>.    This Agreement (including the schedules and exhibits hereto and other documents specifically referred to herein) represents the entire understanding and agreement between the parties hereto with respect to the subject matter hereof.    This Agreement may be amended, supplemented or changed, and any provision hereof may be waived, only by written instrument making specific reference to this Agreement signed by the party against whom enforcement of any such amendment, supplement, modification or waiver is sought.    No action taken pursuant to this Agreement, including without limitation, any investigation by or on behalf of any party shall be deemed to constitute a waiver by the party taking such action of compliance with any representation, warranty, covenant or agreement contained herein.    The waiver by any party hereto of a breach of any provision of this Agreement shall not operate or be construed as a further or continuing waiver of such breach or as a waiver of any other or subsequent breach.    No failure on the part of any party to exercise, and no delay in exercising, any right, power or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of such right, power or remedy by such party preclude any other or further exercise thereof or the exercise of any other right, power or remedy.    All remedies hereunder are cumulative and are not exclusive of any other remedies provided by applicable Law.

12.4    <u>Counterparts</u>.    For the convenience of the parties hereto, this Agreement may be executed (by facsimile or PDF signature) in any number of counterparts, each such counterpart being deemed to be an original instrument, and all such counterparts shall together constitute the same agreement.

12.5    <u>Governing Law</u>.    THIS AGREEMENT IS TO BE GOVERNED BY AND CONSTRUED IN ACCORDANCE WITH FEDERAL BANKRUPTCY LAW, TO THE EXTENT APPLICABLE AND WHERE STATE LAW IS IMPLICATED, THE LAWS OF THE STATE OF NEW YORK SHALL GOVERN, WITHOUT GIVING EFFECT TO THE CHOICE OF LAW PRINCIPLES THEREOF, INCLUDING ALL MATTERS OF CONSTRUCTION, VALIDITY AND PERFORMANCE.

12.6    <u>Jurisdiction, Waiver of Jury Trial</u>.

(a)    THE BANKRUPTCY COURT WILL HAVE JURISDICTION OVER THE PARTIES HERETO AND ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY; <u>PROVIDED</u>,

60

HOWEVER, THAT IF THE BANKRUPTCY COURT IS UNWILLING OR UNABLE TO HEAR ANY SUCH DISPUTE, THE COURTS OF THE STATE OF NEW YORK AND THE FEDERAL COURTS OF THE UNITED STATES OF AMERICA LOCATED IN THE SOUTHERN DISTRICT OF THE STATE OF NEW YORK WILL HAVE SOLE JURISDICTION OVER ANY AND ALL DISPUTES BETWEEN OR AMONG THE PARTIES, WHETHER IN LAW OR EQUITY, ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY AGREEMENT CONTEMPLATED HEREBY.

(b)    EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY LEGAL PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY.

12.7    Notices.  Unless otherwise set forth herein, any notice, request, instruction or other document to be given hereunder by any party to the other parties shall be in writing and shall be deemed duly given (i) upon delivery, when delivered personally, (ii) one (1) day after being sent by overnight courier or when sent by facsimile transmission (with a confirming copy sent by overnight courier), and (iii) three (3) days after being sent by registered or certified mail, postage prepaid, as follows:

If to Sellers, to:

> Medical Staffing Network Holdings, Inc.
> 901 Yamato Road
> Boca Raton, Florida 33431
> Attention: Robert Adamson, Chairman and CEO
> and Kevin Little, President and CFO
> Facsimile No. 561-322-1201

With a copy (which shall not constitute effective notice) to:

> Akerman Senterfitt
> One Southeast Third Avenue
> Miami, Florida 33131
> Attention: Philip B. Schwartz, Esq. and Kim Hines, Esq.
> Facsimile No. 305-374-5095

and to:

> Berger Singerman, P.A.
> 200 South Biscayne Blvd.
> Suite 1000
> Miami, FL  33131-5308
> Attn:  Daniel H. Aronson, Esq. and Paul Steven Singerman, Esq.
> Facsimile No.:  305-714-4340

61

If to the Purchaser, to:

>MSN AcquisitionCo, LLC
>c/o Smith & Smith LLC
>34 Sherman Court
>Fairfield, CT 06824
>Attn: Christopher H. Smith
>Facsimile No.: 203-292-8998

With a copy (which shall not constitute effective notice) to:

>Latham & Watkins LLP
>233 South Wacker Drive, Suite 5800
>Chicago, IL 60606
>Attn: Richard S. Meller
>Facsimile No.: 312-993-9767

or to such other Persons or addresses as may be designated in writing by the party to receive such notice.

12.8    <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon the Purchaser and, subject to entry of the Bidding Procedures Order (with respect to the matters covered thereby) and the Sale Order, Sellers, and inure to the benefit of the parties and their respective successors and permitted assigns, including, without limitation, any trustee or estate representative appointed in the Chapter 11 Case or any successor Chapter 7 case.  Nothing in this Agreement shall create or be deemed to create any third party beneficiary rights in any Person or entity not a party to this Agreement except as provided below.  No assignment of this Agreement or of any rights or obligations hereunder may be made by Sellers or the Purchaser (by operation of law or otherwise) without the prior written consent of the other parties hereto and any attempted assignment without the required consents shall be void; provided, that the Purchaser may assign its rights and obligations hereunder in whole or in part to one or more wholly owned subsidiaries of the Purchaser (subject to the next succeeding sentence).  No assignment of any obligations hereunder shall relieve the parties hereto of any such obligations.  Upon any such permitted assignment, the references in this Agreement to the Purchaser shall also apply to any such assignee unless the context otherwise requires.

12.9    <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of Law or public policy, all other conditions and provisions of this Agreement shall nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in a manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto shall negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable

CH\1168949.14

manner to the end that the transactions contemplated hereby are fulfilled to the fullest extent possible.

12.10    Injunctive Relief.

(a)    The parties agree that damages at Law may be an inadequate remedy for the breach of any of the covenants, promises and agreements contained in this Agreement by the Sellers, and, accordingly, the Purchaser shall be entitled to injunctive relief with respect to any such breach, including without limitation, specific performance of such covenants, promises or agreements or an order enjoining the Purchaser from any threatened, or from the continuation of any actual, breach of the covenants, promises or agreements contained in this Agreement by the Sellers. The rights set forth in this Section 12.10 shall be in addition to any other rights which the Purchaser may have at Law or in equity pursuant to this Agreement.

(b)    For the avoidance of doubt, except in the case of fraud by the Purchaser, DIP Agent, DIP Lenders, First Lien Agent or First Lien Lenders or any of their respective Affiliates or subsidiaries, the right of the Sellers to receive the Purchaser Termination Fee as provided in Section 4.6(b) shall be the sole and exclusive remedy of the Sellers against the Purchaser, DIP Agent, DIP Lenders, First Lien Agent and First Lien Lenders and any of their respective Affiliates or subsidiaries for any loss or damage suffered as a result of Purchaser's breach of this Agreement or termination of this Agreement pursuant to Section 4.4(j), Section 4.4(l) or pursuant to any other provision of Section 4.4 due to the Purchaser's breach of any of its obligations under this Agreement and the Sellers are explicitly not entitled to (and hereby waive) any other remedy, including specific performance, for damages suffered by the Sellers as a result of the Purchaser's breach of this Agreement or the termination of this Agreement for any reason.

12.11    Non Recourse.    Except as expressly contemplated by this Agreement, no past, present or future director, officer, employee, advisor, lawyer, agent, representative, incorporator, member, partner or equityholder of any Seller or the Purchaser shall have any liability for any obligations or liabilities of any Seller or the Purchaser under this Agreement or Sellers' Documents or the Purchaser's Documents of or for any claim based on, in respect of, or by reason of, the transactions contemplated hereby and thereby.

12.12    No Waiver or Release.    Notwithstanding anything herein to the contrary (other than the Purchaser Termination Fee described in Section 4.6(b) of this Agreement), all terms, conditions, covenants, representations and warranties contained in the DIP Loan Documents or First Lien Loan Documents, and all rights, powers and remedies of the DIP Agent, the DIP Lenders, the First Lien Agent and First Lien Lenders and all of the obligations of the Debtors (as defined in the DIP Loan Documents or First Lien Loan Documents, as applicable) and other Loan Parties (as defined in the DIP Loan Documents or First Lien Loan Documents, as applicable) thereunder (including, without limitation, the obligation to reimburse the First Lien Agent and First Lien Lenders for fees and expenses incurred in connection with preparation and negotiation of this Agreement to the extent set forth therein), are reserved and are not amended, modified, limited or otherwise affected by the terms and conditions of this Agreement.

CH\1168949.14

12.13   <u>Time of the Essence</u>.  Time is of the essence in the performance of each of the obligations of the parties and with respect to all covenants and conditions to be satisfied by the parties in this Agreement and all documents, acknowledgments and instruments delivered in connection herewith.

12.14   <u>Certain Interpretations</u>.

(a)   Unless otherwise expressly provided, for purposes of this Agreement, the following rules of interpretation shall apply:

(i)   All references in this Agreement to Articles, Sections, Schedules and Exhibits shall be deemed to refer to Articles, Sections, Schedules and Exhibits to this Agreement.

(ii)   All Exhibits and Schedules annexed hereto or referred to herein are hereby incorporated in and made a part of this Agreement as if set forth in full herein. Any capitalized terms used in any Schedule or Exhibit but not otherwise defined therein shall be defined as set forth in this Agreement.

(iii)   The Article, Section and paragraph captions herein are for convenience of reference only, do not constitute part of this Agreement and shall not be deemed to limit or otherwise affect any of the provisions hereof.

(iv)   The words "include," "includes" and "including," when used herein shall be deemed in each case to be followed by the words "without limitation" (regardless or whether such words or similar words actually appear).

(v)   When calculating the period of time before which, within which or following which any act is to be done or step taken pursuant to this Agreement, the date that is the reference date in calculating such period shall be excluded.

(vi)   Any reference in this Agreement to $ shall mean U.S. dollars.

(vii)   Any reference in this Agreement to gender shall include all genders, and words imparting the singular number only shall include the plural and vice versa.

(viii)   The words such as "herein," "hereinafter," "hereof," and "hereunder" refer to this Agreement as a whole and not merely to a subdivision in which such words appear unless the context otherwise requires.

(b)   The parties hereto agree that they have been represented by legal counsel during the negotiation and execution of this Agreement and, therefore, waive the application of any Law, regulation, holding or rule of construction providing that ambiguities in an agreement or other document shall be construed against the party drafting such agreement or document.

CH\1168949.14

(c)    Purchaser acknowledges hereby that Sellers may not comply with the provisions of any bulk transfer laws of any jurisdiction in connection with the transactions contemplated by this Agreement.

*[Remainder of page intentionally left blank]*

65

**IN WITNESS WHEREOF,** the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

PURCHASER:

MSN ACQUISITIONCO, LLC

By:  _[signature]_
     Name: CHRISTOPHER H. SMITH
     Title: Sole Member + Manager

SELLERS:

MEDICAL STAFFING NETWORK, INC.

By:  _____
     Name:  Kevin Little
     Title:  President

MEDICAL STAFFING NETWORK
HOLDINGS, INC.

By:  _____
     Name:  Kevin Little
     Title:  President

MEDICAL STAFFING HOLDINGS, LLC

By:  Medical Staffing Network Holdings, Inc.
Its:  Sole Member

By:  _____
     Name:  Kevin Little
     Title:  President

MSN-ILLINOIS HOLDINGS, INC.

By:  _____
     Name:  Kevin Little
     Title:  Treasurer

[Signature Page to Asset Purchase Agreement]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed by their respective duly authorized officers as of the date first above written.

**PURCHASER:**

**MSN ACQUISITIONCO, LLC**

By: _____
        Name:
        Title:

**SELLERS:**

**MEDICAL STAFFING NETWORK, INC.**

By: _____
        Name: Kevin Little
        Title: President

**MEDICAL STAFFING NETWORK HOLDINGS, INC.**

By: _____
        Name: Kevin Little
        Title: President

**MEDICAL STAFFING HOLDINGS, LLC**

By:  Medical Staffing Network Holdings, Inc.
Its:  Sole Member

By: _____
        Name: Kevin Little
        Title: President

**MSN-ILLINOIS HOLDINGS, INC.**

By: _____
        Name: Kevin Little
        Title: Treasurer

[Signature Page to Asset Purchase Agreement]

**MEDICAL STAFFING NETWORK OF ILLINOIS, LLC**

By:     MSN-Illinois Holdings, Inc.,
Its:    Sole Member

By:     _____
        Name: Kevin Little
        Title: Manager


**MEDICAL STAFFING NETWORK ASSETS, LLC**

By:     _____
        Name: Kevin Little
        Title: Manager


**INTELISTAF HOLDINGS, INC.**

By:     _____
        Name: Kevin Little
        Title: Treasurer


**INTELISTAF GROUP, INC.**

By:     _____
        Name: Kevin Little
        Title: President


**INTELISTAF HEALTHCARE, INC.**

By:     _____
        Name: Kevin Little
        Title: President


[Signature Page to Asset Purchase Agreement]

**INTELISTAF PARTNERS NO. 1, LLC**

By: _____

Name: Kevin Little
Title: President


**INTELISTAF PARTNERS NO. 2, LLC**

By: _____

Name: Kevin Little
Title: President


**INTELISTAF HEALTHCARE
MANAGEMENT, L.P.**

By: Intelistaf Partners No. 1, LLC
Its: General Partner

By: _____

Name: Kevin Little
Title: President


[Signature Page to Asset Purchase Agreement]

**EXHIBIT B**

**Bidding Procedures Order**

**(including exhibits)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                                          Chapter 11 Cases

MEDICAL STAFFING NETWORK HOLDINGS,                       Case No. 10-29101-EPK
INC., *et al.*, [1]

                                                                                (Jointly Administered)

      Debtors.
_____/

### ORDER (A) APPROVING COMPETITIVE BIDDING AND SALE PROCEDURES; (B) APPROVING FORM AND MANNER OF NOTICES; (C) APPROVING ASSET PURCHASE AGREEMENT; (D) SCHEDULING DATES TO CONDUCT AUCTION AND HEARING TO CONSIDER FINAL APPROVAL OF SALE, INCLUDING TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES; (E) AUTHORIZING SALE OF SUBSTANTIALLY ALL THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; AND (F) GRANTING RELATED RELIEF

---

[1] The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis:  (i) Medical Staffing Network Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii) Medical Staffing Network, Inc. (9868); (iv) MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings, Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii) Medical Staffing Network of Illinois, LLC (4409); (viii) Medical Staffing Network Assets, LLC (4413); (ix) InteliStaf Healthcare, Inc. (7108); (x) InteliStaf Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC (5965); and (xii) InteliStaf Healthcare Management, L.P. (7958).

**THIS CAUSE** came before the Court on July [  ], 2010 at ___ p.m. in West Palm Beach, Florida upon the *Emergency Motion For Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Asset Purchase Agreement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Authorizing Sale of Substantially All The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief* (the "Bid Procedures Motion" or the "Motion")[2] [D.E. __] filed by MEDICAL STAFFING NETWORK HOLDINGS, INC., ("MSN") and each of the other above-captioned debtors and debtors in possession (collectively, the "Debtors" or the "Companies"). Having reviewed the Bid Procedures Motion and the record in these cases, including the *Declaration of Moshin Y. Meghji In Support of Chapter 11 Petitions and First Day Relief* (the "First Day Declaration") and the *Declaration Of Leon Szlezinger In Support Of: Motion For Entry of Order (A) Approving Competitive Bidding and Sale Procedures; (B) Approving Form and Manner of Notices; (C) Approving Asset Purchase Agreement; (D) Scheduling Dates To Conduct Auction and Hearing to Consider Final Approval of Sale, Including Treatment of Executory Contracts and Unexpired Leases; (E) Approving Sale of Substantially All The Debtors' Assets Free and Clear of All Liens, Claims, Encumbrances and Interests; and (F) Granting Related Relief* (the "Szlezinger Declaration"), having considered the statements of counsel for the Debtors and the Proposed Purchaser (defined below), and the evidence adduced by the Debtors (including proffers of evidence admitted into evidence without

---

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion, the bidding procedures attached hereto as Exhibit 1 (the "Bidding Procedures") or that certain Asset Purchase Agreement dated as of July 2, 2010 among MSN AcquisitionCo., LLC, as purchaser (the "Proposed Purchaser"), Medical Staffing Network Holdings, Inc. and the other sellers named therein, as sellers thereto (as amended, modified or supplemented, the "Asset Purchase Agreement"), as applicable.

objection), the Court finds that establishing procedures for a sale of the Purchased Assets (as defined below) and Transferred Equity Interests in accordance with this Bidding Procedures Order, is in the best interests of the Debtors' estates. Accordingly,

IT IS HEREBY FOUND AND DETERMINED THAT:

A.    The findings and conclusions set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), made applicable to this proceeding pursuant to Bankruptcy Rule 9014;

B.    The Court has jurisdiction over the Motion and the transaction contemplated by the Asset Purchase Agreement pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A), (M) and (O).  Venue in this district is proper under 28 U.S.C. §§ 1408 and 1409;

C.    The statutory bases for the relief requested in the Motion are (i) sections 105, 363, 364 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 et seq. (the "Bankruptcy Code"); (ii) Bankruptcy Rules 2002(a)(2), 6004, 6006 and 9014; and (iii) Rule 6004-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida (the "Local Rules");

D.    Good and sufficient notice of the Motion and the relief sought therein has been given under the circumstances, and no other or further notice is required except as set forth herein with respect to the Sale Hearing.  A reasonable opportunity to object or be heard regarding the relief provided herein has been afforded to creditors, equity holders and other parties in interest;

E.    The Debtors' proposed notice of the Bidding Procedures is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the

3

Auction, the sale of substantially all of the Debtors' assets (the "Purchased Assets") and the Transferred Equity Interests, and the Bidding Procedures to be employed in connection therewith;

F.      The Debtors have articulated good and sufficient reasons for the Court to: (i) approve the Bidding Procedures; (ii) set the Sale Hearing and approve the manner of notice of the Motion and the Sale Hearing; and (iii) approve the procedures for the assumption and assignment of certain executory contracts and unexpired leases (collectively, the "Assumed Executory Contracts"), including notice of proposed cure amounts;

G.      The entry of this Bidding Procedures Order is in the best interests of the Debtors, their estates, their creditors, equity holders and other parties in interest; and

H.      The Bidding Procedures are reasonably designed to maximize the value to be achieved for the Purchased Assets and Transferred Equity Interests.

IT IS THEREFORE ORDERED, ADJUDGED AND DECREED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      All objections to the Motion or the relief provided herein that have not been withdrawn, waived or settled, and all reservations of rights included therein, hereby are overruled and denied on the merits.

3.      The Bidding Procedures, attached hereto as Exhibit 1, are hereby incorporated herein and approved in their entirety.  The Debtors are authorized to take any and all actions necessary or appropriate to implement the Bidding Procedures.

4.      As further described in the Bidding Procedures, the deadline for submitting bids for the Purchased Assets and Transferred Equity Interests (the "Bid Deadline") is **August __, 2010 at 4:00 p.m. (prevailing Eastern Time)**.  No Bid shall be deemed to be a

Qualified Bid or otherwise considered for any purposes unless such Bid meets the requirements set forth in the Bidding Procedures.

5.      The Debtors may sell the Purchased Assets and the Transferred Equity Interests, and enter into the transactions contemplated by the Asset Purchase Agreement by conducting an Auction in accordance with the Bidding Procedures.

6.      If Qualified Bids are timely received by the Debtors in accordance with the Bidding Procedures, the Auction shall take place on August __, 2010 at __:__ _.m. (prevailing Eastern Time) at the offices of Berger Singerman, P.A., 350 East Las Olas Blvd., Suite 1000, Fort Lauderdale, 33301, or such other place and time as the Debtors shall notify all Qualified Bidders, including the Proposed Purchaser, any official committee of unsecured creditors appointed in these chapter 11 cases (the "Committee"), counsel for the Proposed Purchaser and other invitees.  The Auction shall be conducted in accordance with the Bidding Procedures.  If, however, no such Qualified Bid is received by the Bid Deadline, then the Auction will not be held and the Debtors shall seek Bankruptcy Court approval of the Asset Purchase Agreement with the Proposed Purchaser at the Sale Hearing.

7.       The Sale Hearing shall be held before the Court on August __, 2010 at __:__ _.m. (prevailing Eastern Time), or at such earlier date as counsel and interested parties may be heard.

8.      Objections, if any, to the sale of the Purchased Assets and the Transferred Equity Interests, and the transaction contemplated by the Asset Purchase Agreement, or the relief requested in the Motion must:  (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, West Palm Beach Division, Flagler Waterview Building, 151 North Flagler Drive, 8th

Floor, West Palm Beach, Florida 33401 (or filed electronically via CM/ECF), on or before 4:00 p.m. (prevailing Eastern Time) on _____ __, 2010 (the "Sale Objection Deadline"); and (d) be served upon (i) counsel to the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Paul Steven Singerman, Esq. and Jordi Guso, Esq., (ii) counsel to the Committee, if any, (iii) counsel to the Proposed Purchaser, Latham & Watkins, LLP, 885 Third Avenue, New York, New York, 10022-4834, Attn: David S. Heller, Esq. and Roger G. Schwartz, Esq.; and Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, 150 W. Flagler Street, Suite 2100, Miami, Florida 33131, Attn: Patricia A. Redmond, and (iv) the Office of the United States Trustee, in each case, so as to be actually received no later than 4:00 p.m. (prevailing Eastern Time) on the same day.

9.    The notice, substantially in the form attached hereto as Exhibit 2 (the "Sale Notice"), is hereby approved.

10.    On or before three (3) business days after entry of this Bidding Procedures Order, the Debtors will cause the Sale Notice to be sent by first-class mail postage prepaid, to the following: (a) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets and Transferred Equity Interests; (b) the Office of the United States Trustee; (c) the Securities and Exchange Commission; (d) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets and Transferred Equity Interests, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets and Transferred Equity Interests or have any known interest in the relief requested by the Motion; (e) the state and local environmental agencies in the jurisdictions where the Debtors own

2854690-6

or lease real property; (f) counsel to the First Lien Agent; (g) counsel to the Second Lien Agent; (h) counsel to the DIP Agent; (i) the United States Attorney's office for the Southern District of Florida; (j) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002 as of the date of entry of this Bidding Procedures Order; (k) counsel to the Committee, if any; (l) all parties to any litigation involving the Debtors; (m) all counterparties to any executory contract or unexpired lease of the Debtors; (n) all other known creditors and interest holders of the Debtors; and (o) all potential bidders previously identified or otherwise known to the Debtors.

11.    In addition to the foregoing, as soon as practicable, but in any event no later than five (5) business days after the entry of this Bidding Procedures Order, the Debtors shall publish the Sale Notice (modified for publication, as necessary) in *The Wall Street Journal*, national edition.

12.    The notice of potential assumption and assignment of the Scheduled Contracts (as defined in the Cure Notice), substantially in the form attached hereto as Exhibit 3 (the "Cure Notice"), is hereby approved.

13.    On or before three (3) business days after the entry of this Bidding Procedures Order, the Debtors shall serve by first class mail or hand delivery the Cure Notice on all non-Debtor parties to the Scheduled Contracts. The Cure Notice shall identify the Scheduled Contracts and provide the cure amounts that the Debtors believe must be paid to cure all prepetition defaults under the Scheduled Contracts (the "Cure Amounts").

14.    Unless the non-Debtor party to a Scheduled Contract files an objection (the "Cure Amount Objection") to its scheduled Cure Amount, the assumption and assignment to the Proposed Purchaser of the Scheduled Contracts or the ability of the Proposed Purchaser to provide adequate assurance of future performance by the Sale Objection Deadline and serves a

copy of the Cure Amount Objection so as to be received no later than the Sale Objection Deadline on the same day to: (a) the Debtors, Medical Staffing Network Holdings, Inc., 901 Yamato Road, Suite 110, Boca Raton, Florida 33431; (b) counsel for the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq. and Jordi Guso, Esq.; (c) counsel to the Committee, if any; (d) counsel to the Proposed Purchaser, Latham & Watkins, LLP, 885 Third Avenue, New York, New York, 10022-4834, Attn: David S. Heller, Esq. and Roger G. Schwartz, Esq.; and Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, 150 W. Flagler Street, Suite 2100, Miami, Florida 33131, Attn: Patricia A. Redmond; and (e) the Office of the United States Trustee; such non-Debtor party shall be deemed to consent to the Cure Amount proposed by the Debtors and shall be forever enjoined and barred from seeking an additional amount on account of the Debtors' cure obligations under section 365 of the Bankruptcy Code or otherwise from the Debtors, their estates or the Proposed Purchaser (or other Prevailing Bidder) on account of the assumption and assignment of the Scheduled Contracts and shall be deemed to have consented to the proposed assumption and assignment. In addition, if no timely Cure Amount Objection is filed, the Proposed Purchaser (or other Prevailing Bidder) shall enjoy all the rights and benefits under all Scheduled Contracts without the necessity of obtaining any party's written consent to the Debtors' assumption and assignment of such rights and benefits, and each such party shall be deemed to have waived any right to object to, contest, condition or otherwise restrict any such assumption and assignment or to object or contest that the Proposed Purchaser (or other Prevailing Bidder) has not provided adequate assurance of future performance.

15.      If the Proposed Purchaser is not the Prevailing Bidder, the non-Debtor parties to the Scheduled Contracts shall have until the Sale Hearing (the "Adequate Assurance

Objection Deadline") to object to the assumption and assignment of such Scheduled Contract solely on the issue of whether the Prevailing Bidder can provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code (an "Adequate Assurance Objection"); provided, however, that if the Proposed Purchaser is the Prevailing Bidder, all Adequate Assurance Objections must be filed by the Sale Objection Deadline; provided, further, however, that all objections to the assumption and assignment of Scheduled Contracts that do not relate to the issue of whether the Prevailing Bidder can provide adequate assurance of future performance must be filed by the Sale Objection Deadline.

        16.     In the event of a dispute regarding:  (a) any Cure Amount with respect to any Scheduled Contract; (b) the ability of the Prevailing Bidder (including the Proposed Purchaser) to provide adequate assurance of future performance as required by section 365 of the Bankruptcy Code, if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption and assignment, the Cure Amounts shall be paid as soon as reasonably practicable after the Closing and following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtors, with the consent of the Proposed Purchaser or other Prevailing Bidder, as applicable, are authorized to settle any dispute regarding the amount of any Cure Amount or assignment to the Prevailing Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of the Court.

        17.     Notwithstanding the inclusion of an executory contract or unexpired lease on any list of Scheduled Contracts, the Proposed Purchaser or other Prevailing Bidder, as applicable, shall have authority, in its sole discretion, to remove any contract or lease from the list of Scheduled Contracts either (i) five (5) calendar days prior to the Sale Hearing, or (ii)

within five (5) business days after the Bankruptcy Court sustains, in whole or in part, such non-Debtor party's Cure Amount Objection or Adequate Assurance Objection; in either such case, the Debtor shall not assume and assign such Scheduled Contract to the party who removed such contract or lease from any list of Scheduled Contracts.

18.     Within two (2) business days after the Closing Date, the Debtors will file a complete list of the Scheduled Contracts that were assumed and assigned as Assumed Executory Contracts, as of the Closing Date, to the Proposed Purchaser or to the Prevailing Bidder, to the extent that the Prevailing Bidder is not the Proposed Purchaser.

19.     The notice of assumption and assignment of the Assumed Executory Contracts, substantially in the form attached hereto as Exhibit 4 (the "Assumption Notice"), is hereby approved.

20.     The Sale Hearing may be continued, from time to time, without further notice to creditors, equity holders or other parties in interest other than by announcement of said continuance before the Court on the date scheduled for such hearing or in the hearing agenda for such hearing.

21.     The Asset Purchase Agreement is approved in all respects.

22.     No party submitting an offer or Bid for the Purchased Assets and Transferred Equity Interests or a Qualified Bid shall be entitled to any expense reimbursement, breakup, termination or similar fee or payment;

23.     Except as otherwise provided in the Asset Purchase Agreement or this Bidding Procedures Order, the Debtors further reserve the right as they may reasonably determine to be in the best interests of their estates, after consultation with the Committee, if any, to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified

Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of the Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) remove some or all of the Purchased Assets and Transferred Equity Interests from the Auction; (f) waive terms and conditions set forth herein with respect to all potential bidders; (g) impose additional terms and conditions with respect to all potential bidders; (h) extend the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify the Bidding Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.  Notwithstanding the foregoing sentence, in the event that the Debtors make material modifications to the Bidding Procedures that are not consented to by the Proposed Purchaser, such material modifications shall permit the Proposed Purchaser to terminate the Asset Purchase Agreement and withdraw its bid without any liability to the Debtors, their estates or otherwise; provided, however, the Debtors may seek a determination from the Court that any such modifications are not material and should not permit the Proposed Purchaser to terminate the Asset Purchase Agreement in accordance with this paragraph.

24.     To the extent that any chapter 11 plan confirmed in these cases or any order confirming any such plan or any other order in these cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code) alters, conflicts with or derogates from the provisions of this Bidding Procedures Order, the provisions of this Bidding Procedures Order shall control.  The Debtors' obligations under this Bidding Procedures Order, the provisions of this Bidding Procedures Order and the portions of the Asset

Purchase Agreement pertaining to the Bidding Procedures shall survive confirmation of any plan of reorganization or discharge of claims thereunder and shall be binding upon the Debtors, and the reorganized or reconstituted debtors, as the case may, after the effective date of a confirmed plan or plans in the Debtors' cases (including any order entered after any conversion of these cases to cases under chapter 7 of the Bankruptcy Code).

25.    To the extent there are any inconsistencies between the terms of this Bidding Procedures Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Bidding Procedures Order shall govern.

26.    The stays provided for in Bankruptcy Rules 6004(h) and 6006(d) are hereby waived and this Bidding Procedures Order shall be effective immediately upon its entry.

27.    All time periods set forth in this Bidding Procedures Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

28.    The Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bidding Procedures Order in accordance with the Motion.

29.    The Court shall retain jurisdiction over any matters related to or arising from the implementation of this Bidding Procedures Order.

# # #

Submitted by:
Jordi Guso, Esq.
Berger Singerman, P.A.
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Tel.:  (305) 755-9500
Fax:  (305) 714-4340
Email:  jguso@bergersingerman.com

Copy furnished to:
Jordi Guso, Esq.
*(Attorney Guso is directed, pursuant to Local Rule 5005-1, to serve conformed copies of this Bidding Procedures Order upon all parties in interest, and to file a Certificate of Service with the Court confirming such service.)*

12

**EXHIBIT 1 to the Bidding Procedures Order**

**(Bidding Procedures)**

## BIDDING PROCEDURES[1]

By the Bidding Procedures Motion dated July 2, 2010, Medical Staffing Network Holdings, Inc., and its affiliated debtors and debtors in possession (collectively, the "Debtors"),[2] sought approval of, among other things, the procedures through which they will determine the highest and best bid for the sale of substantially all of their assets (the "Purchased Assets") and the Transferred Equity Interests described in the Asset Purchase Agreement by and among, MSN AcquisitionCo., LLC as purchaser (the "Proposed Purchaser"), and Medical Staffing Network Holdings, Inc. and other sellers named therein, as sellers thereto, dated as of July ___, 2010 (the "Asset Purchase Agreement"), a copy of which is attached to the proposed Sale Order as Exhibit 1, attached as Exhibit B to the Bidding Procedures Motion.

On July [__], 2010, the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") entered an order (the "Bidding Procedures Order"), which, among other things, authorized the Debtors to determine the highest and best price for the Purchased Assets and the Transferred Equity Interests through the process and procedures set forth below (the "Bidding Procedures").

## Marketing Process

### *Contact Parties*

The Debtors, in consultation with their investment banker, Jefferies & Company, Inc. ("Jefferies"), have developed a list of parties whom the Debtors believe may potentially be interested in and who the Debtors reasonably believe would have the financial resources to consummate a competing transaction to that of the Proposed Purchaser (a "Competing Transaction"), which list includes both potential strategic investors and potential financial investors (each, individually, a "Contact Party", and collectively, the "Contact Parties"). The Debtors and Jefferies are already in the process of contacting the Contact Parties to explore their interest in pursuing a Competing Transaction. The Contact Parties may include parties whom the Debtors or their advisors have previously contacted regarding a transaction, regardless of whether such parties expressed any interest, at such time, in pursuing a transaction. The Debtors will continue to discuss and may supplement the list of Contact Parties throughout the marketing process, as appropriate.

---

[1]   Capitalized terms used but not defined herein shall have the meanings set forth in the motion to approve these Bidding Procedures (the "Bidding Procedures Motion") or the Asset Purchase Agreement, as applicable.

[2]   The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Medical Staffing Network Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii) Medical Staffing Network, Inc. (9868); (iv) MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings, Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii) Medical Staffing Network of Illinois, LLC (4409); (viii) Medical Staffing Network Assets, LLC (4413); (ix) InteliStaf Healthcare, Inc. (7108); (x) InteliStaf Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC (5965); and (xii) InteliStaf Healthcare Management, L.P. (7958).

The Debtors may distribute to each Contact Party an "Information Package," comprising:

(a)     A cover letter;

(b)     A copy of these Bidding Procedures; and

(c)     A copy of a confidentiality agreement (unless the party has already signed a confidentiality agreement).

*Access to Diligence Materials*

To participate in the bidding process and to receive access to due diligence (the "Diligence Materials"), a party must submit to the Debtors an executed confidentiality agreement in the form and substance satisfactory to the Debtors and evidence demonstrating the party's financial capability with respect to the Competing Transaction as determined by the Debtors.

A party who qualifies for access to Diligence Materials shall be a "Preliminary Interested Investor." All due diligence requests must be directed to Jefferies.

For any Preliminary Interested Investor who is a competitor of the Debtors or is affiliated with any competitor of the Debtors, the Debtors reserve the right to withhold any Diligence Materials that the Debtors, in their sole discretion, determine are business-sensitive or otherwise not appropriate for disclosure to such Preliminary Interested Investor.

## Auction Qualification Process

To be eligible to participate in the Auction (defined below), each offer, solicitation or proposal (each, a "Bid"), and each party submitting such a Bid (each, a "Bidder"), must be determined by the Debtors to satisfy each of the following conditions:

(d)     Good Faith Deposit:  Each Bid must be accompanied by a deposit in the amount of $5,000,000 to an interest bearing escrow account to be identified and established by the Debtors (the "Good Faith Deposit").

(e)     Same or Better Terms:  The Bid must be on terms that, in the Debtors' business judgment, are substantially the same or better than the terms of the Asset Purchase Agreement.  A Bid must include executed transaction documents pursuant to which the Bidder proposes to effectuate the Competing Transaction (the "Modified Asset Purchase Agreement").  A Bid shall include a copy of the Asset Purchase Agreement marked to show all changes requested by the Bidder (including those related to purchase price); provided, however, that the terms of the Modified Asset Purchase Agreement are substantially similar, the same or better than the terms of the Asset Purchase Agreement.  A Bid must propose a Competing Transaction involving all or substantially all of the Debtors' assets or operations.  A Bid must propose a purchase price equal to or greater than $84,122,982.40, plus the outstanding Obligations under the DIP Loan Documents

2

in cash (the "Minimum Cash Amount"), plus an amount equivalent to the liabilities being assumed under the Asset Purchase Agreement. A Bid will not be considered by Sellers as qualified for the Auction if (i) such Bid contains additional representations and warranties, covenants, closing conditions, termination rights other than as may be included in the Asset Purchase Agreement (it being agreed and understood that the Modified Asset Purchase Agreement shall modify the Asset Purchase Agreement as needed to comply in all respects with the Bidding Procedures Order and will remove provisions that apply only to the Proposed Purchaser as the stalking horse bidder); (ii) such Bid is not received by Sellers and Purchaser in writing on or prior to the Bid Deadline (as defined herein), and (iii) such Bid does not contain evidence that the Person submitting it has received unconditional debt and/or equity funding commitments (or has unrestricted and fully available cash) sufficient in the aggregate to finance the purchase contemplated thereby. A Bid must obligate the Bidder to pay, to the extent provided in the Asset Purchase Agreement, all Cure Amounts and any cure amounts with respect to the Assumed Executory Contracts for which an Assumption Notice is provided. The Bid shall also identify any executory contracts and unexpired leases of the Debtors that the Bidder wishes to have assumed and assigned to it pursuant to the Competing Transaction.

(f)     Corporate Authority:   The Bid must include written evidence reasonably acceptable to the Debtors demonstrating appropriate corporate authorization to consummate the proposed Competing Transaction; provided, however, that, if the Bidder is an entity specially formed for the purpose of effectuating the Competing Transaction, then the Bidder must furnish written evidence reasonably acceptable to the Debtors of the approval of the Competing Transaction by the equity holder(s) of such Bidder.

(g)     Proof of Financial Ability to Perform:  The Bid must include written evidence that the Debtors reasonably conclude demonstrates that the Bidder has the necessary financial ability to close the Competing Transaction and provide adequate assurance of future performance under all contracts to be assumed and assigned in such Competing Transaction.   Such information must include, *inter alia*, the following:

(i)      contact names and numbers for verification of financing sources;

(ii)     evidence of the Bidder's internal resources and proof of unconditional debt or equity funding commitments, from a recognized banking institution in the amount of the cash portion of such Bid or the posting of an irrevocable letter of credit from a recognized banking institution issued in favor of the Debtors in the amount of the cash portion of such Bid, in each case, as are needed to close the Competing Transaction;

(iii)    the Bidder's current financial statements (audited if they exist), provided, that if the Bidder is an entity formed solely for the purpose of the Bid, the

3

Bidder shall include current financial statements (audited if they exist) for such Bidder's equity holders; and

(iv)    any such other form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors demonstrating that such Bidder has the ability to close the Competing Transaction; provided, however, that the Debtors shall determine, in their reasonable discretion, in consultation with the Debtors' advisors, whether the written evidence of such financial wherewithal is reasonably acceptable, and shall not unreasonably withhold acceptance of a Bidder's financial qualifications.

(h)    Contingencies:    A Bid may not (i) contain representations and warranties, covenants, termination rights, financing, due diligence contingencies other than as may be included in the Asset Purchase Agreement (it being agreed and understood that such Bid shall modify the Asset Purchase Agreement as needed to comply in all respects with the Bidding Procedures Order (including removing any termination rights in conflict with the Bidding Procedures Order) and will remove provisions that apply only to the Proposed Purchaser as the stalking horse bidder) and (ii) be conditioned on obtaining financing or any internal approval, or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects of specified representations and warranties at the Closing.

(i)    Irrevocable:    A Bid must be irrevocable through the time of the Auction (as defined herein), provided, however, that if such Bid is accepted as the Successful Bid or the Backup Bid (each as defined herein), such Bid shall continue to remain irrevocable, subject to the terms and conditions of these Bidding Procedures.

(j)    Bid Deadline:    Regardless of when a party qualifies as a Preliminarily Interested Investor, the following parties must actually receive a Bid in writing, on or before August ___, 2010 at 4:00 p.m. (prevailing Eastern Time) or such earlier date as may be agreed to by the Debtors (the "Bid Deadline"): (i) the Debtors, Medical Staffing Network Holdings, Inc., 901 Yamato Road, Suite 110, Boca Raton, Florida 33431; (ii) counsel for the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq. and  Jordi Guso, Esq.; (iii) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases, if any (the "Committee"); (iv) counsel to the Proposed Purchaser, Latham & Watkins, LLP, 885 Third Avenue, New York, New York, 10022-4834, Attn: David S. Heller, Esq. and Roger G. Schwartz, Esq.; and Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, 150 W. Flagler Street, Suite 2100, Miami, Florida 33131, Attn: Patricia A. Redmond; and (v) Jefferies & Company, Inc., 520 Madison Avenue, 7th Floor, New York, New York 10022, Attn:  Leon Szlezinger, Managing Director.

A Bid received from a Bidder before the Bid Deadline that meets the above requirements shall constitute a "Qualified Bid," and such Bidder shall constitute a "Qualified Bidder."  For

purposes of the Auction, the Asset Purchase Agreement submitted by the Proposed Purchaser is a Qualified Bid and the Proposed Purchaser is a Qualified Bidder for all purposes and requirements pursuant to these Bidding Procedures, notwithstanding the requirements that bidders must satisfy to be a Qualified Bidder.  The Proposed Purchaser shall not be required to take any further action in order to participate in the Auction, or if the Asset Purchase Agreement submitted by the Proposed Purchaser is the Successful Bid (as defined herein) or the Backup Bid (as defined herein), to be named the Prevailing Bidder (as defined below) or the Backup Bidder (as defined below), as applicable.  In accordance with these Bidding Procedures, counsel to the Proposed Purchaser will receive a copy of any Bids at the time such Bid is submitted to the Debtors.  The Debtors shall inform counsel to the Proposed Purchaser whether the Debtors will consider such Bids to be Qualified Bids within one (1) calendar day after the Bid Deadline.

## Auction

If one or more Qualified Bids (other than the Asset Purchase Agreement submitted by the Proposed Purchaser) are received by the Bid Deadline, the Debtors will conduct an auction (the "Auction") to determine the highest and best Qualified Bid.  This determination shall take into account any factors the Debtors reasonably deem relevant to the value of the Qualified Bid to the estates, including, among other things, the following:  (a) the amount and nature of the consideration; (b) the number, type and nature of any changes to the Asset Purchase Agreement requested by each Bidder; (c) the extent to which such modifications are likely to delay closing of the sale of the Purchased Assets and Transferred Equity Interests and the cost to Sellers of such modifications or delay; (d) the total consideration to be received by Sellers; (e) the likelihood of the Bidder's ability to close a transaction and the timing thereof; (f) the net benefit to the estates; and (g) the impact of the transaction on any actual or potential litigation (collectively, the "Bid Assessment Criteria").  The highest and best Bid must include cash in an amount no less than the Minimum Cash Amount.  If no Qualified Bid (other than the Asset Purchase Agreement) is received by the Bid Deadline, the Debtors shall not conduct the Auction.  Unless otherwise agreed to by the Proposed Purchaser in its sole discretion, only Qualified Bidders may participate in the Auction.

The Auction shall take place on August ___, 2010 at 10:00 a.m. (prevailing Eastern Time) at the offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301, or such other place and time as the Debtors shall notify all Qualified Bidders, including the Proposed Purchaser, the Committee, if any, counsel for the Proposed Purchaser and other invitees. The Auction shall be conducted according to the following procedures:

(a)    The Debtors Shall Conduct the Auction.

The Debtors and their professionals shall direct and preside over the Auction.  At the start of the Auction, the Debtors shall describe the terms of the highest and best Qualified Bid received prior to the Bid Deadline (such Qualified Bid, the "Auction Baseline Bid").  Each Qualified Bidder participating in the Auction must confirm that it has not engaged in any collusion with respect to the bidding or sale of the Purchased Assets and Transferred Equity Interests.

Only the Debtors, representatives of the DIP Agent and its counsel, members of the Committee, if any, and its counsel, the Proposed Purchaser and its counsel and any other Qualified Bidder, in each case, along with their representatives, shall attend the Auction in person, and only the Proposed Purchaser and such other Qualified Bidders will be entitled to make any Bids at the Auction.

(b)    Terms of Overbids.

An "Overbid" is any bid made at the Auction subsequent to the Debtors' announcement of the Auction Baseline Bid.  To submit an Overbid for purposes of the Auction, a Bidder must comply with the following conditions:

(i)    Minimum Overbid Increment.

Any Overbid after the Auction Baseline Bid shall be made in increments valued at not less than $100,000.  Additional consideration in excess of the amount set forth in the Auction Baseline Bid may include cash and/or noncash consideration, and, in the case of a Bid by the Proposed Purchaser, a credit bid, including, but not limited to, a credit bid of additional First Lien Lender claims (as such term is defined in the Bankruptcy Code) with respect to First Lien Indebtedness.

(ii)    Remaining Terms Are the Same as for Qualified Bids.

Except as modified herein, an Overbid must comply with the conditions for a Qualified Bid set forth above, provided, however, that the Bid Deadline shall not apply.  Any Overbid must remain open and binding on the Bidder until and unless the Debtors accept a higher Overbid.

To the extent not previously provided (which shall be determined by the Debtors), a Bidder submitting an Overbid must submit, as part of its Overbid, written evidence (in the form of financial disclosure or credit-quality support information or enhancement reasonably acceptable to the Debtors) demonstrating such Bidder's ability to close the Competing Transaction proposed by such Overbid and performance obligations under any assumed contracts.

(iii)    Announcing Overbids.

The Debtors shall announce at the Auction the material terms of each Overbid, the basis for calculating the total consideration offered in each such Overbid and the resulting benefit to the Debtors' estates based on, *inter alia*, the Bid Assessment Criteria.

(iv)    Consideration of Overbids.

The Debtors reserve the right, in their reasonable business judgment, to make one or more continuances of the Auction to, among other things: facilitate discussions between the Debtors and individual Bidders; allow individual Bidders to consider how they wish to proceed; and give Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their reasonable business judgment may require, that the Bidder has sufficient internal

6

resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed Competing Transaction at the prevailing Overbid amount.

       (c)     Backup Bidder.

       Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the party with the next highest Qualified Bid after the Bid made by the Prevailing Bidder (as defined herein) or otherwise second best Qualified Bid at the Auction, as determined by the Debtors, in the exercise of their reasonable business judgment, will be designated as the potential backup bidder (the "Potential Backup Bidder").  In the event that a Qualified Bidder other than the Proposed Purchaser is identified by the Debtors as the Potential Backup Bidder, such party shall be required to serve as the backup bidder (the "Backup Bidder").  The Backup Bidder shall be required to keep its initial Bid, if any, (or if the Backup Bidder submitted one or more Overbids at the Auction, its final Overbid) (the "Backup Bid") open and irrevocable until the earlier of (i) 5:00 p.m. (prevailing Eastern Time) on the date that is fifteen (15) days after the date of the Sale Hearing (the "Outside Backup Date"); provided, however, that notwithstanding the foregoing, in no event shall the Outside Backup Date be later than October 15, 2010 or (ii) the date of closing of an Alternative Transaction with the Prevailing Bidder.  Following the Sale Hearing, if the Prevailing Bidder fails to consummate an approved transaction, because of a breach or failure to perform on the part of such Prevailing Bidder, the Debtors may designate the Backup Bidder to be the new Prevailing Bidder, and the Debtors will be authorized, but not required, to consummate the transaction, with the Backup Bidder without further order of the Bankruptcy Court.  In such case, the defaulting Prevailing Bidder's deposit, if any, shall be forfeited to the Debtors, and the Debtors specifically reserve the right to seek all available damages from the defaulting Prevailing Bidder; provided, however, that notwithstanding the foregoing, in the event that the Proposed Purchaser is the Prevailing Bidder or the Backup Bidder, the Debtors' rights to seek damages from, or to otherwise exercise remedies against, the Proposed Purchaser shall be expressly limited to, and governed by, the terms and conditions set forth in the Asset Purchase Agreement.  The deposit of the Backup Bidder, if any, shall be held by the Debtors until the earlier of 24 hours after (i) the closing of the transaction with the Prevailing Bidder and (ii) the Outside Backup Date.

       (d)     Additional Procedures.

       The Debtors may announce at the Auction additional procedural rules that are reasonable under the circumstances (*e.g.*, the amount of time to make subsequent Overbids) for conducting the Auction so long as such rules are not inconsistent with these Bidding Procedures or the Asset Purchase Agreement.

       (e)     Consent to Jurisdiction as Condition to Bidding.

       The Proposed Purchaser and all Qualified Bidders at the Auction shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and waived any right to a jury trial in connection with any disputes relating to these Bidding Procedures, the Asset Purchase Agreement, the Auction or the construction and enforcement of any documents delivered in connection with a Bid.

(f)    Sale Is As Is/Where Is.

Except as expressly provided in the Asset Purchase Agreement, the Purchased Assets and Transferred Equity Interests shall be conveyed at Closing free and clear of all liens, claims, interests and encumbrances, and in their then present condition, "**AS IS, WITH ALL FAULTS, AND WITHOUT ANY WARRANTY WHATSOEVER, EXPRESS OR IMPLIED.**"

(g)    Closing the Auction.

The Auction shall continue until there is only one Qualified Bid that the Debtors determine in their reasonable business judgment, after consultation with their financial and legal advisors, is the highest and best Qualified Bid at the Auction (the "Successful Bid" and the Bidder submitting such Successful Bid, the "Prevailing Bidder"). In making this decision, the Debtors, in consultation with their financial and legal advisors, shall consider the Bid Assessment Criteria. The Auction shall not close unless and until all Bidders who have submitted Qualified Bids have been given a reasonable opportunity to submit an Overbid at the Auction to the then-existing Overbid.

The Debtors shall not consider any Bids submitted after the conclusion of the Auction.

## Sale Hearing

The Court will conduct a hearing (the "Sale Hearing") on **August _____, 2010 at ___ a.m. (prevailing Eastern Time)**, at which the Debtors will seek approval of the transactions contemplated by the Asset Purchase Agreement or any Modified Asset Purchase Agreement with the Prevailing Bidder. Objections, if any, to the sale of the Purchased Assets and Transferred Equity Interests to the Prevailing Bidder and the transactions contemplated therewith must be in writing and filed with the Court no later than **4:00 p.m. (prevailing Eastern Time) on August ___, 2010** and be served such that they are actually received by (a) counsel to the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Paul Steven Singerman, Esq. and Jordi Guso, Esq.; (b) counsel to the Committee, if any; (c) counsel to the Proposed Purchaser, Latham & Watkins, LLP, 885 Third Avenue, New York, New York, 10022-4834, Attn: David S. Heller, Esq. and Roger G. Schwartz, Esq.; and Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, 150 W. Flagler Street, Suite 2100, Miami, Florida 33131, Attn: Patricia A. Redmond; and (d) the Office of the United States Trustee.

## Return of Good Faith Deposit

The Good Faith Deposits of all Qualified Bidders, if any, shall be held in one or more interest-bearing escrow accounts by the Debtors, but shall not become property of the Debtors' estates absent further order of the Court. The Good Faith Deposit of any Qualified Bidder that is neither the Prevailing Bidder nor the Backup Bidder, if any, shall be returned to such Qualified Bidder not later than two (2) business days after the Sale Hearing. The Good Faith Deposit, if any, of the Backup Bidder shall be returned to the Backup Bidder on the date that is the earlier of 24 hours after (a) the closing of the transaction with the Prevailing Bidder and (b) the Outside Backup Date. Upon the return of the Good Faith Deposits, if any, their respective owners shall receive any and all interest that will have accrued thereon. If the Prevailing Bidder timely closes

8

the winning transaction, its Good Faith Deposit, if any, shall be credited towards its purchase price.

## **Reservation of Rights**

Except as otherwise provided in the Asset Purchase Agreement or the Sale Order, the Debtors further reserve the right as they may reasonably determine to be in the best interests of their estates, after consultation with the Committee, if any, to:  (a) determine which bidders are Qualified Bidders; (b) determine which Bids are Qualified Bids; (c) determine which Qualified Bid is the highest and best proposal and which is the next highest and best proposal; (d) reject any Bid that is (i) inadequate or insufficient, (ii) not in conformity with the requirements of these Bidding Procedures or the requirements of the Bankruptcy Code or (iii) contrary to the best interests of the Debtors and their estates; (e) remove some or all of the Purchased Assets and Transferred Equity Interests from the Auction; (f) waive terms and conditions set forth herein with respect to all potential bidders; (g) impose additional terms and conditions with respect to all potential bidders; (h) extend the deadlines set forth herein; (i) continue or cancel the Auction and/or Sale Hearing in open court without further notice; and (j) modify these Bidding Procedures as they may determine to be in the best interests of their estates or to withdraw the Motion at any time with or without prejudice.  Notwithstanding the foregoing sentence, in the event that the Debtors made material modifications to the Bidding Procedures that are not consented to by the Proposed Purchaser, such material modifications shall permit the Proposed Purchaser to terminate the Asset Purchase Agreement and withdraw its bid without any liability to the Debtors, their estates or otherwise; provided, however, the Debtors may seek a determination from the Court that any such modifications are not material and should not permit the Proposed Purchaser to terminate the Asset Purchase Agreement in accordance with this paragraph.

9

**EXHIBIT 2 to the Bidding Procedures Order**

**(Sale Notice)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                                    Chapter 11 Cases

MEDICAL STAFFING NETWORK HOLDINGS,                Case No.
INC., *et al.*,[1]

                                                                          (Jointly Administered)

           Debtors.
_____/

## NOTICE OF AUCTION AND SALE HEARING

**PLEASE TAKE NOTICE OF THE FOLLOWING:**

           1.       On July 2, 2010, Medical Staffing Network Holdings, Inc., and its affiliated debtors and debtors-in-possession in the above-captioned cases (collectively, the "Debtors"), filed their Motion[2] for entry of an order (the "Bidding Procedures Order"), among other things, (a) approving Bidding Procedures for the sale of substantially all of the assets owned by the Debtors (the "Purchased Assets") and Transferred Equity Interests as described in the Asset Purchase Agreement by and between MSN AcquisitionCo., LLC (the "Proposed Purchaser") and the Debtors dated as of July ___, 2010 (the "Asset Purchase Agreement"); (b) approving the Asset Purchase Agreement; (c) approving the form and manner of notice of the auction on the Purchased Assets and the Sale Hearing; (d) approving procedures relating to the assumption and assignment of contracts and leases; and (e) scheduling a sale hearing (the "Sale Hearing") to consider the sale of the Purchased Assets and Transferred Equity Interests and setting objection and bidding deadlines with respect to the sale of the Purchased Assets and Transferred Equity Interests.  The Motion additionally requests entry of an order (the "Sale Order") approving (i) the sale of the Purchased Assets and Transferred Equity Interests free and clear of liens, claims, encumbrances and interests contemplated by the Asset Purchase Agreement; (ii) assumption and assignment of certain executory contracts and unexpired leases; and (iii) certain related relief.

---

[1] The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis:  (i) Medical Staffing Network Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii) Medical Staffing Network, Inc. (9868); (iv) MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings, Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii) Medical Staffing Network of Illinois, LLC (4409); (viii) Medical Staffing Network Assets, LLC (4413); (ix) InteliStaf Healthcare, Inc. (7108); (x) InteliStaf Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC (5965); and (xii) InteliStaf Healthcare Management, L.P. (7958).

[2] Capitalized terms used and not otherwise defined herein shall have the meanings ascribed to them in the Motion and/or the Bidding Procedures, as applicable.

2.     On July ___, 2010, the United States Bankruptcy Court for the Southern District of Florida entered the Bidding Procedures Order [DE # Not Yet Assigned].  Pursuant to the Bidding Procedures Order, the auction for the Purchased Assets and Transferred Equity Interests shall take place on **August ___, 2010 at _____ a.m./p.m. (prevailing Eastern Time)** at the offices of Berger Singerman, P.A., 350 East Las Olas Boulevard, Suite 1000, Fort Lauderdale, Florida 33301.  Only parties that have submitted a Qualified Bid in accordance with the Bidding Procedures, attached to the Bidding Procedures Order as Exhibit 1, by no later than **August ___, 2010 at 4:00 p.m. (Eastern Time)** (the "Bid Deadline") may participate at the Auction.  Any party that wishes to take part in this process and submit a bid for the Purchased Assets and Transferred Equity Interests must submit their competing bid prior to the Bid Deadline and in accordance with the Bidding Procedures.  Parties interested in receiving information regarding the sale of the Purchased Assets and Transferred Equity Interests should contact the Debtors' investment bankers, Jefferies & Company, Inc., 520 Madison Avenue, 7th Floor, New York, NY 10022, Attn:  Leon Szlezinger, Managing Director.

3.     The Sale Hearing to consider approval of the Sale of the Purchased Assets and Transferred Equity Interests to the Proposed Purchaser or Prevailing Bidder free and clear of all liens, claims and encumbrances will be held before the Honorable _____, United States Bankruptcy Judge, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, West Palm Beach, Florida 33401 on **August ___, 2010 at ____ a.m./p.m. (prevailing Eastern Time)**, or at such earlier date as counsel may be heard.  The Sale Hearing may be continued from time to time without further notice to creditors or parties in interest other than by announcement of the continuance in open court on the date scheduled for the Sale Hearing (or in agenda).

4.     Objections, if any, to the sale of the Purchased Assets and Transferred Equity Interests contemplated by the Asset Purchase Agreement, or the relief requested in the Motion (including with respect to cure amounts and adequate assurance) must: (a) be in writing; (b) comply with the Bankruptcy Rules and the Local Rules; (c) be filed with the clerk of the Bankruptcy Court for the Southern District of Florida, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, West Palm Beach, Florida 33401 (or filed electronically via CM/ECF), on or before **4:00 p.m. (prevailing Eastern Time) on August ___, 2010**, or such earlier date and time as the Debtors may agree and (d) be served so as to be received no later than 4:00 p.m. (prevailing Eastern Time) on the same day, upon:  (i) counsel to the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Paul Steven Singerman, Esq. and Jordi Guso, Esq.; (ii) counsel to the Committee, if any; (iii) counsel to the Proposed Purchaser, Latham & Watkins, LLP, 885 Third Avenue, New York, New York, 10022-4834, Attn: David S. Heller, Esq. and Roger G. Schwartz, Esq.; and Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, 150 W. Flagler Street, Suite 2100, Miami, Florida 33131, Attn: Patricia A. Redmond; and (iv) the Office of the United States Trustee.

5.     In the event that the Proposed Purchaser is not the Prevailing Bidder at the Auction, the non-Debtor party to any Scheduled Contract(s) will have until the Sale Hearing to object to the Prevailing Bidder's ability to perform under such Scheduled Contract(s).

6.     This Notice and the Sale Hearing are subject to the fuller terms and conditions of the Motion, the Bidding Procedures Order and the Bidding Procedures, which shall control in the event of any conflict and the Debtors encourage parties in interest to review such

documents in their entirety.  Copies of the Motion, the Asset Purchase Agreement, the Bidding Procedures, and/or the Bidding Procedures Order may be obtained by written request to counsel to the Debtors, c/o Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Paul Steven Singerman, Esq. and Jordi Guso, Esq.  In addition, copies of the aforementioned pleadings may be found on the Pacer's website, http://ecf.flsb.uscourts.gov, and are on file with the Bankruptcy Court for the Southern District of Florida, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, West Palm Beach, Florida 33401.

  Dated: July __, 2010                          Respectfully submitted,

                                                BERGER SINGERMAN, P.A.
                                                *Counsel for the Debtors*
                                                200 South Biscayne Boulevard, Suite 1000
                                                Miami, FL  33131
                                                Telephone:  (305) 755-9500
                                                Facsimile:   (305) 714-4340


                                                By:  /s/  Jordi Guso
                                                      Paul Steven Singerman
                                                      Florida Bar No. 378860
                                                      singerman@bergersingerman.com
                                                      Jordi Guso
                                                      Florida Bar No. 863580
                                                      jguso@bergersingerman.com

**EXHIBIT 3 to the Bidding Procedures Order**

**(Cure Notice)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Cases

MEDICAL STAFFING NETWORK HOLDINGS,                        Case No.
INC., *et al.*, [1]

                                                         (Jointly Administered)

       Debtors.

_____/

**NOTICE TO COUNTERPARTIES TO POTENTIALLY ASSUMED
EXECUTORY CONTRACTS AND UNEXPIRED LEASES[2]**

     **PLEASE TAKE NOTICE** that on July 2, 2010, the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") filed a motion [DE # Not Yet Assigned] (the "Sale Motion") with the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") which seeks approval of key dates, times and procedures related to the sale of substantially all of the Debtors' assets (the "Purchased Assets") and Transferred Equity Interests to MSN AcquisitionCo, LLC (the "Proposed Purchaser") contemplated by the Asset Purchase Agreement. On July __, 2010, the Bankruptcy Court approved the Bidding Procedures. On August ___, 2010, the Debtors intend to seek approval of, among other things, the sale of the Purchased Assets and Transferred Equity Interests, including the assumption and assignment of certain executory contracts and unexpired leases. To the extent that there are any inconsistencies between the Bidding Procedures and the summary description of the terms and conditions contained in this Notice, the terms of the Bidding Procedures shall control.

     **YOU ARE RECEIVING THIS NOTICE BECAUSE YOU OR ONE OF YOUR AFFILIATES IS A COUNTERPARTY TO AN EXECUTORY CONTRACT OR**

---

[1] The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Medical Staffing Network Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii) Medical Staffing Network, Inc. (9868); (iv) MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings, Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii) Medical Staffing Network of Illinois, LLC (4409); (viii) Medical Staffing Network Assets, LLC (4413); (ix) InteliStaf Healthcare, Inc. (7108); (x) InteliStaf Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC (5965); and (xii) InteliStaf Healthcare Management, L.P. (7958).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding Procedures or the Bidding Procedures Order, as applicable.

**UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS AS SET FORTH ON EXHIBIT A ATTACHED HERETO.**[3]

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures, the Debtors **may** assume and assign to the Proposed Purchaser the executory contract(s) or unexpired lease(s) listed on Exhibit A attached hereto (each, an "Scheduled Contract") to which you are a counterparty. The Debtors have conducted a review of their books and records and have determined that the cure amount for unpaid monetary obligations under such Scheduled Contract is as set forth on Exhibit A attached hereto (the "Cure Amount"). **If you disagree with the proposed Cure Amount, object to the proposed assignment to the Proposed Purchaser of the Scheduled Contract(s) or object to the Proposed Purchaser' ability to provide adequate assurance of future performance with respect to any Scheduled Contracts, you must file an objection with the Bankruptcy Court no later than 4:00 p.m. (prevailing Eastern Time) on August [ ], 2010, (the "Objection Deadline") and serve such objection on (a) the Debtors, Medical Staffing Network Holdings, Inc., 901 Yamato Road, Suite 110, Boca Raton, Florida 33431; (b) counsel for the Debtors, Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn: Jordi Guso, Esq.; (c) counsel to the official committee of unsecured creditors appointed in these chapter 11 cases, if any (the "Committee"); (d) counsel to the Proposed Purchaser, Latham & Watkins, LLP, 885 Third Avenue, New York, New York, 10022-4834, Attn: David S. Heller, Esq. and Roger G. Schwartz, Esq.; and Stearns, Weaver, Miller, Weissler, Alhadeff & Sitterson, 150 W. Flagler Street, Suite 2100, Miami, Florida 33131, Attn: Patricia A. Redmond; and (e) The Office of the United States Trustee, so that it is actually received no later than 4:00 p.m. (prevailing Eastern Time) on August [ ], 2010.**

**PLEASE TAKE FURTHER NOTICE** that the Debtors propose that if no objection to (a) the Cure Amount(s); (b) the proposed assignment of the Scheduled Contract(s) to the Proposed Purchaser or (c) adequate assurance of the Proposed Purchaser' ability to perform is filed by Objection Deadline, (i) you will be deemed to have stipulated that the Cure Amount(s) as determined by the Debtors is correct, (ii) you shall be forever barred, estopped and enjoined from asserting any additional cure amount under the Scheduled Contract(s) and (iii) you will be forever barred from objecting to the assignment of the Assumed Executory Contract(s) to the Proposed Purchaser.

**PLEASE TAKE FURTHER NOTICE** that in the event the Proposed Purchaser is not the Prevailing Bidder at the Auction, any counterparty to a Scheduled Contract shall have the right to object to the Prevailing Bidder's ability to perform on or before the Sale Hearing scheduled for **August ___, 2010 at _____ a.m./p.m. (prevailing Eastern Time)**. To the extent such counterparty does not object in accordance herewith, the Bankruptcy Court may enter an order forever barring such counterparty to a Scheduled Contract from objecting to the adequate assurance of the Prevailing Bidder's ability to perform.

---

[3] This Notice is being sent to counterparties to Executory Contracts and Unexpired Leases. This Notice is not an admission by the Debtors that such contract or lease is executory or unexpired.

**PLEASE TAKE FURTHER NOTICE** that with respect to any Scheduled Contract assumed and assigned to the Prevailing Bidder (including the Proposed Purchaser), all Cure Amounts shall be satisfied by payment of the Cure Amounts as soon as reasonably practicable after Bankruptcy Court approval of the sale of the Purchased Assets and Transferred Equity Interests to the Prevailing Bidder (including the Proposed Purchaser) or on such other terms as the parties to each such Scheduled Contract may otherwise agree without any further notice to or action, order or approval of the Bankruptcy Court.  In addition, the assumption of each such Scheduled Contract may be conditioned upon the disposition of all issues with respect to such Scheduled Contract.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bidding Procedures, with respect to any Scheduled Contract, in the event of a dispute regarding: (a) the amount of any Cure Amount; (b) the ability of the Prevailing Bidder (including the Proposed Purchaser) to provide "adequate assurance of future performance" (within the meaning of section 365 of the Bankruptcy Code), if applicable, under such Scheduled Contract; or (c) any other matter pertaining to assumption, the Cure Amounts shall be paid as soon as reasonably practicable following the entry of a final order resolving the dispute and approving the assumption of such Scheduled Contract; provided, however, that the Debtors, with the consent of the Proposed Purchaser or other Prevailing Bidder, as applicable, may settle any dispute regarding the amount of any Cure Amount or assignment to the Prevailing Bidder (including the Proposed Purchaser) without any further notice to or action, order or approval of the Bankruptcy Court.

**PLEASE THAT FURTHER NOTICE THAT** notwithstanding anything herein, this Notice shall not be deemed to be an assumption, adoption, rejection or termination of the Scheduled Contracts.  Moreover, the Debtors explicitly reserve their rights, in their sole discretion, to reject or assume each Scheduled Contract pursuant to section 365(a) of the Bankruptcy Code and nothing herein (a) alters in any way the prepetition nature of the Scheduled Contracts or the validity, priority or amount of any claims of a counterparty to an Scheduled Contract against the Debtors that may arise under such Scheduled Contract; (b) creates a postpetition contract or agreement or (c) elevates to administrative expense priority any claims of an counterparty to an Scheduled Contract against the Debtors that may arise under such Scheduled Contract.

**PLEASE THAT FURTHER NOTICE THAT** this Notice is subject to the fuller terms and conditions of the Motion, the Bidding Procedures Order, the Asset Purchase Agreement and the Bidding Procedures, which shall control in the event of any conflict and the Debtors encourage parties in interest to review such documents in their entirety.  Copies of the Motion, the Asset Purchase Agreement, the Bidding Procedures, and/or the Bidding Procedures Order may be obtained by written request to counsel to the Debtors, c/o Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Paul Steven Singerman, Esq. and Jordi Guso, Esq.  In addition, copies of the aforementioned pleadings may be found on the Pacer's website, http://ecf.flsb.uscourts.gov, and are on file with the Bankruptcy Court for the Southern District of Florida, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, West Palm Beach, Florida 33401.

3

Dated: July __, 2010

Respectfully submitted,

BERGER SINGERMAN, P.A.
*Counsel for the Debtors*
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Telephone:  (305) 755-9500
Facsimile:  (305) 714-4340

By:  _/s/  Jordi Guso_____
        Jordi Guso
        Florida Bar No. 863580
        jguso@bergersingerman.com

4

# EXHIBIT A

[Counterparty Name]                    [Contract/Lease]                              Cure Amount

**EXHIBIT 4 to the Bidding Procedures Order**

**(Assumption Notice)**

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

IN RE:                                                    Chapter 11 Cases

MEDICAL STAFFING NETWORK HOLDINGS,                        Case No.
INC., *et al.*, [1]

                                                          (Jointly Administered)

         Debtors.

_____/

**NOTICE OF ASSUMPTION AND ASSIGNMENT
OF EXECUTORY CONTRACT OR UNEXPIRED LEASE**

         **PLEASE TAKE NOTICE THAT**:

         1.       A hearing (the "Sale Hearing")[2] was held at _____ a.m./p.m. on August ___,
2010 before the Honorable _____, United States Bankruptcy Judge, in the Bankruptcy
Court, Flagler Waterview Building, 1515 North Flagler Drive, 8th Floor, West Palm Beach,
Florida 33401.  At the Sale Hearing, the Bankruptcy Court entered an order (the "Sale Order")
(a) approving the sale of the Purchased Assets and Transferred Equity Interests to
_____ (the "Purchaser") in accordance with the Asset Purchase Agreement,
and (b) authorizing, among other things, the Debtors, pursuant to the terms of the Asset Purchase
Agreement, to assume and assign certain executory contracts and unexpired leases to the
Purchaser.

         2.       The Purchaser has elected to take assignment of the executory contracts and
unexpired leases as set forth on Exhibit A hereto.

---

[1] The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last four digits
of the taxpayer identification number of each of the Debtors follows in parenthesis:  (i) Medical Staffing Network
Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii) Medical Staffing Network, Inc. (9868); (iv)
MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings, Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii)
Medical Staffing Network of Illinois, LLC (4409); (viii) Medical Staffing Network Assets, LLC (4413); (ix)
InteliStaf Healthcare, Inc. (7108); (x) InteliStaf Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC
(5965); and (xii) InteliStaf Healthcare Management, L.P. (7958).

[2] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Bidding
Procedures or the Bidding Procedures Order, as applicable.

**EXHIBIT A**

[Counterparty Name/Address]          [Contract/Lease]                    Cure Amount

**EXHIBIT C**

**Sale Order**

**IN THE UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**
www.flsb.uscourts.gov

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| MEDICAL STAFFING NETWORK HOLDINGS, INC., *et al.*,[1] | ) | Case No. 10-29101-EPK |
| | ) | |
| Debtors. | ) | Jointly Administered |
| | ) | |

**ORDER (I) AUTHORIZING THE SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS; (II) AUTHORIZING AND APPROVING THE ASSET PURCHASE AGREEMENT; (III) APPROVING PROCEDURES AND RIGHTS RELATED TO ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES; AND (IV) GRANTING RELATED RELIEF**

---

[1] The address of each of the Debtors is 901 Yamato Road, Suite 110, Boca Raton, FL 33431; and the last four digits of the taxpayer identification number of each of the Debtors follows in parenthesis: (i) Medical Staffing Network Holdings, Inc. (5171); (ii) Medical Staffing Holdings, LLC (2662); (iii) Medical Staffing Network, Inc. (9868); (iv) MSN-Illinois Holdings, Inc. (4402); (v) InteliStaf Holdings, Inc. (4008); (vi) InteliStaf Group, Inc. (7220); (vii) Medical Staffing Network of Illinois, LLC (4409); (viii) Medical Staffing Network Assets, LLC (4413); (ix) InteliStaf Healthcare, Inc. (7108); (x) InteliStaf Partners No. 1, LLC (2832); (xi) InteliStaf Partners No. 2, LLC (5965); and (xii) InteliStaf Healthcare Management, L.P. (7958).

THIS CAUSE came before the Court on August __, 2010 upon the motion, dated July 2, 2010 (the "Sale Motion") [D.E. ___] of the above-captioned debtors and debtors-in-possession (collectively, the "Debtors") for the entry of an order (the "Order") pursuant to sections 105, 363 and 365 of chapter 11 of title 11 of the United States Code, 11 U.S.C. §101 et seq. (the "Bankruptcy Code") and Rules 2002, 6004, 6006 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) approving the sale of substantially all of the Debtors' assets free and clear of liens, claims, encumbrances and other interests, with such sale to be consummated in accordance with the terms and conditions of the Asset Purchase Agreement[2]; (b) authorizing and approving the execution and delivery of the Asset Purchase Agreement; (c) approving procedures and rights related to the assumption and assignment of certain executory contracts and unexpired leases; and (d) granting related relief, as more particularly described in the Sale Motion; and a hearing having been held to consider the relief requested in the Sale Motion (the "Sale Hearing"); and this Court having entered an order dated [        ], 2010 (the "Bidding Procedures Order") authorizing the Debtors to solicit and consider offers for the Purchased Assets and Transferred Equity Interests and conduct the Auction in accordance with the terms and conditions of the Bidding Procedures (as such term is defined in the Bidding Procedures Order) and approving, *inter alia*, (i) the Bidding Procedures; (ii) the form and manner of notice of the Auction, and the Sale Hearing; and (iii) procedures relating to the assumption and assignment of certain unexpired leases and executory contracts, including notice of proposed Cure Costs; and the Court having jurisdiction to consider the Sale Motion and the relief

---

[2]    Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in, as applicable, the Sale Motion or that certain Asset Purchase Agreement, dated as of July 2, 2010, by and among MSN AcquisitionCo, LLC , as Purchaser, and Medical Staffing Network, Inc., Medical Staffing Holdings, LLC, Medical Staffing Network Holdings, Inc. and all subsidiaries of Medical Staffing Network, Inc., as Sellers (as may be amended, supplemented or otherwise modified from time to time, the "Asset Purchase Agreement"), a copy of which is attached hereto as Exhibit A.

requested therein in accordance with 28 U.S.C. §§ 157(b)(1) and 1334(a); and consideration of

the Sale Motion, the relief requested therein, and the responses thereto being a core proceeding

in accordance with 28 U.S.C. § 157(b)(2); and upon consideration of the *Declaration of Moshin*

*Y. Meghji In Support of Petitions and First Day Pleadings* (the "First Day Declaration") and the

*Declaration of Leon Szlezinger In Support of Emergency Motion to Approve Secured Debtor In*

*Possession Financing and Related Relief* (the "DIP Motion Declaration"); and the appearance of

all interested parties and all responses and objections to the Sale Motion having been duly noted

in the record of the Sale Hearing; and upon the record of the Sale Hearing, and all other

pleadings and proceedings in this case, including the Sale Motion; and it appearing that the relief

requested in the Sale Motion is in the best interests of the Debtors, their estates, their creditors

and all other parties in interest; and after due deliberation and sufficient cause appearing

therefore;

IT IS HEREBY FOUND, DETERMINED AND CONCLUDED THAT:[3]

      A.     The findings and conclusions set forth herein constitute the Court's findings of

fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this

proceeding pursuant to Bankruptcy Rule 9014.

      B.     To the extent any of the following findings of fact constitute conclusions of law,

they are adopted as such.  To the extent any of the following conclusions of law constitute

findings of fact, they are adopted as such.

      C.     The Court has jurisdiction over this matter and over the Debtors' estates and their

property pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding pursuant to 28

---

[3]    All findings of fact and conclusions of law announced by the Court at the Sale Hearing in relation to the Sale Motion are hereby incorporated herein to the extent not inconsistent herewith.

U.S.C. § 157(b)(2).  Venue of these chapter 11 cases in this district is proper pursuant to 28

U.S.C. §§ 1408 and 1409.

D.      This Order constitutes a final and appealable order within the meaning of 28

U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent

necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure,

as made applicable by Bankruptcy Rule 7054, this Court expressly finds that there is no just

reason for delay in the implementation of this Order, and expressly directs entry of judgment as

set forth herein.

E.      The Asset Purchase Agreement is substantially in the form approved by the

Bidding Procedures Order.  MSN AcquisitionCo, LLC is an entity owned by the persons that are

the lenders (the "First Lien Lenders", and including the First Lien Agent, the "First Lien

Parties") party to that certain Amended and Restated Credit Agreement, dated as of March 12,

2009 (the "First Lien Credit Agreement") and was formed for the purpose of acquiring

substantially all of the Debtors' assets.

F.      The Purchased Assets and Transferred Equity Interests constitute property of the

Debtors' estates and title thereto is vested in the Debtors' estates within the meaning of section

541(a) of the Bankruptcy Code.

G.      The statutory predicates for the relief sought in the Sale Motion and the basis for

the approvals and authorizations herein are (i) sections 102, 105, 363, and 365 of the Bankruptcy

Code and (ii) Bankruptcy Rules 2002, 6004, 6006, 9007 and 9014.

H.      On July 2, 2010 (the "Petition Date"), each of the Debtors filed voluntary

petitions under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

Southern District of Florida (West Palm Beach Division) (the "Bankruptcy Court" or this

"Court").  Since the Petition Date, the Debtors have continued to operate their businesses and manage their properties as debtors-in-possession pursuant to Bankruptcy Code sections 1107 and 1108.

I.       This Court entered the Bidding Procedures Order on [_____], 2010, (i) approving competitive bidding and sale procedures (the "Bidding Procedures"); (ii) approving the form and manner of notices; (iii) approving entry into the Asset Purchase Agreement; (iv) scheduling dates to conduct an auction and a hearing to consider final approval of the sale, including treatment of executory contracts and unexpired leases; (v) authorizing the sale of substantially all of the Debtors' assets free and clear of all liens, claims, encumbrances and interests; and (vi) granting certain related relief.

J.       Actual written notice of, and a reasonable opportunity to object or be heard with respect to, the Sale Hearing, the Auction, the Sale Motion and the transactions contemplated by the Asset Purchase Agreement has been afforded to all known interested entities, including, but not limited to the following parties: (i) all creditors or their counsel known to the Debtors to assert a lien (including any security interest), claim, right, interest or encumbrance of record against all or any portion of the Purchased Assets and Transferred Equity Interests; (ii) the Office of the United States Trustee; (iii) all applicable federal, state and local taxing and regulatory authorities of the Debtors or recording offices or any other governmental authorities that, as a result of the sale of the Purchased Assets and Transferred Equity Interests, may have claims, contingent or otherwise, in connection with the Debtors' ownership of the Purchased Assets and Transferred Equity Interests or have any known interest in the relief requested by the Sale Motion; (iv) the state and local environmental agencies in the jurisdictions where the Debtors own or lease real property; (v) counsel to the Purchaser; (vi) counsel to the agents for prepetition

and postpetition secured lenders; (vii) the United States Attorney's office; (viii) all parties in interest who have requested notice pursuant to Bankruptcy Rule 2002; (ix) all parties to any litigation involving the Debtors; (x) all of the Debtors' current employees and former employees, if any, who were terminated immediately prior to the commencement of these cases, (xi) all counterparties to any executory contract or unexpired lease of the Debtors; (xii) all other known creditors and interest holders of Debtors; (xiii) all potential bidders previously identified or otherwise known to the Debtors; and (xiv) the Securities and Exchange Commission.

K.      The Debtors have articulated good and sufficient reasons for this Court to grant the relief requested in the Sale Motion.

L.      As evidenced by the affidavits of service previously filed with this Court, proper, timely, adequate, and sufficient notice of the Sale Motion, the Auction, the Sale Hearing and the transactions contemplated by the Asset Purchase Agreement has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9006, 9007, 9008 and 9014.  The Debtors have also complied with all obligations to provide notice of the Sale Motion, the Auction, the Sale Hearing and the transactions contemplated by the Asset Purchase Agreement as required by the Asset Purchase Agreement and Bidding Procedures Order, including with respect to notice of the assumption, sale and assignment of the Assigned Contracts.  Notice of the Sale Hearing, the Auction, the Sale Motion and the sale of the Purchased Assets and Transferred Equity Interests was also published in *The Wall Street Journal*, national edition, on [_____], 2010.  Such notice was good and sufficient and appropriate under the particular circumstances.  No other or further notice of the Sale Motion, the Auction, the Sale Hearing, or of the entry of this Order is necessary or shall be required.

M.    The Debtors have demonstrated compelling circumstances and good, sufficient, and sound business purposes and justifications for the sale of the Purchased Assets and Transferred Equity Interests and the transactions contemplated by the Asset Purchase Agreement outside of the ordinary course of business.  Such business reasons include, but are not limited to, the facts that (i) there is substantial risk of deterioration of the value of the Purchased Assets and Transferred Equity Interests if the sale is not consummated quickly; (ii) the Asset Purchase Agreement constitutes the highest or best offer for the Purchased Assets and Transferred Equity Interests; (iii) the Asset Purchase Agreement and the Closing will present the best opportunity to realize the value of the Debtors on a going concern basis and avoid decline and devaluation of the Debtors' businesses; and (iv) unless the sale is concluded expeditiously as provided for in the Sale Motion and pursuant to the Asset Purchase Agreement, there is a substantial risk of liquidation.

N.    The Bidding Procedures set forth in the Bidding Procedures Order were non-collusive, proposed and executed in good faith as a result of arm's length negotiations between the Debtors and the Purchaser, and were substantively and procedurally fair to all parties.

O.    The Debtors conducted the sale and the Auction process in accordance with, and have otherwise complied in all respects with, the Bidding Procedures Order.  As demonstrated by (i) testimony and other evidence proffered or adduced at the Sale Hearing and (ii) the representations of counsel made on the record at the Sale Hearing, through marketing efforts and a competitive sale process which was conducted in accordance with the Bidding Procedures Order, the Debtors (a) afforded interested potential purchasers a full, fair and reasonable opportunity to qualify and submit their highest or otherwise best offer to purchase all or

substantially all of the Debtors' assets, (b) provided potential purchasers, upon request, sufficient information to enable them to make an informed judgment on whether to bid on the Purchased Assets and Transferred Equity Interests, and (c) considered any bids submitted on or before the Bid Deadline (as defined in the Bidding Procedures Order).

P.    The Purchaser is the Prevailing Bidder (as defined in the Sale Motion) for the Purchased Assets and Transferred Equity Interests in accordance with the Bidding Procedures Order.  The Credit Bid of the Purchaser, upon the terms and conditions set forth in the Asset Purchase Agreement, including the form and total consideration to be realized by the Debtors pursuant to the Asset Purchase Agreement, (i) is the highest and best offer received by the Debtors; (ii) is fair and reasonable; (iii) is in the best interests of the Debtors' creditors and estates; (iv) constitutes full and adequate consideration and reasonably equivalent value for the Purchased Assets and Transferred Equity Interests; and (v) will provide a greater recovery for the Debtors' creditors and other interested parties than would be provided by any other practically available alternative.

Q.    The Purchaser is a buyer in good faith, as that term is used in the Bankruptcy Code and the decisions thereunder, and is entitled to the protections of section 363(m) and (n) of the Bankruptcy Code with respect to all of the Purchased Assets and Transferred Equity Interests.  The Asset Purchase Agreement was negotiated and entered into in good faith and without collusion or fraud of any kind.  Neither the Debtors nor the Purchaser has engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of or implicate section 363(n) of the Bankruptcy Code to the Asset Purchase Agreement or to the consummation of the sale transaction and transfer of the Purchased Assets and Transferred Equity Interests.  The Purchaser is entitled to all the protections and immunities

of section 363(m) of the Bankruptcy Code.  The Purchaser is not an "insider" of any of the

Debtors, as that term is defined in section 101(31) of the Bankruptcy Code.

R.      The Debtors have full corporate power and authority to execute the Asset

Purchase Agreement and all other documents contemplated thereby, and the consummation of

such transactions has been duly and validly authorized by all necessary corporate or limited

liability company authority by the Debtors.  No consents or approvals, other than as may be

expressly provided for in the Asset Purchase Agreement, are required by the Debtors.

S.      Except as otherwise provided in the Asset Purchase Agreement, the Purchased

Assets and Transferred Equity Interests shall be sold free and clear of all mortgages, restrictions,

hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options,

deeds of trust, security interests, conditional sale or other title retention agreements, pledges,

liens (including, without limitation, mechanics', materialmens' and other consensual and

non-consensual liens and statutory liens), judgments, demands, encumbrances, rights of first

refusal, offsets, contracts, recoupment, rights of recovery, claims for reimbursement,

contribution, indemnity, exoneration, products liability, alter-ego, environmental, pension, or tax,

decrees of any court or foreign or domestic governmental entity, or charges of any kind or

nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of

income or other exercise of any attributes of ownership, debts arising in any way in connection

with any agreements, acts, or failures to act, of the Debtors or the Debtors' predecessors or

affiliates, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations,

liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions,

interests and matters of any kind and nature, whether known or unknown, choate or inchoate,

filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded,

perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (other than as expressly provided in the Asset Purchase Agreement; collectively, "Liens, Claims, Encumbrances and Interests") with such Liens, Claims, Encumbrances and Interests to attach to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and the Purchaser would not enter into the Asset Purchase Agreement to purchase the Purchased Assets and Transferred Equity Interests otherwise.

T.      The transfer of the Purchased Assets and Transferred Equity Interests to the Purchaser is a legal, valid and effective transfer of the Purchased Assets and Transferred Equity Interests, and, except as may otherwise be provided in the Asset Purchase Agreement, shall vest the Purchaser with all right, title and interest of the Debtors to the Purchased Assets and Transferred Equity Interests free and clear of any and all Liens, Claims, Encumbrances and Interests.  Except as specifically provided in the Asset Purchase Agreement or this Order, the Purchaser shall not assume or become liable for any Liens, Claims, Encumbrances and Interests relating to the Purchased Assets and Transferred Equity Interests being sold by the Debtors.

U.      The transfer of the Purchased Assets and Transferred Equity Interests to the Purchaser free and clear of all Liens, Claims, Encumbrances and Interests will not result in any undue burden or prejudice to any holders of any Liens, Claims, Encumbrances and Interests as all such Liens, Claims, Encumbrances and Interests of any kind or nature whatsoever shall attach to the net proceeds of the sale of the Purchased Assets and Transferred Equity Interests received

by the Debtors in the order of their priority, with the same validity, force and effect which they now have as against the Purchased Assets and Transferred Equity Interests and subject to any claims and defenses the Debtors or other parties may possess with respect thereto.  All persons having Liens, Claims, Encumbrances or Interests of any kind or nature whatsoever against or in any of the Debtors or the Purchased Assets and Transferred Equity Interests shall be forever barred, estopped and permanently enjoined from pursuing or asserting such Liens, Claims, Encumbrances or Interests against the Purchaser, any of its assets, property, successors or assigns, or the Purchased Assets and Transferred Equity Interests.

V.      The Debtors may sell the Purchased Assets and Transferred Equity Interests free and clear of all Liens, Claims, Encumbrances and Interests of any kind or nature whatsoever because, in each case, one or more of the standards set forth in section 363(f) of the Bankruptcy Code has been satisfied.  Those (i) holders of Liens, Claims, Encumbrances and Interests and (ii) non-debtor parties to the Assigned Contracts, who did not object, or who withdrew their objections, to the sale of the Purchased Assets and Transferred Equity Interests and the Sale Motion are deemed to have consented pursuant to section 363(f)(2) of the Bankruptcy Code.  All objections to the Sale Motion have been resolved or overruled.

W.      If the sale of the Purchased Assets to the Purchaser was not free and clear of all Liens, Claims, Encumbrances and Interests, or if the Purchaser would, or in the future could, be liable for any of the Liens, Claims, Encumbrances and Interests, the Purchaser would not have entered into the Asset Purchase Agreement and would not consummate the sale or the transaction contemplated by the Asset Purchase Agreement, thus adversely impacting the Debtors, their estates and their creditors.

X.      The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the Asset Purchase Agreement and is in the best interests of the Debtors and their estates, creditors and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtors.

Y.      The Debtors and Purchaser have, to the extent necessary, satisfied the requirements of section 365 of the Bankruptcy Code, including sections 365(b)(1)(A), (B) and 365(f), in connection with the sale and assumption and assignment of the Assigned Contracts and the Material Permits to the extent provided under the Asset Purchase Agreement.  The Purchaser is able to demonstrate adequate assurance of future performance with respect to any Assigned Contracts and Material Permits pursuant to section 365(b)(1)(C) of the Bankruptcy Code. Except as provided by in the Asset Purchase Agreement, the Assigned Contracts and the Material Permits are assignable notwithstanding any provisions contained therein to the contrary.

Z.      To maximize the value of the Purchased Assets and Transferred Equity Interests, it is essential that the Closing occur within the time constraints set forth in the Asset Purchase Agreement.  Time is of the essence in consummating the transaction contemplated by the Asset Purchase Agreement.

AA.     In the absence of a stay pending appeal, the Purchaser is acting in good faith, pursuant to section 363(m) of the Bankruptcy Code, in closing the transactions contemplated by the Asset Purchase Agreement at any time on or after the entry of this Order and cause has been shown as to why this Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

BB.     The transactions contemplated under the Asset Purchase Agreement do not amount to a consolidation, merger or *de facto* merger of the Purchaser and the Debtors and/or the

Debtors' estates, there is not substantial continuity between the Purchaser and the Debtors, there is no common identity between the Debtors and the Purchaser, there is no continuity of enterprise between the Debtors and the Purchaser, the Purchaser is not a mere continuation of the Debtors or their estates, and the Purchaser does not constitute a successor to the Debtors or their estates.  Other than the Assumed Liabilities, the Purchaser shall have no obligations with respect to any liabilities of the Debtors, including, without limitation, the Excluded Liabilities, and the Debtors and their estates will release and forever discharge the Purchaser and any of their affiliates, their successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale, except for liabilities and obligations under the Asset Purchase Agreement.

CC.     The sale of the Purchased Assets and Transferred Equity Interests outside of a plan of reorganization pursuant to the Asset Purchase Agreement neither impermissibly restructures the rights of the Debtors' creditors nor impermissibly dictates the terms of a liquidating plan of reorganization for the Debtors.  The sale does not constitute a "*sub rosa*" chapter 11 plan.

DD.     The Challenge Period (as defined in the DIP Order) has expired without the filing or assertion of a challenge and accordingly, the First Lien Lenders hold an allowed secured claim in the aggregate amount of not less than $[__ million], which claim is not subject to avoidance, reduction, disallowance, impairment, recharacterization or subordination pursuant to the Bankruptcy Code or applicable non-bankruptcy law, plus such additional amounts, all to the extent allowed under, and pursuant to, the First Lien Credit Agreement (the "First  Lien Allowed Secured Claim").  On account of the First Lien Allowed Secured Claim, the First Lien Lenders

are secured creditors of the Debtors, holding valid, binding, enforceable and perfected security interests in, on and against the Debtors, their estates and property of the estates, arising in connection with, and pursuant to, that certain First Lien Credit Agreement.  Pursuant to the Bidding Procedures Order, the First Lien Lenders were authorized to credit bid any or all such First Lien Allowed Secured Claim at the Auction under section 363(k) of the Bankruptcy Code.

EE.    Pursuant to the Asset Purchase Agreement and Bankruptcy Code sections 363(b) and 363(k), the First Lien Lenders credit bid a portion of the Pre-Petition Loan Obligations in an amount equal to $[___ million], which credit bid was a valid and proper bid pursuant to the Bidding Procedures Order.

FF.    The Purchase Price for the Purchased Assets and Transferred Equity Interests including, but not limited to the Credit Bid, is the highest and best offer received by the Debtors, and the Purchase Price constitutes (a) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (b) fair consideration under the Uniform Fraudulent Conveyance Act and (c) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession, or the District of Columbia, for the Purchased Assets and Transferred Equity Interests.

GG.    Given all of the circumstances of the chapter 11 cases and the adequacy and fair value of the Purchase Price under the Asset Purchase Agreement, the transactions contemplated by the Asset Purchase Agreement constitute a reasonable and sound exercise of the Debtors' business judgment, is in the best interests of the Debtors, their estates, their creditors and other parties in interest and should be approved.

HH.    The consummation of the transactions contemplated by the Asset Purchase Agreement is legal, valid and properly authorized under all applicable provisions of the

Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the transaction.

NOW, THEREFORE, BASED UPON ALL OF THE FOREGOING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

1.      The relief requested in the Sale Motion is granted and approved and the transactions contemplated thereby and by the Asset Purchase Agreement is approved, as set forth in this Order.

2.      All objections, responses, and requests for continuance concerning the Sale Motion are resolved in accordance with the terms of this Order and as set forth in the record of the Sale Hearing.  To the extent any such objection, response or request for continuance was not otherwise withdrawn, waived, or settled, it, and all reservations of rights contained therein, is overruled and denied.

3.      Notice of the Sale Motion, Sale Hearing, the Auction and the transactions contemplated by the Asset Purchase Agreement was fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

**Approval of Sale**

4.      Prior to the Auction the Purchaser obtained, and at the Auction the Purchaser exercised, the right to bid the Credit Bid in accordance and compliance with the terms of the Bidding Procedures Order, the Asset Purchase Agreement, and the First Lien Credit Agreement. All actions taken by the Purchaser arising from or relating to its exercise of the right to bid the Credit Bid were proper.  The Purchaser's offer for the Purchased Assets and Transferred Equity Interests, as embodied in the Asset Purchase Agreement, was deemed a Qualified Bid (as defined

in the Bidding Procedures Order) and is the highest and best offer for the Purchased Assets and

Transferred Equity Interests (thereby providing a greater recovery for the Debtors' estates than

would be provided by any other available alternative), and the Asset Purchase Agreement,

including all other ancillary documents, and all of the terms and conditions thereof, and the

transactions contemplated thereby, including the Credit Bid, are hereby approved in all respects.

5.    The sale of the Purchased Assets and Transferred Equity Interests and the

consideration provided by the Purchaser under the Asset Purchase Agreement, including the

amount provided pursuant to the Credit Bid, is fair and reasonable and shall be deemed for all

purposes to constitute a transfer for reasonably equivalent value and fair consideration under the

Bankruptcy Code and any other applicable law.

6.    The Purchaser is hereby granted and is entitled to all of the protections provided

to a good faith buyer under section 363(m) of the Bankruptcy Code.  Pursuant to section 363(m)

of the Bankruptcy Code, if any or all of the provisions of this Order are hereafter reversed,

modified, or vacated by a subsequent order of this Court or any other court, such reversal,

modification, or vacatur shall not affect the validity and enforceability of any transfer under the

Asset Purchase Agreement or obligation or right granted pursuant to the terms of this Order

(unless stayed pending appeal), and notwithstanding any reversal, modification or vacatur shall

be governed in all respects by the original provisions of this Order and the Asset Purchase

Agreement, as the case may be.

7.    The Debtors are hereby authorized to fully assume, perform under, consummate

and implement the terms of the Asset Purchase Agreement together with any and all additional

instruments and documents that may be reasonably necessary or desirable to implement and

effectuate the terms of the Asset Purchase Agreement, this Order and sale of the Purchased

Assets and Transferred Equity Interests contemplated thereby including, without limitation, deeds, assignments, stock powers and other instruments of transfer, and to take all further actions as may reasonably be requested by the Purchaser for the purpose of assigning, transferring, granting, conveying and conferring to the Purchaser, or reducing to possession any or all of the Purchased Assets and Transferred Equity Interests or Assumed Liabilities, as may be necessary or appropriate to the performance of the Debtors' obligations as contemplated by the Asset Purchase Agreement, without any further corporate action or orders of this Court.  Neither the Purchaser nor the Sellers shall have an obligation to proceed with the Closing under the Asset Purchase Agreement until all conditions precedent to their respective obligations to do so have been met, satisfied or waived.

8.      The Debtors are further authorized and empowered to cause to be filed with the secretary of state of any state or other applicable officials of any applicable governmental units, any and all certificates, agreements, or amendments necessary or appropriate to effectuate the transactions contemplated by the Asset Purchase Agreement, any related agreements and this Order, including amended and restated certificates or articles of incorporation and by-laws or certificates or articles of amendment, and all such other actions, filings, or recordings as may be required under appropriate provisions of the applicable laws of all applicable governmental units or as any of the officers of the Debtors may determine are necessary or appropriate.  The execution of any such document or the taking of any such action shall be, and hereby is, deemed conclusive evidence of the authority of such person to so act.  Without limiting the generality of the foregoing, this Order shall constitute all approvals and consents, if any, required under applicable state corporation laws, and all other applicable business corporation, trust, and other laws of the applicable governmental units with respect to the implementation and consummation

of the Asset Purchase Agreement, any related agreements and this Order, and the transactions contemplated thereby and hereby.

9.      Effective as of the Closing (a) the sale of the Purchased Assets and Transferred Equity Interests by the Debtors to the Purchaser shall constitute a legal, valid and effective transfer of the Purchased Assets and Transferred Equity Interests notwithstanding any requirement for approval or consent by any person and vests the Purchaser with all right, title and interest of the Debtors in and to the Purchased Assets and Transferred Equity Interests, free and clear of all Liens, Claims, Encumbrances and Interests of any kind, pursuant to section 363(f) of the Bankruptcy Code, and (b) the assumption of any Assumed Liabilities by the Purchaser constitutes a legal, valid and effective delegation of any Assumed Liabilities to the Purchaser and divests the Debtors of all liability with respect to any Assumed Liabilities.

**Transfer of Assets**

10.     Except to the extent specifically provided in the Asset Purchase Agreement, upon the Closing, the Debtors shall be, and hereby are, authorized, empowered, and directed, pursuant to sections 105, 363(b) and 363(f) of the Bankruptcy Code, to sell the Purchased Assets and Transferred Equity Interests to the Purchaser.  Other than as expressly provided in Section 2.1 of the Asset Purchase Agreement, the sale of the Purchased Assets and Transferred Equity Interests vests the Purchaser with all right, title and interest of the Debtors to the Purchased Assets and Transferred Equity Interests free and clear of any and all Liens, Claims, Encumbrances and Interests and other liabilities, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Liens, Claims, Encumbrances and Interests to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Purchased Assets and

Transferred Equity Interests.  Following the Closing Date, no holder of any Liens, Claims, Encumbrances and Interests in the Purchased Assets and Transferred Equity Interests may interfere with the Purchaser's use and enjoyment of the Purchased Assets and Transferred Equity Interests based on or related to such Liens, Claims, Encumbrances and Interests, or any actions that the Debtors may take in their chapter 11 cases and no person may take any action to prevent, interfere with or otherwise enjoin consummation of the transactions contemplated in or by the Asset Purchase Agreement or this Order.

11.     The provisions of this Order authorizing the sale of the Purchased Assets and Transferred Equity Interests free and clear of Liens, Claims, Encumbrances and Interests and the Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Purchaser shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Order.  The previous sentence notwithstanding, the Purchaser is hereby authorized to file, register, or otherwise record a certified copy of this Order, which, once filed, registered, or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances and Interests in the Purchased Assets and Transferred Equity Interests.

12.     On or before the Closing Date, the Debtors' creditors are authorized and directed to execute such documents and take all other actions as may be necessary to release any Liens, Claims, Encumbrances or Interests of any kind against the Purchased Assets and Transferred Equity Interests, as such Liens, Claims, Encumbrances or Interests may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements or other documents or agreements evidencing any Liens, Claims, Encumbrances or Interests in or against the Purchased Assets and Transferred Equity Interests shall not have delivered to the Debtors

prior to the Closing after request therefor, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, or releases of all such Liens, Claims, Encumbrances or Interests that the person or entity has with respect to the Purchased Assets and Transferred Equity Interests, the Debtors are hereby authorized to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to such Purchased Assets and Transferred Equity Interests prior to the Closing, and the Purchaser is authorized to file such documents after the Closing.

13.    To the greatest extent available under applicable law, and except as provided in the Asset Purchase Agreement, the Purchaser shall, as provided by the Asset Purchase Agreement, be authorized, as of the Closing Date, to operate under any Material Permit of the Debtors with respect to the Purchased Assets and Transferred Equity Interests, and all such Material Permits are deemed to have been, and hereby are, directed to be transferred to the Purchaser as of the Closing Date as provided by the Asset Purchase Agreement.

14.    All of the Debtors' interests in the Purchased Assets and Transferred Equity Interests to be acquired by the Purchaser under the Asset Purchase Agreement shall be, as of the Closing Date and upon the occurrence of the Closing, transferred to and vested in the Purchaser. Upon the occurrence of the Closing, this Order shall be construed and considered for any and all purposes a full and complete general assignment, conveyance and transfer of the Purchased Assets and Transferred Equity Interests acquired by the Purchaser under the Asset Purchase Agreement and/or a bill of sale or assignment transferring indefeasible title and interest in the Purchased Assets and Transferred Equity Interests to the Purchaser.

15.    Except as expressly permitted or otherwise specifically provided by the Asset Purchase Agreement or this Order, the Purchaser is not assuming nor shall it or any affiliate of

the Purchaser be in any way liable or responsible, as a successor or otherwise, for any liabilities, debts, or obligations of the Debtors in any way whatsoever relating to or arising from the Debtors' ownership or use of the Purchased Assets and Transferred Equity Interests prior to the consummation of the transactions contemplated by the Asset Purchase Agreement, or any liabilities calculable by reference to the Debtors or their operations or the Purchased Assets and Transferred Equity Interests, or relating to continuing or other conditions existing on or prior to consummation of the transactions contemplated by the Asset Purchase Agreement, which liabilities, debts, and obligations are hereby extinguished insofar as they may give rise to liability, successor or otherwise, against the Purchaser or any affiliate of the Purchaser.

16.     Except as otherwise expressly provided in the Asset Purchase Agreement, all persons or entities, presently or on or after the Closing Date, in possession of some or all of the Purchased Assets and Transferred Equity Interests are directed to surrender possession of the Purchased Assets and Transferred Equity Interests to the Purchaser on the Closing Date or at such time thereafter as the Purchaser may request.

17.     Upon the Closing, the prepetition First Lien Allowed Secured Claim shall be deemed satisfied in an amount equal to the Credit Bid in accordance with the allocation provided in the Asset Purchase Agreement.  After deducting the applicable portion of the amount of the Credit Bid, the prepetition First Lien Allowed Secured Claim shall be deemed reduced in such amount with any remainder an allowed claim in each of the Debtors' cases without further order of the Court.  Upon the Closing, the liens on the assets of the Debtors granted under the First Lien Loan Documents to secure the indebtedness thereunder shall be deemed released solely with respect to the Purchased Assets and Transferred Equity Interests, as applicable, and the Debtors shall take all reasonable actions to confirm removal of any such liens.

18.     Effective upon the Closing Date and without further order of the Court, the Debtors and their estates shall waive any and all actions related to and release the First Lien Parties and the DIP Lenders and DIP Agent from any and all claims and causes of action arising out of, based upon or related to, in whole or in part, any of the DIP Loan Agreement or the DIP Order, any documents related to the DIP Loan Agreement or the DIP Order, any aspect of the prepetition or postpetition relationship with the First Lien Lenders and DIP Lenders and any Debtor, or any other acts or omissions by the First Lien Lenders or DIP Lenders in connection with the DIP Loan Agreement or the DIP Order, any documents related to the DIP Loan Agreement or the DIP Order and any aspect of their prepetition or postpetition relationship with any Debtor.

**Contracts to be Assigned**

19.     From and after the date of entry of this Order, the Debtors shall not reject any executory contracts or unexpired leases to which any Debtors are a party unless otherwise agreed to in writing by Purchaser or as provided in the Asset Purchase Agreement.

20.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, and subject to and conditioned upon the occurrence of the Closing Date, the Debtors' assumption and assignment to the Purchaser, and the Purchaser's assumption on the terms set forth in the Asset Purchase Agreement of each Assigned Contract is hereby approved in its entirety, and the requirements of section 365 of the Bankruptcy Code with respect thereto are hereby deemed satisfied.

21.     The Debtors are hereby authorized and directed in accordance with sections 105(a), 363 and 365 of the Bankruptcy Code to (a) assume and assign to the Purchaser, effective upon the Closing Date of the sale of the Purchased Assets and Transferred Equity Interests, the

Assigned Contracts free and clear of all Liens, Claims, Encumbrances or Interests of any kind or nature whatsoever and (b) execute and deliver to the Purchaser such documents or other instruments as may be necessary to assign and transfer the Assigned Contracts to the Purchaser.

22.    Upon the Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Purchaser shall be fully and irrevocably vested in all right, title and interest of each Assigned Contract.  The Debtors shall cooperate with, and take all actions reasonably requested by, the Purchaser to effectuate the foregoing, as further provided in the Asset Purchase Agreement.

23.    The Assigned Contracts shall be transferred to, and remain in full force and effect for the benefit of, the Purchaser in accordance with their respective terms, notwithstanding any provision in any such Assigned Contract (including those of the type described in sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts or conditions such assignment or transfer.

24.    Pursuant to sections 365(b)(1)(A) and (B) of the Bankruptcy Code, and except as otherwise provided by this Order, the Purchaser shall promptly pay the Cure Costs of or relating to any Assigned Contract as set forth in the Cure Notice (as defined in the Bidding Procedures Order) served by the Debtors on each of the parties to Assigned Contracts in the amount(s) listed on Schedule 1.1(l) to the Asset Purchase Agreement.  The non-Debtor parties to the Assigned Contracts are forever bound by such Cure Costs and are hereby enjoined from taking any action against the Purchaser or the Purchased Assets and Transferred Equity Interests with respect to any claim for cure under any Assigned Contract.  The payment of the applicable Cure Costs (if any) by the Purchaser shall (a) effect a cure of all defaults existing thereunder as of the date that such executory contracts or unexpired leases are assumed and (b) compensate for any actual

pecuniary loss to such non-Debtor party resulting from such default. The Purchaser shall then have assumed the Assigned Contracts and, pursuant to section 365(f) of the Bankruptcy Code, the assignment by the Debtors of such Assigned Contracts shall not be a default thereunder. After the payment of the relevant Cure Costs by the Purchaser, neither the Debtors nor the Purchaser shall have any further liabilities to the counterparties to the Assigned Contracts other than the Purchaser's obligations under the Assigned Contracts that accrue and become due and payable on or after the date that such Assigned Contracts are assumed.

25.      Any executory contract or unexpired lease for which the Purchaser has not determined whether to reject or assume as of the Closing shall be automatically deemed to be a Non-Assumed Contract for all purposes under the Asset Purchase Agreement. The Debtors may immediately reject such Non-Assumed Contract, and all Liabilities in connection with such Non-Assumed Contract shall be considered Excluded Liabilities under the Asset Purchase Agreement.

26.      Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contract or allow the party to such Assigned Contracts to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such Assigned Contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect. For the avoidance of doubt, the assumption or assignment of any Assigned Contract shall not be a "change of control", however such term may be defined in the relevant Assigned Contract. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Purchaser of the Assigned Contracts have been satisfied.

27.      Any party having the right to consent to the assumption or assignment of any Assigned Contract that failed to object to such assumption or assignment is deemed to have

consented to such assumption and assignment as required by section 365(c) of the Bankruptcy Code.

28.     Upon the conditions set forth in Sections 2.1 through 2.7 of the Asset Purchase Agreement, including Purchaser's payment of the relevant Cure Costs, if any, the Purchaser shall be deemed to be substituted for the Debtors as a party to the applicable Assigned Contracts and the Debtors shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

29.     The Purchaser is able to provide adequate assurance of future performance under the relevant Assigned Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

30.     There shall be no assignment fees, increases, rent-acceleration or any other fees charged to the Purchaser or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

31.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all counterparties to the Assigned Contracts are forever barred and permanently enjoined from raising or asserting against the Debtors or Purchaser any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Assigned Contracts, existing as of the date that such contracts are assumed or arising by reason of the Closing.

32.     Neither Purchaser nor any successor of Purchaser shall be responsible for or have any Liens, Claims, Encumbrances or Interests or obligations arising out of any of the contracts, agreements or understandings that are Non-Assumed Contracts.

**Additional Provisions**

33.     This Order and Asset Purchase Agreement shall be binding upon and govern the acts of all persons and entities, including without limitation, the Debtors and the Purchaser, their respective successors and permitted assigns, including, without limitation, any Chapter 11 trustee hereinafter appointed for the Debtors' estates or any trustee appointed in a Chapter 7 case if this case is converted from Chapter 11, all creditors of any Debtor (whether known or unknown), filing agents, filing officers, title agents, recording agencies, secretaries of state, and all other persons and entities who may be required by operation of law, the duties of their office or contract, to accept, file, register, or otherwise record or release any documents or instruments or who may be required to report or insure any title in or to the Purchased Assets.

34.     Each and every federal, state and local government agency or department is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Asset Purchase Agreement.

35.     To the extent prohibited by section 525 of the Bankruptcy Code, no governmental unit may revoke or suspend any permit or license relating to the operation of the Purchased Assets and Transferred Equity Interests sold, transferred or conveyed to the Purchaser on account of the filing or pendency of these chapter 11 cases or the consummation of the transaction contemplated by the Asset Purchase Agreement.

36.     Except to the extent expressly included in the Assumed Liabilities, pursuant to sections 105 and 363 of the Bankruptcy Code, all persons and entities, including, but not limited to, the Debtors and their estates, all debt security holders, equity security holders, the Debtors' employees or former employees, governmental, tax and regulatory authorities, lenders, parties to or beneficiaries under any benefit plan, trade and other creditors asserting or holding a Lien, Claim, Encumbrance or Interest of any kind or nature whatsoever against, in or with respect to

any of the Debtors or the Purchased Assets and Transferred Equity Interests (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, senior or subordinated), arising under or out of, in connection with, or in any way relating to the Purchased Assets, the operation of the Debtors' businesses prior to the Closing Date or the transfer of the Purchased Assets and Transferred Equity Interests to the Purchaser, shall be forever barred, estopped, and permanently enjoined from asserting, prosecuting or otherwise pursuing such Lien, Claim, Encumbrance or Interest, whether by payment, setoff, or otherwise, directly or indirectly, against the Purchaser or any affiliates, successors or assigns thereof and each of their respective current and former members, officers, directors, managed funds, investment advisors, attorneys, employees, partners, affiliates, financial advisors and representatives (each of the foregoing in its individual capacity), or the Purchased Assets and Transferred Equity Interests.

37.    Other than the Assumed Liabilities or as otherwise provided for in the Asset Purchase Agreement, the Purchaser shall have no obligations with respect to any liabilities of the Debtors, including, without limitation, the Excluded Liabilities, and the Purchaser has not purchased any of the Excluded Assets.  The Debtors and their estates are deemed to release and forever discharge the Purchaser and any of its affiliates, successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale, except for liabilities and obligations under the Asset Purchase Agreement.

38.    The Purchaser is not and shall not be deemed a "successor" to the Debtors or their estates as a result of the consummation of the transactions contemplated by the Asset Purchase Agreement or any other event occurring in the chapter 11 cases under any theory of law or

equity, and the Purchaser shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise expressly provided in the Asset Purchase Agreement.  Except to the extent the Purchaser assumes the Assumed Liabilities pursuant to the Asset Purchase Agreement, neither the purchase of the Purchased Assets and Transferred Equity Interests by the Purchaser or its affiliates, nor the fact that the Purchaser or their affiliates are using any of the Purchased Assets and Transferred Equity Interests previously operated by the Debtors, will cause the Purchaser or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), (ii) under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor

Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to the Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Purchased Assets and Transferred Equity Interests prior to the Closing, and (ix) any litigation.

39.     Subject to the terms of the Asset Purchase Agreement, the Asset Purchase Agreement and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Purchaser, without further action or order of the Court, provided that any such waiver, modification, amendment or supplement is not materially less favorable to the Debtors.  In the event a modification is materially less favorable to the Debtors, the Debtors shall file and serve a notice of such modification.  If no party-in-interest files a written objection with the Court within five (5) business days, such modification shall be deemed approved without further order of the Court, but the Court may enter any such further order as may be necessary.

40.     The failure specifically to include any particular provisions of the Asset Purchase Agreement or any related agreements in this Order shall not diminish or impair the effectiveness

of such provision, it being the intent of the Court, the Debtors and the Purchaser that the Asset Purchase Agreement and any related agreements are authorized and approved in their entirety with such amendments thereto as may be made by the parties in accordance with this Order prior to the Closing.

41.      All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

42.      To the extent this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in these chapter 11 cases, the terms of this Order shall govern and control.

43.      To the extent there are any inconsistencies between the terms of this Order and the Asset Purchase Agreement (including all ancillary documents executed in connection therewith), the terms of this Order shall govern.

44.      The provisions of this Order are non-severable and mutually dependent without written consent of Purchaser.

45.      Nothing in any order of this Court or contained in any plan of reorganization or liquidation confirmed in the chapter 11 cases, or in any subsequent or converted cases of the Debtors under chapter 7 or chapter 11 of the Bankruptcy Code, shall conflict with or derogate from the provisions of the Asset Purchase Agreement or the terms of this Order.

46.      Notwithstanding Bankruptcy Rules 6004, 6006 and 7062, this Order shall be effective and enforceable immediately upon entry and its provisions shall be self-executing, and the Sale Motion shall be deemed to provide sufficient notice of the Debtors' request for relief from stay.  In the absence of any person or entity obtaining a stay pending appeal, the Debtors and the Purchaser are free to close under the Asset Purchase Agreement at any time, subject to

the terms of the Asset Purchase Agreement.  In the absence of any person or entity obtaining a stay pending appeal, if the Debtors and the Purchaser close under the Asset Purchase Agreement, the Purchaser shall be deemed to be acting in "good faith" and shall be entitled to the protections of section 363(m) of the Bankruptcy Code as to all aspects of the transactions under and pursuant to the Asset Purchase Agreement if this Order or any authorization contained herein is reversed or modified on appeal.

      47.     This Court shall retain exclusive jurisdiction to enforce the terms and provisions of this Order, the Bidding Procedures Order, and the Asset Purchase Agreement in all respects and to decide any disputes concerning this Order and the Asset Purchase Agreement, or the rights and duties of the parties hereunder or thereunder or any issues relating to the Asset Purchase Agreement and this Order including, but not limited to, the interpretation of the terms, conditions and provisions hereof and thereof, the status, nature and extent of the Purchased Assets and Transferred Equity Interests and any Assigned Contracts and all issues and disputes arising in connection with the relief authorized herein, inclusive of those concerning the transfer of the assets free and clear of all Liens, Claims, Encumbrances and Interests.

# # #

Submitted by:
Jordi Guso, Esq.
Berger Singerman, P.A.
200 South Biscayne Boulevard, Suite 1000
Miami, FL  33131
Tel.:  (305) 755-9500
Fax:  (305) 714-4340
Email:  jguso@bergersingerman.com

Copy furnished to:
Jordi Guso, Esq.
*(Attorney Guso is directed, pursuant to Local Rule 5005-1, to serve conformed copies of this Bidding Procedures Order upon all parties in interest, and to file a Certificate of Service with the Court confirming such service.)*